**No. 26-2440**

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

HANNAH C. DUGAN,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Eastern District of Wisconsin,
No. 25-cv-00089

# BRIEF AND REQUIRED SHORT APPENDIX FOR DEFENDANT-APPELLANT

Oral Argument Requested

STEVEN M. BISKUPIC
STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com
(414) 828-7233

PAUL D. CLEMENT
*Counsel of Record*
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

September 8, 2026

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1) The full name of every party that the attorney represents in the case:

Judge Hannah C. Dugan

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Clement & Murphy, PLLC

Steven Biskupic Law Office, LLC

Strang Bradley, LLC (in the district court)

Gimbel Reilly Guerin & Brown, LLP (in the district court)

Mastantuono Coffee & Thomas SC (in the district court)

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any: N/A

ii) List any publicly held company that owns 10% or more of the party's or amicus' stock: N/A

CLEMENT & MURPHY, PLLC

s/Paul D. Clement
Paul D. Clement

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

September 8, 2026

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1) The full name of every party that the attorney represents in the case:

Judge Hannah C. Dugan

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Clement & Murphy, PLLC

Steven Biskupic Law Office, LLC

Strang Bradley, LLC (in the district court)

Gimbel Reilly Guerin & Brown, LLP (in the district court)

Mastantuono Coffee & Thomas SC (in the district court)

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any: N/A

ii) List any publicly held company that owns 10% or more of the party's or amicus' stock: N/A

CLEMENT & MURPHY, PLLC

s/Mitchell Keshava Pallaki
Mitchell Keshava Pallaki

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

September 8, 2026

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1) The full name of every party that the attorney represents in the case:

Judge Hannah C. Dugan

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Clement & Murphy, PLLC

Steven Biskupic Law Office, LLC

Strang Bradley, LLC (in the district court)

Gimbel Reilly Guerin & Brown, LLP (in the district court)

Mastantuono Coffee & Thomas SC (in the district court)

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any: N/A

ii) List any publicly held company that owns 10% or more of the party's or amicus' stock: N/A

STEVEN BISKUPIC LAW OFFICE, LLC

s/Steven M. Biskupic
Steven M. Biskupic

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

September 8, 2026

**TABLE OF CONTENTS**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS .......... i

TABLE OF AUTHORITIES .......... vi

REQUEST FOR ORAL ARGUMENT .......... xiv

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 4

A. Factual Background .......... 4

B. Procedural History .......... 11

SUMMARY OF ARGUMENT .......... 15

STANDARD OF REVIEW .......... 19

ARGUMENT .......... 20

I. The Conviction Violates Judge Dugan's Judicial Immunity From Criminal Prosecution .......... 20

II. Judge Dugan's Conviction Violates The Tenth Amendment .......... 31

III. The District Court Improperly Broadened The Scope Of 18 U.S.C. §1505 .......... 38

A. The Execution of an ICE Warrant Cannot Qualify as a "Pending Proceeding" Under §1505 .......... 39

B. The District Court Failed to Properly Instruct the Jury on the Scope of §1505 .......... 48

1. Nexus Requirement .......... 49

2. Lawful Acts .......... 54

CONCLUSION .......... 59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

CERTIFICATE OF SERVICE

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*Amado v. Microsoft Corp.*,
517 F.3d 1353 (Fed. Cir. 2008) .......... 26

*Arthur Andersen LLP v. United States*,
544 U.S. 696 (2005) .......... 55, 56

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*,
398 U.S. 281 (1970) .......... 32, 33

*Bauers v. Heisel*,
361 F.2d 581 (3d Cir. 1966) .......... 24

*Bond v. United States*,
572 U.S. 844 (2014) .......... 18, 35, 38, 52

*Book of Assise*,
27 Ed. III, pl.18 .......... 20

*Bradley v. Fisher*,
80 U.S. (13 Wall.) 335 (1871) .......... 22, 28, 31, 52

*Cameron v. Seitz*,
38 F.3d 264 (6th Cir. 1994) .......... 27

*Civil Rights Cases*,
109 U.S. 3 (1883) .......... 24

*Commonwealth v. Addison*,
4 U.S. (4 Dall.) 225 (Pa. 1801) .......... 21, 23

*Commonwealth v. Dandridge*,
4 Va. 408 (Va. Gen. Ct. 1824) .......... 21

*Commonwealth v. Tartar*,
239 S.W.2d 265 (Ky. 1951) .......... 23, 30

*Cushing v. Packard*,
30 F.4th 27 (1st Cir. 2022) .......... 24

*Dennis v. Sparks*,
449 U.S. 24 (1980)....................29

*Doermer v. Callen*,
847 F.3d 522 (7th Cir. 2017).................... 28, 57

*Doğan v. Barak*,
932 F.3d 888 (9th Cir. 2019)....................24

*Durst v. Tautges, Wilder & McDonald*,
44 F.2d 507 (7th Cir. 1930)....................58

*Ex parte Virginia*,
100 U.S. 339, 340 (1879).................... 23, 28

*Figueroa v. Blackburn*,
208 F.3d 435 (3d Cir. 2000)....................27

*Fischer v. United States*,
603 U.S. 480 (2024).................... 43, 48

*Floyd v. Barker*,
77 Eng.Rep. 1305 (Star Chamber 1607).................... 21

*Gillespie v. Equifax Info. Servs.*,
484 F.3d 938 (7th Cir. 2007)....................40

*Glick v. Gutbrod*,
782 F.2d 754 (7th Cir. 1986)....................25

*Gregory v. Ashcroft*,
501 U.S. 452 (1991).................... *passim*

*Hamilton v. Williams*,
26 Ala. 527 (1855) ....................21

*Hicks v. Forest Preserve Dist.*,
677 F.3d 781 (7th Cir. 2012)....................54

*Howlett v. Rose*,
496 U.S. 356 (1990)....................32

*Imbler v. Pachtman*,
424 U.S. 409 (1976) .......... 24, 28

*In re Kendall*,
712 F.3d 814 (3d Cir. 2013) .......... 23

*Lange v. Benedict*,
73 N.Y. 12 (1878) .......... 21

*Mann v. Conlin*,
22 F.3d 100 (6th Cir. 1994) .......... 26

*Marinello v. United States*,
584 U.S. 1 (2018) .......... 43

*McDonnell v. United States*,
579 U.S. 550 (2016) .......... 18, 41

*McHenry Cnty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .......... 36

*Mireles v. Waco*,
502 U.S. 9 (1991) .......... 28

*Missouri v. Lewis*,
101 U.S. 22 (1879) .......... 32

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 37

*New York v. United States*,
505 U.S. 144 (1992) .......... 38

*O'Keefe v. Chisholm*,
769 F.3d 936 (7th Cir. 2014) .......... 32

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......... 29

*Osicka v. Off. Of Lawyer Reg.*,
25 F.4th 501 (7th Cir. 2022) .......... 47

*Pablo Sequen v. Albarran*,
814 F.Supp.3d 1005 (N.D. Cal. 2025) ....................5

*Perrin v. United States*,
444 U.S. 37 (1979)....................29

*Pet. of Dwyer*,
406 A.2d 1355 (Pa. 1979) ....................31

*Pierson v. Ray*,
386 U.S. 547 (1967)....................24

*Printz v. United States*,
521 U.S. 898 (1997).................... 1, 30, 32

*Pulliam v. Allen*,
466 U.S. 522 (1984).................... 24, 52, 56

*Rice v. United States*,
356 F.2d 709 (8th Cir. 1966)....................40

*Rockett v. Eighmy*,
71 F.4th 665 (8th Cir. 2023).................... 22, 23, 28

*Ryan v. ICE*,
974 F.3d 9 (1st Cir. 2020) .................... 34, 38

*S. Branch LLC v. Com. Edison Co.*,
46 F.4th 646 (7th Cir. 2022)....................36

*Sekhar v. United States*,
570 U.S. 729 (2013)....................37

*Sheppard v. Maxwell*,
384 U.S. 333 (1966).................... 27, 34

*Spalding v. Vilas*,
161 U.S. 483 (1896).................... 20, 22

*Stevens v. Osuna*,
877 F.3d 1293 (11th Cir. 2017)....................27

*Stump v. Sparkman*,
435 U.S. 349 (1978) ........................................................................................ 27

*Tenney v. Brandhove*,
341 U.S. 367 (1951) ........................................................................................ 25

*Trump v. United States*,
603 U.S. 593 (2024) ........................................................................................ 30, 31

*United States v. Aguilar*,
515 U.S. 593 (1995) ........................................................................................ 49, 50, 51, 53

*United States v. Brewster*,
408 U.S. 501 (1972) ........................................................................................ 29

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........................................................................... 37, 57

*United States v. Chaplin*,
54 F.Supp. 926 (S.D. Cal. 1944) ..................................................................... 23, 30, 31

*United States v. Claiborne*,
727 F.2d 842 (9th Cir. 1984) ........................................................................... 29

*United States v. Cueto*,
151 F.3d 620 (7th Cir. 1998) ........................................................................... 54, 57

*United States v. Dorfman*,
184 F.4th 577 (7th Cir. 2026) .......................................................................... 49

*United States v. Edwards*,
869 F.3d 490 (7th Cir. 2017) ........................................................................... 56

*United States v. Ermoian*,
752 F.3d 1165 (9th Cir. 2013) ......................................................................... 40

*United States v. Gustafson*,
130 F.4th 608 (7th Cir. 2025) .......................................................................... 19, 20

*United States v. Hastings*,
681 F.2d 706 (11th Cir. 1982) ......................................................................... 29

*United States v. Hernandez*,
173 F.4th 94 (4th Cir. 2026) ........ *passim*

*United States v. Higgins*,
511 F.Supp. 453 (W.D. Ky. 1981) ........ 42

*United States v. Hopper*,
177 F.3d 824 (9th Cir. 1999) ........ 42

*United States v. Isaacs*,
493 F.2d 1124 (7th Cir. 1974) ........ 29

*United States v. Joseph*,
2020 WL 4288425 (D. Mass. July 27, 2020) ........ 11

*United States v. Kirst*,
54 F.4th 610 (9th Cir. 2022) ........ 42

*United States v. Mannie*,
509 F.3d 851 (7th Cir. 2007) ........ 27

*United States v. New York*,
810 F.Supp.3d 329 (N.D.N.Y. 2025) ........ 1, 58

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006) ........ 50, 53

*United States v. Sarno*,
37 F.4th 1249 (7th Cir. 2022) ........ 20

*United States v. Senffner*,
280 F.3d 755 (7th Cir. 2002) ........ *passim*

*United States v. Simone*,
14 F.3d 833 (3d Cir. 1994) ........ 27

*United States v. Sutton,*
30 F.4th 981 (10th Cir. 2022) ........ 51

*United States v. Woods*,
148 F.3d 843 (7th Cir. 1998) ........ 53

*United States v. Young*,
316 F.3d 649 (7th Cir. 2002) .......... 54

*Yates v. Lansing*,
5 Johns. 282 (N.Y. Sup. Ct. 1810) .......... 20, 21

**Constitutional Provisions**

U.S. Const. amend. X .......... 31

Wis. Const. art. VII, §7 .......... 34

**Statutes**

8 U.S.C. §1253 .......... 44

18 U.S.C. §241 .......... 24

18 U.S.C. §242 .......... 16, 24, 29

18 U.S.C. §243 .......... 24

18 U.S.C. §1071 .......... 43, 48

18 U.S.C. §1501 .......... 43, 48

18 U.S.C. §1505 .......... *passim*

18 U.S.C. §1512(f)(1) .......... 47

Wis. Stat. §753.03 .......... 34

Wis. Stat. §757.01(3) .......... 34

Wis. Stat. §885.56 .......... 27, 34

Wis. Stat. §885.60 .......... 27, 34

Wis. Stat. §946.41 .......... 43

Wis. Stat. §946.65 .......... 43

Enforcement Act of 1870, 16 Stat. 140 .......... 24

Civil Rights Act of 1875, 18 Stat. 336 ....................24

62 Stat. 770 (1948).................... 39

**Rules**

Wis. Sup. Ct. R. 68.04....................34

Wis. Sup. Ct. R. 70.19.................... 34

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)....................40

Dismissal Order, *United States v.* Joseph, No.1:19-cr-10141 (D. Mass. Sept. 23, 2022) ....................11

Casey Gannon, *FBI Director Posts Photo of Arrested Wisconsin Judge's Perp Walk, Possibly Violating DOJ Policy*, CNN (Apr. 26, 2025), https://perma.cc/86EL-MZ4E....................11

Lydia O'Connor, *Pam Bondi Hints at More Judge Arrests in Bone-Chilling Interview*, HuffPost (Apr. 25, 2025), https://perma.cc/6SBK-MCZB ....................12

Oxford English Dictionary (1933) ....................40

Scalia & Garner, *Reading Law* (2012)....................43

Webster's New Collegiate Dictionary (1949) ....................40

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Seventh Circuit Rule 34(f), Defendant-Appellant Judge Hannah C. Dugan respectfully submits that oral argument will aid the Court's resolution of this case.

## INTRODUCTION

Our federal system divides both judicial and law-enforcement authority between state and federal authority. The "genius" of the framers was to recognize that such a division, properly administered, could provide "double security" for the liberty of the people. *See Printz v. United States*, 521 U.S. 898, 918-22 (1997). But that division also requires a degree of cooperation and respect between the federal and state authorities. When a state exercises compulsory process over a criminal defendant, it does so to promote the fair and efficient administration of state law, not to make it easier for federal authorities to arrest him. Similarly, when Congress acts to protect the integrity of pending federal agency proceedings from obstruction, it is targeting the misconduct of private individuals, not attempting to make certain official actions of state-court judges federal felonies.

The prosecution in this case lost sight of those first principles. First, the federal government cast aside the "'very ancient' privilege protecting parties and witnesses from civil arrests in courthouses," *United States v. New York*, 810 F.Supp.3d 329, 341 (N.D.N.Y. 2025), and directed Immigration and Customs Enforcement (ICE) agents to execute an administrative arrest warrant in the Milwaukee County Courthouse. When a state-court judge then took official actions, including while on the bench, that made it more difficult for federal authorities to execute that warrant, the federal government upped the ante to an unprecedented

degree. Instead of engaging in a dialogue, federal authorities charged a sitting state-court judge with a federal felony based on her official actions, and then literally reached for the cuffs with the resulting arrest footage shared on social media. The threat to principles of cooperative federalism and judicial independence were then made explicit, as state-court judges nationwide were threatened with similar treatment by the Attorney General of the United States.

None of that is consistent with first principles or centuries of practice and tradition. It is little surprise then that this virtually unprecedented prosecution is flawed at least three times over. First, it is barred by principles of judicial immunity. Those principles pre-date the Nation's founding and are fully applicable to criminal prosecutions. Indeed, the possibility of a felony conviction poses a far greater threat to judicial independence than civil liability. While Congress has the power to abrogate that immunity (at least when it exercises its enforcement powers under the Reconstruction Amendments), it did not come close to doing so in 18 U.S.C. §1505, which is a broadly applicable, anti-obstruction statute that neither targets nor even mentions official judicial actions. Second, it is barred by Tenth Amendment and federalism principles embodied in the clear-statement rule of *Gregory v. Ashcroft*, 501 U.S. 452 (1991). There are a thousand ways to obstruct a pending federal agency proceeding and virtually none of them involves the official actions of state-court judges. Absent a clear statement indicating that Congress expressly considered the

possibility of the statute being wielded against state-court judges and affirmatively wanted to upset the federal balance in that way, it does not reach the judicial conduct here. Third, the federal government has not identified a valid "pending proceeding" "before" a federal agency. At most, the actions here frustrated an arrest. But that is not the same thing as obstructing a pending agency proceeding. Indeed, a different statute expressly addresses interfering with arrests (again without expressly reaching official judicial action) and treats it as a misdemeanor. Finally, all three of those fatal flaws were exacerbated by inadequate and flawed jury instructions.

Simply put, the prosecution is as flawed as it is unprecedented. It cannot stand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. The court entered a judgment of conviction and sentence on July 8, 2025, D.Ct.Dkt.136, and Judge Dugan timely filed a notice of appeal on July 9, 2026, D.Ct.Dkt.138. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in refusing to grant Judge Dugan a judgment of acquittal because she has judicial immunity from criminal prosecution for her official acts.

2. Whether the district court erred in refusing to grant Judge Dugan a judgment of acquittal because her conviction violates the Tenth Amendment.

3. Whether the district court erred in refusing to grant Judge Dugan a judgment of acquittal or a new trial because the execution of an ICE civil arrest warrant is not a "pending proceeding" under 18 U.S.C. §1505.

4. Whether the district court erred in refusing to grant Judge Dugan a new trial because its instructions improperly expanded the scope of 18 U.S.C. §1505.

## STATEMENT OF THE CASE

### A. Factual Background.

1. Judge Dugan is a life-long Wisconsinite, who has dedicated her career to public service and promoting justice. *See* D.Ct.Dkt.134.at.2-4. After earning her Juris Doctor from the University of Wisconsin, Judge Dugan spent her legal career working at various organizations dedicated to public service, from the Legal Aid Society of Wisconsin to the Catholic Charities of Milwaukee, before a short stint in private practice. D.Ct.Dkt.129.at.21-22; D.Ct.Dkt.134.at.3-4. Judge Dugan's legal career and public service reached a capstone in her election to the Milwaukee County Circuit Court, in April 2016. *See* D.Ct.Dkt.129.at.21; D.Ct.Dkt.134.at.3-4. There, she served with distinction as a circuit court judge for nearly a decade, without controversy or even a hint of suspected wrongdoing. D.Ct.Dkt.134.at.4; *see* Tr.731-32. Judge Dugan was a quintessential state-court judge.

2. This prosecution concerns events that transpired on April 18, 2025, over a few minutes of that decade-long judicial career. The events followed major changes to immigration enforcement made in the early days of the second Trump Administration. In January 2025, ICE dramatically altered its policies regarding when and where it conducted civil arrests of aliens subject to removal orders. *Pablo Sequen v. Albarran*, 814 F.Supp.3d 1005, 1019 (N.D. Cal. 2025). Prior ICE policy had barred courthouse arrests absent a "serious risk to public safety" posed by aliens who had committed violent criminal offenses or endangered "national security." *Id.* at 1016-17. The newly minted ICE Policy No. 11072.3, by contrast, authorized agents to routinely "conduct civil immigration enforcement actions in or near courthouses." GX.7.at.3.

In the weeks leading up to April 18, 2025, ICE exercised this newfound authority to conduct two separate arrests of aliens attending proceedings at the Milwaukee courthouse. GX.6.at.3-4; Tr.594-95. The fallout was significant. Fearing detention, some litigants stopped showing up for court, Tr.794, which prompted members of the bar to raise concerns about the effect of ICE operations around the courthouse on their clients. *See* Tr.711-12.

Judges of the Milwaukee Circuit Court echoed these concerns. Chief Judge Carl Ashley publicly criticized the courthouse arrests, as "pos[ing] significant concerns regarding the integrity, impartiality of the judicial system," having a

"chilling effect on access to justice," and causing an "[e]rosion of [t]rust in the [j]udicial [s]ystem," while underscoring that "[c]ourthouses are traditionally places where individuals can seek justice and legal recourse without fear of retribution or apprehension." DX.201. The Milwaukee judges internally discussed ICE's new arrest policy, the scope of the court's authority to intervene, and the need for the court to institute its own protocol to minimize disruptions. Tr.594-99. Judge Dugan recommended that the judges meet to establish a policy so they could adequately respond to the rapidly developing situation surrounding ICE courthouse arrests—one that was drawing the attention of local organizations and press. GX.6.

The Chief Judge put together a draft policy to govern how court personnel conducted themselves when ICE was present. GX.8-9. That policy made clear that state resources and personnel would not assist ICE activities and that ICE could not enter nonpublic areas of the court. Tr.803; *cf.* Tr.515. It included proposed language court personnel could use in responding to agents. Tr.623. The policy indicated that court personnel would not prevent a lawful ICE arrest, Tr.626-27, but it notably omitted language from the model policy from which it was drawn that recognized ICE's authority "to conduct [its] operations in the court's public areas." Tr.624-25. Although the policy was not finalized, Tr.803-04, the Milwaukee judges met to discuss the draft, resulting in revisions that required federal agents to contact the Chief Judge before conducting any courthouse arrest, *compare* GX.8, *with* GX.9.

Those discussions and the draft policy thus set the tenor for how Milwaukee judges approached ICE activities at the courthouse. *See* Tr.802.

3. On the morning of April 18, six plainclothes federal agents arrived at the Milwaukee County Courthouse. Tr.245-48. They were members of an ICE taskforce that planned to arrest Eduardo Flores-Ruiz, an alien set to appear before Judge Dugan for a hearing regarding misdemeanor battery charges pending against him. Tr.50-54. ICE learned of Flores-Ruiz's immigration status and mandatory court appearance because his fingerprints were entered into a data-sharing system due to the state criminal charges. Tr.50-51. That biometric data allowed ICE to determine that Flores-Ruiz had been subject to a prior order of removal and was in the country illegally. Tr.54-55; *see* Tr.218-19. Based on this information, an agent signed an I-200 arrest warrant. GX.1A. As a taskforce member testified, that warrant authorized only Flores-Ruiz's "arrest." Tr.193. It did not implicate a proceeding or involve an exercise of discretion; it simply "**COMMANDED**" federal agents "to arrest and take into custody" Flores-Ruiz. GX.1A.

After arriving at the courthouse, the agents sat at various intervals in the public hallway to wait for Flores-Ruiz's hearing to end. Tr.356-58. Judge Dugan arrived at the courthouse shortly after Flores-Ruiz's hearing (and a slew of other matters) was set to begin. Tr.51-52; Tr.448-49. She took the bench and started to hear cases, Tr.736-37, but stopped after being told that ICE agents were in the hallway, Tr.662-

63. Responding in real time, Judge Dugan initially proposed calling the Chief Judge's assistant but then decided to speak with the agents herself. Tr.662-63. She stepped down from the bench and went to the neighboring courtroom to seek assistance from Judge Kristela Cervera. Tr.450-51.

Judge Dugan notified Judge Cervera that ICE was present in the building and that they "need[ed] to check a warrant." Tr.452. Wearing their robes (signifying their official status and capacity), the Judges entered the public hallway and addressed the agents directly. *See* Tr.452-54. Judge Dugan first approached two taskforce members to ask what business they had in the courthouse. Tr.319. Upon learning that they intended to make an arrest, Judge Dugan asked if they had a judicial warrant. Tr.403. An agent informed her that they had only an administrative warrant, so Judge Dugan directed them to report to the Chief Judge's chambers, Tr.403-04, in line with the Chief Judge's draft policy, GX.9; *see* Tr.792. Because the agents were unfamiliar with the building's layout, Judge Cervera offered to escort them. Tr.458-59. As Judge Cervera walked the first two agents down the hall, Judge Dugan directed three other agents to follow. Tr.104-05, 367-68. During these interactions, ICE agents never showed Judge Dugan the warrant or identified the intended target. Tr.403-04.

Judge Dugan then returned to her courtroom and her docket. *See* Tr.116. Microphones in the courtroom did not clearly capture all parts of the conversation.

But they captured Judge Dugan announcing that she would change the order of her docket for the morning and call Flores-Ruiz's case first, rather than continue with the other matter she was addressing before meeting the federal agents in the hallway. Tr.117, 736-37. That was not all that unusual. Flores-Ruiz was present merely to obtain a date for another status conference, so Judge Dugan, in her discretion, proceeded to call the case off-the-record. *See* Tr.475-76. As her clerk testified, an off-the-record hearing was standard fare for Flores-Ruiz's particular appearance that morning as a matter of expediency, Tr.685-86—something Milwaukee judges had done "[h]undreds" of times, Tr.747, and Judge Dugan did nine times that same morning, Tr.680-81. The process was typical, whether or not victims of the crime were present in the courtroom. Tr.680. While Judge Dugan typically shared the new date with the district attorney in such circumstances so victims could appear at the next hearing date, Judge Dugan's clerk did not recall being notified that victims were present in the courtroom for Flores-Ruiz's case that morning. Tr.679-80.

During the off-the-record hearing, Judge Dugan instructed Flores-Ruiz's attorney to obtain a date for a subsequent hearing, Tr.668, and then directed her and her client to exit through the jury door, Tr.674, which led into a restricted hallway off to the side of the courtroom, Tr.71-72. Although that corridor was non-public and not the standard means of egress from the courtroom, Wisconsin judges not only had the authority to direct attorneys and parties through the nonpublic door, Tr.476-

77, but did so on occasion as circumstances warranted, *see* Tr.723, 730. In the hallway, Judge Dugan directed Flores-Ruiz's counsel and Flores-Ruiz to walk straight ahead toward the public hallway, Tr.729—exiting a mere 12 feet from the public courtroom door in view of two federal agents, who were unaware that they walked through the restricted hallway, Tr.552-53.[1] While they were exiting the courtroom, Judge Dugan informed Flores-Ruiz's attorney that the next hearing could be by Zoom, Tr.725—something Milwaukee judges had the authority to do, Tr.476. Flores-Ruiz's attorney later recounted that she thought the brief exchange of words with Judge Dugan was a kind of "mentoring moment." Tr.731-32.

As Flores-Ruiz was exiting the courtroom, several taskforce members were waiting in the Chief Judge's chambers, while their leader spoke on the phone with the Chief Judge. Tr.322-23, 405-06. As Flores-Ruiz left the building, one agent followed him to the elevators and outside the courthouse. Tr.540-44. Once the remainder of the taskforce caught up, they arrested Flores-Ruiz across the street after a brief foot chase. Tr.544-45.

[1] Microphones picked up a whispered discussion about the stairwell accessible via the jury door. Tr.761-67. But that detail was never shared with Flores-Ruiz's attorney. Tr.729. And the government did not rely on it: it argued that Judge Dugan "complete[d]" the offense simply by allowing Flores-Ruiz to exit via the jury door. Tr.822, 892.

### B. Procedural History.

1. While the federal authorities got their man, this brief interaction nonetheless precipitated a virtually unprecedented federal prosecution.[2] The federal government filed a two-count indictment, charging Judge Dugan with a misdemeanor count of concealing Flores-Ruiz from arrest (Count I), and a felony count of endeavoring to obstruct a "pending proceeding" "before" a federal agency (Count II). D.Ct.Dkt.6.

Although the government did not seek pre-trial detention, D.Ct.Dkt.5.at.4, it was not content to permit Judge Dugan's voluntary surrender. Instead, federal authorities elevated both the case's profile and the affront to federalism by arresting Judge Dugan on her way into the Milwaukee courthouse, handcuffing her, and posting staged photos of the arrest to social media. D.Ct.Dkt.134.at.10-11; Casey Gannon, *FBI Director Posts Photo of Arrested Wisconsin Judge's Perp Walk, Possibly Violating DOJ Policy*, CNN (Apr. 26, 2025), https://perma.cc/86EL-MZ4E. This public spectacle made an example of Judge Dugan and sent a clear message to judges throughout the country: The government would continue to use mandatory state-court appearances to facilitate federal arrests and would use its full authority, including criminal prosecution, to prevent any perceived interference with its

[2] The only other precedent of which Judge Dugan is aware was an effort by the first Trump Administration to prosecute another state-court judge. *United States v. Joseph*, 2020 WL 4288425 (D. Mass. July 27, 2020). But unlike here, that indictment was dismissed before trial. Dismissal Order, No.1:19-cr-10141 (D. Mass. Sept. 23, 2022), Dkt.178.

immigration priorities. *See* Sent'g.Tr.24-25. Indeed, the Attorney General used the incident to publicly warn other judges to fall into line. Lydia O'Connor, *Pam Bondi Hints at More Judge Arrests in Bone-Chilling Interview*, HuffPost (Apr. 25, 2025), https://perma.cc/6SBK-MCZB.

2. Judge Dugan moved to dismiss the indictment on the grounds that her prosecution, which turned entirely on official acts she took as a state-court judge, violated principles of both judicial immunity and federalism. D.Ct.Dkts.20-21. The district court rejected these arguments and pointedly refused to narrow the scope of §1505 to avoid or ameliorate these common-law and constitutional difficulties.[3] D.Ct.Dkt.48; *see* D.Ct.Dkt.72.at.11-14. Instead, the final jury instructions defined §1505's elements expansively. They left no room for the jury to acquit on the grounds that the charged conduct involved official actions Judge Dugan was legally authorized to take as a judge, which the court dismissed as "rehash[ing]" the "immunity argument" it already rejected. D.Ct.Dkt.97.at.6. Likewise, they defined "pending proceeding" under §1505 broadly to encompass "all steps and stages" of the "process" an agency used to "conduct[] business … before" it. D.Ct.Dkt.97.at.4-5; *contra* D.Ct.Dkt.57.at.14 (proposing a definition excluding mere police activity).

[3] Under 18 U.S.C. §1505, "[w]hoever corruptly … obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States" faces criminal penalties.

3. The matter proceeded to trial in December 2025. The government's case turned primarily on its effort to paint Judge Dugan's actions as unusual and implemented so rapidly that one would have to infer a criminal intent. Tr.822-23, 833-36. The government candidly acknowledged Judge Dugan had full authority to "decide which case to call, who can use a hallway, whether arrests can be made in their courtroom, [and] who can cut the line"—the actions alleged to underlie the charged offenses. Tr.882-83. The existence of such official acts should have raised serious red flags about the prosecution. But emboldened by the judge's pre-trial ruling, the government pushed ahead. In its view, so long as Judge Dugan engaged in official acts for what it deemed "an improper and wrongful purpose," she was guilty. Tr.883.

During deliberations, the jury asked for clarification about the elements of the charged offenses. As to both counts, it asked whether Judge Dugan needed "to know the identity of the subject" of the I-200 arrest warrant. Tr.909 (question about Count I); Tr.919 (similar question about Count II). After conferring with counsel, the court confirmed that Judge Dugan needed "to know the identity [of] the subject of the warrant" to be guilty of the Count I misdemeanor of concealing Flores-Ruiz from arrest. Tr.918. But over Judge Dugan's objection, the court refused to provide a similar instruction regarding the Count II felony obstruction offense. Instead, it explained that for Judge Dugan "[t]o know <u>of</u> the pending proceeding," she needed

only "sufficient knowledge about the nature of the proceeding." Tr.926. Shortly thereafter, the jury acquitted Judge Dugan of the misdemeanor concealment charge, but found her guilty of felony obstruction. Tr.927.

4. Judge Dugan filed a post-trial motion for acquittal or new trial, D.Ct.Dkt.109, which the district court rejected in full, D.Ct.Dkt.117. It concluded that it did not err in declining to instruct the jury that Judge Dugan needed to know Flores-Ruiz was the subject of the arrest warrant under §1505. D.Ct.Dkt.117.at.19-25. It likewise rejected Judge Dugan's arguments that it improperly expanded §1505's scope. D.Ct.Dkt.117.at.25-31, 35-38. And despite previously leaving the door open to revisiting its Tenth Amendment and judicial-immunity rulings, the district court declined to do so without further elaboration. D.Ct.Dkt.117.at.38.

Several weeks later, the Fourth Circuit issued *United States v. Hernandez*, 173 F.4th 94 (4th Cir. 2026), which held that the execution of an ICE arrest warrant did not qualify as a "pending proceeding" under §1505. Because *Hernandez* was the first on-point circuit precedent on the issue and strongly supported Judge Dugan's arguments, she moved for reconsideration. D.Ct.Dkts.119-20. But after a hearing, the district court remained unpersuaded that it had erred. D.Ct.Dkt.128.

The district court sentenced Judge Dugan to a fine of $5,000. D.Ct.Dkt.136.

## SUMMARY OF ARGUMENT

By seeking to hold Judge Dugan criminally liable for official judicial acts under a law targeting private actors, the government's prosecution marks an unprecedented break with long-entrenched common-law and constitutional principles that protect state judicial officers from liability for their official acts. In enacting §1505, Congress did not consider the delicate consequences of criminalizing the official conduct of state actors, let alone tap into its extraordinary enforcement powers under the Reconstruction Amendments. Instead, Congress passed an ordinary criminal law that ordinarily implicates only private conduct obstructing pending federal proceedings, not the official actions of state-court judges (or other state officials) that make federal law enforcement marginally more difficult. Indeed, the charged conduct—the purported obstruction of a civil arrest—does not even involve the kind of "pending proceeding" necessary to violate §1505, even when it comes to non-official conduct. Worse still, the jury instructions did nothing to adequately cabin §1505's scope to avoid an unwarranted intrusion on state judicial authority. The Court should reverse and order a judgment of acquittal, or at least a new trial, to make clear that §1505 is too thin a reed for the government to hold Judge Dugan criminally liable for exercising her state judicial authority.

I. The district court should never have permitted this case to proceed to trial, let alone entered a judgment of conviction. For centuries, the common law has

immunized judges from suit—whether by civil action or criminal prosecution—for their official acts regardless of the judge's motives or how erroneous her decisions. The doctrine safeguards judicial independence, so judges can exercise their authority without fear of retribution from unhappy litigants or public officials. Since the Founding, American courts have fully embraced this doctrine and, when squarely presented with the issue, have consistently applied it to civil suits and criminal prosecutions alike. While Congress has the authority to abrogate this common-law immunity, at least when acting pursuant to its enforcement powers under the Reconstruction Amendments, it must evince a clear intent to do so before an ordinary criminal law will be deemed to have abrogated that deep-seated immunity. Congress never came close in §1505, neither specifically targeting official action nor purporting to invoke its extraordinary enforcement powers (as, *e.g.*, in 18 U.S.C. §242). Section 1505 broadly applies to private and official conduct alike, and in practice, until this case, was invoked almost exclusively to target non-official efforts to obstruct pending proceedings. That is the precise context where the Supreme Court has found that judicial immunity remains intact.

That should have been a complete bar to prosecution here. The government charged Judge Dugan with obstructing an ICE arrest based solely on her official acts: directing where individuals in and around her courtroom went, organizing her docket, musing about governing law, and making decisions about how to conduct

hearings. Those judicial acts presumptively entitled Judge Dugan to absolute immunity. The district court held otherwise by inexplicably finding that no judicial immunity exists in criminal cases. Not so. The seminal case of judicial immunity involved a criminal prosecution. And the few criminal cases involving judicial acts have all affirmed the doctrine. Moreover, the Supreme Court dicta that the district court invoked states only that judges can be liable for unofficial acts (*e.g.*, bribery) or when Congress exercises its authority under the Reconstruction Amendments. As neither exception applies, Judge Dugan's judicial acts entitled her to immunity from prosecution here.

II. The Tenth Amendment likewise should have barred this prosecution. Under the Constitution's system of dual sovereigns, laws addressing conduct overwhelmingly undertaken by private actors do not extend to state officials unless Congress makes its intent to ruffle federalism feathers clear. *Gregory v. Ashcroft*, 501 U.S. 452, is a classic example. Congress plainly wanted to limit age discrimination by ordinary employers, but never expressly contemplated that such a generally applicable law would overturn state limits on state-court judge's judicial service. Accordingly, the Supreme Court declined to extend the generally applicable prohibition on age discrimination to state-court judges. The same logic precludes extending §1505, which generally prohibits private efforts to obstruct pending federal proceedings, to the official actions of state-court judges. Section 1505

contains nothing approaching the kind of clear statement needed to extend a general prohibition to the official acts of state-court judges or other state actors, like legislators or governors. The district court forged ahead and applied §1505 only by ignoring cases like *Gregory* and *Bond v. United States*, 572 U.S. 844 (2014), which reaffirm the clear-statement rule's application to this context. The court brushed aside any federalism concern on the theory that agents did not directly compel Judge Dugan to enforce federal immigration law. But the Tenth Amendment is not limited to the anti-commandeering rule. Indeed, *Gregory* predated the Court's anti-commandeering cases, involved no commandeering, and compels reversal.

III. Even if the government could overcome those twin insurmountable hurdles, Judge Dugan's conviction could not stand.

Section 1505 requires obstruction of a "pending proceeding." That term requires more than the mere execution of an arrest warrant, as the Fourth Circuit has held. Not everything government does rises to the level of a "pending proceeding," as the Supreme Court made clear in *McDonnell v. United States*, 579 U.S. 550 (2016). The term "proceeding" instead connotes an official action by a deliberative body—a reading the surrounding statutory text confirms, since the proceeding must be "pending" "before" an agency. So §1505 reaches only those agency activities that implicate its formal decision-making or adjudicative process, *i.e.*, the kind of proceedings that can be obstructed, much like court proceedings. Hence, courts have

consistently held that mere police activity, such as the execution of a warrant, is not a "pending proceeding" for purposes of §1505 convictions. That describes the execution of the ICE arrest warrant at issue here to a T. Judge Dugan thus did not violate §1505.

The district court's instructions also improperly expanded the scope of §1505. In response to a question during deliberations, the district court told the jury that Judge Dugan could be found guilty if she knew only that ICE sought to arrest someone (*i.e.*, knew only of the "nature of the proceeding"), but did not know whom ICE sought to arrest or that its actions implicated a pending removal proceeding. Under governing caselaw, one cannot obstruct a proceeding unless there is a "nexus" between the charged conduct and the proceeding itself—merely knowing of agency activities generally is insufficient. And while one who has a lawful right to act cannot be found guilty of obstruction (even if she has an improper motive), the lower court refused to provide a jury instruction to that effect. The court's instructions thus misapplied the law and flouted Supreme Court cases requiring narrow statutory constructions, especially when common-law privileges and areas of traditional state authority are at stake. At a minimum, that requires reversal for a new trial.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment of acquittal *de novo*. *United States v. Gustafson*, 130 F.4th 608, 613 (7th Cir. 2025). The Court reviews

the denial of a motion for new trial and denial of a motion for reconsideration for abuse of discretion. *Id.*; *United States v. Sarno*, 37 F.4th 1249, 1253 (7th Cir. 2022).

## ARGUMENT

### I. The Conviction Violates Judge Dugan's Judicial Immunity From Criminal Prosecution.

No one seriously disputes that every act in the indictment, D.Ct.Dkt.6, and that the government deemed obstructive at trial, *see* Tr.882-83, are "part of a judge's job," D.Ct.Dkt.117.at.34. But for centuries, judicial immunity has barred judges from being held liable for such official acts. And the statute Judge Dugan purportedly violated here, 18 U.S.C. §1505, lacks anything like a clear statement evincing Congress' intention to reach official conduct or abrogate that immunity. The doctrine thus precludes this virtually unprecedented and entirely misguided federal prosecution.

1. Few common-law doctrines are as longstanding and well-established as judicial immunity. "The doctrine[,] which holds a judge exempt from a civil suit or indictment" for her judicial acts, stretches to cases from the mid-14th Century. *Yates v. Lansing*, 5 Johns. 282, 291-92 (N.Y. Sup. Ct. 1810) (Kent, C.J.) (relaying the facts of a 1353 case reported in the *Book of Assise*, 27 Ed. III, pl.18). From the outset, judicial immunity had broad application to any form of "prosecution," *id.* at 292-93, whether by "civil suit or indictment" for what one did "sitting as judge," *Spalding v. Vilas*, 161 U.S. 483, 494 (1896). *Floyd v. Barker*, the seminal common-law judicial

immunity case, arose from a criminal prosecution for conspiracy brought against a judge that had presided over a murder trial. 77 Eng.Rep. 1305 (Star Chamber 1607). In explaining the decision to quash the indictment, Lord Coke emphasized that "insomuch as the Judges of the realm have the administration of justice[,] … they ought not to be drawn into question for any supposed corruption" and cannot "be [criminally] charged … before any other Judge at the suit of the King." *Id.* at 1307.

Courts readily adopted these principles early in the Republic's history. The Supreme Court of Pennsylvania, for example, rejected an effort to indict a common pleas judge for willful misconduct in the exercise of his judicial authority. *Commonwealth v. Addison*, 4 U.S. (4 Dall.) 225 (Pa. 1801). Other state courts were quick to recognize that judicial immunity applied to both civil suits and criminal prosecutions. *Yates*, 5 Johns. at 291; *Commonwealth v. Dandridge*, 4 Va. 408, 424 (Va. Gen. Ct. 1824) (Dade, J.) (recognizing judges' immunity "against a Civil suit, or Criminal prosecution"); *Hamilton v. Williams*, 26 Ala. 527, 533 (1855) (judicial immunity from "civil suit, or indictment" "was (and still is) the salutary common-law rule"); *Lange v. Benedict*, 73 N.Y. 12, 33 (1878).

Unsurprisingly, the Supreme Court has also long embraced this common-law rule. As it observed, the doctrine ensures "a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher*, 80 U.S. (13

Wall.) 335, 347 (1871). The impending threat of liability "to every one who might feel himself aggrieved" by a judge would plainly endanger judicial independence. *Id.* And because judicial independence is an indispensable feature of a functioning judicial system, the Court made clear that judges could not be held liable for their official acts. *Id.* It also confirmed that "the exemption cannot be affected by any consideration of the motives," as "allegation[s] of malicious or corrupt motives could always be made," "subject[ing] [judges] to the same vexatious litigation." *Id.* at 354. As a result, the doctrine, when it applies, constitutes "an 'absolute' barrier to suit," "even for judicial acts done 'in error, … maliciously, or … in excess of … authority." *Rockett v. Eighmy*, 71 F.4th 665, 670 (8th Cir. 2023).

Importantly, the Supreme Court did not limit these principles to civil suits. After all, the "apprehension of personal consequences" and the resulting threat to judicial independence are only heightened when the consequences shift from civil to criminal. The Court thus recognized that the common-law immunity protects judges from liability for their official judicial acts whether by "a civil suit or indictment." *Spalding*, 161 U.S. at 494. And in the sole case implicating judicial immunity in the context of a criminal prosecution that reached the Court—involving a judge criminally charged for depriving citizens of their constitutional rights by excluding African Americans from the jury pool—the Court appeared to take that immunity for granted, rejecting the judge's immunity defense on the ground that the

case involved only unofficial acts that could not trigger the doctrine. *Ex parte Virginia*, 100 U.S. 339, 340, 348-49 (1879) (explaining that jury selection was "merely a ministerial act" and that the judge "acted outside of his authority" under state law). Had the Court believed that judicial immunity did not apply to criminal cases, it could simply have said so. Yet, it went out of its way to state that on the facts of the case, the doctrine did not apply because no official acts were at issue—an approach that makes sense only if the Court understood that judicial immunity extends to criminal prosecutions.

There thus can be little doubt that "[j]udicial immunity continues to apply today … in prosecutions." *Rockett*, 71 F.4th at 669. That explains why (before this prosecution) courts unanimously extended judicial immunity to the vanishingly few cases where it was invoked and the charges targeted official *judicial* acts. *United States v. Chaplin*, 54 F.Supp. 926, 934-35 (S.D. Cal. 1944); *Commonwealth v. Tartar*, 239 S.W.2d 265, 266-67 (Ky. 1951); *accord Addison*, 4 U.S. (4 Dall.) 225; *cf. In re Kendall*, 712 F.3d 814, 835-37 (3d Cir. 2013) (Roth, J., concurring) (collecting cases).

To be sure, as a common-law immunity, the doctrine is not immutable. Congress can, at least when it acts under its authority to enforce the Reconstruction Amendments, abrogate the immunity by expressly criminalizing official conduct. But it must make "clear [its] legislative intent to do so," *Pulliam v. Allen*, 466 U.S.

522, 529 (1984), by "expressly so stat[ing]" or because abrogation follows ineluctably "from the nature of the enactment," *Bauers v. Heisel*, 361 F.2d 581, 587 (3d Cir. 1966) (en banc). The criminal provisions of the Enforcement Act of 1870, §§6, 17, 16 Stat. 140 (codified at 18 U.S.C. §§241-42), and the Civil Rights Act of 1875, §4, 18 Stat. 336 (codified at 18 U.S.C. §243), exemplify this principle. Those statutes regulate *only* state action. *Civil Rights Cases*, 109 U.S. 3, 16-18 (1883). And "[s]ince a State acts only by its legislative, executive, or judicial authorities," if §§241-43 are to have any force at all, they necessarily "must be addressed to those authorities, including the State's judges." *Pulliam*, 466 U.S. at 541; *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (making this observation with respect to §242).

By contrast, when Congress enacts a provision that does not target state action and official conduct, but is generally applicable and "makes liable 'every person,'" not just state officials, courts have concluded that Congress did not provide the "clear indication" required "to abolish wholesale [the] common-law immunities." *Pierson v. Ray*, 386 U.S. 547, 554 (1967). Hence, courts have consistently held that broadly worded statutes that cover a wide range of public and private conduct do not abrogate common-law immunities, because they do not narrowly target official action. *Id.*; *Doğan v. Barak*, 932 F.3d 888, 895 (9th Cir. 2019) (Torture Victim Protection Act applies to "*all* individuals," so "we 'assum[e] that common-law ... immunit[ies] were incorporated'"); *Cushing v. Packard*, 30 F.4th 27, 48 (1st Cir. 2022) (en banc)

("general language" in the Americans with Disability Act failed "to manifest a clear congressional intent to abrogate legislative immunity"); *cf. Glick v. Gutbrod*, 782 F.2d 754, 756 (7th Cir. 1986) (judicial immunity barred Racketeer Influenced And Corrupt Organizations Act (RICO) claims).

Section 1505 is a clear example of a criminal statute that applies broadly and does not even try to abrogate judicial immunity. That provision applies broadly to "[*w*]*hoever* corruptly … obstructs" a pending agency proceeding and lacks any limiting language that remotely implies Congress intended to target solely official action. 18 U.S.C. §1505 (emphasis added). To the contrary, the provision is plainly designed to protect official proceedings from interference by private conduct. The record of §1505 prosecutions, which overwhelmingly involve private parties, proves the point. *E.g.*, *United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002). Indeed, that §1505's general language applies "broadly," *id.*, only reinforces the conclusion that Congress did not focus on criminalizing official misconduct or clearly intend to abrogate judicial immunity in §1505 prosecutions. Simply, courts do not assume that Congress would abrogate common-law immunities "by covert inclusion in [such] general language." *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).

2. Accordingly, judicial immunity precludes a §1505 prosecution that is premised on official judicial acts. That should have disposed of this case at the outset, and certainly once the trial evidence underscored the government's view of

the *actus reus*. The actions Judge Dugan took on April 18th that underlie the obstruction charge stemmed from her official acts as a duly elected circuit court judge. Namely, the government claimed Judge Dugan obstructed Flores-Ruiz's arrest because she required federal agents to check in with the Chief Judge, suggested the agents needed a stronger warrant to conduct an arrest,[4] held an off-the-record hearing, addressed Flores-Ruiz's case first, directed where Flores-Ruiz and her attorney exited the courtroom, and permitted him to attend a future hearing remotely. Tr.828-31, 882-85. As the government conceded in closing, those acts all fall comfortably within the scope of her official judicial duties—judges "can decide which case to call, who can use a hallway, whether arrests can be made in their courtroom, [and] who can cut the line." Tr.882-83.

Ample authority confirms as much. As a judicial officer, Judge Dugan had broad authority to dictate the order that she called cases. *Mann v. Conlin*, 22 F.3d 100, 104 (6th Cir. 1994) (scheduling decisions constitute "paradigmatic judicial acts," triggering judicial immunity); *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1358 (Fed. Cir. 2008) (judges have "broad discretion … to decide the order in which they hear" pending matters). She equally had broad discretion to decide whether to hear such matters on- or off-the-record, Tr.680-82, 747; *cf. United States v. Simone*,

[4] *But see, e.g.*, Tr.403-04 (testimony indicating Judge Dugan never told officers they needed a judicial warrant).

14 F.3d 833, 838 (3d Cir. 1994) (judges have discretion to conduct certain proceedings *in camera*), and whether to hold in-person or remote hearings, Tr.476; Wis. Stat. §§885.56, .60. *See Stump v. Sparkman*, 435 U.S. 349, 360-63 (1978) (judge engaged in judicial acts despite making an *ex parte* decision without a hearing or appointing a guardian ad litem).

Judge Dugan likewise had the inherent judicial authority to control where parties entered and exited her courtroom, *see* Tr.476-77, 723-24, 730, and make similar decisions with respect to others in the courthouse. *See Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir. 1994) (judicial immunity applied to a judge, who barred a party from the courtroom); *United States v. Mannie*, 509 F.3d 851, 857 (7th Cir. 2007) ("district court[s] ha[ve] wide latitude to control courtroom atmosphere"); *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966) ("the courtroom and courthouse premises are subject to the control of the court"). And that is true even if her decisions were premised on "an error of law" (*e.g.*, believing officers needed a stronger warrant to effectuate a courthouse arrest). *Figueroa v. Blackburn*, 208 F.3d 435, 444 (3d Cir. 2000); *see Stump*, 435 U.S. at 359-60.

This authority all supports the key insight that governs here: "[a] judge's authority to control h[er] courtroom—and, necessarily, the environment surrounding h[er] courtroom—stems directly from h[er] duties as a judge." *Stevens v. Osuna*, 877 F.3d 1293, 1306 n.9 (11th Cir. 2017). The insuperable conclusion is that Judge

Dugan's actions, which triggered criminal liability here, were all judicial in nature. Because §1505 does not abrogate judicial immunity, it stands as "an 'absolute' barrier to suit." *Rockett*, 71 F.4th at 670. Whether "corrupt motives" led Judge Dugan to "exercis[e] the[se] judicial functions," as the government claimed, Tr.883—they did not—is simply irrelevant. *Bradley*, 80 U.S. (13 Wall.) at 354. The immunity bars this prosecution all the same—"no matter how erroneous or harmful" one deems her judicial acts. *Doermer v. Callen*, 847 F.3d 522, 530 (7th Cir. 2017).

3. The district court's contrary conclusion, which rested entirely on the mistaken premise that there is no criminal judicial immunity, cannot withstand scrutiny.[5] To reject centuries of common-law practice and clear statements about the doctrine's scope, it mistakenly invoked *dicta* in a handful of Supreme Court cases that cannot support the reading the district court ascribed to them. *See* D.Ct.Dkt.48.at.8-11. Those cases stand for only fairly unremarkable propositions that do not support this remarkable and virtually unprecedented prosecution. *Mireles v. Waco* made clear that judges cannot avoid criminal liability simply because of their status as judges, a proposition no one disputes. 502 U.S. 9, 10 n.1 (1991) (citing *Ex parte Virginia*, which involved solely unofficial acts, for the proposition that judges can generally face criminal liability). In *Imbler*, 424 U.S. at 429, and *O'Shea v.*

[5] The court did not address—and therefore did not impugn—Judge Dugan's argument that §1505 does not abrogate judicial immunity. D.Ct.Dkt.48.at.18.n.13.

*Littleton*, 414 U.S. 488, 503 (1974), the Court observed that Congress can punish judicial acts that "would willfully deprive the citizen of his constitutional rights" under 18 U.S.C. §242—an example of a statute clearly evincing Congress' intent to abrogate judicial immunity by targeting official misconduct and thus enforce the promise of the Reconstruction Amendments, *see supra* pp.23-24. And *Dennis v. Sparks* underscored that judges whose judicial decisions are the result of graft or bribe-taking can be criminally punished for such unofficial acts, 449 U.S. 24, 28 (1980)—a rule that tracks the common law, which treated judicial bribe-taking as an unofficial act, *see Perrin v. United States*, 444 U.S. 37, 43 (1979).[6]

None of those sensible (and easily administrable) exceptions applies here. Judge Dugan is not charged with violating the constitutional rights of any citizens or with exercising judicial authority due to graft. Nor is she claiming blanket exemption from criminal law by virtue of being a judge. Rather, she invokes judicial immunity because the government seeks to criminally penalize how she exercised her judicial authority. The background common-law rule that judicial immunity applies in criminal cases is simply unaffected by the dicta cited below.

[6] Nor is this approach foreign. The Supreme Court has long held that bribery of legislative officials is "not a legislative act" that triggers the Speech or Debate Clause's protections. *United States v. Brewster*, 408 U.S. 501, 526 (1972). Hence, bribery cases like *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984), *United States v. Hastings*, 681 F.2d 706 (11th Cir. 1982), and *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974), *see* D.Ct.Dkt.48.at.11.n.5, demonstrate only that judicial bribe-taking is no more an official act than legislative bribe-taking.

There is thus no force to the district court's suggestion that cases like *Tartar* and *Chaplin* "provide[] little support" for the application of judicial immunity here. D.Ct.Dkt.48.at.17. Contrary to its reasoning, *see* D.Ct.Dkt.48.at.14-15, *Tartar* expressly invoked "the common law" immunity for judges from "civil suits or criminal prosecutions," 239 S.W.2d at 266; and *Chaplin* confirmed the immunity attaches to federal criminal prosecutions, 54 F.Supp. at 934-35.

That a criminal prosecution against a judge for her official acts is a *rara avis* does not render the few examples sustaining the immunity "a thin reed upon which to rest a claim of criminal judicial immunity." D.Ct.Dkt.48.at.15. Rather, the rarity itself reveals the government's breathtaking departure from well-understood common-law principles in prosecuting Judge Dugan for her actions overseeing her docket and courtroom. Indeed, that is the lesson of *Trump v. United States*, which recognized that the President enjoyed "some immunity from criminal prosecution for official acts." 603 U.S. 593, 606 (2024). The absence of prior efforts to criminally prosecute Presidents for official acts and the resulting reality that "only a limited number" of cases were relevant to the Court's analysis supported, rather than detracted from, its finding of an immunity. *Id.* at 610. In separation-of-powers and federalism cases, the failure of one part of the government to exercise a "highly attractive" and dangerous power is often evidence that it simply does "not [] exist." *Printz*, 521 U.S. at 905.

Moreover, the concerns that allowing civil actions against judges will degrade judicial independence expressed in *Bradley* apply *a fortiori* here. 80 U.S. (13 Wall.) at 347. "Potential criminal liability, and the peculiar public opprobrium that attaches to criminal proceedings, are plainly more likely to distort [judicial] decisionmaking than the potential payment of civil damages." *Trump*, 603 U.S. at 613; *Pet. of Dwyer*, 406 A.2d 1355, 1361 (Pa. 1979) ("Judges made timid because of fear of criminal prosecutions for errors in their decisions make poor public servants."). The wisdom of that observation is obvious here where the federal government went out of its way to connect the dots and make the chilling effect unmistakable—it used this prosecution to warn all judges not to cross the Administration. *See* Sent'g.Tr.24-25; *see supra* pp.11-12. So "[i]f judges are protected against civil actions for judicial acts, the reasons are more weighty that they should be protected against criminal actions." *Chaplin*, 54 F.Supp. at 934. Because the conviction below ran afoul of that robust authority, it cannot stand.

## II. Judge Dugan's Conviction Violates The Tenth Amendment.

The Tenth Amendment and clear-statement principles exemplified in *Gregory v. Ashcroft* likewise bar this prosecution.

1. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively." U.S. Const. amend. X. It encapsulates in express terms

the "system of 'dual sovereignty'" created by the U.S. Constitution and underscores that even though the federal government has broad authority, states retain "residuary and inviolable sovereignty." *Printz*, 521 U.S. at 918-19, 921. As "[t]he Framers' experience under the Articles of Confederation had persuaded them," "using the States as the instruments of federal governance was both ineffectual and provocative of federal-state conflict." *Id.* at 919.

These background federalism principles thus safeguard the various ways states wield their sovereign authority, including via their state courts. After all, "[o]ne of the reserved powers" of state sovereignty is "the maintenance of state judicial systems." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970). Hence, the federal government cannot compel states to create a forum to hear federal claims if one does not already exist, *Howlett v. Rose*, 496 U.S. 356, 372 (1990), as it is "the right of every State to establish such courts as it sees fit," *Missouri v. Lewis*, 101 U.S. 22, 30 (1879). Likewise, "state courts are free to conduct their own litigation, without ongoing supervision by federal judges, let alone threats … [of] contempt." *O'Keefe v. Chisholm*, 769 F.3d 936, 939 (7th Cir. 2014). Plus, states can "establish[] [judicial] qualification[s]," even ones that are contrary to federal law, given that deciding who can wield judicial authority is the state's "prerogative as … sovereign." *Gregory*, 501 U.S. at 473.

Simply put, the "independence of the States and their courts" is of "fundamental constitutional" importance. *Atl. Coast*, 398 U.S. at 287. Thus, the Supreme Court assumes that Congress will not lightly disregard those fundamental principles and "upset the usual constitutional balance of federal and state powers" unless Congress "make[s] its intention to do so 'unmistakably clear in the language of the statute.'" *Gregory*, 501 U.S. at 460. "This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.* at 461. Under these principles, the Supreme Court in *Gregory* concluded that the Age Discrimination in Employment Act (ADEA), despite its facial broad application to all employment relationships, did not apply to state-court judges and thus did not override judicial qualifications set by Missouri law. *Id.* at 466-67. Indeed, regardless whether the ADEA was considered an exercise of Congress's Article I powers or its authority to enforce the Fourteenth Amendment, the core problem with applying the ADEA to state-court judges was that it was "at least ambiguous whether Congress intended" that result. *Id.* at 470. "In the face of such ambiguity," the Court was unwilling to "attribute to Congress an intent to intrude on state governmental functions." *Id.*

2. This clear-statement rule confirms that §1505 should not have reached Judge Dugan's conduct here. As outlined above, *see supra* Part I, the principal acts

on which the government premised its obstruction charge all involved Judge Dugan's exercise of state sovereign authority as a state-court judge. *See* Wis. Const. art. VII, §7. Under state law, Judge Dugan had "all the powers … necessary to … the full and complete administration of justice, and to carry into effect their judgments, orders and other determinations," Wis. Stat. §753.03, including any administrative duties the Chief Judge delegated to her, Wis. Sup. Ct. R. 70.19. She had the power to decide on what order to call her cases, whether to hear such matters on- or off-the-record, and whether to conduct hearings in person or electronically. *See* Tr.476, 680-82, 747; Wis. Stat. §§757.01(3), 885.56, .60. And she could control what occurred in and around her courtroom, including where parties entered and exited, *see* Tr.476-77, 723-24, 730, and whether courthouse visitors needed to check in with the Chief Judge. *See* Wis. Sup. Ct. R. 68.04 (judicial officers retain discretion to make security decisions regarding day-to-day operations).[7] Judge Dugan's actions, which were taken as a state official, thus amounted to "a fundamental exercise of state sovereignty." *Ryan v. ICE*, 974 F.3d 9, 30 (1st Cir. 2020).

Because the core actions targeted by this prosecution were *official* acts of a state judicial officer, the government can justify its prosecution only if Congress

[7] As "the courtroom and courthouse premises are subject to the control of the court," *Sheppard*, 384 U.S. at 358, whether Judge Dugan's direction to the federal agents was based on a misperception that they needed a stronger warrant than they possessed is irrelevant for the Tenth Amendment analysis; in either case, she was exercising state authority to control the courthouse premises.

clearly evinced "an intent to intrude on state governmental functions" when enacting §1505. *Gregory*, 501 U.S. at 470. Section 1505 does not come close. The statute lacks any specificity that would allow an inference that Congress "clear[ly]" intended "judges [to be] *included*" in its prohibition on obstruction when they exercise state judicial authority. *Id.* at 467. This Court accordingly is "not [to] presume Congress to have authorized such a stark intrusion into traditional state authority." *Bond*, 572 U.S. at 866.

Section 1505 speaks broadly, subjecting "[w]hoever" engages in obstructive conduct to criminal penalties. But that is precisely the context where the clear-statement rule applies, as in casting such a wide net, there is no indication that Congress specifically considered the distinct sensitives of regulating the official conduct of state actors. After all, the statute in *Gregory* extended broadly to employers, including state-government employers. Yet the Supreme Court still discerned no clear intent to reach state-court judges. The same principle is fully applicable to criminal statutes. In *Bond*, for example, the Supreme Court expressly cautioned against reading the "improbably broad" language in a criminal statute as reflecting a "clear indication that Congress meant" to interfere with traditional state authority. 572 U.S. at 859-60.

This Court too has recognized that "in the absence of the plain statement *Gregory* requires," we assume "that federal legislation threatening to trench on the

States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power." *McHenry Cnty. v. Raoul*, 44 F.4th 581, 590 (7th Cir. 2022). Hence, a federal law authorizing "any 'State, territory, *or* political subdivision thereof'" to enter into immigration cooperative agreements could not be read as a federal prohibition on states' authority to control local subdivisions—a traditional form of state governance—and bar them from executing such agreements. *Id.* at 589-90; *S. Branch LLC v. Com. Edison Co.*, 46 F.4th 646, 651-52 (7th Cir. 2022) (RICO's broad language did not evince a clear intent to disrupt state authority over "utility rates").

The same principles apply here. Not only does §1505 lack any clear statement that it extends to the official actions of state actors, but its primary purpose is to shield official actions of federal officials from obstruction efforts by private citizens. There is no indication Congress wrestled with the distinct issues created when state and federal officials have different policy priorities, and state officials take official actions that the federal government dislikes—let alone resolved those issues in favor of empowering federal prosecutors to bring felony prosecutions against state judges for their official acts. Under *Gregory*, §1505's capacious language simply cannot be read to stretch federal prosecutorial authority so far as to allow for criminalizing official state acts. Otherwise, every sanctuary city ordinance or related provision could be construed as a criminal violation of §1505. Such a reading of §1505

"sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). That is why courts have had no difficulty balking at federal efforts to characterize state sanctuary policies, such as the refusal to honor ICE detainers, as obstruction. "Even if" such state action "obstructs federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment." *United States v. California*, 921 F.3d 865, 888-91 (9th Cir. 2019).

3. The district court's contrary conclusion largely overlooked this analysis. In its view, the Tenth Amendment had little role to play because the prosecution was not a federal effort to commandeer state officials, as it "command[ed] no one to participate in federal immigration enforcement," and thus "pose[d] no similar threat to Wisconsin's sovereignty." D.Ct.Dkt.48.at.23-25. But the Tenth Amendment is not limited to the anti-commandeering principle. *Gregory* itself predates the modern anti-commandeering cases, and the Supreme Court more recently rejected the same "empty" "distinction" between "command[ing] 'affirmative' action" and "imposing a prohibition" in *Murphy v. NCAA*. 584 U.S. 453, 475 (2018). The "basic" protections against federal interference with state sovereignty "appl[y] in either event." *Id.*

The district court nonetheless concluded that *Gregory* was inapplicable by insisting that no authority required "a clear statement … before a criminal statute of general applicability may be applied to a state official." D.Ct.Dkt.48.at.24. But that

reasoning attacks a strawman. No one has argued that federal criminal laws do not extend to state judges acting in their private capacity. Prohibitions on bribery, illegal drug use, fraud, and the rest have no implicit exception for state judges. But the situation is very different when the federal government tries to treat the official actions of state-court judges (or state legislators or state executive officials) as criminal obstruction of pending federal proceedings. That extension of a generic federal prohibition to the official actions of state officials comes within the heartland of *Gregory* and its requirement of a clear statement in order for Congress to "subject state governments to generally applicable laws." *New York v. United States*, 505 U.S. 144, 160 (1992); *accord Bond*, 572 U.S. at 857 (applying similar principles to a broadly phrased criminal statute).

The district court's disregard of *Gregory* and minimization of the Tenth Amendment was clearly erroneous. The court imposed criminal penalties on Judge Dugan for her official acts absent the requisite clear statement—thereby sanctioning an unprecedented interference with a "fundamental exercise of state sovereignty." *Ryan*, 974 F.3d at 30. That conviction must be vacated.

## III. The District Court Improperly Broadened The Scope Of 18 U.S.C. §1505.

The problems with this ill-found prosecution do not end there. Judge Dugan's actions at most interfered with the execution of an administrative warrant, which is ordinary law-enforcement activity, not the kind of "pending proceeding" the statute

and Fourth Circuit require for a violation of §1505. And the jury instructions exacerbated the problem by impermissibly broadening the provision's scope.

### A. The Execution of an ICE Warrant Cannot Qualify as a "Pending Proceeding" Under §1505.

This is a §1505 prosecution in search of a "pending proceeding." The government never identified an actual "pending proceeding" before a federal agency that Judge Dugan purportedly obstructed. Rather, it charged her with obstructing the execution of an administrative warrant for a civil arrest. But that quintessential law-enforcement activity falls outside §1505's reach, as the Fourth Circuit squarely held in precisely this context.

1. Section 1505 applies to any person who "corruptly … obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States." 18 U.S.C. §1505. So the key question here is whether ICE's execution of an administrative arrest warrant against Flores-Ruiz to effectuate a prior order of removal against him, *see* Tr.223-24, constitutes a "pending proceeding" that is "being had before" a federal agency. It does not.

The text makes that clear. The term "proceeding" is ordinarily understood as encompassing the various steps necessary to complete a formal decision-making process. Indeed, when Congress enacted §1505 in 1948, *see* 62 Stat. 770 (1948), contemporary dictionaries defined "proceeding" in relevant part as "[t]he course of

procedure in an action at law" and "[a]ny step or act taken in conducting litigation." *E.g.*, *Proceeding*, Webster's New Collegiate Dictionary 672 (1949); *Proceeding*, 8 Oxford English Dictionary 1407 (1933) (similar).[8] To be sure, these definitions suggest that the term on its own, devoid of context, could stretch "rather broadly." *Senffner*, 280 F.3d at 761. But the word "proceeding" does not stand alone, and the balance of §1505 supplies important limitations on its scope. *Gillespie v. Equifax Info. Servs.*, 484 F.3d 938, 941 (7th Cir. 2007). The surrounding terms make clear that the provision covers only "*pending* proceeding[s]" "being had *before*" an agency. 18 U.S.C. §1505 (emphases added). That is, §1505's text targets only ongoing "business *before* the department or agency," *Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966) (emphasis added), that is "await[ing] [a] decision," *Pending*, 7 Oxford English Dictionary 638 (1933). *Accord United States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013) (noting "before a Federal Government agency" would be an "odd" "choice of phrase … if [§1512] were referring to criminal investigations"; "before" implies the proceeding "involves some formal convocation of the agency").

Section 1505 thus seems to contemplate only presently pending administrative proceedings, excluding certain anterior and posterior steps remote in time and space.

[8] Modern dictionaries similarly recognize that the term contemplates an exercise of adjudicative authority. *E.g.*, *Proceeding*, Black's Law Dictionary (12th ed. 2024) ("regular and orderly progression of a lawsuit"; "business conducted by a court or other official body").

Recent precedent supports that textual analysis. Take *McDonnell v. United States*. There, the Supreme Court interpreted the term "official act," which was defined to include a proceeding, as naturally "connot[ing] a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." 579 U.S. at 567-68. And because the statute at issue required a proceeding to "be 'pending'" or "'brought' before 'any public official,'" the Court underscored that a proceeding is best understood as an ongoing process that can be "tracked for progress." *Id.* at 570. An arrest, by contrast, is different in kind.

*United States v. Hernandez* held as much in this precise context. There, the Fourth Circuit became the first circuit court to specifically address whether §1505 applies to an alleged obstruction of ICE's execution of an arrest warrant—ultimately holding that it does not. 173 F.4th at 98. The court recognized the term "proceeding" can be broadly construed, but nevertheless concluded that the remaining statutory language narrowed §1505's scope to cover only those "*administrative* proceeding[s]" with an open question for the agency to resolve. *Id.* at 99-100. Hence, §1505 excluded "rote police work" and "isolated enforcement activity," like "ICE's execution of a warrant" of removal. *Id.* at 100-02. No immigration proceeding could be said to be pending because the removal proceedings had already long been completed. *Id.*

Nor was the Fourth Circuit persuaded by the government's alternative theory that the ICE arrest itself could constitute an agency proceeding. As it explained, courts have unanimously held that "mere police" activity cannot qualify as a "pending proceeding," *Hernandez*, 173 F.4th at 100 (collecting cases)—indeed, this Court numbers among that authority, *Senffner*, 280 F.3d at 761. *United States v. Higgins*, 511 F.Supp. 453, 455 (W.D. Ky. 1981) ("in [its] eighty-two years" of existence, §1505 "has apparently never been applied to a criminal investigation by a federal law enforcement agency"). That makes sense. Unlike when an agency exercises adjudicative or rule-making authority (and conducts any attendant investigations), law enforcement tasked with finding and apprehending the subject of an arrest warrant is not presented with a pending decision requiring resolution. *Hernandez*, 173 F.4th at 103. Rather, the entire purpose of an arrest is to execute determinations and judgments that have already been made. Such isolated law-enforcement activity does not qualify as a "pending proceeding." *Id.* at 102-04.[9]

---

[9] The Fourth Circuit accordingly recognized it was irrelevant that ICE generally could "take oaths and issue subpoenas," since ICE does not "wield[]" such powers when taking aliens into custody. *Hernandez*, 173 F.4th at 103. It likewise rejected the government's analogy to cases like *Senffner*, 280 F.3d at 761, *United States v. Kirst*, 54 F.4th 610, 614 (9th Cir. 2022), and *United States v. Hopper*, 177 F.3d 824 (9th Cir. 1999), which all involved "enforcement action[s]" conducted by "the agency charged with [and actively] investigating the violations of law at issue." *Hernandez*, 173 F.4th at 101, 103-04. Namely, while *Senffner*, *Kirst*, and *Hopper* involved investigations tied to an "existing" (or in §1505 parlance, "pending") "proceeding" of the given agency, ICE's "pure enforcement action" to arrest a

That presumably explains why federal (and state) law separately prohibits interfering with or resisting isolated law-enforcement activity, like an arrest. Misdemeanor provisions like 18 U.S.C. §1071, which criminalizes concealing the subject of an arrest warrant, and §1501, which criminalizes obstructing an officer attempting arrest, target the specific conduct charged here—interference with the execution of legal process—without referring to pending proceedings. *Cf.* Wis. Stat. §§946.41, .65 (criminalizing obstruction of law enforcement separately from obstruction of court proceedings). Numerous principles of statutory construction counsel against adopting a broad construction of "proceeding" in §1505 that would render those more focused provisions beside the point and allow the federal government to elevate what Congress intended to be a mere misdemeanor to a felony. *E.g.*, Scalia & Garner, *Reading Law* 174-82 (2012). In materially similar circumstances, the Supreme Court has insisted that courts adopt a narrower construction. *Fischer v. United States*, 603 U.S. 480, 492-93 (2024) (rejecting a reading of §1512 that would "largely obviate the need for that broad array of other obstruction statutes"); *Marinello v. United States*, 584 U.S. 1, 9 (2018) (rejecting a broad reading that would "transform many … misdemeanor provisions into felonies" and create "redundancy" with more targeted provisions); *accord*

---

removable alien—after removal proceedings had terminated—fell outside §1505's scope. *Id.*; *contra* D.Ct.Dkt.128.at.30.n.9.

*Hernandez*, 173 F.4th at 101 (rejecting a broad reading of §1505, as an alien's resisting arrest is already criminalized under 8 U.S.C. §1253).

That reality thus solidifies what §1505's text and on-point precedent make clear: there is a fundamental difference between obstructing an agency proceeding and obstructing ordinary law enforcement. The latter simply does not qualify as obstruction of a "pending proceeding." *See Hernandez*, 173 F.4th at 100-02.

Under these principles, the prosecution below cannot stand. ICE's execution of the arrest warrant against Flores-Ruiz amounted to nothing more than traditional police activity that falls outside §1505's scope. At trial, federal agents testified that they understood that they were executing the I-200 warrant at issue here simply to make "[a]n arrest." Tr.193. That is simply "mere police" activity, which this Court, *Senffner*, 280 F.3d at 761, and the Fourth Circuit, *Hernandez*, 173 F.4th at 104, have made clear cannot support a §1505 conviction.

Even if the alleged "proceeding" being obstructed were Flores-Ruiz's removal proceedings generally, the same result would attain. As the evidence confirms, ICE was not tasked with making assessments about Flores-Ruiz's rights or immigration status. Tr.213 (asylum claims must be "refer[red]" to a separate agency "for adjudication"). Nor was there a question posed for ICE's resolution—federal agents testified that there were no "pending" removal "proceedings" at issue *at all*. GX.1A; Tr.391 (officer testifying that "there were no immigration-related hearings pending"

regarding Flores-Ruiz). Flores-Ruiz, after all, had been previously removed from the country and the pre-existing agency databases simply reported that he had no legal status in the United States and was thus removable. Tr.388-89. Rather, the agents' task on April 18, under the I-200 warrant, was simply to take custody of a removable alien. That any relevant proceeding had run its course meant there was simply no "pending proceeding" for Judge Dugan to obstruct.

2. The district court's contrary holding is unavailing and, if accepted here, would open up an explicit split with the Fourth Circuit. Although its analysis was not entirely clear, the lower court seemed to endorse the view that Judge Dugan's actions violated §1505 because the relevant "proceeding" she purportedly obstructed was the removal process ICE employed against Flores-Ruiz, D.Ct.Dkt.128.at.29-32; *see* Tr.887—the alternative of treating the ICE arrest itself as the pending proceeding is foreclosed by the well-established rule that "mere police" activity cannot support a §1505 conviction. *Senffner*, 280 F.3d at 761.

But even characterizing the relevant "pending proceeding" as the overall removal process still runs up against the law-enforcement exception. After all, as the federal agents explained, their sole responsibility in executing the I-200 warrant at issue here was to make "[a]n arrest," Tr.193—quintessential police activity. To hold otherwise, the district court emphasized the government's reticulated checklist outlining the various steps taken to locate and then arrest Flores-Ruiz. *See*

D.Ct.Dkt.128.at.6-7, 29 (citing GX.47). While the list atomizes each step in the process of effectuating an arrest, that window dressing does little to obscure the fact that the taskforce's sole obligation here was to locate and apprehend an alien. Tr.193. A similar step-by-step checklist could be created to describe quotidian police work when they "effectuat[e] an arrest upon a magistrate's warrant." *Hernandez*, 173 F.4th at 101.[10] If outlining each step in the process were all it takes to establish that an agency proceeding is occurring, there would be nothing left of the long line of cases finding that "'mere police' activity" "fall[s] outside §1505's scope." *Id.* at 102.

Moreover, on this record, it is hard to take seriously the claim that Flores-Ruiz's arrest implicated removal proceedings—the evidence confirmed there were no extant removal proceedings involving Flores-Ruiz. GX.1A; Tr.391. Certainly, Flores-Ruiz might have contested his removal order or sought asylum after ICE's execution of the I-200 arrest warrant—something he did not do, Tr.416-17. But *contra* D.Ct.Dkt.128.at.29, 31-32, that does not require a different result. The hypothetical possibility of future proceedings cannot convert law-enforcement activity, like an arrest, into a "pending proceeding" involving adjudicatory or

---

[10] To take a more mundane analogy, one can delineate the steps necessary to brush one's teeth and characterize each as "discretionary"—*e.g.*, select toothbrush, select toothpaste, consider whether to wet the bristles, resolve how much paste to apply and how evenly to do so, *etc.* But neither the number of steps nor the use of decision-making language can obscure the reality that each component relates to one thing—brushing teeth. So too here. Even a cursory review of the checklist confirms that every part is inextricably connected to mere law-enforcement activity. *See* GX.47.

decision-making authority. Every arrestee could initiate proceedings to claim police officers arrested the wrong individual or file habeas proceedings to challenge the legal basis for his detention. But the prospect of future adjudicatory proceedings by some other entity simply does not transmogrify the execution of an arrest warrant into a proceeding, let alone a "pending" proceeding "before" those other entities.

In the same way, the future prospect of an alien's challenge to his removal cannot allow the government to reimagine ICE's arrest here as anything other than rote police activity not covered by §1505. A comparison to §1512 solidifies this point. There, "an official proceeding need not be pending or about to be instituted at the time of the offense" for a party to be charged, 18 U.S.C. §1512(f)(1), whereas a §1505 offense occurs only if the agency proceeding is "pending." As "different language ordinarily conveys different meaning," *Osicka v. Off. Of Lawyer Reg.*, 25 F.4th 501, 506 (7th Cir. 2022), the contrast between §1505 and §1512 makes clear that when §1505 refers to a "pending proceeding," it cannot extend to the mere *possibilit*y of a future proceeding. Congress knew how to adopt language to do so, but it did so in §1512, not §1505.[11]

Likewise, if the mere possibility of future proceedings were enough to convert ordinary police activity into a "pending proceeding," that would effectively allow

[11] Hence, any attempt to reframe ICE's arrest as supporting some other yet-to-be-initiated criminal prosecution against Flores-Ruiz cannot move the needle either. *Contra* D.Ct.Dkt.128.at.29.

for *any* agency action to be the subject of a §1505 prosecution. *See Hernandez*, 173 F.4th at 102. Such a result is intolerable given the Supreme Court's "usual approach in obstruction cases" is to "'resist reading' particular sub-provisions 'to create a coverall' statute"—especially when doing so creates redundancies with other criminal provisions (even ones with "lesser *mens rea*") as is the case here with 18 U.S.C. §§1071, 1501 (discussed *supra*). *Fischer*, 603 U.S. at 494-96. The district court's disregard for the serious redundancy caused by its expansive reading of §1505 cannot withstand the weight of this authority. *See* D.Ct.Dkt.117.at.27-30.

In sum, all relevant factors confirm that the Fourth Circuit got this right and the court below erred. In reality, Judge Dugan could not and did not obstruct a "pending proceeding" in violation of §1505. ICE's execution of the arrest warrant for Flores-Ruiz was mere law enforcement that fell far outside §1505's scope.

### B. The District Court Failed to Properly Instruct the Jury on the Scope of §1505.

The district court compounded that dispositive legal error by issuing jury instructions that improperly expanded §1505 along two dimensions: (1) its response to the second jury question negated the nexus requirement necessary to tie Judge Dugan's conduct to Flores-Ruiz's arrest, and (2) its instructions failed to sufficiently account for Judge Dugan's lawful acts as a state-court judge.

**1. Nexus Requirement.**

To ensure the obstruction statutes do not become unbounded, the Supreme Court has required a "nexus" between the charged acts and the federal actions alleged to have been obstructed. *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995). By requiring "a relationship in time, causation, or logic," courts can ensure that the defendant has "the requisite intent to obstruct." *Id.* at 599. Otherwise, "*any* act, done with the intent to 'obstruct,'" would be "sufficient to impose criminal liability." *Id.* at 602. Although *Aguilar* involved §1503, it is fully applicable here. The language in §1503 mirrors that in §1505—with the only relevant difference being the proceeding purportedly obstructed. So the two provisions must be read *in pari materia*, *see United States v. Dorfman*, 184 F.4th 577, 583-84 (7th Cir. 2026), which explains why this Court adopted *Aguilar*'s "nexus" requirement for §1505 prosecutions. *Senffner*, 280 F.3d at 762.

The district court was thus required to instruct the jury in like fashion here to ensure that the government established the requisite connection between Judge Dugan's actions and Flores-Ruiz's arrest. *See* D.Ct.Dkt.6.at.2 (indictment charging Judge Dugan with obstructing "the administrative arrest of E.F.R."). The court failed to do so. Its original instructions required the jury to find that Judge Dugan "knew of the pending proceeding." D.Ct.Dkt.94.at.21. But the jury asked for clarification whether Judge Dugan needed "to know the identity of the subject" of the I-200 arrest

warrant to convict her under §1505. Tr.919. Rather than underscore that Judge Dugan's actions had to be connected to *Flores-Ruiz's* particular arrest, such that they would have a "'natural and probable' effect of interfering with that proceeding," *Senffner*, 280 F.3d at 762, the lower court (over Judge Dugan's objection) told the jury she could be found guilty based on "know[ing] of the pending proceeding" generally—*viz.*, merely knowing "about the nature of the proceeding." Tr.926. That does not adequately articulate the "nexus" requirement. It stands for the opposite proposition. Under that response, the jury could return a guilty verdict based only on Judge Dugan's vague knowledge that ICE sought to arrest *someone* in the courthouse, even if her lack of knowledge of the target meant she could not "know that h[er] … actions '[we]re likely to affect the … proceeding.'" *United States v. Quattrone*, 441 F.3d 153, 178-79 (2d Cir. 2006).

*Aguilar* rejected that precise outcome. As it explained, a man "l[ying] to his wife about his whereabouts" because she might be interviewed by federal agents, who might then be swayed by that false account, does not engage in obstruction; a nexus is lacking in that attenuated chain of causation. 515 U.S. at 602. The same holds true here. Had the jury concluded that Judge Dugan's actions were taken with the hope of generally interfering with ICE's arrest but without knowing which litigant was targeted and whether her efforts would be "likely to affect" the arrest, there would be an insufficient basis for liability. *Id.* at 599. However, because the

jury needed to find only that she simply knew "about the nature of the proceeding," Tr.926, so long as it found that she wanted to make ICE's job more difficult, the district court's instruction ensured that "*any* act[] done with th[at] intent" would suffice "to impose criminal liability." *Aguilar*, 515 U.S. at 602; *cf. United States v. Sutton,* 30 F.4th 981, 985-86 (10th Cir. 2022) (reversing §1512 conviction when defendant intended to obstruct state proceeding without knowledge about the federal proceeding charged). Under *Aguilar*, that is erroneous.

The problems run deeper still. As noted, the district court seemed to treat (as the government argued in closing, Tr.887) the "pending proceeding" as the removal process as a whole. *See supra* p.45. But if that is correct, the court's response to the jury's question was plainly inadequate. It failed to inform the jury that Judge Dugan needed to know that her actions were "likely to affect" a *pending removal proceeding*. *Aguilar*, 515 U.S. at 599. By focusing primarily on the I-200 warrant, the court never accounted for (what it deemed) the actual "pending proceeding" implicated here. Its instruction instead allowed the jury to convict Judge Dugan based on her mere awareness (*i.e.*, "sufficient knowledge," Tr.926) that ICE sought to arrest someone without the government ever needing to show that she knew the arrest was tied to a pending removal proceeding. Namely, the jury never had to find that Judge Dugan knew her actions would "ha[ve] the 'natural and probable' effect of interfering with *that proceeding*." *Senffner*, 280 F.3d at 762 (emphasis added).

That result cannot stand, especially considering the judicial-independence and federalism principles at play—even assuming §1505 can govern a state-court judge's official acts (it cannot). As the Supreme Court has admonished, courts cannot "give [immunity- or] state-displacing weight … to mere congressional *ambiguity*." *Gregory*, 501 U.S. at 467; *Pulliam*, 466 U.S. at 529. Yet, by omitting a "nexus" requirement tying Judge Dugan's judicial actions to *Flores-Ruiz*'s arrest and removal, the district court did just that. Its failure to instruct the jury that there needed to be a close fit between the charged conduct and Flores-Ruiz's arrest and removal meant the court let "ambiguity deriv[ing] from the improbably broad reach of the key statutory" terms, *Bond*, 572 U.S. at 859-60, criminalize a substantial amount of judicial conduct based just on an alleged "corrupt motive[]"—an "allegation" which can "always be made," *Bradley*, 80 U.S. (13 Wall.) at 354. As a long line of cases underscore, *see* Parts I-II, that ambiguity should have been resolved in favor of cabining §1505's scope.

Nor was the error harmless. The jury asked the same question with respect to the concealment count, Tr.909, and was told that Judge Dugan needed "to know the identity [of] the subject of the warrant" to be found guilty, Tr.918—*viz.*, a nexus was required. And while the jury returned a guilty verdict under §1505 because it could convict Judge Dugan based on her vague awareness of ICE operations that morning, it acquitted her on the concealment charge—the exact context where an instructional

error requires a new trial. *United States v. Woods*, 148 F.3d 843, 849 (7th Cir. 1998). In addition, because there was no evidence that Judge Dugan ever saw the arrest warrant at issue, Tr.403-04, there is precious little supporting the notion that she had any awareness her actions were "likely to affect" a *pending removal proceeding*. *Aguilar*, 515 U.S. at 599.

The district court barely attempted to square its response with the analysis above. True, its response included the words "'the proceeding,' not 'a proceeding,' 'any proceeding,' or 'some proceeding.'" D.Ct.Dkt.117.at.21-22. But the problem is not, as the lower court thought, that the jury could convict Judge Dugan for obstructing just any proceeding. It is that the response lowered the level of proof, facilitating a guilty verdict even if Judge Dugan knew only that an arrest was happening without proof that she "kn[e]w that h[er] … actions '[we]re likely to affect the … [relevant] proceeding.'" *Quattrone*, 441 F.3d at 178-79. Accordingly, the court's use of the language "the proceeding" in response failed to capture "*Aguilar*'s nexus requirement" as required. D.Ct.Dkt.117.at.24-25.

Nor was it correct to brush aside that mistake by noting that "jury instructions must be considered as a whole," such that "one instruction [that] falls short on clarity" does not require a new trial. D.Ct.Dkt.117.at.21. The error here was not a lack of clarity, but an affirmative misstatement of the law. So while district courts have "broad discretion to respond to questions propounded" during deliberations,

the court should have cleared up the jury's confusion here "with concrete accuracy." *United States v. Young*, 316 F.3d 649, 661 (7th Cir. 2002). The instruction below—that a guilty verdict could subsist on Judge Dugan's knowledge only of "the nature of the proceeding," Tr.926, without proof that her actions would have the "'natural and probable' effect of interfering with" Flores-Ruiz's arrest and removal, *Senffner*, 280 F.3d at 762—constituted a concrete *misstatement* of the law that was clearly material to the jury's verdict. No matter how broad a district court's discretion, it does not include "misstat[ing] the law." *Hicks v. Forest Preserve Dist.*, 677 F.3d 781, 791 (7th Cir. 2012). This erroneous instruction warrants retrial.

### 2. Lawful Acts.

The district court also clearly erred in refusing to provide an instruction to the jury explaining that Judge Dugan could not commit a violation of §1505 if she had a legal right to act as she did.

Under its plain terms, §1505 does not target just any conduct that "obstruct[s] … the due and proper administration of the law"; it criminalizes only those actions that are done "corruptly." 18 U.S.C. §1505. So "it is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action." *United States v. Cueto*, 151 F.3d 620, 631 (7th Cir. 1998). But because much of the conduct that can be covered by §1505 is "by itself innocuous," the Supreme Court has been highly

sensitive to instructions that would allow the obstruction statutes to cover a broad range of lawful conduct—from persuading a family member to invoke the "right against compelled self-incrimination" and not "disclos[ing] marital confidences" to "withholding documents" subject to "attorney-client privilege." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703-04 (2005). Even if the natural result of those actions is an impeded governmental proceeding, that the individuals had a lawful right under the Constitution or common law to take each act in question means the charged conduct does not rise to "the level of 'culpability … usually require[d]" for criminal liability. *Id.* at 706.

The same principles apply here. As detailed, regardless of her motives, Judge Dugan had broad authority as a *state official* and as *a judge* to take *all* of the actions that purportedly obstructed ICE's arrest of Flores-Ruiz. *See supra* Parts I-II. Under *Arthur Andersen*, Judge Dugan was entitled to an instruction explaining to the jury that it can *and must* evaluate the lawfulness of her actions as a state-court judge in determining whether she "corruptly" obstructed Flores-Ruiz's arrest. Indeed, just as the Fifth Amendment and common-law marital-communications and attorney-client privileges are lawful bases for individuals to take actions that would otherwise be obstructionist, *Arthur Andersen*, 544 U.S. at 703-04, Judge Dugan's common-law judicial immunity and constitutional right to invoke state sovereign authority in her

judicial capacity fully justified her actions in question—even if that impeded ICE's execution of the I-200 arrest warrant here.

However, the instructions provided below allowed the jury simply to credit the government's insistence that because Judge Dugan acted with "an improper purpose," her official acts, which made the ICE arrest more complicated, constituted obstruction. D.Ct.Dkt.94.at.21-22. With weighty constitutional and judicial-independence principles at stake—principles which normally weigh in favor of *narrowing* instructions, *Gregory*, 501 U.S. at 467; *cf. Pulliam*, 466 U.S. at 529—"it is striking how little culpability the instructions required," *Arthur Andersen*, 544 U.S. at 706. *Accord United States v. Edwards*, 869 F.3d 490, 499 (7th Cir. 2017). For that reason, the district court's failure to provide this requisite guidance to ensure the jury accounted for Judge Dugan's lawful right to act as a state official and as a judge likewise requires a new trial.

The lower court's reasons for refusing to provide such guidance do not hold water, especially because they largely turned on its erroneous rejection of Judge Dugan's judicial-immunity and Tenth Amendment arguments. *See* D.Ct.Dkt.97.at.6; D.Ct.Dkt.117.at.35-36. And while the court believed that parroting the definition of "corruptly" in 18 U.S.C. §1515(b) sufficed to cover its bases, D.Ct.Dkt.117.at.31, that overlooks the reality that after *Arthur Andersen*, courts must police the line between lawful and obstructionist acts carefully to account for any privileges or

constitutional rights a defendant may lawfully invoke. That is especially true here, where an insufficiently bounded interpretation of §1505 threatens core structural and constitutional principles. After all, a judge has a lawful right to exercise her judicial authority over cases before her "no matter how erroneous or harmful," *Doermer*, 847 F.3d at 530, and the Tenth Amendment safeguards the official acts of state officers "[e]ven if" they "obstruct[]" federal activities, *California*, 921 F.3d at 888-91.[12] It is the confluence of those common-law and constitutional principles that confirms why a safety-valve was needed. So the district court should have instructed the jury that Judge Dugan could not violate §1505 if she was legally authorized to engage in the charged conduct as a state-court judge. Its failure to do so requires reversal.

* * *

In sum, this misguided criminal prosecution of Judge Dugan was flawed to its core. By targeting the official acts of a state-court judge, including acts literally taken on the bench, via a generally applicable criminal statute, the federal government bucked centuries of Anglo-American legal development. It disregarded core common-law protections safeguarding judges from both civil suits and criminal prosecutions for their official acts—an immunity essential to judicial

[12] The structural and common-law protections implicated here reveal why *Cueto* is distinguishable. D.Ct.Dkt.117.at.36-37. In *Cueto*, there was simply no corresponding constitutional or common-law privilege authorizing the attorney to offer legal advice aimed at facilitating criminal activity. 151 F.3d at 631-32.

independence—without any effort by Congress to abrogate that immunity or even target state action. It intruded on a state judge's exercise of core state sovereign power, without anything like the kind of clear statement that the Tenth Amendment and Supreme Court cases require. And it did all that without even identifying a pending proceeding before an agency, as opposed to the quintessential law-enforcement activity of executing a warrant. The conviction here is flawed several times over and cannot stand.

Our system of federalism depends on allowing for healthy friction between state and federal officials. While the Supremacy Clause comes into play when Congress indicates an unmistakable intent to target the official actions of state actors, absent that, policy disputes between states and federal actors are not the stuff of federal criminal prosecutions. That is particularly true when it comes to the state judicial process, which is designed to adjudicate violations of state law, not serve as a helpmate for federal law-enforcement officials. Those commonsense principles are reflected in the "'very ancient' privilege protecting parties and witnesses from civil arrests in courthouses," *New York*, 810 F.Supp.3d at 341—a privilege "necessary … to promote the due and efficient administration of justice," *Durst v. Tautges, Wilder & McDonald*, 44 F.2d 507, 508-09 (7th Cir. 1930). This prosecution lost sight of those first principles. The resulting conviction cannot stand.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment and order a judgment of acquittal or a new trial.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
*Counsel of Record*
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

STEVEN M. BISKUPIC
STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com
(414) 828-7233

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

September 8, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2016, the Brief contains 13,997 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

September 8, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.

September 8, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**No. 26-2440**

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

HANNAH C. DUGAN,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Eastern District of Wisconsin,
No. 25-cv-00089

**SHORT APPENDIX OF DEFENDANT-APPELLANT HANNAH C. DUGAN**

Oral Argument Requested

STEVEN M. BISKUPIC
STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com
(414) 828-7233

PAUL D. CLEMENT
*Counsel of Record*
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

September 8, 2026

**TABLE OF CONTENTS**

Judgment (July 8, 2026) (R.136) .......... SA1

Decision and Order Denying Defendant's Motion to Dismiss (Aug. 26, 2025) (R.48).......... SA4

Decision and Order on Jury Instruction (Dec. 18, 2025) (R.97) .......... SA31

Decision and Order on Post-Verdict Motions (Apr. 6, 2026) (R.117) .......... SA38

Decision and Order Denying Defendant's Motion for Reconsideration (June 16, 2026) (R.128) .......... SA77

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

I hereby certify that the Short Appendix herein includes all of the materials required by Circuit Rule 30(a) and (b).

September 8, 2026

s/Paul D. Clement
Paul D. Clement

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA
V.
HANNAH C. DUGAN

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 25-CR-89

USM Number: 76517-511

Steven Biskupic
Defendant's Attorney

Richard Frohling
Assistant United States Attorney

THE DEFENDANT:

☐ Plead guilty to the indictment.

☐ pleaded nolo contendere to count(s) which was accepted by the court.

☒ was found guilty on count 2 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| **18 U.S.C. § 1505** | **Obstruction of Proceedings Before Departments, Agencies and Committees** | **4/18/2025** | **2** |

The defendant is sentenced as provided in Pages 2 through 3 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count 1.

☐ Indictment is dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and the United States attorney of material changes in economic circumstances.

7/8/2026
Date of Imposition of Judgment

/s Lynn Adelman

Signature of Judicial Officer

Lynn Adelman, District Judge
Name & Title of Judicial Officer

7/8/2026
Date

AO 245B (Rev 10/15) Judgment in a Criminal Case:
Sheet 5 - Criminal Monetary Penalties

Defendant: Hannah C. Dugan
Case Number: 25-CR-89

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **Totals:** | **$100.00** | **$5,000.00** | **N/A** |

☐ The determination of restitution is deferred until ________ An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| **Totals:** | $ ________ | $ ________ | |

☐ Restitution amount ordered pursuant to plea agreement $ ________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev 10/15) Judgment in a Criminal Case:
Sheet 6 - Schedule of Payments

Defendant: Hannah C. Dugan
Case Number: 25-CR-89

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☒ Lump sum payment of $5,100.00 due immediately: $5,000.00 fine and $100.00 special assessment

☐ not later than ______________________, or

☐ in accordance ☐ C, ☐ D, ☐ E or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal __________ (e.g., weekly, monthly, quarterly) installments of $ __________ over a period of __________ (e.g., months or years), to commence __________ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal __________ (e.g., weekly, monthly, quarterly) installments of $ __________ over a period of __________ (e.g., months or years), to commence __________ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within __________ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several
Defendant and Co-Defendant Names, Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.** **Case No. 25-CR-89**

**HANNAH C. DUGAN**
**Defendant.**

---

**DECISION AND ORDER**

Defendant Hannah Dugan moves to dismiss the indictment charging her with concealing a person from arrest, 18 U.S.C. § 1071, and obstructing removal proceedings of the Department of Homeland Security, 18 U.S.C. § 1505. Summarized, the government alleges that defendant, a state court judge, concealed from arrest and obstructed the apprehension of a person wanted by federal immigration authorities for removal. The magistrate judge handling pre-trial proceedings in this case issued a recommendation that the motion be denied. Defendant objects, requiring me to review the matter de novo. Fed. R. Crim. P. 59(b).

**I. THE INDICTMENT**

When considering a motion to dismiss, the court limits its review to the face of the indictment, assumes all facts alleged are true, and views the facts in the light most favorable to the government. See Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952); United States v. White, 610 F.3d 956, 958 (7th Cir. 2010); United States v. Yashar, 166 F.3d 873, 880 (7th Cir. 1999). The parties have in their briefing related additional facts, but consideration of those facts on a motion to dismiss would be improper. See United States v. Yasak, 884 F.2d 996, 1001 (7th Cir. 1989).

The indictment alleges:

**COUNT ONE**

**THE GRAND JURY CHARGES THAT**:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

knowingly concealed E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R.

In violation of Title 18, United States Code, Section 1071.

**COUNT TWO**

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

a) confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b) upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c) addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d) directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e) advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of Title 18, United States Code, Section 1505.

(R. 6.)

## II. DISCUSSION

In her motion, defendant argued that (1) she enjoys absolute judicial immunity for the official acts alleged in the indictment; (2) this prosecution violates the Tenth Amendment and the Constitution's vertical separation of powers by intruding on the authority of state judges to manage their own courtrooms and proceedings; and (3) §§ 1071 and 1505 should be construed so as to avoid the constitutional issues she raises. (R. 21 at 2.) The magistrate judge concluded that, while the Supreme Court has granted judges immunity from civil liability, no such rule has been established in the criminal context. (R. 43 at 27-31.) She further concluded that defendant's Tenth Amendment claim required the assessment of disputed facts and characterization of the events underlying the indictment, which could not be done on a motion to dismiss. (R. 43 at 31-32.) Finally, the magistrate judge rejected the constitutional avoidance argument, as defendant identified no ambiguity in the charging statutes. (R. 43 at 32-34.)

### A. Immunity

In her objections, defendant begins with the proposition that every act alleged in the indictment is "'part of a judge's job.'"(R. 45 at 1, quoting the Report and Recommendation [R. 43] at 30.) In other words, they are all "official acts." (R. 45 at 4; <u>see also</u> R. 47 at 3, "core judicial acts".) She then posits that immunity is not restricted to the civil sphere; it protects

against criminal liability for most official acts. (R. 45 at 3; R. 47 at 3.) She admits three exceptions to the general rule of judicial immunity: (1) wholly unofficial acts, e.g., a judge who murders his wife in their home or who shares child pornography files on his own time; (2) graft or coercive sexual gratification, for which collateral judicial acts are the inducement or the threat; and (3) official acts that deprive persons of their constitutional rights under statutes enacted pursuant to the Reconstruction Amendments, which abrogated judicial immunity. (R. 45 at 3, 14-19; R. 21 at 13.)[1] Defendant concludes that her case involves none of these exceptions: all of the acts alleged in the indictment were done in her capacity as a judge; the indictment alleges no graft or self-interest, such as a bribe or kickback in exchange for an official act; and there is no allegation that she violated individual rights protected by the Thirteenth, Fourteenth, and Fifteenth Amendments. (R. 45 at 20-21.) While the indictment does allege that defendant "knowingly" concealed E.F.R. and "corruptly" obstructed the administration of law, she remains immune for the charged acts, as immunity operates to foreclose inquiry into motives. (R. 45 at 22; R. 47 at 1.)

The government responds that the Supreme Court has never recognized absolute judicial immunity from criminal liability (R. 46 at 5), and that defendant's assumption of immunity, subject to exceptions, wrongly inverts the analysis (R. 46 at 13). The government argues that defendant's creation of categorical exceptions to immunity constitutes an attempt to explain away the many historical prosecutions of judges in a gerrymandered way, one which excludes the conduct alleged here. (R. 46 at 13-14.) The government further contends that, even if a doctrine of immunity for judicial acts existed, the evidence in this case will show that

[1]To be clear, in the objections defendant contends that the graft cases are really a subcategory of the unofficial acts cases. (R. 45 at 16.)

defendant went well beyond her judicial role; instead, all events arose from her unilateral, non-judicial, and unofficial actions outside the role of a Wisconsin state judge by obstructing a federal immigration matter over which she had no authority. (R. 46 at 15-16.) Although the magistrate judge allowed that some of the allegations described conduct that could be considered part of a judge's job, she clarified that defendant was not being prosecuted for opining on the fly, managing her courtroom, or allowing someone to appear by Zoom; rather, the indictment charged specific violations of federal criminal laws. (R. 46 at 18-19.) The government concludes that defendant is not immune simply because she encountered federal agents while working at the courthouse. (R. 46 at 19.)

The dispute between the parties boils down to this: Defendant posits a general rule of immunity, subject to certain exceptions which account for the previous (and legitimate) prosecutions of judges. According to the government, there is no general rule of immunity, and what defendant calls exceptions are simply examples of the types of prosecutions that have been brought against judges. A review of the relevant history reveals the government has the better of the argument.

The concept of judicial immunity is often traced to Floyd v. Barker, 77 Eng. Rep. 1305 (Star Chamber 1607), where a judge who presided over a murder trial was hailed into a rival court and charged with conspiracy for his role. Lord Coke concluded that "a Judge, for any thing done by him as Judge, by the authority which the King hath committed him, and as sitting in the seat of the King (concerning his justice) shall not be drawn into question before any other Judge, for any surmise of corruption, except before the King himself[.]" Id. at 1307.

Relying on Floyd and similar English authorities, early American courts granted judicial immunity in civil cases, although at times they stated the rule more broadly. E.g., Yates v.

Lansing, 5 Johns. 282, 291 (N.Y. Sup. Ct. 1810), aff'd, 9 Johns 395 (N.Y. 1811) ("The doctrine which holds a judge exempt from a civil suit or indictment, for any act done, or admitted to be done by him, sitting as judge, has a deep root in the common law."); id. at 293 ("In the case of Floyd v. Barker (12 Co. 23), the subject underwent a solemn consideration by Lord Coke, and all the judges; and their resolution was . . . that no judge, who tries and gives judgment in a criminal case, or does any act in court, was to be questioned for it either at the suit of the party or of the king."); see also Hamilton v. Williams, 26 Ala. 527, 533 (Ala. 1855) (quoting the rule from Yates, 5 Johns. at 291).[2]

The Supreme Court first addressed the issue in Randall v. Brigham, 74 U.S. 523 (1869), a case in which a lawyer filed a civil action against a state court judge alleging that the judge wrongly removed him from the state bar. Relying on Floyd, Yates, and other authorities, the Court found the judge immune, stating: "[I]t is a general principle applicable to all judicial officers, that they are not liable to a civil action for any judicial act done within their jurisdiction." Id. at 535. In Bradley v. Fisher, 80 U.S. 335, 347 (1872), also a civil action brought by a lawyer alleging wrongful removal from the bar by a judge, the Court, again citing Yates and Floyd, concluded that a judge "cannot be subjected to responsibility for [a judicial act] in a civil action, however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." The Court continued:

[2]As defendant notes, a recent civil case also stated the rule broadly. See Rockett v. Eighmy, 71 F.4th 665, 669 (8th Cir. 2023) ("Judicial immunity continues to apply today, not only in prosecutions like Floyd, but in civil-rights actions brought under 42 U.S.C. § 1983."). In Spalding v. Vilas, 161 U.S. 483, 494 (1896), the Court quoted from Yates, 5 Johns. at 291, but that case involved a claim of civil immunity by the Postmaster General, not a judge. As defendant concedes in reply, these references are dicta. (R. 47 at 6.) But to be fair, some of the language relied upon by the government is too. I have considered all of the caselaw cited in deciding this motion.

> The principle . . . which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well-ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country.

Id. The Court also clarified that this exemption of judges from civil liability cannot "be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry." Id.

In Pierson v. Ray, 386 U.S. 547 (1967), the Court granted immunity to a judge sued under 42 U.S.C. § 1983 based on his involvement in a prosecution of civil rights protestors. The Court explained:

> We find no difficulty in agreeing with the Court of Appeals that Judge Spencer is immune from liability for damages for his role in these convictions. The record is barren of any proof or specific allegation that Judge Spencer played any role in these arrests and convictions other than to adjudge petitioners guilty when their cases came before his court. Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in Bradley v. Fisher, 13 Wall. 335 (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." (Scott v. Stansfield, L. R. 3 Ex. 220, 223 (1868), quoted in Bradley v. Fisher, supra, 349, note, at 350.) It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

Id. at 553-54 (footnote omitted).

The Court continued, in a number of subsequent cases, to afford judicial immunity in civil actions brought under § 1983, including some with egregious facts. See, e.g., Stump v.

Sparkman, 435 U.S. 349 (1978) (immunity for order authorizing sterilization of a minor performed under false pretenses); Dennis v. Sparks, 449 U.S. 24 (1980) (judge civilly immune for improperly issuing an injunction as part of an alleged conspiracy with other defendants, although the action could proceed against the other defendants, which may require the judge to testify and defend his judicial conduct); Mireles v. Waco, 502 U.S. 9 (1991) (immunity granted where a judge, angered that a lawyer failed to appear in his courtroom, ordered the police to forcibly and with excessive force seize and bring the lawyer into his courtroom).

In sum, then, a "long line of [the] Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages." Mireles, 502 U.S. at 9 (collecting cases).[3] "The Court, however, has recognized that a judge is not absolutely immune from criminal liability, Ex parte Virginia, 100 U.S. 339, 348-349 (1880), or from a suit for prospective injunctive relief, Pulliam v. Allen, 466 U.S. 522, 536-543 (1984), or from a suit for attorney's fees authorized by statute, id., at 543-544." Id. at 10 n.1.[4]

---

[3]The Court has explained that this immunity is overcome in only two sets of circumstances. "First, a judge is not immune from liability for nonjudicial actions, i. e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. at 11-12 (internal citations omitted). The Court has also clarified that "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." Forrester v. White, 484 U.S. 219, 227 (1988). In other words, immunity does not attach simply because the defendant is a judge. The Court has drawn a "distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." Id. The former gain immunity, the latter do not.

[4]The specific holdings of Pulliam have been superseded by statute. See Pub. L. 104-317, § 309(c), 110 Stat. 3847, 3853 (1996) (codified as amended at 42 U.S.C. § 1983) ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."); Pub. L. 104-317, § 309(b), 110 Stat. 3847, 3853 (1996), (codified as amended at 42 U.S.C. § 1988(b)) ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held

In Ex parte Virginia, a state court judge was charged with excluding Black persons from grand and petit juries. 100 U.S. at 340. The charging statute provided that:

> no citizen, possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude; and any officer or other person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen for the cause aforesaid shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than $5,000.

Id. at 344. In declining to grant habeas relief to the judge, the Court spent most of its opinion discussing Congress's authority to enact the statute pursuant to the Thirteenth and Fourteenth Amendments. Id. at 344-48. At the end of the opinion, the Court briefly discussed immunity:

> It was insisted during the argument on behalf of the petitioner that Congress cannot punish a State judge for his official acts; and it was assumed that Judge Cole, in selecting the jury as he did, was performing a judicial act. This assumption cannot be admitted. Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. It often is given to county commissioners, or supervisors, or assessors. In former times, the selection was made by the sheriff. In such cases, it surely is not a judicial act, in any such sense as is contended for here. It is merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads. That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?
>
> But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were

---

liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction."). However, the Court's consideration of common law immunity principles remains instructive, as defendant acknowledges. (R. 45 at 6-7; R. 47 at 5.) I discuss Pulliam further below.

> colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

Id. at 348-49.

The Court returned to the issue in O'Shea v. Littleton, 414 U.S. 488 (1974), a case in which the plaintiffs sought injunctive and equitable relief against a number of county officials, including two judges, alleging ongoing civil rights violations in the handling of criminal cases. The Court held that the complaint failed to satisfy the case or controversy requirement imposed by Article III, id. at 493, and that granting relief would also result in unwarranted federal intervention into state proceedings, id. at 500. The Court concluded that the unavailability of injunctive relief did not mean federal law would exercise no deterrent effect in these circumstances:

> Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. § 242. See Greenwood v. Peacock, supra, at 830; United States v. Price, 383 U.S. 787, 793-794 (1966); United States v. Guest, 383 U.S. 745, 753-754 (1966); Screws v. United States, 325 U.S. 91, 101-106 (1945); United States v. Classic, 313 U.S. 299 (1941). Cf. Monroe v. Pape, 365 U.S. 167, 187 (1961). That section provides:
>
> > "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined . . . or imprisoned . . . ."
>
> Whatever may be the case with respect to civil liability generally, see Pierson v. Ray, 386 U.S. 547 (1967), or civil liability for willful corruption, see Alzua v. Johnson, 231 U.S. 106, 110-111 (1913); Bradley v. Fisher, 13 Wall. 335, 347, 350, 354 (1872), we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. Cf. Ex parte Virginia, 100 U.S. 339 (1880). On the contrary, the judicially fashioned

> doctrine of official immunity does not reach "so far as to immunize criminal conduct proscribed by an Act of Congress. . . ." Gravel v. United States, 408 U.S. 606, 627 (1972).

Id. at 503; see also Imbler v. Pachtman, 424 U.S. 409, 429 (1976) ("This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242, the criminal analog of § 1983.") (footnote omitted); Dennis, 449 U.S. at 31 ("But judicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from § 1983 damages actions, but they are subject to criminal prosecutions as are other citizens.").[5]

---

[5]While the statements in Dennis, Imbler, and O'Shea could be deemed dicta, lower federal courts have broadly denied criminal immunity to judges. See, e.g., United States v. Claiborne, 727 F.2d 842, 845 (9th Cir. 1984) ("[T]he Constitution does not immunize a sitting federal judge from the processes of criminal law."); id. at 847 ("Article III protections, though deserving utmost fidelity, should not be expanded to insulate federal judges from punishment for their criminal wrongdoing."); id. at 848 ("We . . . think it unlikely that judicial independence would be measurably diminished by subjecting judges to the processes of criminal laws."); United States v. Hastings, 681 F.2d 706, 711 (11th Cir. 1982) ("Indeed, the miniscule increment in judicial independence that might be derived from the proposed rule would be outweighed by the tremendous harm that the rule would cause to another treasured value of our constitutional system: no man in this country is so high that he is above the law. . . . A judge no less than any other man is subject to the processes of the criminal law.") (citing Dennis, Imbler, and O'Shea); id. at 711 n.17 ("The rule of absolute immunity from criminal prosecution of active federal judges for acts committed in their official capacities poses too great a threat to the public interest in the rule of law to be adopted by this court."); United States v. Isaacs, 493 F.2d 1124, 1142 (7th Cir. 1974) ("The Constitution does not forbid the trial of a federal judge for criminal offenses committed either before or after the assumption of judicial office"); id. at 1144 ("[W]hatever immunities or privileges the Constitution confers for the purpose of assuring the independence of the co-equal branches of government they do not exempt the member of those branches 'from the operation of the ordinary criminal laws.'"); see also Wallace v. Powell, No. 3:09-cv-286, et seq., 2009 U.S. Dist. LEXIS 109163, at *35 (M.D. Pa. Nov. 20, 2009) ("Judges are also subject to criminal prosecutions. O'Shea v. Littleton, 414 U.S. 488, 503 (1974). Indeed, the judges here have been indicted by a federal grand jury for the conduct for which damages are sought in this case."). Cf. United States v. Gillock, 445 U.S. 360, 373

Thus, while the Court has declined to grant judicial immunity in the context of a criminal civil rights violation,[6] and cited 18 U.S.C. § 242 as an example of a statute that might be used,[7] the Court has never suggested that judges are immune from prosecution for other crimes involving official acts. The Court's discussion in Pulliam further shows that the Court has not accepted a common law immunity rule as broad as defendant suggests.

In Pulliam, the plaintiffs obtained injunctive relief under § 1983, as well as costs and attorney's fees under § 1988, in an action brought against a state judge.[8] 466 U.S. at 524-25. The Court surveyed the common law, drawing a parallel between the use of the prerogative writs of mandamus and prohibition by the King's Bench to control collateral and inferior courts in England, and the ability of federal courts in this country to grant injunctions against state

(1980) (noting a similar rule for state legislators, drawing "the line at civil actions"). While these were bribery and kickback cases, I cannot accept defendant's attempt to distinguish them from her situation, for the reasons set forth below.

[6]Defendant argues that the Court in Ex parte Virginia essentially ducked the immunity issue, holding that the judge's acts were ministerial rather than judicial. (R. 45 at 13.) The Court itself has said the case did more than that. Mireles, 502 U.S. at 10 n.1; see also Pulliam, 466 U.S. at 541 n.21 ("The Court assumed that the judge was performing a ministerial rather than a judicial function. It went on to conclude, however, that even if the judge had been performing a judicial function, he would be liable under the statute. 100 U.S., at 348-349.").

[7]Defendant states that Ex parte Virginia would have been better framed as a recognition of congressional power under the Reconstruction Amendments, an argument in keeping with her contention that prosecutions under 18 U.S.C. § 242 are the exception that proves the rule. (R. 45 at 12-13; R. 47 at 6.) As discussed in the following text, however, the Court has never suggested that judges are immune from charges under other criminal statutes, and lower federal courts have regularly held they are not, as noted above. The Court's citation of 18 U.S.C. § 242, "the criminal analog to § 1983," Imbler, 424 U.S. at 429, in cases like O'Shea is best understood, not as endorsing an exception to immunity, but reassurance that civil rights violations will not necessarily go unpunished if judges are granted immunity from civil damages actions under § 1983.

[8]As noted above, Congress later amended §§ 1983 and 1988 in response.

judges. Id. at 535-36. The Court further concluded that permitting injunctive relief posed no significant threat to judicial independence, stressing the limitations already imposed by the requirements for obtaining equitable relief against any defendant. Id. at 536-37.[9] "Absent some basis for determining that such a result is compelled, either by the principles of judicial immunity, derived from the common law and not explicitly abrogated by Congress, or by Congress' own intent to limit the relief available under § 1983, we are unwilling to impose those limits ourselves on the remedy Congress provided." Id. at 539-40.

The Court acknowledged its previous holding in Pierson, granting immunity from damages actions under § 1983, but in that case the Court "simply declined to impute to Congress the intent to abrogate common-law principles of judicial immunity. Absent the presumption of immunity on which Pierson was based, nothing in the legislative history of § 1983 or in this Court's subsequent interpretations of that statute supports a conclusion that Congress intended to insulate judges from prospective collateral injunctive relief." Id. at 540. Apparently, then, the presumption of immunity the Court acknowledged in Pierson extended no further than civil damages.

Finally, the Court was unmoved by the dissenters' complaint that injunctive relief carried with it the threat of contempt—with the possibility of a fine or even imprisonment—which could deter even the most courageous judge from exercising free and independent judgment. Id. at 555 (Powell, J., dissenting); see id. at 538 n.19 (majority acknowledging that a judge risks

[9]Of course, the requirements for obtaining a criminal conviction are even greater. See Claiborne, 727 F.2d at 848 ("First, aside from Article III safeguards, judges enjoy the same protection as ordinary citizens do from vindictive prosecution. Second, . . . a criminal prosecution encounters several procedural barriers -- such as the indictment, burden of proof, and presumption of innocence.") (internal citations omitted).

contempt for violating a writ of mandamus); see also In Re Kendall, 712 F.3d 814, 822 n.4 (3rd Cir. 2012) (finding judge not entitled to immunity from criminal contempt for judicial acts).

Against this authority, defendant cites two cases for the proposition that there is judicial immunity from criminal prosecution for official acts not involving constitutional rights under the Reconstruction Amendments. (R. 45 at 6.) The first is Commonwealth v. Tartar, 239 S.W.2d 265 (Ky. Ct. App. 1951), where a judge was indicted for "wrongfully and corruptly" certifying a list of grand jurors. While a state statute described the manner in which grand jurors were to be selected, failure to comply was not made a statutory offense. Instead, the prosecutor argued the judge committed the "common law offense of misfeasance in office." Id. at 266. The trial court sustained a demurrer to the indictment, and in a brief opinion the appellate court affirmed. The court of appeals first noted that "judges acting in their official capacities should be protected from harassment by either civil suits or criminal prosecutions." Id. (citing Yates). The court then stated:

> We believe the authorities are generally in agreement that misfeasance of a judicial officer, acting in his official capacity, did not constitute a criminal offense under the common law. The reasons for such rule are sound, since otherwise judges might be unduly burdened defending charges instigated by other governmental officers or aggrieved members of the public.

Id.

It is unclear whether the Tartar court found the judge immune or decided that the indictment failed to charge a common law offense against the judge. As the magistrate judge noted, one commentator, after stating a general rule that "judicial immunity does not exempt judges from criminal liability," in discussing Tartar stated:

> The one area where judges can be said to enjoy immunity from criminal liability is for malfeasance or misfeasance in the performance of judicial tasks undertaken in good faith. In some states malfeasance or misfeasance in office

> is made criminal either by statute or common law rule. However, this criminal liability will be precluded by judicial immunity unless the malfeasance or misfeasance is accompanied by bad faith.

Jeffrey M. Shaman, Judicial Immunity from Civil and Criminal Liability, 27 San Diego L. Rev. 1, 18 (1990) (internal footnotes omitted).[10] If this is indeed the rule, it is inapplicable here, as defendant is not charged under a state statute or common law prohibition on malfeasance or misfeasance in office but rather a federal criminal statute of general applicability. (R. 43 at 17.) At all events, Tartar is a thin reed upon which to rest a claim of criminal judicial immunity, subject to narrow exceptions.

The other case is United States v. Chaplin, 54 F. Supp. 926 (S.D. Cal. 1944), where a judge was indicted for conspiracy to deprive civil rights under a predecessor to 18 U.S.C. § 242. The court, surveying caselaw dating back to England (and distinguishing Ex parte Virginia as a case involving ministerial acts), agreed the judge was immune from prosecution. Id. at 928-33. The cases upon which the court relied generally involved civil immunity. The Chaplin court

[10] In a more recent article, Professor Combs states: "[W]hereas American law provides judges absolute immunity against civil lawsuits, it provides no immunity whatsoever against criminal prosecutions." See Nancy Amoury Combs, Redressing Judicial Misbehavior: An Integrated Approach to Judicial Immunity, 58 U.C. Davis L. Rev. 1165, 1171 (2024); see also id. at 1174 ("[T]he bottom line is that judicial immunity is bipolar. Judges are entirely shielded from civil money damage suits, but they have no shielding whatsoever from criminal prosecutions."); id. at 1183 ("By contrast, judges possess no immunity whatsoever from criminal prosecutions."); id. at 1186 ("[I]t is uncontroverted that the doctrine of judicial immunity does not shield judges from criminal liability for their judicial acts.") (citing Shaman, supra, at 18-20; Samuel P. Stafford, An Overview of Judicial Immunity: Including Legal Representation of Judges, State Ct. J. 1, 4 (1977) ("It is axiomatic that common law judicial immunity has never been extended to shield a judge from criminal liability.")). "That said, somewhat tangentially, some cases have held that the misfeasance of a judge, when acting in his official capacity, does not constitute a criminal offense." Id. at 1186 n.119 (citing Tartar). One federal court has suggested, citing Tartar, that "there may exist a common law immunity from criminal prosecution" for acts done in the judge's official capacity "undertaken in good faith." Hastings, 681 F.2d at 711 n.17. I discuss this further below.

did cite Commonwealth v. Addison, 4 Dall. 225, 1 L. Ed. 810 (Pa. 1801), which involved a criminal accusation against a judge,[11] but the Addison court did not explicitly rely on immunity, stating, in full:

> We are, unanimously, of opinion, that the case does not present to our consideration an indictable offence; and, of course, it is not a case, in which an information ought to be granted. But we are (with the same unanimity) of opinion, that every Judge has a right, and, emphatically, that it is his duty, to deliver his sentiments upon every subject that occurs in Court. We add, so far as the expression of our sense of decorum may have weight, that we think, it would be indecent and improper, in any presiding Judge, to attempt to prevent his associates from the exercise of this right; from the performance of this duty.
>
> Motion refused.

Id.

The Chaplin court did make a strong policy argument that judges should be immune from criminal civil rights prosecutions, just as they are from civil damages actions:

> The immunity which has clothed judges for a century and a half in our country found its genesis in the English common law simultaneously with the independence of the judiciary. The disappointed litigant cannot embarrass the judge in a civil action for damages irrespective of the justice of his decision, nor can a defendant upon whom sentence has been pronounced, recover damages against the judge for the real or supposed wrong. A decision in favor of the Government in the instant criminal actions would place the official action of every justice of the peace, municipal or city court judges, Superior Court Judges, Appellate Court judges and Supreme Court judges in our country at the mercy of a United States Attorney. Every sentence imposed on a defendant would be subject to review by the representative of the Department of Justice, and if, in the judgment of the Attorney General of the United States or the United States Attorney for the District, the decision deprived the defendant of his civil rights, the judge could be indicted, tried, and, if convicted, punished. Every defendant sentenced to the county jail or the penitentiary is deprived of his civil rights, and

---

[11]In Addison, the attorney general made a motion for a rule to show cause why an information should not be granted against the defendant, the President of the Courts of Common Pleas, on the affidavit of J.C. Lucas, an associate Judge of the Court of Common Pleas of Allegheny county, stating that he had been wilfully prevented by Judge Addison from delivering his sentiments to the grand jury. Id.

> in many instances the civil rights are not revived upon release. The same reasoning would apply to our Federal Courts. To sustain the Government's contention would be to destroy the independence of the judiciary and mark the beginning of the end of an independent and fearless judiciary. No doubt unjust decisions have been rendered and individuals have suffered damage, and others have been unjustly imprisoned, while a few innocent men have suffered the death penalty as the result of a jury's verdict. No judicial system yet devised by man is perfect. The rich tradition, the long line of decisions, the confidence of our people in the state and federal judiciary, the experience of over a century and a half expressed in our legal lore, coextensive with our national existence, cannot be ignored in deciding this issue. The house should not be burned to destroy the mouse. To sustain the Government's contention would invite similar actions against grand and petit jurors, prosecuting attorneys and attorneys representing clients before our courts and juries, now immune.

Id. at 933-34.

Significant as those concerns might be, it is hard to square Chaplin with subsequent cases like O'Shea, 414 U.S. at 503 ("Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. § 242."), and Imbler, 424 U.S. at 429 ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242, the criminal analog of § 1983."), as the magistrate judge noted. (R. 43 at 18.) Indeed, even defendant acknowledges that judges are not immune from prosecution for official acts under civil rights laws. In sum, then, Chaplin also provides little support for defendant's contention here.

Finally, defendant appeals to the recent decision in Trump v. United States, 603 U.S. 593 (2024), where the Supreme Court held the President is entitled to absolute immunity from criminal prosecution when exercising his core constitutional powers, and at least presumptive immunity for all his official acts. Defendant contends that the Court relied on judicial immunity cases for official acts, extending to the President what judges had first. (R. 45 at 3.) The Trump

decision relied primarily on the President's "unique position in the constitutional scheme, as the only person who alone composes a branch of government." Id. at 610 (internal citation and quote marks omitted). The Court concluded, based on separation of powers principles, that immunity was required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution. Id. at 614. These same concerns do not arise when one of the nation's many judges is subject to prosecution. Further, while the Court relied on its previous decision in Nixon v. Fitzgerald, 457 U.S. 731 (1982), granting the President immunity from civil damages actions, a decision which in turn cited Pierson v. Ray, the Court said nothing about criminal immunity for judicial acts.

Ultimately, as the Supreme Court has stated, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns v. Reed, 500 U.S. 478, 486 (1991);[12] see also Antoine v. Byers & Anderson, 508 U.S. 429, 432 (1993) ("The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity."). Defendant has not done so here.[13]

---

[12]"We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant." Id. at 487 (internal citation and quote marks omitted).

[13]In her objections reply, defendant argues that, under Pulliam, "the burden is not on [her] to demonstrate that Congress or the United States Supreme Court created judicial immunity in criminal cases. The burden is on the government to show that the original criminal judicial immunity has been abrogated." (R. 47 at 5.) However, this assumes courts in this country have accepted a common law rule of criminal judicial immunity in the first place; as discussed above, they have not. See Combs, supra, at 1174 ("[T]he bottom line is that judicial immunity is bipolar. Judges are entirely shielded from civil money damage suits, but they have no shielding whatsoever from criminal prosecutions."). Defendant argues that the reasons for judicial immunity are stronger in the criminal context. (R. 45 at 8-10; R. 47 at 9.) It is true that the consequences for a judge, if criminally convicted, will likely be greater than if she is found

This is not to gainsay the very real concerns defendant raises. She wonders why, if official acts enjoy no immunity, a judge could not be prosecuted for handling contraband during a trial or scheduling a hearing in a manner that inconveniences federal law enforcement officers.[14] (R. 45 at 2; R. 47 at 10-11.) Saying "that is not the way the criminal justice system operates" (R. 46 at 22), and that as a matter of "common-sense" operatives in the system would not violate the criminal law if they "are in good faith carrying out their required duties" (R. 46 at 23), as the government does, is unsatisfying.

As the Eleventh Circuit noted in permitting the prosecution of a judge for bribery, "this

---

civilly liable. And, while a public employee can be indemnified for a damages judgment, one cannot shift to an insurer the loss of liberty that comes with a criminal conviction. However, as Professor Combs explains, "criminal prosecutions and civil suits differ in key ways," and "these differences go a long way toward justifying the current doctrinal dichotomy." Combs, supra, at 1217. "[C]ivil suits present a greater threat to judges than criminal prosecutions both because judges are far more likely to be the target of a meritless civil suit than a meritless criminal prosecution and because the risk of a judgment against the judge is higher for a civil suit. Thus, because civil suits present a greater threat, immunity from these suits provides greater benefits, including to the value of judicial independence." Id. First, disappointed private litigants are far more likely to bring a civil suit against a judge than a prosecutor is to launch a criminal prosecution. Id. at 1219. Second, a far broader range of harms are compensable as civil wrongs than are punishable as crimes. Id. at 1223. Third, it is easier for a plaintiff to win a civil case than it is for a prosecutor to secure a conviction on the same facts, given the different burden of proof. Id. at 1223-24. Finally, "civil tort suits exist primarily to recompense individual victims who have suffered harm whereas criminal prosecutions not only vindicate the rights of individual victims but also society as a whole. . . . Consequently, immunity from criminal prosecution imposes costs not just on the individual victim of the judge's wrongful act but also on the larger community." Id. at 1225-26. Defendant concedes that the Supreme Court has never had occasion to apply judicial immunity from criminal prosecution for official acts outside the context of civil rights protected by the Reconstruction Amendments. But this is so, she contends, because prosecutions like this one have so rarely been attempted. (R. 45 at 10-11; R. 47 at 8.) The particulars of this case may be unusual; nevertheless, as discussed above and in the magistrate judge's recommendation, there is no firmly established judicial immunity barring criminal prosecution of judges for judicial acts. (R. 43 at 27.)

[14]Or, in a hypothetical closer to the mark, could a state court judge be prosecuted for obstruction if she remands an undocumented person into custody to answer for state charges, thereby thwarting a planned arrest and removal by federal immigration agents?

is not a case in which a judge is prosecuted for acts in his official capacity undertaken in good faith. In such a case, there may exist a common law immunity from criminal prosecution." Hastings, 681 F.2d at 711 n.17 (citing Braatelien v. United States, 147 F.2d 888, 895 (8th Cir. 1945); Commonwealth v. Tartar, 239 S.W.2d 265, 266 (Ky. App.1951)).[15] But this leads to the government's fallback position, that defendant is not being prosecuted for official acts in the ordinary course of her duties. (R. 46 at 15.) Instead, the government contends, the events alleged in the indictment arose from her unilateral, non-judicial, and unofficial actions outside the role of a state court judge. (R. 46 at 16.) While it would be improper to consider facts outside the four corners of the indictment on a motion to dismiss, viewing the facts that are alleged in the light most favorable to the government, as I must at this stage, and accounting for the indictment's allegation that defendant "knowingly concealed" E.F.R. and acted "corruptly," I cannot say as a matter of law that defendant's alleged conduct falls within even this more limited version of immunity. See United States v. Joseph, No. 19-cr-10141, 2020 U.S. Dist. LEXIS 132387, at *8 (D. Mass. July 27, 2020) ("Of course, any such immunity, if it exists, would never shield corruption or bribery. Where the Indictment charges that Joseph acted 'corruptly,' it is not within this Court's province on a motion to dismiss to determine whether judicial immunity, even if its reach encompasses criminal liability, provides a viable shelter for Joseph in the circumstances alleged here.") (internal citations and quote marks omitted).

---

[15]In Braatelien, the court stated "that as a general rule a judge cannot be held criminally liable for erroneous judicial acts [d]one in good faith. 30 Am. Jur., Judges, 52. But he may be held criminally responsible when he acts fraudulently or corruptly. Judicial title does not render its holder immune to crime even when committed behind the shield of judicial office." 147 F.2d at 895. However, the court denied the defendant's immunity claim on factual grounds, stating: "Braatelien was not indicted for an erroneous or wrongful judicial act. . . .The crime charged is distinct from his official acts. It might have been consummated without the performance of a single judicial act on his part." Id.

There is no basis for granting immunity simply because some of the allegations in the indictment describe conduct that could be considered "part of a judge's job." As the magistrate judge noted, the same is true in the bribery prosecutions, concededly valid, where the judges were prosecuted for performing official acts intertwined with bribery. (R. 43 at 29-30.) Defendant argues that the gravamen of the offense in such cases is accepting the bribe (an unofficial act), with the collateral official act done in response presented as an evidentiary detail to complete the story. (R. 45 at 16-20.) The cases do not support this distinction.[16] See Hastings, 681 F.2d at 707 ("In this case we are asked to decide whether an active federal judge can be subject to federal criminal prosecution for acts involving the exercise of his judicial authority."); Wallace, 2009 U.S. Dist. LEXIS 109163, at *35, *40-41 (holding that a judge had civil but not criminal immunity for his "judicial acts" of sentencing juveniles to detention).[17] Or as the government puts it, a judge may use judicial acts or tools as the means to accomplish an unlawful end.[18] (R. 46 at 21.) Finally, to the extent defendant argues this category of cases

[16]As defendant notes, Justice Barrett discussed this issue in her partial concurrence in Trump. (R. 45 at 18; R. 47 at 9.) However, her views did not carry the day. In any event, for the reasons stated above, Trump is inapposite.

[17]Professor Combs notes that a few cases suggest criminal acts somehow cease to be judicial acts. However, the earliest example, Braatelien, discussed in note 15 above, involved a situation where the defendant's criminal acts were "distinct from his judicial acts." Combs, supra, at 1195-96. "Fortunately, only a few courts implied that criminal judicial acts somehow ceased to be judicial acts. Moreover, even when that rationale has appeared, it has typically been paired with the primary rationale that courts invoke when rejecting immunity for judicial crimes: namely, a summary cost-benefit analysis that is deemed to weigh against immunity for crimes." Id. at 1196.

[18]It is also worth noting that the question is not whether the charged acts are "part of a judge's job." As the Supreme Court has made clear, judges enjoy immunity from civil damages actions for their "judicial acts," but not for "the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." Forrester, 484 U.S. at 27.

requires the judge act for the purpose of self-enrichment or gratification, she provides no authority for the proposition that the motive must be financial to be "corrupt." And to the extent defendant contends a court cannot inquire into the judge's motive for judicial acts, the same could be said in the bribery cases. Accordingly, even if a more limited version of judicial immunity exists, it does not support dismissal of the instant indictment.

**B. Tenth Amendment**

In the objections, defendant contends that the magistrate judge missed the importance of the Tenth Amendment here; she argues that, outside the context of the Reconstruction Amendment enforcement clauses, Congress lacks authority to punish criminally the official acts of state judges. (R. 45 at 22; R. 47 at 13.) However, defendant cites no authority for the proposition that federal criminal statutes of general applicability may not be applied to state court judges, as alleged in the instant indictment.

It is true that the Constitution establishes a system of "dual sovereignty." Printz v. United States, 521 U.S. 898, 918 (1997). Although the states surrendered many of their powers to the new federal government, they retained a residual and inviolable sovereignty, which is reflected in various provisions of the Constitution, including the Tenth Amendment. Id. at 918-19. And the Supreme Court has enforced limitations on the federal government's ability to intervene in state affairs. But none are plainly applicable here.[19] For instance, the indictment in no way

---

[19]Defendant cites Page Co. v. MacDonald, 261 U.S. 446, 447-48 (1923), where the Court held that a party was exempt from service of process initiating a federal action while attending a state court hearing. (R. 45 at 25.) While the Court noted "the necessities of the judicial administration," in which federal and state courts have "equal interest," id. at 448, I see nothing in the decision imposing a Tenth Amendment barrier to the instant prosecution. In a case closer to the mark, the Supreme Court declined to recognize an evidentiary privilege barring the introduction of evidence of the legislative acts undertaken by a state senator in exchange for bribes. Gillock, 445 U.S. at 361-62. The Court first concluded that the separation

suggests that the federal government may commandeer state judges into assisting in the enforcement of federal immigration law. Cf. Printz, 521 U.S. at 935. Nor does the indictment assert federal power to superintend the daily functioning of state courts. (R. 45 at 24-25; R. 47 at 12.) Whether this case involves the routine work of a state court and judge, as defendant contends (R. 45 at 26), or whether defendant added extraneous activities to her usual duties in order to defeat enforcement of federal immigration law, as the government alleges (R. 46 at 19, 25), is not something that can be decided on a motion to dismiss. See Joseph, 2020 U.S. Dist. LEXIS 132387, at *10 ("At bottom, the defendants' constitutional arguments require the assessment of disputed facts, characterizations of the events underlying the Indictment, or other evidentiary analysis.").

That state law permits discipline of judges for ethical violations, as defendant notes (R. 45 at 26), does not preclude the bringing of federal criminal charges. Cf. Hastings, 681 F.2d at 709 (rejecting the argument "that Congress has the exclusive primary jurisdiction to try and punish a federal judge for high crimes and misdemeanors through the impeachment process");

---

of powers doctrine gave no support to the grant of a privilege to state legislators in federal criminal prosecutions. While the federal government has limited powers with respect to the states, "in those areas where the Constitution grants . . . the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power." Id. at 370; see also United States v. Schock, 891 F.3d 334, 337 (7th Cir. 2018) ("Neither the separation of powers generally, nor the Rulemaking Clause in particular, establishes a personal immunity from prosecution or trial. The separation of powers is about the allocation of authority among the branches of the federal government. It is an institutional doctrine rather than a personal one."). The Court further concluded that "Gillock's argument, resting on the Tenth Amendment, has no special force with regard to state legislators; on the rationale advanced, state executive officers and members of the state judiciary would have equally plausible claims that the denial of an evidentiary privilege to them resulted in a direct federal impact on traditional state governmental functions." Gillock, 445 U.S. at 371; see also id. at 373 ("We conclude, therefore, that although principles of comity command careful consideration, our cases disclose that where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields.").

Isaacs, 493 F.2d at 1140-41 (rejecting the argument that impeachment, rather than criminal conviction, is the only means of removing a judge from office). Nor does one indictment against one judge result in the usurpation of Wisconsin's power to select, discipline, and remove its own judges. (R. 45 at 27.) Defendant cites Gregory v. Ashcroft, 501 U.S. 452 (1991), where the Court declined to apply the Age Discrimination in Employment Act to Missouri state court judges absent a clear statement that Congress intended to interfere with the state's power to define the qualifications of its own officials. (R. 45 at 27; R. 47 at 13.) Again, permitting this prosecution to proceed poses no similar threat to Wisconsin's sovereignty. Cf. Gillock, 445 U.S. at 371 (holding that denial of an evidentiary privilege to a state legislator prosecuted for federal crimes was not analogous to a direct regulation of state employee wages). Nor does defendant cite any authority for the proposition that a clear statement from Congress is needed before a criminal statute of general applicability may be applied to a state official. (R. 47 at 13.)

In reply, defendant cites the recent decision in United States v. Illinois, No. 25 CV 1285, 2025 U.S. Dist. LEXIS 142735 (N.D. Ill. July 25, 2025), where the court dismissed the government's complaint against the state of Illinois and various local entities and officials challenging so-called "sanctuary policies." (R. 47 at 13-14.) The court noted that the term "sanctuary policies" is a misnomer, as none of them immunized anyone to the reach of the federal government. Instead, they generally prohibited state and local government support of civil immigration activities, e.g., complying with detainers, giving immigration agents information about non-citizens. Id. at *5-6. The government claimed that these policies were designed to and in fact interfered with the government's enforcement of federal immigration law. Id. at *7. The court engaged in a wide-ranging discussion of preemption and inter-governmental immunity, ultimately concluding that the sanctuary policies reflected the defendants' decision

not to participate in enforcing civil immigration law, a decision protected by the Tenth Amendment and the anti-commandeering doctrine. Id. at *76. As indicated above, the instant indictment commands no one to participate in federal immigration enforcement; rather, it charges obstruction with those efforts pursuant to a statute of general applicability (not one regulating states and their political subdivisions, as in the cited case, see id. at *43).

**C. Avoidance**

Finally, in the objections defendant alleges ambiguity in the terms “corruptly” and “proceeding” used in count two. (R. 45 at 27.) Presumably, the court would construe these terms such that § 1505 does not apply to the conduct alleged, avoiding the need to determine whether the federal government could, consistent with the Tenth Amendment, use ordinary criminal statutes to target state judicial acts. (See R. 47 at 14-15.)

The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, a statute is found to be susceptible of more than one construction; the canon functions as a means of choosing between them so as to avoid constitutional concerns. Clark v. Suarez Martinez, 543 U.S. 371, 385 (2005). In other words, the canon is a tool for choosing between competing plausible interpretations of a provision; it has no application in the absence of ambiguity. Warger v. Shauers, 574 U.S. 40, 50 (2014).

Defendant cites no case finding these terms, as used in 18 U.S.C. § 1505 and further defined in 18 U.S.C. § 1515(b), ambiguous. Instead, she relies on Snyder v. United States, 603 U.S. 1, 5 (2024), where the Court held that 18 U.S.C. § 666—which makes it a crime for state and local officials to “corruptly” solicit, accept, or agree to accept “anything of value from any person, intending to be influenced or rewarded” for an official act—covered bribes but not gratuities. As part of its analysis, the Court did note federalism concerns with a more expansive

construction of the statute, as state and local governments had adopted a variety of approaches to regulating their officials' acceptance of gratuities. Id. at 14-15. The Court also had fair notice concerns, as the government did not "identify any remotely clear lines separating an innocuous or obviously benign gratuity from a criminal gratuity." Id. at 16. The Court declined to rely on the government's promise that federal prosecutors could be trusted not to enforce the statute against small-time violators. Id. at 17.

As noted, however, the issue in Snyder was whether § 666 covered gratuities as well as bribes. The Court did not find the term "corruptly" to be ambiguous.[20] Nor did the Court address the canon of constitutional avoidance. Moreover, as the government notes, defendant cites no authority for this court to decide non-constitutional statutory interpretation questions on a motion to dismiss. (R. 46 at 28.) Finally, even if it would be appropriate to address the issue now, defendant posits no competing, plausible construction of the statutory terms. (R. 46 at 28.) Rather, the issues she raises regarding whether the conduct alleged is covered by the statutes are properly addressed at trial.[21]

---

[20]To the extent the Court considered the term, it did so in concluding that § 666 is a bribery statute. Id. at 11-12 ("Therefore, the dividing line between §201(b)'s bribery provision and §201(c)'s gratuities provision is that bribery requires that the official have a corrupt state of mind . . . Section 666 shares the defining characteristics of §201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the official act. The statutory text therefore strongly suggests that §666—like §201(b)—is a bribery statute, not a gratuities statute."); id. at 18 ("The bribery statute for federal officials, §201(b), uses the term 'corruptly.' But the gratuities statute for federal officials, §201(c), does not. The term 'corruptly' therefore signals that §666 is a bribery statute.").

[21]To the extent defendant raised additional issues in making her avoidance argument before the magistrate judge, I agree with the magistrate judge's analysis. (R. 43 at 32-34.)

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 43) is adopted, and defendant's motion to dismiss (R. 15) is denied.

**IT IS FURTHER ORDERED** that this matter is scheduled for in-court hearing on **Wednesday, September 3, 2025, at 11:00 a.m.** to address further scheduling.

Dated at Milwaukee, Wisconsin, this 26th day of August, 2025.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.** **Case No. 25-CR-89**

**HANNAH C. DUGAN**
**Defendant.**

## DECISION AND ORDER

This decision explains the court's resolution of the parties' written jury instruction arguments. I gave the following Seventh Circuit pattern instructions requested by the government and unopposed by the defense: 1.01, 1.02, 1.03, 2.01, 2.02, 2.03, 2.04, 2.05, 3.01, 3.02, 3.16, 3.17, 4.06, 4.08, 4.10, 7.01, 7.02, and 7.03. I also g ave pattern 3.08.

I declined to give 5.05 (joint venture) and 5.06 (aiding and abetting), proposed by the government, as there was no indication others were involved in the alleged conduct. Such instructions did not appear to be supported by the evidence and could confuse the jury. See United States v. Dinkins, 230 Fed. Appx. 601, 603 (7th Cir. 2007).

I also declined to give 4.05 (date of crime charged). While the indictment does say "on or about April 18, 2025," there appeared to be no evidence of relevant conduct on another date, so this could confuse the jury as well.

On count one, I instructed using the following elements: (1) a federal warrant or process had been issued for the arrest of an individual; (2) the defendant knew that the federal warrant or process had been issued for the individual's arrest; (3) the defendant actually harbored or concealed the individual; and (4) the defendant intended to prevent the individual's discovery

or arrest.[1] As the parties noted, there is no Seventh Circuit pattern instruction for § 1071 offenses, but the cases from other circuits adopt the foregoing elements.

The government argued against use of the word "actually" in the third element, but the cases generally include the term. The government contended the word suggests the defendant must have actually succeeded in concealing the individual, especially when coupled with the defense's proposed definition of "concealed." I address the meaning of that term below. The cases include the word "actually" not to require success but to make clear "that 'section 1071 does not proscribe all forms of aid to a fugitive' and that the 'actual harboring or concealment element requires some affirmative, physical action by the defendant.'" Zabriskie, 415 F.3d at 1145 (quoting United States v. Mitchell, 177 F.3d 236, 239 (4th Cir. 1999)).

I gave an instruction on the definitions in count one as follows:

> A "federal warrant" includes federal administrative arrest warrants, such as Department of Homeland Security Form I-200 ("Warrant for Arrest of Alien") signed by an Authorized Immigration Officer.
>
> The actual harboring or concealing element requires some affirmative, physical action by the defendant to hide, secrete, or keep out of sight.[2]
>
> Mere failure to disclose the location of a fugitive is not concealing.[3]

These definitions are supported by the case law in § 1071 prosecutions and accurately

---

[1]United States v. Zabriskie, 415 F.3d 1139, 1145 (10th Cir. 2005) (citing United States v. Mitchell, 177 F.3d 236, 238 (4th Cir. 1999); United States v. Zerba, 21 F.3d 250, 252 (8th Cir. 1994); United States v. Yarbrough, 852 F.2d 1522, 1543 (9th Cir. 1988); United States v. Lockhart, 956 F.2d 1418, 1423 (7th Cir. 1992)); see also United States v. Waloke, 923 F.3d 1151, 1155 (8th Cir. 2019); United States v. Silva, 745 F.2d 840, 848 (4th Cir. 1984).

[2]United States v. Foy, 416 F.2d 940, 941 (7th Cir.1969).

[3]Foy, 416 F.2d at 941. The parties agreed, on review of the court's draft instructions, to excise the sentence: "Making a false statement, without more, is not concealing." See United States v. Lockhart, 956 F.2d 1418, 1423 (7th Cir.1992); Foy, 416 F.2d at 941.

apprise the jury of what it needs to find. Defendant's proposed # 2, which included language about "protecting a person from some external menace" (R. 57 at 5) appeared to rely on case law construing different statutes. As the government conceded, making a false statement, without more is not concealing. (R. 68 at 4-5.) As noted, however, on review of the court's draft instructions, the partes agreed to excise this language. I agreed with the government that the case law does not support instructing the jury that "sheltering a person . . . is not concealing." (R. 57 at 5.) See Annamalai, 939 F.3d at 1233-34 (collecting cases).

I declined to include the following language sought by the government: "This is so regardless of whether the action was successful in actually delaying the individual's observation, discovery, or arrest." (R. 55 at 22.) While the facts of the cases cited by the government may give that implication (R. 68 at 5), they did not directly support an instruction using these terms.

I also declined to include a materiality instruction, as sought by the defense. Section 1071 does not include the term, and defendant cited no case imposing a materiality requirement in § 1071 prosecutions. Cf. United States v. Burge, 711 F.3d 803, 812 n.4 (7th Cir. 2013) (rejecting a materiality requirement under 18 U.S.C. § 1512(c)). It was also unnecessary to give such an instruction when the third element included the word "actually," which requires some affirmative, physical action by the defendant and addressed the defense concern about mere trifles.

The government opposed including an instruction that mere failure to disclose the location of a fugitive is not concealing, arguing such an instruction would not be supported by the anticipated evidence at trial. (R. 68 at 6.) This is a correct statement of law. Foy, 416 F.2d at 941. On consideration of the evidence, I included it.

Defendant's proposed instructions # 4 and # 5 regarding a "legal right" and an "official act" amounted to a rehash of her immunity argument, which I rejected. The cases she cited, e.g., United States v. Edwards, 869 F.3d 490 (7th Cir. 2017), and United States v. Matthews, 505 F.3d 698 (7th Cir. 2007), pertained to acts like taking the Fifth or asserting a valid privilege, not the conduct alleged here.

On count two, I instructed using the following elements: (1) there was a proceeding pending before a department or agency of the United States; (2) the defendant knew of the pending proceeding; (3) the defendant endeavored to influence, obstruct, or impede the pending proceeding; and (4) the defendant did so corruptly, that is, with the purpose of wrongfully impeding the proceeding.[4] Again, there is no Seventh Circuit pattern instruction for § 1505 offenses, but most circuits use the foregoing elements. I broke out the fourth element, as both parties requested.

I used the following definitions for count two:

> The Department of Homeland Security (DHS) is a department of the United States and Immigration and Customs Enforcement (ICE) is an agency within DHS. In addition, "pending proceeding" simply means any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its inception to its conclusion.[5]
>
> "Endeavored" means having acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the

---

[4]See United States v. Price, 951 F.2d 1028, 1031 (9th Cir. 1991); see also United States v. Edwards, 869 F.3d 490, 498 (7th Cir. 2017).

[5]United States v. Hernandez, No. 3:23cr122 (RCY), 2024 U.S. Dist. LEXIS 649, at *7 *E,D. Va. Jan. 2, 2024) (citing Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966)); see also United States v. Senffner, 280 F.3d 755, 761 (7th Cir. 2002).

proceeding.[6] An "endeavor" need not be successful.[7]

"Corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement.[8]

Defendant's proposed instruction # 8 defined "proceeding" too narrowly under § 1505. I found Hernandez and the cases it cites persuasive on this point. Defendant relied on United States v. McHugh, 583 F. Supp. 1 (D.D.C. 2022), but that case concerned a different statute, § 1512, which refers to an "official proceeding."[9] The first sentence of the defense proposal did not appear to be supported by the authority cited. The language about a "second, outside party" is not required by § 1505. In any event, the proceeding here appeared to involve a second party, i.e., E.F.R. It was not clear why that needed to be defined in the jury instructions. It was also unclear why a unanimity instruction would be needed; as far as I could tell, the government did not seek to prove up more than one "proceeding."

I also declined to add a "materiality" requirement on this count, sought in defendant's proposed # 10, as defendant provided no support for its inclusion, and the Seventh Circuit

---

[6]The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit, at 702 (2023 ed.) (18 U.S.C. § 1503 Definition of "Endeavor").

[7]Price, 951 F.2d at 1031; see also United States v. Bhagat, 436 F.3d 1140, 1148 (9th Cir. 2006).

[8]18 U.S.C. § 1515(b). On review of the court's draft instructions, the defense proposed omitting a separate definition of corruptly, while the government sought the language set forth above. Both sides agreed that, if the court gave the instruction, the court should omit the language about destroying a document, as it did not fit the facts of the case.

[9]The McHugh court held that the term "proceeding" as it appears in § 1515(a)(1) should be defined narrowly. 583 F. Supp. 3d at 12. The Seventh Circuit has held that the term "proceeding" "is defined rather broadly--for the purpose of section 1505." Senffner, 280 F.3d at 761. This is consistent with the Hernandez court's distinction between § 1505 and § 1512. 2024 U.S. Dist. LEXIS 649, at *13-15.

declined to include such a requirement under § 1512(c), another obstruction statute. See United States v. McKibbins, 656 F.3d 707, 712 (7th Cir. 2011). Defendant cited United States v. Kirst, 54 F.4th 610, 623-24 (9th Cir. 2022), where the court upheld the district judge's instruction that "[a]n act is 'material' if it has a natural tendency to influence, or is capable of influencing, the agency's decisions or activities." The definition of "endeavored" used in these instructions got at that same concept.

Defendant's proposed # 9 included "substantial step" language that did not appear to be supported by the case law. I used language drawn from the Seventh Circuit pattern instruction for the term "endeavor" in § 1503. The additional language in the last sentence of proposed # 9 was unnecessary. See United States v. Sullivan, 131 F.4th 776, 782-83 (9th Cir. 2025) (declining to require an additional "nexus" instruction).

Defendant's proposed # 11 demanded more than § 1505 or Matthews/Edwards require. Nothing in the statutory text of § 1505 or the case law requires the defendant act for personal/unlawful gain or benefit. The concurring opinion defendant cited, United States v. Fischer, 64 F.4th 329, 361-62 (D.C. Cir. 2023) (Walker, J., concurring), was in a § 1512 case. As the government noted, that statute uses different operative language. (R. 68 at 9.) Defendant also overlooked the statutory definition of the term corruptly in 18 U.S.C. § 1515(b). The "legal right" requirement is again a rehash of defendant's immunity argument. The cases she cited, e.g., Edwards and Matthews, pertain to legal rights like taking the Fifth or asserting a valid privilege, not the conduct alleged here. The same was true of proposed defense instructions # 12, 13, 14, 15, 16, 17, 18, 19, and 20.

Defendant's proposed # 21 sought a unanimity instruction on count two. Matthews stated in dicta that such an instruction would have avoided the issue on appeal, but Matthews was a

conspiracy case involving an overt act; the court did not hold such an instruction was necessary in a § 1505 case. The other case defendant cited, United States v. Fawley, 137 F.3d 458 (7th Cir. 1998), was a perjury prosecution, where the jury must agree on the specific false statement.

The acts alleged in count two constituted means of commission, which need not be treated as elements. See United States v. Griggs, 569 F.3d 341, 343 (7th Cir. 2009) ("The law distinguishes between the elements of a crime, as to which the jury must be unanimous, and the means by which the crime is committed."). Unlike the perjury statute, which criminalizes the making of a particular false statement, § 1505 criminalizes a corrupt "endeavor" to obstruct. The jury need not unanimously agree on the acts committed to execute the "endeavor." United States v. Jindal, 621 F. Supp. 3d 727, 738 (E.D. Tex. 2022) ("Accordingly, the most natural reading of the statute and case law make clear that a specific act taken by a defendant in his or her 'corrupt' 'endeavor' to obstruct a pending proceeding is not a required element under § 1505. Rather, the specific acts taken by a defendant are merely examples of the means a defendant uses to commit an element of the crime."); see also United States v. Daniel, 749 F.3d 608, 614 (7th Cir. 2014) (holding that the particular fraudulent representations made to execute a scheme to defraud were underlying brute facts, and that an additional specific unanimity instruction was not required).

Dated at Milwaukee, Wisconsin, this 18th day of December, 2025.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.** **Case No. 25-CR-89**

**HANNAH C. DUGAN**
**Defendant.**

---

**DECISION AND ORDER**

A jury convicted defendant Hannah Dugan, a state court judge, of obstructing a proceeding before the Department of Homeland Security (DHS), contrary to 18 U.S.C. § 1505. Defendant moves for judgment of acquittal, Fed. R. Crim. P. 29, and/or for a new trial, Fed. R. Crim. P. 33. For the reasons that follow, her motions will be denied.

## I. FACTS AND BACKGROUND

### A. The Indictment

The government obtained a two-count indictment charging defendant as follows:

> **COUNT ONE**
>
> **THE GRAND JURY CHARGES THAT**:
>
> On or about April 18, 2025, in the State and Eastern District of Wisconsin,
>
> **HANNAH C. DUGAN**
>
> knowingly concealed E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R.
>
> In violation of Title 18, United States Code, Section 1071.

**COUNT TWO**

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

a) confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b) upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c) addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d) directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e) advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of Title 18, United States Code, Section 1505.

(R. 6.)

## B. Pre-Trial Motions

Defendant filed a pre-trial motion to dismiss, arguing that: (1) she enjoyed absolute judicial immunity for the official acts alleged in the indictment; (2) the prosecution violated the Tenth Amendment and the Constitution's vertical separation of powers by intruding on the

authority of state judges to manage their own courtrooms and proceedings; and (3) §§ 1071 and 1505 should be construed so as to avoid the constitutional issues she raised. (R. 21 at 2.) The magistrate judge handling pre-trial proceedings in this case recommended that the motion be denied, and after receiving briefing I adopted the recommendation and declined to dismiss the indictment. (R. 48 at 27.) After surveying the caselaw, I concluded that there is no general rule of criminal immunity for judges, nor was there a basis for granting immunity simply because some of the allegations in the indictment described conduct that could be considered "part of a judge's job." (R. 48 at 21.)

Prior to trial, the parties filed motions in limine. As is pertinent here, defendant requested an order that the government could not rely on her lawful official acts to sustain the charges. She cited cases holding that an act one has a legal right to undertake does not obstruct or hinder. (R. 58 at 3, citing United States v. Edwards, 869 F.3d 490, 492-99 (7th Cir. 2017); United States v. Matthews, 505 F.3d 698, 705-06 (7th Cir. 2007); see also Arthur Andersen LLP v. United States, 544 U.S. 696, 705-06 (2005).) In these cases, the courts recognized that corrupt interference with an investigation would not exist where, e.g., a mother suggests her son invoke his right against compelled self-incrimination, a wife persuades her spouse not to disclose marital confidences, or a lawyer counsels a client not to turn over documents pursuant to a valid claim of privilege. Edwards, 869 F.3d at 498 (citing Arthur Andersen, 544 U.S. at 704); Matthews, 505 F.3d at 705. Rather, the term "corruptly" requires the person act with consciousness of wrongdoing. Edwards, 869 F.3d at 498 (citing Arthur Andersen, 544 U.S. at 706). In Matthews, the court stated:

> As explained in Arthur Andersen, under limited circumstances, a defendant is privileged to obstruct the prosecution of a crime. That privilege flows from the defendant's enjoyment of a legal right--such as the right to avoid

> self-incrimination. By including the word "wrongfully" in the definition of "corruptly" and criminalizing only the act of "wrongfully impeding the due administration of justice," the instructions directed the jury to convict only those who have no legal right to impede justice.

505 F.3d at 706. Defendant argued that, because she had a legal right to do each of the five acts alleged in the indictment—all within the scope of her authority as a Wisconsin state judge—there necessarily was no consciousness of wrongdoing. (R. 58 at 4.) She accordingly moved to exclude all government evidence that she impeded or in any way hindered, within the scope of counts one and two, the efforts of federal agents to arrest E.F.R. in a state courthouse's public hallway by engaging in the five lawful acts that the indictment listed. (R. 58 at 5-7.)

The government responded that defendant's motion in limine would in effect confer partial judicial immunity and put much of the government's proof off limits. I agreed that the correct approach was to permit the jury to consider all of defendant's conduct on April 18, 2025, in deciding whether she concealed an alien under § 1071 or corruptly endeavored to obstruct a proceeding under § 1505. (R. 72 at 13.)

I further explained that the cases upon which defendant relied did not suggest a different result. Edwards and Matthews were jury instruction cases, construing the term "corruptly" to require wrongful conduct, not immunity cases placing official judicial acts outside the scope of the statutes. As I had noted in denying defendant's motion to dismiss, there was no basis for granting immunity simply because some of the allegations in the indictment describe conduct that could be considered part of a judge's job. (R. 72 at 13.) And as the Seventh Circuit had explained in rejecting a similar argument made by a lawyer:

> [I]t is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the

> action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.

United States v. Cueto, 151 F.3d 620, 631 (7th Cir. 1998); see also United States v. Cintolo, 818 F.2d 980, 992 (1st Cir. 1987) (holding that means, though lawful in themselves, can cross the line of illegality if employed with a corrupt motive).

I declined to reconsider my previous ruling on the immunity motion or to adopt an evidentiary standard based on an official/unofficial distinction inconsistent with that ruling. I noted that defendant would be free to present evidence and argument that the events of April 18, 2025, involved the routine work of a state court and judge, and the government would be allowed to contend that defendant added extraneous activities to her usual duties in order to defeat enforcement of federal immigration law. With that understanding, I denied this defense motion in limine. (R. 72 at 13-14.)

**C. The Trial**

The case proceeded to trial on December 15, 2025. (R. 92.) In its case-in-chief, the government presented evidence that the state of Wisconsin charged Eduardo Flores-Ruiz (referred to as E.F.R. in the indictment) with three counts of domestic violence battery, and his case was scheduled for a hearing in defendant's courtroom on the sixth floor of the Milwaukee County Courthouse on April 18, 2025, at 8:30 a.m. (Trial Tr. at 50-51, 52.) Following his arrest on those charges, Immigration and Customs Enforcement (ICE) learned that Flores-Ruiz was present in the United States without legal status, with a previous order of removal, and issued an administrative warrant for his arrest. (Tr. at 51, 54-55, 192, 215, 388-89; Ex. 1A.) Members of an ICE task force planned to arrest Flores-Ruiz at the courthouse on April 18, 2025. (Tr. at 53, 394.) Six federal agents—ICE/ERO Officer Joseph Vasconcellos, CBP Officer Joseph

Zuraw, FBI Agent Phillip Jackling, FBI Agent Jeffrey Baker, DEA Special Agent Bryan Ayers, and DEA Special Agent Janene Spitaletto—arrived to make the arrest,[1] identifying themselves at courthouse security checkpoints.[2] (Tr. at 54, 245, 247-48, 315, 355, 398, 533.) Agents Baker and Jackling also checked in with defendant's courtroom bailiff, advising that they planned to arrest Flores-Ruiz after his hearing. (Tr. at 248, 250-51, 317, 400.) The agents then sat in the public hallway to wait. (Tr. at 76, 79, 249, 356-57.) Zuraw and Ayers observed Flores-Ruiz arrive and walk towards the courtroom. (Tr. at 360-61, 536.)

On learning of the agents' presence in the hall from her clerk, defendant left the bench, went to a neighboring courtroom, and gestured for Judge Kristela Cervera to come off her bench. (Tr. at 450-51, 634, 662-63, 758; Ex. 42.) On entering chambers, Judge Cervera began to take her judicial robe off, but defendant told her to leave her robe on. (Tr. at 452.) Defendant said, "ICE is here. We need to check a warrant." (Tr. at 452:9.) Defendant then proceeded to walk down a restricted hallway, with Judge Cervera following. Defendant was speaking as they were walking, and Judge Cervera testified that she "heard the name something about Flores." (Tr. at 452:14.) She asked, "Is that someone on my docket?" (Tr. at 453:6.) Defendant did not

---

[1]Vasconcellos, the team leader, testified that they chose to make the arrest at the courthouse because all persons entering must go through security and be screened for weapons. (Tr. at 396.) Vasconcellos explained that he had, during the course of his duties, been shot at and stabbed, ruptured his Achilles fighting with a suspect, and been in multiple high-speed pursuits leading to injury and accident. (Tr. at 395.)

[2]When Zuraw and Vasconcellos arrived, personnel at the security checkpoint made a phone call to a supervisor to determine whether they needed an escort. (Tr. at 355, 398.) Vasconcellos spoke to Milwaukee County Sheriff's Department Sgt. David DeSmet, who indicated they did not need an escort but asked they wait until after Flores-Ruiz's hearing to make the arrest. (Tr. at 399, 492, 493.) Vasconcellos agreed and further assured Sgt. DeSmet the arrest would not occur in the courtroom. (Tr. at 399.) Chief Deputy Brian Barkow also called Chief Judge Carl Ashley to advise that ICE was going to detain someone at the courthouse. (Tr. at 607.)

answer. Judge Cervera followed defendant down the restricted hallway out into the public hallway. (Tr. at 453-54.) Judge Cervera hesitated at the doorway because she did not want to enter the public hallway with her robe on. (Tr. at 454.)

Once in the public hallway, defendant confronted two of the agents (Vasconcellos and Jackling), who were seated on a bench, asking why they were there. (Tr. at 99, 102, 363, 403, 430, 456.) Vasconcellos indicated they were there to make an arrest of a person unlawfully present in the United States, and defendant asked if they had a judicial warrant. (Tr. at 456.) Vasconcellos responded they had an administrative warrant, and defendant replied that it had to be a judicial warrant. (Tr. at 457.) Defendant then directed them to go to the chief judge's office. (Tr. at 319-20, 364, 403, 430, 458.) Because Vasconcellos did not know where the chief judge's office was, Judge Cervera offered to walk him there. (Tr. at 104, 321, 404-05, 431, 458-59.) Defendant approached the other federal agents she identified in the hallway, directing them to the chief judge's office as well.[3] (Tr. at 105, 259, 322, 365, 368.) Defendant failed to identify Agent Spitaletto, who remained in the public hallway.[4] (Tr. at 292, 311, 323, 370, 539.)

After the agents had been cleared from the hallway, defendant returned to her courtroom and asked: "Which client is it?" (Tr. at 117:5; Ex. 42.) She also said: "We'll call it right away." (Tr. at 117:10; Ex. 42.) She told the attorney seated at counsel table, Walter Piel, who expected his case to be called first, to step back. (Tr. at 117, 736-37; Ex. 42.) She then turned to Flores-Ruiz's case, first telling Flores-Ruiz's lawyer, Mercedes de la Rosa, to take her client out and

---

[3]Zuraw testified defendant initially told him to "get out." (Tr. at 366:14-15.) She then said, "Get down to the chief judge's office." (Tr. at 366:24-25.) Ayers testified that he walked to the chief judge's area because he saw the other agents headed that day. (Tr. at 551.)

[4]Per the courtroom recording, the clerk told defendant there were "five ICE guys in the hall." (Ex. 42.)

come back and get a date. (Tr. at 117, 668, 760; Ex. 42.) She then instructed the clerk to just give her a new date. (Ex. 42.) A courtroom recording device captured whispered conversation between defendant and her court reporter, Joan Butz, in which they discussed de la Rosa and Flores-Ruiz leaving through the jury door, with defendant stating "down the stairs." (Tr. at 672:2, 761; Ex. 42.) The jury door opened into a restricted hallway leading to two doors, one opening to a set of stairs down to the fifth floor, the other back out into the public hallway. (Tr. at 71, 73, 761.) The restricted hallway is generally limited to court staff and jurors; criminal defendants are not ordinarily allowed to exit through this hallway. (Tr. at 71-72, 444-45.) Butz asked if she should show them, because de la Rosa might go out the "wrong door," i.e., the door back out to the public hallway where ICE was rather than the door leading downstairs. (Tr. at 118, 762-67; Ex. 42.) Defendant replied: "I'll do it. I'll get the heat." (Tr. at 119:4-5, 673:1-2, 765; Ex. 42.) She also indicated Flores-Ruiz could appear by Zoom for his next hearing. (Tr. at 725; Ex. 42.) Defendant then escorted de la Rosa and Flores-Ruiz through the jury door and directed them down the restricted hallway. (Tr. at 636, 674, 718-22, 741, 767-68.) De la Rosa and Flores-Ruiz took the door back out into the public hallway.[5] (Tr. at 123, 725.)

Neither the assistant district attorney nor the alleged victims in Flores-Ruiz's case, who were present for the hearing, were involved in this exchange. (Tr. at 136, 562, 638-39.) Unaware the case had been handled in this fashion, the alleged victims left after waiting for about an hour. (Tr. at 139, 568, 705.) Defendant's handling of Flores-Ruiz's matter differed from how she usually handled cases with victims, including one addressed off-the-record on April 18, 2025, with defendant typically ensuring compliance with victim notification

[5]De la Rosa testified she did not know there was an entrance to the stairs from that restricted hallway. (Tr. at 725.)

requirements and that the prosecutor was aware of the new date in the event the victims wanted to be there. (Tr. at 138, 678-79; Ex. 43.)

On her return to the bench, defendant's clerk, Alan Freed, asked if they should call the other interpreter cases first. Defendant responded by asking if there is "anybody else that looks . . ." (Tr. at 135:21; Ex. 42.) Freed replied: "I'm not sure." (Tr. at 135: 24; Ex. 42A.) Defendant then called Attorney Piel's case on the record. (Tr. at 136, 677; Ex. 43.)

Meanwhile, Vasconcellos had gone into the chief's judge's area with Judge Cervera, proceeding behind glass doors into the office, while the other four members of the team remained in the vestibule. (Tr. at 323, 368, 583.) Vasconcellos showed Judge Cervera the administrative warrant.[6] (Tr. at 405-06, 461, 586.) He also spoke with Chief Judge Ashley by phone. (Tr. at 406, 463, 584.) Vasconcellos later motioned for Zuraw to come behind the glass door, while he spoke to Chief Judge Ashley. (Tr. at 371-72, 406.)

A member of the sheriff's office entered the vestibule area, and Ayers heard him say something to the effect of "she's trying to speed him through." (Tr. at 540:8-9.) Ayers exited the vestibule, saw Flores-Ruiz and his attorney enter the public hallway, and followed them down in the elevator and outside the courthouse. (Tr. at 128-29, 262, 265, 324-25, 540-44.) After

[6] Judge Cervera testified that defendant did not follow them to the chief judge's office, which surprised her. (Tr. at 460.) She further testified that, after leaving the chief judge's office, she returned to her courtroom through defendant's courtroom, observing defendant back on the bench hearing cases. She indicated this irritated her; she felt abandoned after being pulled off her bench. (Tr. at 466.) Finally, Judge Cervera testified that later that day members of the state public defender's office congratulated her, which she found confusing. One explained, "Just so you know, our client was arrested on 10th Street. . . . Because we know what you guys were trying to do." (Tr. at 467:5-8.) When she learned the full circumstances, i.e., what the public defenders assumed the two judges were "trying to do," Judge Cervera testified she was "shocked." "Judges shouldn't be helping defendants evade arrest." (Tr. at 470:4.) She further testified that she felt "mortified" because someone might think she "was a part of . . . what happened." (Tr. at 470:11-14.)

other members of the team arrived, the agents attempted to arrest Flores-Ruiz, but he ran; agents were able to catch him and take him into custody across the street. (Tr. at 130, 267-69, 327, 329, 544-45.) On the following Monday, April 21, 2025, defendant told Judge Cervera she was "in the doghouse" with the chief judge (Tr. at 474:24) "[b]ecause I tried to help that guy." (Tr. at 475:8-9.)

Defendant moved for judgment of acquittal at the close of the government's case-in-chief, and I reserved decision. (Tr. at 774; R. 88.) The defense called four witnesses, including two circuit court judges who testified about previous ICE arrests in the courthouse and the development of a policy about the issue. (Tr. at 779- 814.) While the chief judge had produced a draft policy, no final policy had been created at the time of these events. (Tr. at 804.)

Following closing arguments, I instructed the jury that to find defendant guilty on count one the government had to prove four elements beyond a reasonable doubt: (1) a federal warrant or process had been issued for the arrest of an individual; (2) the defendant knew that the federal warrant or process had been issued for the individual's arrest; (3) the defendant actually harbored or concealed the individual; and (4) the defendant intended to prevent the individual's discovery or arrest. (Tr. at 901; R. 94 at 19.) I instructed that count two also had four elements: (1) there was a proceeding pending before a department or agency of the United States; (2) the defendant knew of the pending proceeding; (3) the defendant endeavored to influence, obstruct, or impede the pending proceeding; and (4) the defendant did so corruptly, that is, with the purpose of wrongfully impeding the proceeding. (Tr. at 902; R. 94 at 21.) For purposes of count two, I explained that the term "pending proceeding" simply means any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its

inception to its conclusion. (R. 94 at 22.) I further explained that the term “endeavored” means having acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding. An “endeavor” need not be successful. (R. 94 at 22.) Finally, I explained that the term “corruptly” means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement. (R. 94 at 22.)

During deliberations, the jury asked: “As per Page 19 [setting forth the elements of count one], Bullet Point No. 2, we desire clarity as to whether or not Judge Dugan needed to know the identity of the subject of the arrest warrant, for example, his specific name.” (Tr. at 909.) After hearing from counsel, I responded that “in order to commit the offense charged in Count 1, the defendant needed to know the identity the subject of the warrant.” (Tr. at 918.) Later, the jury asked: “As per Page 21, Element No. 2, we desire clarity as to whether or not Judge Dugan needed to know the identity of the subject of the pending proceeding.” (Tr. at 919.) After hearing from counsel and considering the issue in chambers, I responded: “To know <u>of</u> the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the proceeding.” (Tr. at 926.) The jury found the defendant not guilty of count one and guilty of count two. (Tr. at 927.)

Defendant subsequently renewed her motion for acquittal and added, in the alternative, a request for a new trial. The matter is fully briefed and ready for decision.

## II. DISCUSSION

### A. Standards of Review

A defendant seeking entry of a judgment of acquittal under Rule 29 faces a nearly

insurmountable hurdle, as the court defers heavily to the jury's findings, views the evidence in the light most favorable to the government, and will grant relief only where no rational trier of fact could have found the defendant guilty. United States v. Edwards, 161 F.4th 1088, 1098 (7th Cir. 2025). When reviewing a challenge to the sufficiency of the evidence, the court will neither re-weigh the evidence nor second-guess the jury's credibility determinations. Id.

Rule 33 permits the district court to vacate a judgment and grant a new trial in a criminal case "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts have ordered new trials under Rule 33 in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial. Edwards, 161 F.4th at 1099. This may include situations where the court improperly instructed the jury. See, e.g., United States v. Cui, 163 F.4th 1072, 1085 (7th Cir. 2026). A new trial may also be ordered where the evidence preponderates so heavily against the verdict that it would be a manifest injustice to let the verdict stand. United States v. Conley, 875 F.3d 391, 399 (7th Cir. 2017). Exercise of the power conferred by Rule 33 is reserved for only the most extreme cases. Edwards, 161 F.4th at 1099; Conley, 875 F.3d at 399.

**B. The Evidence Was Sufficient**

Viewing "the totality of the evidence that the government presented in this case, it is sufficient to provide a rational basis upon which a jury could find guilt beyond a reasonable doubt." United States v. Tinsley, 62 F.4th 376, 388 (7th Cir. 2023) (cleaned up). The government demonstrated that on April 18, 2025, agents arrived at the Milwaukee County Courthouse to arrest Flores-Ruiz pursuant to an administrative warrant (Tr. at 54, 245, 247-48,

315, 355, 398, 533), a step in his pending removal proceeding (Tr. at 210-23, 414-18, 525-27).[7] The government further demonstrated that defendant was made aware of ICE's presence and the administrative warrant. (Tr. at 403, 450-51, 456; Ex. 42.) The government showed that defendant then engaged in a course of conduct that had the natural and probable effect of wrongfully obstructing the proceeding, including clearing the agents from the public hallway (Tr. at 105, 259, 322, 365, 368), stating that they needed a judicial warrant to make the arrest (Tr. at 457),[8] rushing Flores-Ruiz's case through while the agents were in the chief judge's office (Tr. at 540; Ex. 42), and ushering him out the jury door into the restricted hallway with the apparent intention that he go "down the stairs" to the fifth floor, rather than out the "wrong door" into the public hallway where the agents were (Tr. at 118, 762-67).[9] Finally, the government presented evidence that defendant acted wrongfully, including her statements that "I'll do it. I'll get the heat" (Tr. at 119, 765), and "I'm in the doghouse with Carl for trying to help that guy."

---

[7]In the original motion for acquittal, defendant argued that there was no "pending proceeding" because Flores-Ruiz's removal proceeding had ended. (R. 88 at 20.) However, defendant does not address the testimony from supervisory detention and deportation officer Anthony Nimtz discussing the steps in a removal proceeding, which in this situation began with Flores-Ruiz's arrest in April 2025 and concluded with his actual removal in November 2025. (Tr. at 210-23.) The government presented similar testimony from assistant field office director Cassandra Kubiszewski (Tr. at 525-27) and from agent Vasconcellos (Tr. at 414-18).

[8]Defendant notes that the agents did not testify she told them they needed a judicial warrant. (R. 109 at 9-10.) However, Judge Cervera testified that defendant did make this statement, repeating it three times. (Tr. at 457:8-14.) The jury was free to accept her testimony. See United States v. Wallace, 991 F.3d 810, 814 (7th Cir. 2021) ("The jury was free to believe Kristensen. We will not reassess credibility or reweigh the evidence. The evidence was sufficient for a rational jury to find Wallace guilty.").

[9]In the original motion, defendant argued that she pointed Flores-Ruiz and his lawyer to the door to the public hallway, not the door to the stairs. (R. 88 at 2, 17-18; see also R. 109 at 12.) However, a reasonable jury could find, based on her conversation with the court reporter, that defendant intended Flores-Ruiz take the door to the stairs, but Attorney de la Rosa used the "wrong door."

(Tr. at 474-75).[10]

### C. Defendant's Arguments

Defendant's renewed motion brings four specific challenges to the verdict. I address each in turn.

#### 1. Privilege Against Civil Arrest in Courthouse

Defendant argues that she committed no crime because ICE arrests in courthouses violate the common law privilege against the execution of civil process or civil arrest warrants on a party appearing in a courthouse. (R. 109 at 2-3.) She contends that, because ICE had no legal authority to act on an administrative arrest warrant within the Milwaukee County Courthouse on April 18, 2025, she did not unlawfully impede the execution of a civil warrant in that building. (R. 109 at 3; see also R. 88 at 5-10, 18-19.)

Defendant relies on several district court decisions applying the common law privilege to civil ICE arrests in courthouses. (R. 109 at 13-17.) As she acknowledges, the only circuit court to address the issue has rejected her position that such arrests violate the privilege. See Ryan v. United States Immigration & Customs Enf't, 974 F.3d 9, 27 (1st Cir. 2020) (noting that the privilege has never been thought to protect against criminal arrests or other forms of criminal process in courthouses, and analogizing criminal arrests and civil immigration arrests). The Ryan court explained: "Just as criminal arrests implicate the uniquely sovereign interests in enforcing the penal laws and protecting the public, so too do civil immigration arrests seek

[10] Where, as here, the court reserves decision on a Rule 29 motion made at the close of the government's case, the court decides the motion on the basis of the evidence at the time the ruling was reserved. Fed. R. Crim. P. 29(b). As indicated in the text, the government presented sufficient evidence in its case-in-chief to enable a reasonable jury to find defendant guilty beyond a reasonable doubt. Defendant makes no argument that the defense case compels a different result.

to vindicate similar kinds of interests in controlling immigration and the presence of noncitizens in the country." Id. Defendant counters that the purpose of the privilege is to protect the court, an independent branch of government. (R. 109 at 15.) "The holding in Ryan wholly ignores this purpose. Civil arrest—whether by a private individual or by the government—runs afoul of this privilege of the court. The Executive may have sovereign power over immigration enforcement, but the Executive does not have sovereign power over the court." Velazquez-Hernandez v. United States Immigration & Customs Enf't, 500 F. Supp. 3d 1132, 1145 (S.D. Cal. 2020); see also United States v. New York, 810 F. Supp. 3d 329, 346 (N.D.N.Y. 2025) (holding that the 1952 Immigration & Nationality Act did not displace the common law privilege), appeal docketed, No. 26-104 (2d Cir. Jan. 16, 2026).

Defendant continues that, here, her actions were on behalf of the court itself. She contends that, by donning her robe and directing the agents to the chief judge's office, she acted well within her judicial authority. (R. 109 at 19.) She concludes that, because Flores-Ruiz had a privilege to come and go from his court appearance without execution of a civil arrest warrant, there could have been no obstructing or impeding. (R. 109 at 20-21.)

For two reasons, I reject defendant's argument.

First, I agree with the government that defendant waived the argument by failing to raise it via pre-trial motion. (R. 113 at 16-17.) Under Fed. R. Crim. P. 12(b)(3), certain motions "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Among these are motions alleging a defect in the indictment, such as "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). Here, defendant filed a detailed pre-trial motion to dismiss the indictment, which included claims that she enjoyed judicial immunity, that the Tenth Amendment precluded the

prosecution, and that § 1505 should be construed to not cover the conduct alleged in the indictment. (R. 48 at 3.) Absent from the motion was any claim that Flores-Ruiz was privileged from arrest at the courthouse, such that "no crime occurred" when defendant allegedly obstructed ICE's efforts. (R. 109 at 13.) An argument that the conduct alleged in an indictment does not, "as a matter of law" (R. 109 at 21), constitute a crime is properly raised under Rule 12(b)(3). Defendant makes no attempt to show "good cause" for her failure to timely raise the issue, as Rule 12(c)(3) requires. United States v. Aron, 98 F.4th 879, 882 (7th Cir. 2024).

Defendant replies that the problem was not a defect in the indictment but a failure of proof. She indicates that the indictment was not defective on its face: it cited a specific federal statute and alleged all of the essential elements. (R. 115 at 4.) She contends that the factual basis for a motion relating to the civil arrest privilege was not reasonably available before trial and could not have been determined without hearing the government's case-in-chief in full. (R. 115 at 4-5.) She continues that the indictment did not establish the privilege's application factually; the indictment also permitted the government to offer a more expansive factual case, which it did. (R. 115 at 6.)

The indictment plainly alleged that ICE task force agents had an administrative warrant for Flores-Ruiz, that they planned to arrest him in the public hallway of the courthouse, and that Flores-Ruiz was in the courthouse that day to address his criminal case. (R. 6 at 2.) These allegations made available an argument based on the privilege. Defendant posits that the government could have offered evidence that might have taken Flores-Ruiz outside the scope of the privilege, e.g., by converting to a criminal arrest or by changing the location of his intended arrest (R. 115 at 6), but this speculation does not make the argument unavailable for pre-trial determination. That the evidence presented at trial confirmed the factual predicate for

a privilege argument (as defendant concedes, R. 115 at 6-7) also does not mean the argument could be saved for a post-verdict motion.

Tellingly, defendant never explains how her privilege argument fits under either Rule 29 or Rule 33. The argument does not go to the sufficiency of the evidence under 18 U.S.C. § 1505. Nor is it based on some prejudicial error in the manner in which the case was presented to the jury. See United States v. Maclin, 915 F.3d 440, 444 (7th Cir. 2019) ("The applicable standard under Rule 33 requires a new trial only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict.") (internal quote marks omitted). As the government notes, the argument is instead that the indictment does not state an offense because there was no crime as a matter of law. "If that were accurate, the proper remedy would have been dismissal pretrial, not a new trial." (R. 113 at 17 n.3.)

Second, even if defendant had not waived the argument, and even if the district court cases defendant cites are right and Ryan is wrong regarding the applicability of the privilege to civil ICE arrests in courthouses (an issue I need not decide), defendant cites no authority that she may assert the privilege in this context. As the government notes, while courts have articulated the policy justification for the privilege in terms of promoting access to the courts and ensuring the efficient administration of justice, in the cases defendant cites the privilege was asserted by or for the benefit of a party or witness who was subject to civil process or arrest while attending court. (R. 113 at 20.) In the present context, accordingly, the privilege would belong to Flores-Ruiz, not defendant. Defendant cites no authority that she may assert the privilege derivatively to avoid criminal liability for obstructing Flores-Ruiz's arrest.

Even if the privilege may be asserted by a judge, the facts presented at trial do not support defendant's contention that her actions here "were on behalf of the court itself." (R. 109

at 19.) No court policy forbid civil ICE arrests in public areas of the Milwaukee County Courthouse or otherwise sanctioned defendant's course of conduct on April 18, 2025. As the government notes, the operating assumption of those involved in creating a policy was that civil ICE arrests in public areas of the courthouse were lawful and the judiciary did not have the ability to stop them. (R. 113 at 4, 21.) Shortly before the incident in question, defendant was forwarded training materials by one of her colleagues indicating that "ICE can legally conduct enforcement, i.e., take people into custody, in public areas of the courthouse." (Tr. at 114:21-23, 596:20-21.) Defendant's statements that she would "take the heat" for her actions (Tr. at 673) and that she was "in the doghouse" with the chief judge for "trying to help that guy" (Tr. at 474-75) suggest that she knew her actions were not "on behalf of the court."

Defendant replies that judges have standing to speak for, and as, the court. (R. 115 at 8.) She cites the statute defining the jurisdiction of circuit courts, Wis. Stat. § 753.03, but she fails to reply to the government's argument that her actions in this case found no support in court policy. Defendant also cites cases describing the nature of the privilege. Stewart v. Ramsay, 242 U.S. 128, 130 (1916) ("The privilege which is asserted here is the privilege of the court, rather than of the defendant. It is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify.") (internal quote marks omitted); Durst v. Tautges, Wilder & McDonald, 44 F.2d 507, 508-09 (7th Cir. 1930) ("It is not simply a personal privilege, but it is also the privilege of the court, and is deemed necessary for the maintenance of its authority and in order to promote the due and efficient administration of justice."). Importantly, though, in neither case was the privilege actually asserted by the court, as opposed to a private party attending a court

proceeding. Defendant cites no case where the privilege was asserted by a judge charged with obstructing civil process or arrest in a courthouse.[11] (R. 115 at 8-9.)

**2. The Required "Nexus" on Count Two**

Defendant notes that count two alleged a violation of § 1505 through five specific acts, all tied to the administrative arrest of E.F.R. She states that the indictment left no doubt that the government was bound to prove she acted with specific knowledge that the administrative warrant was for E.F.R. (R. 109 at 21.) She accordingly argues that I erred in responding to the jury's second question. (R. 109 at 22.) I should have answered that question the same, she contends, as I did the question about count one, i.e., that defendant needed to know the identity of the subject of the warrant/pending proceeding. (R. 109 at 22-23.) Defendant argues that knowledge of the particular proceeding is a required element under § 1505, since that knowledge provides the required "nexus" between the obstructive acts and the charged proceeding. (R. 109 at 23-24.) The answer also betrayed the indictment, which identified the proceeding by reference to Flores-Ruiz's arrest and removal. (R. 109 at 24.)

Defendant begins with the contention that § 1505 must be construed narrowly, consistent with the Supreme Court's recent decisions in public corruption cases. (R. 109 at 24.) Citing United States v. Aguilar, 515 U.S. 593 (1995) and like cases, defendant argues these

---

[11] In Velazquez-Hernandez, the case upon which defendant primarily relies, the court granted to non-citizen plaintiffs a temporary restraining order barring courthouse arrests. 500 F. Supp. 3d at 1136-37; see also Doe v. United States Immigration & Customs Enf't, 490 F. Supp. 3d 672 (S.D.N.Y. 2020) (civil action brought by an individual plaintiff who feared arrest by ICE should he go to court and organizational plaintiffs who provided services to such persons). In United States v. New York, 810 F. Spp. 3d at 333, the court discussed the privilege in addressing a federal government suit seeking to enjoin New York state laws generally forbidding civil ICE actions in courthouses. None of these cases involved invocation of the privilege by a judge.

obstruction statutes cannot be converted into catch-all provisions where inadequate notice is given as to what does and does not constitute a crime. (R. 109 at 25.)

Defendant continues that the government should have been required to prove that she had knowledge of "the" charged proceeding, not "a" proceeding or the "nature" of some proceeding. (R. 109 at 25.) Drawing on Aguilar, she phrases this in terms of the required "nexus" between the obstructive acts and the particular/specific proceeding. Here, defendant contends, she was never told that the administrative proceeding (or even the warrant) concerned Flores-Ruiz. (R. 109 at 26.)

Defendant further argues that my answer to the jury's second question constructively amended the indictment, broadening the possible bases for conviction beyond those presented by the grand jury. (R. 109 at 27.) Specifically, she contends that the phrase "nature of the proceeding" is found nowhere in § 1505, runs contrary to Aguilar, and its use relieved the government of proving beyond a reasonable doubt that she knew the administrative arrest warrant at issue in this case was specifically for Flores-Ruiz, the particular proceeding alleged in the indictment. (R. 109 at 27-28.)

Finally, defendant contends that, by acquitting on count one, the jury must have found that she did not know the identity of the subject of the warrant. Had the jury been similarly instructed on count two, a not guilty verdict would logically have followed on that count as well. (R. 109 at 28.)

Defendant's arguments fail. As the Supreme Court held in Aguilar, there must indeed be a "nexus" between the obstructive conduct and the proceeding at issue. 515 U.S. at 600. Absent such a connection, the conduct "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice." Id. at 601. The instructions in this case

included that requirement. As indicated above, the jury was told the government needed to prove that defendant "endeavored to influence, obstruct or impede the pending proceeding" (R. 94 at 21 #3), meaning she "acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding." (R. 94 at 22.) The jury was also told the government was required to prove that she "did so corruptly, that is, with the purpose of wrongfully impeding the proceeding." (R. 94 at 21 #4.) By focusing solely on my response to the jury's second question, defendant ignores that the instructions as a whole plainly required a nexus between defendant's conduct and the pending proceeding. See United States v. Christophel, 92 F.4th 723, 727 (7th Cir. 2024) ("Because jury instructions must be considered as a whole, even if one instruction falls short on clarity, a court may consider the jury properly directed where the totality of the instructions sets forth the proper requirements for conviction.").

In any event, defendant fails to show that my response to the jury's second question was wrong. This question concerned the level of detail needed for the jury to find, as required by the second element, that defendant "knew of" the pending proceeding. Defendant cites no authority that such knowledge must include the identity of the person or persons involved in the proceeding.[12] In arguing that such knowledge is required to ensure the required nexus between the conduct and the proceeding, defendant overlooks that the third and fourth elements,

[12]The government notes that such a requirement could lead to absurd results, allowing a defendant to obstruct the arrest of a person she does not know by name. (R. 113 at 26-27.) Defendant replies that you can know the "identity" of a wanted person without knowing their name. (R. 115 at 15.) This debate pertains more to my answer to the first question, "whether or not Judge Dugan needed to know the identity of the subject of the arrest warrant, for example, his specific name." (Tr. at 909.) The operative term in count two is "pending proceeding."

summarized in the preceding paragraph, encompass that requirement. And here, these elements referred to "the proceeding," not "a proceeding," "any proceeding," or "some proceeding."

The evidence presented at trial concerned just one proceeding, involving Flores-Ruiz's removal from the United States. The evidence permitted the jury to find that defendant knew the person whose arrest she sought to prevent was the same person subject to the pending removal proceeding, whether or not she knew his name.[13] (R. 113 at 25.) Defendant cannot claim surprise at the manner in which the case was presented. Nor can she reasonably claim that my answer to the jury's second question permitted the jury to convict based obstruction of some other proceeding.

Defendant argues that because the indictment identified the "proceeding" by reference to Flores-Ruiz's arrest and removal, the government was required to prove she knew his name.

---

[13]In reply, defendant contends that she had no reason to know that Flores-Ruiz, as opposed to any of the other people on her docket that morning, was the one wanted for removal. (R. 115 at 12.) Judge Cervera testified that, as she and defendant walked down the restricted hallway to confront the agents, she "heard the name something about Flores." (Tr. at 452:14.) Defendant's clerk testified that prior to court starting he printed out the calendar and placed a copy on the judge's dais. (Tr. at 658.) That calendar listed the matter of Eduardo Flores-Ruiz. (Tr. at 52; Ex. 11.) Further, the courtroom recording showed that, after clearing the ICE agents from the hallway and returning to court, defendant asked, "Which client is it?" (Tr. at 117:5.) The recording captured her addressing Flores-Ruiz's lawyer, asking "What's the name of the client?" (Ex. 42.) In response, Attorney de la Rosa said the name Eduardo Flores-Ruiz. (Ex. 42.) Defendant then directed Flores-Ruiz quickly be given a date off the record before escorting him and his lawyer out the jury door and down the restricted hallway. As defendant notes, the agents never showed her the warrant or told her the name of the man they were after. (R. 109 at 13; R. 115 at 12.) But a reasonable jury could find that ICE agent Vasconcellos told defendant they were there to "apprehend a person who is unlawfully present in the United States" (Tr. at 456:22-23), and that he had an administrative warrant (Tr. at 403, 457). Judge Cevera also testified that she started to ask to see the warrant while they were still in the hallway, but defendant quickly sent him to the chief judge's office. (Tr. at 457-58.) And as discussed above, it is undisputed that defendant learned Flores-Ruiz's name prior to ushering him out the jury door and down the restricted hallway.

(R. 115 at 11-13.) The primary purpose of an indictment is to provide the defendant with notice of the charges against her so that she may prepare a defense; it also serves to cabin the government's evidence so as to avoid unfair surprise at trial and avoid the possibility the petit jury will convict on a crime different from the one approved the grand jury. See, e.g., United States v. Fassnacht, 332 F.3d 440, 444-45 (7th Cir. 2003). In some cases, specific language in an indictment that provides detail beyond the general elements of the crime may make the specified detail essential to the charged crime, which must be proven beyond a reasonable doubt. E.g., United States v. Pierson, 925 F.3d 913, 920 (7th Cir. 2019), vacated on other grounds, Pierson v. United States, 589 U.S. 1262 (2020).

However, an indictment does not by including certain details about the offense necessarily alter the knowledge requirements set in the charging statute. By way of analogy, in felon in possession prosecutions the government typically identifies the firearm by make, model, and serial number. But no one would argue the government is therefore required to prove the defendant knew the gun's serial number. Rather, in that situation, the government must prove that the defendant knowingly possessed the same gun identified in the indictment. Cf. United States v. Leichtnam, 948 F.2d 370, 379-81 (7th Cir. 1991) (finding constructive amendment where the indictment charged possession of a Mossberg rifle, but at trial the jury was shown three guns, not just the Mossberg, and then received an instruction that it could convict if convinced that the defendant possessed "a firearm"—in effect, any one of the three). Here, the government had to prove defendant obstructed the same "pending proceeding" identified in the indictment, but it did not have to prove specific knowledge of each and every

detail of that proceeding.[14]

Defendant also fails to demonstrate that my answer to the second question constructively amended the indictment. A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury. United States v. Haas, 37 F.4th 1256, 1266 (7th Cir. 2022). Not all variations between an indictment and the evidence or jury instructions amount to a constructive amendment, however. Id. at 1266-67. Rather, the offense charged in the indictment must be materially different or substantially altered at trial, such that it is impossible to know whether the grand jury would have indicted for the crime actually proved. Id. at 1267.

Defendant cites no authority supporting her contention that the answer was wrong simply because the words I used do not appear in the statute. And as discussed above, the instructions included Aguilar's nexus requirement and required the government to prove

[14]In reply, defendant cites United States v. Coleman, 138 F.4th 489 (7th Cir. 2025), a felon in possession case where the indictment specified the firearm by make, model, and serial number. (R. 115 at 14.) Yet at trial, the government presented evidence of two other firearms and the court instructed the jury that the government had to prove the defendant possessed "a firearm." Id. at 499. The Seventh Circuit explained that "the indictment did not have to include the make and serial number of the firearm, but because it did, the jury had to find, beyond a reasonable doubt, that Coleman possessed a Glock with serial number NLW237." Id. at 499-500. However, because the defendant failed to object at trial, the court reviewed only for plain error, declining to grant relief because the evidence focused on the Glock and the instructions referred the jury back to the indictment. Id. at 501-04. Defendant argues that there is no plain error hatch here, as she objected to the court's supplemental instruction. (R. 115 at 14-15.) As discussed in the text, cases like Coleman and Leichtnam stand for the proposition that the government must at trial prove the defendant possessed the same gun identified in the indictment. These cases do not support the enhanced knowledge requirement she demands, i.e., that the defendant must know the gun's serial number or all the details of the pending proceeding included in the indictment.

defendant obstructed "the proceeding"—the same one referenced in the indictment. Nothing in my answer undermined these requirements or otherwise permitted the jury to convict defendant of an offense different from the one charged in the indictment.

In reply, defendant appears to argue that I should have answered the question more specifically, noting that the jury asked about the subject of the proceeding while I gave a general answer about the nature of the proceeding. She also suggests the phrase "sufficient knowledge" was vague. (R. 115 at 10.)

"District judges have considerable discretion on both whether and how to answer a jury's question." United States v. Zhao, 141 F.4th 833, 845 (7th Cir. 2025). The Seventh Circuit considers three factors when reviewing the language of a supplemental instruction or answer to a jury question: (1) whether the instructions as a whole fairly and adequately treated the issue; (2) whether the supplemental instruction was a correct statement of law; and (3) whether the district court answered the jury's question specifically. Id.

For the reasons set forth above, the instructions as a whole fairly treated the issue, including the nexus requirement upon which defendant insists and ensuring that the "proceeding" referred to in element #1 (and the indictment) was the same proceeding referenced in elements #2-4. For the reasons also set forth above, defendant fails to show that her preferred answer was a correct statement of the law. Perhaps the answer could have been more specific: "no." But defendant fails to demonstrate that she was prejudiced by the one I gave.

**3. Breadth of § 1505**

As indicated, the government charged defendant with concealing Flores-Ruiz from arrest under 18 U.S.C. § 1071, a misdemeanor, and with obstruction of Flores-Ruiz's removal

proceeding, under 18 U.S.C. § 1505, a felony. Defendant argues that nothing in the text or history of § 1505 demonstrates congressional intent to make a felony the same conduct labeled a misdemeanor under other statutes. (R. 109 at 28-29.) She cites Fischer v. United States, 603 U.S. 480, 491-92 (2024), where the Supreme Court reversed the conviction of a January 6 defendant under the "otherwise" clause in 18 U.S.C. § 1512(c)(2), holding that the scope of that clause must be limited by the specific examples list in § 1512(c)(1), which pertained to records, documents, or other objects. Defendant specifically relies on Justice Jackson's concurrence, which noted that "nearly all of the broad, all-purpose obstruction statutes that various States have enacted are classified as misdemeanors," id. at 504, while § 1512(c)(2) is a 20-year felony. See id. at 505 ("Here, it beggars belief that Congress would have inserted a breathtakingly broad, first-of-its-kind criminal obstruction statute (accompanied by a substantial 20-year maximum penalty) in the midst of a significantly more granular series of obstruction prohibitions without clarifying its intent to do so[.]").

Defendant also cites Marinello v. United States, 584 U.S. 1 (2018), where the Court reversed an obstruction conviction under the omnibus clause in 26 U.S.C. § 7212(a). Relying on Aguilar, the Court held that under this clause there must be a nexus between the defendant's obstructive conduct and a particular administrative proceeding, such as an investigation, an audit, or other targeted administrative action. Id. at 13. In the course of explaining its holding, the Court noted:

> Viewing the Omnibus Clause in the broader statutory context of the full Internal Revenue Code also counsels against adopting the Government's broad reading. That is because the Code creates numerous misdemeanors, ranging from willful failure to furnish a required statement to employees, §7204, to failure to keep required records, §7203, to misrepresenting the number of exemptions to which an employee is entitled on IRS Form W-4, §7205, to failure to pay any tax owed, however small the amount, §7203. To interpret the Omnibus Clause as applying

> to all Code administration would potentially transform many, if not all, of these misdemeanor provisions into felonies, making the specific provisions redundant, or perhaps the subject matter of plea bargaining. Some overlap in criminal provisions is, of course, inevitable. Indeed, as the dissent notes, post, at 22 (opinion of Thomas, J.), Marinello's preferred reading of §7212 potentially overlaps with another provision of federal law that criminalizes the obstruction of the "due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States," 18 U. S. C. §1505. But we have not found any case from this Court interpreting a statutory provision that would create overlap and redundancy to the degree that would result from the Government's broad reading of §7212—particularly when it would render superfluous other provisions in the same enactment.

Id. at 9 (internal citations and quote marks omitted).

Defendant argues that in this case the government turned a misdemeanor obstruction of an arrest into felony obstruction of a pending proceeding. She argues that, under this construction, the potential arrest of every illegal immigrant in the country is part of a pending administrative proceeding covered by § 1505. (R. 109 at 32.) She concludes that, under the reasoning of Fischer and Marinello, the guilty verdict on count two should be set aside. In the alternative, the court should grant a new trial with proper instructions. (R. 109 at 33.)

In ruling on the party's jury instruction dispute over the meaning of the term "proceeding," I found United States v. Hernandez, No. 3:23cr122 (RCY), 2024 U.S. Dist. LEXIS 649, at *7 (E.D. Va. Jan. 2, 2024) (citing Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966)), persuasive. (R. 97 at 5.) As defendant notes, Hernandez is on appeal, with the case argued before the Fourth Circuit in January 2026. (R. 109 at 33 n.7.) However, nothing in the current submission persuades me that the instructions were wrong. As I noted in the instructions order, the Seventh Circuit has held that the term "proceeding" is defined "rather broadly" for the purpose of § 1505, United States v. Senffner, 280 F.3d 755, 761 (7th Cir. 2002), undermining defendant's claim, based on Supreme Court decisions construing different statutes, that § 1505

must be construed narrowly. As the government notes, other circuits construing § 1505 have also recognized the broad nature of the term "proceeding." (R. 113 at 29, collecting cases.)

The government further argues that there is little overlap between § 1071 and § 1505, as the latter requires the person act "corruptly," i.e., with an improper purpose, and is focused on obstruction of a proceeding, as opposed to the concealment of a person. (R. 113 at 30-31.) In any event, as the Supreme Court has noted: "Redundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws, a court must give effect to both." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) (internal citation and quote marks omitted). Indeed, the Court in Marinello acknowledged the overlap between the narrow construction of § 7212(a) pressed by the defendant and § 1505, stating: "Some overlap in criminal provisions is, of course, inevitable." 584 U.S. at 9. As indicated in the block quote above, the Court went on to accept the defendant's construction in part because the government's broad reading of § 7212 would render superfluous other provisions in the same enactment. Id. at 9. As the government demonstrates, while Congress placed § 1071 and § 1505 in their current locations in the U.S. Code—chapters 49 and 73, respectively—as part of its June 1948 reorganization of the criminal laws, they are not fairly deemed part of the "same enactment," as were the provisions of the Internal Revenue Code discussed in Marinello. (R. 113 at 33-34.)

Fischer is likewise distinguishable. As indicated, that case addressed the catchall provision in § 1512(c)(2), which penalized one who "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so." Applying the canons of noscitur a sociis and ejusdem generis, the Court held that the provision should be limited based on the specific examples of obstructive conduct listed in § 1512(c)(1), i.e., altering, destroying, mutilating, or

concealing a record, document, or other object. 603 U.S. at 487. The Court also noted that the government's contention that (c)(2) covers all forms of obstructive conduct left (c)(1) with no work to do. Id. at 490. The Court further noted that § 1512(c)(2) was enacted to close a gap in the law exposed by the Enron scandal, i.e., that the former statute imposed criminal liability on a person who persuaded another to destroy documents but did not cover a person who destroyed the records herself. Id. at 492. The Court found it unlikely that "Congress actually hid away in the second part of the third subsection of Section 1512 a catchall provision that reaches far beyond the document shredding and similar scenarios that prompted the legislation in the first place." Id. Finally, the Court noted that a broad construction of § 1512(c)(2) could render superfluous other obstruction statutes in chapter 73, including § 1505. Id. at 492-93.

Nothing in the Court's reasoning implicates defendant's conviction on count two. Section 1505 contains one obstruction provision, rather than the two provisions in § 1512(c) at issue in Fischer. Defendant cites no legislative history suggesting § 1505 must be construed narrowly, as she contends. While Fischer mentions § 1505 as another obstruction statute within chapter 73, the Court did not discuss the meaning of that statute or the term "proceeding." Finally, as the government notes, Congress may have intended the harsher penalty in § 1512(c) (up to 20 years) apply to a person who obstructs "an official proceeding" as opposed to the lesser penalty (up to 5 years) that applies to those who obstruct "any pending proceeding" under § 1505. (R. 113 at 35.) And, as the government further notes, courts have construed the statutes differently because an "official proceeding" must be different than "any pending proceeding."[15] (R. 113 at 36-37.)

---

[15]In reply, defendant contends that Fischer was concerned not just with consistency within § 1512(c) but with the obstruction chapter as a whole. (R. 115 at 17-18.) But this concern

Defendant replies that none of the cases cited by the government construing § 1505 involved ICE arrests as part of a removal proceeding (R. 115 at 16), but this simply reflects the fact that the statute applies to many different agency proceedings; it is no reason to disregard the manner in which these courts construed the key term. Defendant further replies that these cases pre-date Marinello and Fischer, which marked a shift in the manner in which the Court interpreted obstruction statutes. (R. 115 at 16.) As discussed above, however, the instructions in this case included the "nexus" requirement from Aguilar and Marinello. In other words, defendant could not have been convicted based on her obstruction of some unknown proceeding or the general work of DHS.[16]

**4. Legal Acts**

Finally, defendant argues that the verdict on count two was based on conduct, e.g., addressing a case off the record, directing Flores-Ruiz to leave through the jury door, and permitting him to appear by Zoom for his next hearing, that is not inherently illegal or corrupt. Instead, she was convicted based on acts that were part of her job and within her authority as a judge. (R. 109 at 33-36.)

---

was that an overbroad construction of § 1512(c)(2) would swallow other obstruction provisions in chapter 73. This does not help defendant's argument that § 1505 renders § 1071 superfluous. Nor does it help her argument regarding the meaning of the term "proceeding" in § 1505. Defendant argues that my answer to the second question relieved the government of its burden to prove the proceeding was "pending" (R. 115 at 18-19), but the answer itself included the word "pending." As discussed above, the government presented sufficient evidence regarding the "proceeding" for Flores-Ruiz.

[16]Defendant contends that because Vasconcellos declined to check the box on the warrant form indicating probable cause was based upon "the pendency of ongoing removal proceedings" against Flores-Ruiz there could have been no pending removal proceeding. (R. 115 at 17; see also R. 109 at 8-9, 31-32.) However, the manner in which an agent fills out a form does not alter the meaning of a statutory term.

These arguments are largely a rehash of those presented in defendant's previous motions and in her proposed jury instructions. As I noted in denying defendant's motion to dismiss (R. 48 at 21), there is no basis for granting immunity simply because some of the allegations in the indictment describe conduct that could be considered part of a judge's job. Further, as I noted in denying her motion in limine (R. 72 at 11-14), otherwise lawful conduct can amount to a crime if done with a corrupt motive. Again, as the Seventh Circuit put it,

> [I]t is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.

Cueto, 151 F.3d at 631; see also Cintolo, 818 F.2d at 992 ("[M]eans, though lawful in themselves, can cross the line of illegality if (i) employed with a corrupt motive, (ii) to hinder the due administration of justice, so long as (iii) the means have the capacity to obstruct.").

Defendant argues that the term "corruptly" should be limited to inherently evil conduct, and that there is no evidence here that she engaged in "corruption" in the ordinary sense. (R. 109 at 37-38.) The instructions here included the definition of the term "corruptly" adopted by Congress. (R. 97 at 5, citing 18 U.S.C. § 1515(b).) Defendant cites no authority that a conviction under § 1505 cannot stand absent evidence of extortion, bribery, or destroying evidence.[17]

[17]Contrary to the suggestion in the original motion (R. 88 at 14), the instructions here required the government prove defendant acted with an "improper purpose" (R. 94 at 22), consistent with Edwards, 869 F.3d at 499. Defendant suggests that the term "corruptly" requires a defendant act with the intent to procure an improper benefit for herself or some other person. (R. 88 at 14 & R. 109 at 38, citing United States v. Fischer, 64 F.4th 329, 361-62 (D.C. Cir. 2023) (Walker, J., concurring in part), vacated, 603 U.S. 480 (2024).) As I explained in the jury instruction decision, Fischer is a § 1512 case and does not control here. (R. 97 at 6.) And for the reasons set forth above, the evidence was sufficient for the jury to find defendant acted

Defendant further argues that the instructions left no room for good faith. (R. 109 at 38.) Defendant did not request a specific jury instruction on good faith. (See R. 57.) In any event, the instructions permitted her to argue that the government failed to prove she acted wrongfully or with an improper purpose. See United States v. Smith, 150 F.4th 832, 850 (7th Cir. 2025) (noting the court can find a good faith instruction unnecessary where a lack of good faith is a part of the charge); see also United States v. Blagojevich, 794 F.3d 729, 738 (7th Cir. 2015) (discussing when a good faith instruction is needed). Defendant contends the government offered nothing to impugn her good faith (R. 109 at 39), but that was an issue for the jury to decide. Defendant argued to the jury that her conduct was a legitimate exercise of judicial authority and that she tried to comply with the expectations of Chief Judge Ashley. The government countered that defendant committed a series of acts, including making false statements, not sanctioned by court policy, and that she did so to corruptly undermine proceedings with which she disagreed. (R. 113 at 40.) A reasonable jury could accept the government's version.

Defendant next takes issue with the definition of "endeavor," which permitted the government to argue the crime was complete as soon as she allowed Flores-Ruiz to leave through the jury door, regardless of the fact that he emerged into the same public hallway (where the agents were waiting). (R. 109 at 39.) I drew this instruction from the Seventh Circuit's pattern for § 1503, which makes clear than an endeavor need not be successful. (R.

---

for an "improper purpose." Defendant also argued in the original motion that the rule of lenity required the court to adopt her preferred meaning of "corruptly." (R. 88 at 15.) The rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the court must simply guess as to what Congress intended. Maracich v. Spears, 570 U.S. 48, 76 (2013). Here, Congress provided a specific definition of the term "corruptly" as used in § 1505. 18 U.S.C. § 1515(b).

97 at 5.) Defendant repeats the argument she made to the jury—that Flores-Ruiz emerged into the same public hallway, less than 12 feet from the public courtroom door (R. 109 at 40)—but she fails to explain how any error in the jury instructions prevented the jury from considering that argument.[18] Defendant also fails to appreciate that, so long as the government proved a corrupt intent to obstruct, it does not matter that her endeavor did not succeed. As discussed above, the "endeavored" instruction required that she have acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding. This provided the required nexus.

Defendant next disputes my refusal to give a "materiality" instruction. (R. 109 at 41; see also R. 88 at 10-11, 20-21.) But she again cites no authority for its inclusion in a § 1505 prosecution. Instead, she cites Neder v. United States, 527 U.S. 1 (1999), a mail/wire/bank fraud prosecution, and civil instructions in patent infringement and employment discrimination cases. (R. 109 at 41-42.) Section 1505 contains no materiality requirement, and the Seventh Circuit has declined to include such a requirement under § 1512(c), another obstruction statute in chapter 73. See United States v. McKibbins, 656 F.3d 707, 712 (7th Cir. 2011) ("The relevant intention is directed at making the government's job harder in proving its case, not at actually succeeding in that effort."). Further, as I noted in the jury instruction decision, the definition of

---

[18]Defendant also overlooks the evidence that the restricted hallway permitted Flores-Ruiz to go "down the stairs" to the fifth floor without being seen by the agents on the sixth floor. In the original motion, defendant argued that the evidence showed she directed Flores-Ruiz and his lawyer to exit into the public hallway. (R. 88 at 17-18.) But a reasonable jury could conclude that defendant endeavored for defendant to exit into the stairway down to the fifth floor, as she and her court reporter discussed, rather than using the "wrong door" back out into the public hallway. (Tr. at 764.) Ultimately, defendant's factual arguments, which break her course of conduct into discrete acts, each of which she had the authority to do, overlooks the totality of the evidence.

"endeavored" used in the instructions permitted defendant to argue that her conduct did not have the natural and probable effect of wrongfully obstructing the proceeding. (R. 97 at 6.) Defendant argues that because Flores-Ruiz emerged into the same public hallway, just a few feet from the regular courtroom door, her conduct was a minor or trivial inconvenience to the agents. (R. 109 at 42; see also R. 88 at 11, 21.) The government responds that, aside from the fact that the statute does not require successful obstruction, defendant's course of conduct that morning changed what was supposed to be a low-key arrest in the hallway by a team of agents into a foot chase through moving traffic by a portion of the team. (R. 113 at 43-44.) At all events, these were issues for the jury to consider.

Defendant argues that the instructions gave the jury no context or guidance for how to consider her legal right to act. She points to her proposed instruction that a defendant who has a legal right to act as she did does not corruptly endeavor to influence, obstruct, or impede the due and proper administration of the law or a federal proceeding. (R. 109 at 42, citing R. 57 at 21.) I rejected this and similar instructions as a rehash of her immunity argument and unsupported by caselaw. (R. 97 at 6.) As I noted in denying the motion to dismiss, there was no basis for granting immunity simply because the indictment described conduct that could be considered "part of a judge's job." The same would be true in a bribery case where the judge is prosecuted for performing official acts intertwined with bribery. Put another way, a judge may use judicial acts or tools as the means to accomplish an unlawful end. (R. 48 at 21.) Defendant's contention that she was authorized to act as she did, regardless of motive (R. 109 at 36; see also R. 88 at 16-17) finds no support in the law. See Cueto, 151 F.3d at 631 ("Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the

statute forbids."). Defendant complains that I cited no authority for limiting "legal rights" to taking the Fifth or asserting a valid privilege (R. 109 at 43; R. 97 at 6), as citizens retain all sorts of rights not specifically enumerated. Those were the rights referenced in the cases defendant cited. Defendant's citation of Arthur Andersen LLP v. United States, 544 U.S. 696 (2005), does not help her because the instructions here required that she act corruptly, that is, with the purpose of wrongfully impeding the proceeding. (R. 94 at 21.) As the Seventh Circuit has noted, "the word 'wrongfully' performs the 'limiting work' discussed in Arthur Andersen." Matthews, 505 F.3d at 706.

In reply, defendant contends that my denial of her proposed instructions—providing that acts a defendant has a legal right to undertake to do not violate § 1505—wholly negated state law as a source of lawful authority. (R. 115 at 20.) In these instructions, defendant proposed the jury be told that a state court judge's official acts, including acts that were part of her job, do not violate count two. These proposed instructions then told the jury that it could not consider in any way the claim that defendant did the various things charged in the indictment, i.e., telling the agents they needed a judicial warrant (R. 57 at 25), directing them to the chief judge's office (R. 57 at 26), calling Flores-Ruiz's case off the record (R. 57 at 27), and directing Flores-Ruiz out through the jury door (R. 57 at 28). These proposed instructions echoed her previous motion in limine seeking to exclude evidence of her "lawful acts" based on the same authority. (R. 58 at 3, citing United States v. Edwards, 869 F.3d 490, 492-99 (7th Cir. 2017); United States v. Matthews, 505 F.3d 698, 705-06 (7th Cir. 2007); Arthur Andersen LLP v. United States, 544 U.S. 696, 705-06 (2005).)

As I explained my order denying the motion in limine, and again in the instructions decision, these arguments essentially requested judicial immunity for the acts alleged, which

I had already denied. (R. 72 at 13; R. 97 at 6.) As I further explained in the motion in limine decision, Edwards and Matthews did not support defendant's position that official judicial acts are outside the scope of § 1505. (R. 72 at 13.) Defendant's arguments also overlooked Cueto, 151 F.3d at 631, and Cintolo, 818 F.2d at 992, cited abov e. (R. 72 at 13.)

Defendant takes issue with the concept that a corrupt motive can make lawful acts unlawful, citing a number hypotheticals where an "improper" motive would make otherwise lawful and protected activity a felony if it inconvenienced ICE. (R. 115 at 20-22.) It suffices to say that this case is different from those defendant posits, and that it would be improper to hold § 1505 cannot be applied to the conduct at issue here just because difficult line drawing issues may arise in other cases.

Defendant attempts in reply to distinguish Cueto because it involved § 1503, not § 1505. (R. 115 at 22.) However, the operative language in both statutes is the same. 18 U.S.C. § 1503(a) ("Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States . . ."); 18 U.S.C. § 1505 ("Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had . . ."). Defendant complains that the government previously argued—inconsistently—that §§ 1503 and 1512 cases were inapplicable, but that was primarily in the context of the statutes different use of the term "proceeding." 18 U.S.C. § 1505 ("any pending proceeding"); 18 U.S.C. § 1512(c) ("an official proceeding").

Defendant also attempts to distinguish Cueto on its facts, noting that the lawyer-defendant in that case, the business partner of a man engaged in an illegal gambling operation,

had a financial interest in the operation. He also made false statements in court filings. (R. 115 at 23.) Defendant notes that she derived no profits from Flores-Ruiz, nor did she make repeated false statements in legal filings. (R. 115 at 24.)

Defendant correctly notes that Cueto's otherwise legal conduct was motivated by his desire to protect the illegal gambling operation and safeguard his own financial interest. 151 F.3d at 631. But nothing in the court's decision suggests the improper motive must be a financial one, and defendant cites no other authority for that proposition. (See R. 115 at 24.) Instead, the Cueto court spoke in broad terms:

> There is little case authority directly on point to consider whether an attorney acting in his professional capacity could be criminally liable under the omnibus clause of § 1503 for traditional litigation-related conduct that results in an obstruction of justice. Correct application of Section 1503 thus requires, in a very real sense, that the factfinder discern--by direct evidence or from inference--the motive which led an individual to perform particular actions. . . . Intent may make any otherwise innocent act criminal, if it is a step in a plot. Therefore, it is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.
>
> . . .
>
> Even though courts may be hesitant, with good reason and caution, to include traditional litigation-related conduct within the scope of § 1503, the omnibus clause has been interpreted broadly in accordance with congressional intent to promote the due administration of justice and to prevent the miscarriage of justice, and an individual's status as an attorney engaged in litigation-related conduct does not provide protection from prosecution for criminal conduct.

Id. at 631 (internal citations and quote marks omitted).

The other case defendant cites (R. 115 at 24), United States v. Gerace, 731 F. Supp. 3d 497 (W.D.N.Y. 2024), is far afield. There, the court denied a motion to disqualify a defendant's lawyer, in which the government argued the lawyer engaged in criminal conduct by including names on a witness list that triggered the assigned judge's recusal. Id. at 505. In

the course of denying the motion, the court noted that the government overlooked 18 U.S.C. § 1515(c), which provides: "This chapter does not prohibit or punish the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding." The court stated that "the safe harbor protects defense attorneys from being accused of obstructing justice merely for doing their jobs." 731 F. Supp. 3d at 515. As I noted in denying defendant's motion in limine, she would be free to present evidence and argument that the events of April 18, 2025, involved the routine work of a state court and judge, and the government would be allowed to contend that defendant added extraneous activities to her usual duties in order to defeat enforcement of federal immigration law. (R. 72 at 14.) The jury was tasked with choosing which version to accept. Defendant indicates that, had she been a lawyer in the courtroom, § 1515(c) would have given her safe harbor, and that judges should not get less consideration. (R. 115 at 25.) It suffices to say that no statute insulates her conduct here.

Defendant also contends in reply that the court's instructions denied her a perfectly valid defense, i.e., the privilege against civil arrests in courthouses, raised in her first argument. She argues that the privilege warrants acquittal or, in the alternative, a new trial with proper instructions. (R. 115 at 25-26.) Defendant requested no instruction touching on the privilege against civil arrest in a courthouse (just as she did not raise the issue via pre-trial motion). In any event, as discussed above, the privilege is not defendant's to assert.

Finally, defendant reasserts her immunity and Tenth Amendment arguments, previously rejected on the motion to dismiss the indictment, in light of the full trial record. (R. 115 at 27-29; R. 109 at 44-45; see also R. 88 at 21.) Defendant provides no new authority or analysis, so I decline to revisit those rulings.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion and renewed motion (R. 88, 109) are denied.

Dated at Milwaukee, Wisconsin, this 6th day of April, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.** **Case No. 25-CR-89**

**HANNAH C. DUGAN**
**Defendant.**

## DECISION AND ORDER

Defendant Hannah Dugan moves for reconsideration of the order denying her motion for judgment of acquittal and/or a new trial. She bases the motion on United States v. Hernandez, 173 F.4th 94 (4th Cir. 2026), in which a panel of the Fourth Circuit Court of Appeals voted 2-1 to reverse a district court decision upon which I had previously relied.

## I. BACKGROUND

The facts and background of the case are set forth in detail in my previous order. I focus herein on the facts relevant to defendant's motion for reconsideration, which hinges on the meaning of the term "any pending proceeding."

The government charged defendant with obstructing a proceeding before the Department of Homeland Security (DHS), contrary to 18 U.S.C. § 1505, namely the administrative arrest of Eduardo Flores-Ruiz for purposes of immigration removal proceedings. Section 1505 provides, in pertinent part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any

> inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress [shall be fined or imprisoned for not more than 5 years].

18 U.S.C. § 1505.

The government proposed the jury be instructed that the term "pending proceeding":

> simply means any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages of any agency administrative or investigative action from its inception to its conclusion. This includes all steps related to removal or reinstatement of removal by DHS and ICE, including the execution of an administrative arrest warrant.

(R. 55 at 25.) The government drew this language primarily from Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966). (R. 55 at 26.)[1]

Defendant proposed the jury be instructed that:

> An effort to arrest a person, or to execute an arrest warrant of any kind, is not a "proceeding" within the meaning of the crime charged in Count 2. As used in that count, the term "proceeding" means an actual administrative or judicial process apart from an attempt to arrest someone that was pending at the time, or at least was reasonably foreseeable to the defendant.

(R. 57 at 14.) In support, defendant cited United States v. Kirst, 54 F.4th 610, 621 (9th Cir. 2022) ("Rather, it was 'a "proceeding" within the meaning of § 1505,' because the agency had the power to issue subpoenas and compel testimony under oath. . . So, too, here. In conducting an investigation of an airplane crash, the NTSB has authority to issue subpoenas and to compel testimony under oath.") (quoting United States v. Kelley, 36 F.3d 1118, 1123 (D.C. Cir. 1994)), and United States v. Senffner, 280 F.3d 755, 761 (7th Cir. 2002) ("And, sufficient to

[1]The Seventh Circuit has no pattern instruction for § 1505 offenses. In Rice, the court held: "Proceedings before a governmental department or agency simply mean proceeding in the manner and form prescribed for conducting business before the department or agency, including all steps and stages in such an action from its inception to its conclusion." 356 F.2d at 712.

distinguish an investigative proceeding (from a mere police investigation) is the authority to issue subpoenas and administer oaths.") (citing Kelley, 36 F.3d at 1127). (R. 57 at 14-15.)

The government opposed defendant's proposed instruction, noting that the term "proceeding" is "defined rather broadly" for purposes of § 1505. Senffner, 280 F.3d at 761; see also Rice, 356 F.2d at 712 ("'Proceeding' is a comprehensive term meaning the action of proceeding—a particular step or series of steps, adopted for accomplishing something."). While defendant proposed the jury be instructed that an "effort to arrest a person, or to execute an arrest warrant of any kind, is not a proceeding," this language was not, the government argued, contained in or supported by Kirst, Kelley, or Senffner. (R. 68 at 12.)

Kirst involved an NTSB investigation into a plane crash. The defendant, who had lied to the NTSB, argued that the investigation could not be a proceeding because the agency lacked regulatory or adjudicatory authority. 54 F.3d at 619. The Ninth Circuit disagreed, holding that an investigation by an agency with the power to issue subpoenas was a proceeding. Id. at 621. The government asserted that this decision did not have anything to do with whether an administrative arrest warrant could be a step in an agency proceeding. (R. 68 at 13.)

In Kelley, the defendant argued that the investigative activities of USAID-OIG fell outside of § 1505 because the term "proceeding" only applied to "adjudicatory or rule-making activities." 36 F.3d at 1127. The D.C. Circuit disagreed, finding that although a "mere police investigation" would not be a proceeding, even investigative activities can qualify as proceedings in part because the agencies might have some adjudicative power or the ability to enhance their activities through subpoenas or administrative warrants. See id. The government argued that, rather than supporting defendant's position, Kelley confirmed that issuing or executing an administrative warrant can be a step in a proceeding. (R. 68 at 13.)

Finally, in Senffner, the defendant argued that the SEC's effort to trace funds was not a proceeding because the SEC had no independent authority to freeze or distribute assets or impose civil penalties but instead needed to obtain an order from a court. 280 F.3d at 760. Citing Kelley, the Seventh Circuit found that an SEC investigation was a proceeding rather than a "mere police investigation" given the agency's ability to issue subpoenas, even if aspects of the investigation did not proceed under that authority. Id. at 762.

The government noted that Senffner also cited United States v. Schwarz, 924 F.2d 410 (2nd Cir. 1991), where customs officials at an airport detained a shipment of arms destined for Poland. When looking into the shipment, officials interviewed the defendants, who gave false information. The defendants argued that the interview was not a "proceeding," but the Second Circuit disagreed, finding that term is to be applied broadly and that the "interview of [the defendants] falls within the meaning of a 'proceeding' under § 1505." Id. at 423.

The government later provided supplemental authority on the issue: United States v. Hernandez, No. 3:23cr122, 2024 WL 23147 (E.D. Va. Jan. 2, 2024). (R. 75.) In Hernandez, the defendant was ordered removed pursuant to a final order of removal in December 2019. In May 2023, he was taken into ICE custody awaiting deportation. Id. at *1. After the defendant escaped from ICE custody, the government charged him with obstructing a proceeding in violation of 18 U.S.C. § 1505. Id. The defendant moved to dismiss the indictment, arguing that the 2023 execution of the removal order was not part of the proceeding, which ended upon the issuance of the final order of removal in 2019. Id. at *4. In rejecting this argument, the court relied upon the definition of "proceeding" from the Eighth Circuit's decision in Rice, holding that the term includes the step of executing a final order, including ICE's execution of the final removal order of the defendant. Id.

Defendant responded that Hernandez was on appeal, with the holding the government cited as the primary issue. (R. 76 at 1.) Defendant argued that the court should instead rely on United States v. McHugh, 583 F. Supp. 3d 1, 13 (D.D.C. 2022), in particular its discussion of the term "before," which refers to some proceeding in the presence of the government agency itself and concerning some second entity. (R. 76 at 1-2.)

I instructed the jury as follows:

> The Department of Homeland Security (DHS) is a department of the United States and Immigration and Customs Enforcement (ICE) is an agency within DHS. In addition, "pending proceeding" simply means any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its inception to its conclusion.

(R. 94 at 22.)

In support, I cited United States v. Hernandez, No. 3:23cr122, 2024 U.S. Dist. LEXIS 649, at *7 (E.D. Va. Jan. 2, 2024) (citing Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966)), and United States v. Senffner, 280 F.3d 755, 761 (7th Cir. 2002). (R. 97 at 4 n.5.) I concluded that defendant's proposed instruction defined "proceeding" too narrowly under § 1505. I found Hernandez and the cases it cited persuasive on this point. Defendant relied on McHugh, but that case concerned a different statute, § 1512, which refers to an "official proceeding." The McHugh court held that the term "official proceeding" as set forth in § 1515(a)(1) should be defined narrowly. 583 F. Supp. 3d at 12. However, the Seventh Circuit has held that the term "proceeding" is defined "rather broadly" for the purpose of § 1505, Senffner, 280 F.3d at 761, consistent with the Hernandez court's distinction between § 1505 and § 1512. See 2024 U.S. Dist. LEXIS 649, at *13-15. I further noted that the first sentence of the defense proposal did not appear to be supported by the authorities cited. Finally, I noted

that § 1505 did not require a "second, outside party." In any event, the proceeding here did involve a second party, i.e., Flores-Ruiz. (R. 94 at 5.)

At trial, the government presented testimony from Anthony Nimtz, a supervisory detention and deportation officer with Immigration & Customs Enforcement (ICE), Enforcement & Removal Operations (ERO), who discussed the steps in a removal proceeding. (Trial Tr. at 210-23; see Govt.'s Ex. 47, demonstrative exhibit.) The government presented similar testimony from assistant field office director Cassandra Kubiszewski (Tr. at 525-27) and from ICE/ERO deportation officer Joseph Vasconcellos (Tr. at 414-18). Those steps are:

1. Check databases

2. Identify target

3. Confirm immigration status

4. Determine criminal history

5. Prepare arrest operation plan, e.g., FOW (field operations worksheet)

6. Draft and submit arrest warrant (e.g., Form I-200, Arrest Warrant)

7. Authorized Immigration Officer determines whether probable cause exists and, if so, signs Arrest Warrant (Form I-200)

8. Arrest target

9. Serve and sign Form I-200 Certificate of Service

10. Complete and serve charging document (e.g., Form I-871, Notice of Intent/Decision to Reinstate Prior Removal Order)
    a. Contest prior removal? (Supervisor or OPLA adjudicates)
    b. Asylum claim? (Refer to USCIS for adjudication)
    c. 8 U.S.C. § 1326 eligible? (Refer to USAO for prosecution)

11. Decision, Order, and Certification Reinstating Prior Removal Order by Authorized Deciding Official (Form I-871)

12. Authorized Immigration Officer signs Warrant of Removal (Form I-205)

13. Fingerprinting, verification, and removal

(R. 123 at 5; Govt.'s Ex. 47.)

In the present case, the government alleged that defendant obstructed an arrest (step eight). Regarding the earlier steps, Vasconcellos testified that he searched agency databases with regard to Flores-Ruiz, learning that he had previously been removed from the United States in 2013 and that he had recently been arrested in Milwaukee County. (Trial Tr. at 388.) Through biometric confirmation (fingerprints) Vasconcellos learned that the Eduardo Flores-Ruiz arrested in Milwaukee County was the same person removed years earlier. (Trial Tr. at 388-89.) Vasconcellos further confirmed that Flores-Ruiz had no legal status in the United States. Vasconcellos then generated a FOW and I-200 warrant for arrest (Trial Tr. at 389. Govt.'s Ex. 1A), sending the I-200 to his supervisor, Nimtz, for approval; Nimtz determined that there was probable cause to believe that Flores-Ruiz was removable from the United States (Trial Tr. at 391) and signed the warrant (Trial Tr. at 392). The FOW Vasconcellos prepared included Flores-Ruiz's criminal history, including his recent arrest for strangulation/suffocation and domestic abuse. (Trial Tr. at 393; Govt's Ex. 45.) Vasconcellos learned that Flores-Ruiz was scheduled to appear in court on April 18, 2025, and he and his team planned to arrest Flores-Ruiz at the courthouse. (Trial Tr. at 394.) As discussed in the earlier Rule 29 decision, the government presented evidence that defendant interfered with the agents' plan to arrest Flores-Ruiz inside the courthouse; nevertheless, the agents were able to apprehend and arrest Flores-Ruiz after a brief foot chase outside the courthouse. (R. 117 at 9-10, citing Trial Tr. at 130, 267-69, 327, 329, 544-45.)

Nimtz testified that ICE/ERO cannot remove someone immediately upon arrest pursuant to an administrative warrant; there are additional steps in the process. (Trial Tr. at 211.) At the

time of arrest, ICE would serve and sign the I-200 under the certificate of service portion. (Trial Tr. at 211.) Vasconcellos testified that he certified that he served the I-200 on Flores-Ruiz in this case. (Trial Tr. at 414.)

Nimtz testified that they would then take a sworn statement from the alien and complete and serve the charging document, in this case a notice of intent to reinstate the prior order of removal. (Trial Tr. at 211.) At this step, the alien is afforded an opportunity to contest the prior order of removal and/or to make a claim for asylum. (Trial Tr. at 212.) If the person makes an asylum claim, the issue is referred to US Citizenship & Immigration Services (USCIS) for adjudication; the alien cannot be removed until the claim is adjudicated. (Trial Tr. at 213.) Also at this step, ICE makes a determination whether the alien is subject to prosecution for illegal reentry under 8 U.S.C. § 1326 and, if so, may make a referral to the United States Attorney's Office (USAO) for prosecution. (Trial Tr. at 213-24.) Vasconcellos testified that Flores-Ruiz declined to make a statement (Trial Tr. at 415), and he did not make a claim for asylum (Trial Tr. at 416). Nimtz testified that a prosecution referral was made in this case, and Flores-Ruiz was criminally charged under § 1326. (Trial Tr. at 214; see also Trial Tr. at 517.)

Nimtz testified that the next step is completion of form I-871, notice of intent to reinstate the prior order of removal, and then issuance of an I-205, warrant of removal or deportation. (Trial Tr. at 214.) In this case, the I-871 was completed and signed by acting supervisor Michael Gavin in Nimtz's absence, and given to Flores-Ruiz; Flores-Ruiz declined to make a statement contesting the determination and refused to sign it. (Trial Tr. at 416-17, 219-20.) The I-205 was also completed and signed by Gavin. (Trial Tr. at 221, 416.) Vasconcellos obtained Flores-Ruiz's biographical information, including his fingerprints and photo (Trial Tr. at 418), and Flores-Ruiz was physically removed on November 13, 2025 (Trial Tr. at 223).

The jury convicted defendant of violating § 1505. (R. 96.) In her motion for acquittal and/or a new trial, defendant argued, inter alia, that § 1505 should be construed narrowly. I rejected this argument, stating:

> In ruling on the party's jury instruction dispute over the meaning of the term "proceeding," I found United States v. Hernandez, No. 3:23cr122 (RCY), 2024 U.S. Dist. LEXIS 649, at *7 (E.D. Va. Jan. 2, 2024) (citing Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966)), persuasive. (R. 97 at 5.) As defendant notes, Hernandez is on appeal, with the case argued before the Fourth Circuit in January 2026. (R. 109 at 33 n.7.) However, nothing in the current submission persuades me that the instructions were wrong. As I noted in the instructions order, the Seventh Circuit has held that the term "proceeding" is defined "rather broadly" for the purpose of § 1505, United States v. Senffner, 280 F.3d 755, 761 (7th Cir. 2002), undermining defendant's claim, based on Supreme Court decisions construing different statutes, that § 1505 must be construed narrowly. As the government notes, other circuits construing § 1505 have also recognized the broad nature of the term "proceeding." (R. 113 at 29, collecting cases.)

(R. 117 at 27-28.)

After the Fourth Circuit issued its decision in Hernandez, defendant moved for reconsideration. The government responded and defendant replied, and I held oral argument. I now deny the motion.

## II. MOTIONS FOR RECONSIDERATION

While the Federal Rules of Criminal Procedure do not authorize motions for reconsideration, they are permitted as a matter of general practice. United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010). Such motions "'serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence.'" United States v. Love, No. 1:25-cr-00045-JPH-MJD, 2026 U.S. Dist. LEXIS 4075, at *2 (S.D. Ind. Jan. 9, 2026) (quoting Eberhardt v. Walsh, 122 F.4th 681, 688 (7th Cir. 2024)); United States v. Canfield, No. 25-CR-150, 2025 U.S. Dist. LEXIS 255445, at *3 (E.D. Wis. Dec. 10, 2025) ("The purpose of a motion to reconsider is 'to correct manifest errors of law or fact or to present newly discovered

evidence.'") (quoting Caisse Nationale de Credit Agricole v. CBI Indus., 90 F.3d 1264, 1269 (7th Cir. 1996)); see also United States v. Kramer, No. 87-cr-40070 JPG, 2022 U.S. Dist. LEXIS 212765, at *2 (S.D. Ill. Nov. 23, 2022) ("This rule allows district courts the opportunity to correct their own alleged errors before burdening a court of appeals with correcting them.") (citing Rollins, 607 F.3d at 502).

Motions for reconsideration are not to be granted lightly. As one court put it:

> The standard is well-established and exacting: a court should only grant a motion to reconsider where the court's misapprehension has produced a manifest error of fact or law, or where a controlling or significant change in fact or law has materialized since the court issued its initial ruling. Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990); Oto v. Metro. Life Ins. Co., 224 F.3d 601, 606 (7th Cir. 2000). Such circumstances are rare, and the moving party bears a heavy burden to prove one exists. Bedford v. DeWitt, 695 F. Supp. 3d 998, 1001 (N.D. Ill. 2023).

United States v. Reeves, No. 21 CR 50027, 2025 U.S. Dist. LEXIS 64872, at *7 (N.D. Ill. Apr. 4, 2025); see also United States v. Linder, No. 12 CR 22, 2013 U.S. Dist. LEXIS 18346, at *5-6 (N.D. Ill. Feb. 12, 2013):

> The purpose of a Motion to Reconsider is to "bring the court's attention to newly discovered evidence or to a manifest error [of] law or fact." Neal v. Newspaper Holdings, Inc., 349 F.3d 363, 368 (7th Cir. 2003). A party moving for reconsideration bears a heavy burden. See Caisse Nationale de Credit Agricole v. CBI Industries, Inc., 90 F.3d 1264, 1270 (7th Cir. 1996). A motion to reconsider is not the appropriate vehicle to rehash previously rejected arguments or introduce new legal theories. See Musch v. Domtar Industries, Inc., 587 F.3d 857, 861 (7th Cir. 2009); Bally Export Corp. v. Balicar, Ltd., 804 F.2d 398, 404 (7th Cir. 1986). Nor should it be used to advance evidence, arguments, and legal theories that were available earlier and could have been presented before the district court entered its judgment. See Sigsworth v. City of Aurora, 487 F.3d 506, 512 (7th Cir. 2007) (citing LB Credit Corp. v. Resolution Trust Corp., 49 F.3d 1263, 1267 (7th Cir. 1995)); Anderson v. Flexel, Inc., 47 F.3d 243, 247-48 (7th Cir. 1995); King v. Cooke, 26 F.3d 720, 726 (7th Cir. 1994). Instead, motions for reconsideration are utilized for very limited purposes: to correct manifest errors of law or fact, present newly discovered evidence, or to address an intervening and substantial change in the controlling law occurring after the submission of the issues to the court. See Cosgrove v. Bartolotta, 150 F.3d 729, 732 (7th Cir.

1988); Publishers Resource, Inc. v. Walker-Davis Publications, Inc., 762 F.2d 557, 561 (7th Cir. 1985) (quoting Keene Corp. v. International Fidelity Ins. Co., 561 F. Supp. 656, 665-666 (N.D. Ill. 1982), aff'd and adopted in relevant part, 736 F.2d 388, 393 (7th Cir. 1984)). A manifest error of law is the "disregard, misapplication, or failure to recognize controlling precedent." Oto v. Metropolitan Life Ins. Co., 224 F.3d 601, 606 (7th Cir. 2000) (quoting Sedrak v. Callahan, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)).

## III. DISCUSSION

### A. Positions of the Parties

In her request for reconsideration, defendant notes that I previously relied on the district court's decision in Hernandez to conclude that the term "pending proceeding" is sufficiently broad to encompass the obstruction of an ICE administrative warrant. (R. 120 at 1, 3.) I also distinguished attempts by the defense to link limitations imposed by the Supreme Court on other obstruction statutes to the language of 18 U.S.C. § 1505. (R. 120 at 4, citing R. 117 at 25-25, discussing Fischer v. United States, 603 U.S. 480 (2024); Marinello v. United States, 584 U.S. 1 (2018); and United States v. Aguilar, 515 U.S. 593 (1995).) On appeal in Hernandez, the Fourth Circuit reversed, with the panel majority holding that the defendant's obstruction of ICE's efforts to enforce an order of removal did not obstruct a "pending proceeding" within the meaning of § 1505.[2] Defendant contends that I should accordingly reconsider my previous decision and enter a judgment of acquittal under Fed. R. Crim. P. 29.[3]

[2]Defendant contends that the Fourth Circuit "held that obstructing an ICE arrest warrant (the same conduct charged in this case) does not constitute a violation of 18 U.S.C. § 1505." (R. 120 at 2; but cf. R. 120 at 4, stating that Hernandez involved "the execution of an ICE arrest warrant of removal".) That is incorrect. As will be further discussed below, in Hernandez, ICE was attempting to enforce an order of removal, not execute an arrest warrant.

[3]In the alternative, defendant argues I should order a new trial with proper instructions. If defendant is correct, however, retrial would be pointless, as the ICE removal action she obstructed would not be a "proceeding" under § 1505 as a matter of law.

(R. 120 at 2.)

Defendant states that the Hernandez majority held that "enforcement proceedings" are not "pending proceedings" as that term is used in 18 U.S.C. § 1505. (R. 120 at 4.) Specifically, while conceding that administrative investigations—not just adjudications—are covered, the court carved out enforcement actions. (R. 120 at 5.) Defendant further states that the Fourth Circuit in Hernandez likened the execution of a removal warrant to "mere police" activity, which has long been excluded from the definition of a proceeding under § 1505. (R. 120 at 5-6.) Defendant also notes that the majority in Hernandez cited Fischer, Marinello, and Aguilar in support of a narrowed construction of § 1505. (R. 120 at 6.) Finally, defendant stresses that the specific issue in Hernandez was one of first impression: no circuit had previously determined whether § 1505 encompassed immigration removal proceedings. (R. 120 at 6.)

Defendant concludes that this court repeatedly relied upon a district court decision that has now been reversed. In a case of first impression, the Fourth Circuit held on appeal that 18 U.S.C. § 1505 does not apply to a charge of obstructing the execution of an ICE warrant, as was alleged in this case. The proof at trial was that the only "proceeding" taking place was the execution of the ICE warrant for enforcement of removal; there was no ongoing and separate factual investigation undertaken, she contends. (R 120 at 7.) In short, defendant claims, the factual and legal record in this case cannot be squared with the Fourth Circuit's holding. (R. 120 at 8.)

The government responds that the majority opinion in Hernandez is neither binding nor persuasive, and thus fails to satisfy the "heavy burden" required for reconsideration. (R. 123 at 1.) The government notes that while defendant describes Hernandez as a case of first impression, there is a substantial body of caselaw, dating back 60 years to the Eighth Circuit's

decision in Rice, construing the term "proceeding" broadly for purposes of § 1505. (R. 123 at 2, collecting cases.) As this court noted in denying the Rule 29 motion initially, while none of these cases involved ICE arrests, "this simply reflects the fact that the statute applies to many different agency proceedings; it is no reason to disregard the manner in which these courts construed the key term." (R. 117 at 30.) The government argues that by charting a different path—placing ICE enforcement actions outside the scope of the statute—the Hernandez majority opinion is an outlier. (R. 123 at 3.)

The government continues that this court found the district court decision in Hernandez, which applied Rice, persuasive, and that the decision remains persuasive. This court did not make Hernandez the linchpin of its analysis. (R. 123 at 3.) Rather, the court focused on the consistency between the instruction given and previous caselaw, including the Seventh Circuit's observation in Senffner that the term proceeding is defined rather broadly for purposes of § 1505. (R. 123 at 3-4.) This consistency is more important, the government contends, than the outcome of the Fourth Circuit appeal. (R. 123 at 4.) The government criticizes defendant for failing to address Senffner in her motion for reconsideration, noting that the Seventh Circuit there held that the SEC's "investigation and enforcement of securities law violations" was a proceeding. 280 F.3d at 760 (emphasis added); see also United States v. Hopper, 177 F.3d 824, 831 (9th Cir. 1999) ("Additionally, enforcement of tax liens by the IRS is an IRS proceeding.") (emphasis added), overruled in part on other grounds, United States v. Lucas, 101 F.4th 1158 (9th Cir. 2024) (en banc).

The government argues that Hernandez is also distinguishable on the facts. In that case, the defendant was ordered removed, in absentia, by the Executive Office for Immigration Review in 2019, but remained a fugitive until 2023 when he was arrested on state charges. (R.

123 at 4.) After his release by the state, he was taken into ICE custody pursuant to a warrant of removal (I-205) but escaped before his planned deportation. (R. 123 at 4-5.) The district court found that the escape obstructed a pending proceeding, but the appellate panel majority concluded that ICE's execution of a removal decision already made by a different agency did not constitute a pending proceeding for purposes of § 1505. In the present case, conversely, defendant intervened earlier in the proceeding, before Flores-Ruiz's order of removal was reinstated and a warrant of removal was issued. (R. 123 at 5.) Following the steps set forth on the government's demonstrative exhibit, set forth on pages six to seven above, defendant obstructed the proceeding between steps seven and eight, while the defendant in Hernandez escaped after step 12, when all that was left to do was physical removal. (R. 123 at 6.)

The government further notes that even the Hernandez majority agreed an agency investigation into whether a person had violated federal law could be an existing proceeding. Here, ICE had such a secondary purpose: to determine whether Flores-Ruiz should be referred to the USAO for criminal prosecution under 8 U.S.C. § 1326. Indeed, such a referral was made and a prosecution undertaken against Flores-Ruiz. (R. 123 at 6.)

The government concludes that while the majority opinion in Hernandez did break new ground, it did so by marginalizing precedent, including from the Seventh Circuit, and ignoring the ordinary meaning of the words in § 1505 to exclude ICE enforcement efforts from the scope of the term "proceeding." (R. 123 at 6-7.) The government urges the court not to change course at this late hour and instead proceed to sentencing. (R. 123 at 7.)

In reply, defendant downplays the factual differences between this case and Hernandez. Essentially, she contends, the only difference is that in her case ICE issued an administrative warrant (I-200) before reinstating the prior removal order and issuing a warrant of removal (I-

205). (R. 124 at 2.) And, she notes, witnesses testified that these forms were both part of the same removal process. (R. 124 at 3, citing Trial Tr. at 223; see also Tr. at 526, noting that the I-200 is "more user friendly".) In any event, Hernandez squarely held that ICE enforcement actions were not "pending proceedings" under § 1505. In her case, government prosecutors and witnesses repeatedly told the jury that defendant obstructed an "enforcement action." (R. 124 at 3.) In Hernandez, as here, the government outlined separate procedural steps beyond the warrant at issue, which together constituted an enforcement "proceeding," yet the Fourth Circuit was unpersuaded. (R. 124 at 5-6.) In opposing reconsideration, the government argued that defendant obstructed the proceeding at an earlier stage but this, defendant contends, overlooks that the I-200 arrest was an effort to reinstate the previous removal order. In any event, if all steps are part of the same proceeding, it logically should not matter at which stage the interference occurred. (R. 124 at 7.) Defendant contends that subsequent contingencies, such as criminal prosecutions, are possible in every case in which a warrant is issued, particularly if the alien violated a prior removal order.[4] (R. 124 at 6.)

Defendant further replies that the Hernandez majority squarely addressed Senffner. (R. 124 at 7.) First, the majority noted that Senffner excluded "mere police activity" from the coverage of § 1505 (as other courts had done), and the majority found that ICE enforcement actions mirror traditional law enforcement activity. Second, the majority found that Senffner dealt with pending litigation in federal court, unlike the isolated enforcement action at issue with the execution of an ICE arrest warrant. Third, the majority noted that Senffner pre-dated

[4]It appears the alien in Hernandez was not subject to a § 1326 prosecution for illegal reentry for the simple reason that he (unlike Flores-Ruiz) never left the country after the initial removal order was entered.

Fischer and Marinello, which cautioned against a broad reading of obstruction statutes. (R. 124 at 8.) Defendant concludes that at worst Senffner is silent on the subject of ICE enforcement, meaning this is an issue of first impression. (R. 124 at 9.)

Defendant complains that, while the government was content to press reliance on the district court's decision in Hernandez previously, it now seeks to downplay the case's significance. (R. 124 at 9-10.) The Fourth Circuit is the only appellate court to consider whether obstruction of an ICE administrative warrant violates § 1505, and its decision provides compelling grounds for this court to reconsider. (R. 124 at 10.) Finally, defendant argues that the Fourth Circuit's decision suggests ambiguity in § 1505, such that the rule of lenity comes into play in her favor. (R. 124 at 10.)

**B. Analysis**

**1. Hernandez**

I begin with a detailed discussion of Hernandez. Dennis Zeledon Hernandez (Zeledon), a native of El Salvador, crossed the U.S. border in Texas in July 2016. On encountering border patrol agents, he made an asylum claim and was released on bond pending a hearing to address the claim before the Executive Office for Immigration Review (EOIR). Zeledon failed to appear for his December 2019 hearing, so the immigration court ordered him removed in absentia. 173 F.4th at 96. He remained a fugitive until May 2023, when he was arrested by state authorities for drunk driving and other charges. Id. at 96-97, 104. At that point, ICE issued a warrant for his removal, and he was transferred to ICE custody. ICE scheduled his removal for July 12, 2023, but he escaped from custody on July 2, 2023. Zeledon was arrested five days

later, and the government subsequently charged him with a violation of 18 U.S.C. § 1505,[5] alleging that he obstructed a pending proceeding when he escaped ICE custody to prevent ICE's enforcement of the order of removal issued by EOIR. Id. at 97.

Zeledon moved to dismiss the § 1505 count, arguing that no immigration court proceeding was pending at the time of his escape. The district court denied the motion, citing the broad construction of the term "proceeding" from Rice and other cases, and holding that execution of an EOIR-issued removal order was a proceeding under the statute. Id.

On appeal, Zeledon argued that he did not obstruct a "proceeding" because the term only includes the steps leading to the conclusion of the agency's decision-making process. Id. at 97-98. As a result, he argued, the district court erroneously extended § 1505 to include ICE enforcement actions. The government responded that the term "proceeding" extended to agency enforcement operations, so it encompassed ICE's enforcement of EOIR's order of removal. The government further argued that ICE's execution of a removal warrant is itself a pending proceeding under § 1505. Id. at 98.

The panel majority rejected these arguments and vacated Zeledon's conviction. Id. First, after stressing that the proceeding at issue must be "pending" "before" the agency, id. at 99, the majority held: "Read together, ICE's execution of the immigration court's judgment cannot be part of the proceedings before the immigration court because the hearing before the immigration court had concluded—Zeledon was no longer 'awaiting decision' from the immigration judge." Id. at 100. Citing immigration regulations, the majority noted that the EOIR's order of removal became final immediately upon entry, such that no EOIR proceedings were

[5] The government also charged him with escape under 18 U.S.C. § 751(a), but that charge is irrelevant here.

pending at the time of Zeledon's escape. Id.

Recognizing the caselaw requiring the term "any proceeding" be construed broadly, the majority likened ICE's action in this case to "mere police" activity, which courts had long excepted from § 1505. "ICE's actions in this case mirror traditional law enforcement activity." Id. The majority further distinguished Senffner and Hopper, both of which involved agency enforcement actions, because:

> Neither agency was engaged in isolated enforcement activity; instead, both agencies sought enforcement based on that same agency's investigation of legal violations. . . . Put another way, the agency's enforcement action in both cases facilitated an existing proceeding: the agency's effort to determine if individuals had violated federal law. Neither case permits us to find that ICE's execution of a warrant, which occurred after EOIR determined that Zeledon should be removed, was part of a pending proceeding before EOIR.

Id. at 101-02.

Finally, the majority dismissed the government's argument that use of the word "any" in the statute supported conviction, citing Fischer, Marinello, and the rule of lenity. "The plain text of § 1505 forecloses us from adopting the Government's reading of the statute, and Zeledon's conviction under § 1505 must be vacated." Id. at 102.

Regarding the government's second argument, the majority held that ICE enforcement proceedings are not pending proceedings being had before ICE for purposes of § 1505. Id. The majority conceded, as required by precedent, that the statue covers more than agency adjudications; it also covers agency investigations. Id. However, after noting that "factual investigations generally enable the adjudicative process," and citing the definition of the term "administrative proceeding" from Black's Law Dictionary, the majority concluded that enforcement actions are excluded. Id. at 103.

The government noted that ICE, like the NTSB (whose investigation was at issue in

Kirst), has the power to take oaths and issue subpoenas, but the majority responded that "an agency's possession of these powers does not turn any action by that agency into a 'proceeding.'" Id. at 103.

> [W]hile the Government argues that ICE's power to swear out subpoenas and issue warrants in an investigation turns its enforcement actions into a "proceeding," possessing such powers alone is not enough. Instead, what matters is the context in which the agency exercises such powers and how those powers assist the agency in the relevant functions. See Senffner, 280 F.3d at 761 (noting the authority to "issue subpoenas and administer oaths" was relevant in the investigatory context). Here, ICE was tasked with executing a warrant of removal. And when enforcing a warrant of removal, ICE wields neither power to further an adjudicative process. That difference distinguishes the case before us from Kirst.
>
> Here, too, we find the Government's reliance on Senffner and Hopper unpersuasive. As discussed above, neither case concerns an agency's pure enforcement action. The enforcement actions taken in those cases extended from the agency's investigations. In contrast, ICE was merely executing a warrant of removal pursuant to an EOIR judgment. The Government has not pointed to—and we could not identify—a case where an agency's execution of a decision already issued by a different agency constituted a proceeding under § 1505. Neither case empowers us to read § 1505 to encompass isolated ICE's execution of a warrant of removal.

Id. at 103-04.

Judge Wilkinson issued a lengthy dissent, stating that:

> the majority consults technical definitions and recasts case law across the country to conclude that a "proceeding" artificially ends at the close of some ill-defined decisionmaking process. But the word's ordinary meaning captures a continuum of targeted actions spanning investigations, adjudications, and enforcement alike. Indeed, enforcement of legal decisions is often part and parcel of the legal decisionmaking process itself.

Id. at 104 (Wilkinson, J., dissenting.)

Judge Wilkinson began with the key term—"proceeding"—which lay and law dictionaries alike consistently describe in broad terms. Id. Similarly, court decisions dating back at least six decades to Rice uniformly hold that the term should be construed broadly. Id. at 104-05

(collecting cases from the Second, Third, Sixth, Seventh, Ninth, and Tenth Circuits). Turning to this case, Judge Wilkinson stated:

> Congress envisioned a "proceeding" as a continuing sequence of investigation, adjudication, and enforcement, which it wished to "proceed" seamlessly and unobstructed. The majority, by contrast, would chop this whole process into little pieces, demarcated by court decisions which will take years to play out. As it sees things, "proceeding" refers only to the steps leading up to an agency's decision and thus excludes any subsequent enforcement. Maj. Op. at 5-6. To get there, the majority shirks all the case law above, and in so doing shrivels Congress's intention to have those like Zeledon, who seek to frustrate the implementation of court removal orders, liable under § 1505.

Id. at 105. In arbitrarily excluding enforcement, the majority effectively deleted the term "any" from the statute. Id. at 105-06.

Judge Wilkinson further noted that the majority's focus on adjudication overlooked the fact that § 1505 is directed at administrative agencies, whose powers are different than and generally exceed those of courts. Id. at 106. While courts are largely adjudicative bodies, agencies often wield significant investigative and enforcement powers—frequently in aid of courts, but which courts themselves cannot replicate. Id. Given these differences, it makes little sense, Judge Wilkinson explained, to invoke such narrow definitions in the context of § 1505. Id. at 107. "Taking everything together, § 1505 proscribes specific interference with any ongoing series of actions, conducted in a manner prescribed by law, that an agency performs to accomplish a targeted objective." Id.

Judge Wilkinson continued that the majority's concession that investigations are covered undercut its ordinary-meaning argument, i.e., that "pending" and "being had before" require some ongoing decisionmaking process before a tribunal. "Section 1505 either criminalizes obstruction of more than just adjudications, or it does not. The majority cannot have it both ways." Id.

Indeed, Judge Wilkinson noted, at least two sister circuits had already applied § 1505 not only to investigations, but also to enforcement. Id. at 107-08 (citing United States v. Hopper, 177 F.3d 824; United States v. Senffner, 280 F.3d 755). In Hopper, the defendants were convicted under § 1505 for trying to use a fraudulent monetary instrument to satisfy a judgment that a federal court had awarded to the IRS. 177 F.3d at 828-29. On appeal, they argued that their conduct at most obstructed the court's judgment, not an agency's proceeding, and thus fell outside of § 1505. Id. at 830. But the Ninth Circuit rejected this argument, stating that the defendants' fraud, had it worked, "would have precluded collection of the tax debt and the enforcement of the IRS tax liens." Id. The court added that "[u]ntil the debt behind those liens was satisfied, the collection proceeding before the IRS continued." Id. And in Senffner, the defendant hid assets from the SEC that were subject to a district court's temporary restraining order. 280 F.3d at 759. Appealing his § 1505 conviction, the defendant "argue[d] that he only obstructed the district court, not the SEC" because the agency "had no independent authority to freeze or distribute assets, or to impose civil penalties." Id. at 760. The Seventh Circuit disagreed, explaining that the SEC's "proceeding did not end by virtue of the filing of the lawsuit" and that the defendant's attempted obfuscation "obstructed the district court and, as a consequence, the SEC's initial investigation and enforcement of securities law violations (an SEC proceeding)." Id. Judge Wilkinson explained that just as a defendant runs afoul of § 1505 by interfering with the IRS's enforcement of a judgment or the SEC's enforcement of a temporary restraining order, so too did Zeledon by interfering with ICE's enforcement of the removal order. 173 F.4th at 108. He concluded:

> The statute speaks of "any" pending proceeding, not some small subset of proceedings that the majority envisions. Moreover, a proceeding remains pending when the very order of the proceeding lies idle and unenforced. Courts not

> infrequently rely on agencies of one sort or another to enforce their orders, and obstruction of the agency's efforts fits right in with the language of § 1505. See Hopper, 177 F.3d at 830-31; Senffner, 280 F.3d at 760-61. Lacking any basis to distinguish these cases, then, the majority departs in substance from them. Worse still, it does so without even giving these courts the respect to acknowledge the circuit split it has made.

Id. at 108.

Finally, Judge Wilkinson responded to the majority's comparison of ICE removal operations to routine law enforcement activities:

> To reiterate, "proceeding" and "the due and proper administration of the law" refer to a continuum of targeted agency actions, not, say, the one-off decisions of an officer (or indeed an ICE agent) on the beat. Here, such targeted action began at the latest when ICE—pursuant to a removal order—detained Zeledon. This targeted action persisted across ICE's preparations to remove him, such as when it examined his health and transferred him between facilities. And the targeted action remained active when Zeledon, only a few days before his scheduled removal, escaped custody. None of ICE's involvement was the stuff of rote police work. Rather, it applied a host of laws laden with agency discretion to effectuate the order of an Immigration Court. In the process, the agency operated under "any pending proceeding."

Id. at 109.

**2. Other Pertinent Caselaw**

While Hernandez appears to be the only case directly addressing ICE removal actions under § 1505,[6] other courts have addressed the scope of the statute, including its potential application to agency "enforcement" activities. I begin with Senffner, the leading case from the Seventh Circuit. That case involved a somewhat complicated factual backdrop. 280 F.3d at

---

[6]As the government noted at oral argument, in United States v. Abrams, 427 F.2d 86 (2nd Cir. 1970), the court upheld a conviction under 18 U.S.C. § 1505 for influencing a witness to lie to the Immigration and Naturalization Service (INS). The court stated: "Nor do we think there can be any doubt that an application for voluntary departure is a 'proceeding' within the intent of 18 U.S.C. § 1505 (1964)." Id. at 90. However, the court engaged in no further analysis of the meaning of the term.

758-59. Summarized, the Securities and Exchange Commission (SEC) investigated the defendants for a variety of investment schemes involving the Chicago Housing Authority (CHA), then filed a lawsuit seeking civil penalties and interest; a temporary and permanent injunction restraining further securities violations; and a freeze of assets. The district court issued a temporary restraining order (TRO), freezing the assets of one of the involved entities, called CCI. Id. at 759. Senffner schemed to redirect some of the funds subject to the TRO, leading to charges for contempt of court under 18 U.S.C. § 401(3), obstruction of justice (in relation to the SEC lawsuit) under 18 U.S.C. § 1503, and obstruction of a proceeding pending before the SEC under 18 U.S.C. § 1505. Id.

After a jury convicted him of all three counts, Senffner appealed, challenging, inter alia, the sufficiency of the evidence on the § 1505 count. Id. at 759-60. As is pertinent here, Senffner argued that the evidence was insufficient to convict him of obstruction of a proceeding pending before the SEC because the SEC had no independent authority to freeze or distribute assets, or to impose civil penalties, but needed to obtain an order from the federal district court. He claimed that he only obstructed the district court, not the SEC. The Seventh Circuit rejected his argument, as "he obstructed both." Id. at 760. The court explained:

> The SEC, as a government agency, can only act through individuals or other instrumentalities using the enforcement mechanisms it has available. These mechanisms may be internal or involve other entities, including the federal courts. Therefore, whenever an entity acting for or at the direct request of an agency has been obstructed, the agency itself has also been obstructed. See, e.g., United States v. Aguilar, 515 U.S. 593, 600 (1995) (recognizing that although no obstruction occurs when an individual lies to FBI agents who might or might not testify before a grand jury, it may occur if the "agents acted as an arm of the grand jury, or indeed that the grand jury had even summoned the testimony of these particular agents"). The fact that an agency cannot perform a particular function itself or through its own labor is of no moment; rather the question is whether the agency proceeding affirmatively, by its specific actions, seeks to have the particular function performed as part of the proceeding.

> The purpose of the SEC's initial proceeding, investigating the securities law violations of Lauer, Senffner, and CCI, was not solely to investigate those violations for the sake of exposing them, but also to identify and recover CHA funds involved in the violations to remedy them. More to the point, that proceeding did not end by virtue of the filing of the lawsuit. To the contrary, the SEC prosecution of the lawsuit was a natural extension of that proceeding, and its efforts to recover and return the funds were necessary to achieve its goal. By obstructing the recovery of CHA funds, Senffner obstructed the district court, and, as a consequence, the SEC's initial investigation and enforcement of securities law violations (an SEC proceeding), which sought the return of the funds.

Id. at 760 (footnote omitted).

The court further noted that the SEC's tracing of the funds could constitute a separate investigation, also a "proceeding," even though the SEC lawsuit was already in progress and the SEC used the district court's process rather than its own. "An SEC investigation is a 'proceeding'—a term that is defined rather broadly—for the purpose of section 1505." Id. at 761. The court further cited the Ninth Circuit's decision in Hopper, 177 F.3d at 830-31, where the court held that the enforcement of tax liens by the IRS is an IRS proceeding:

> Although Senffner tries to distinguish Hopper by pointing out that in that case the IRS was owed the particular debt, and the district court did not take control of the property involved there, neither distinction is persuasive. The SEC's interest, that the securities laws are properly enforced, is a concrete interest and it does not matter that the SEC was not itself actually harmed. The injury to its interest, the securities law violations in this case, could only be remedied if the funds were returned to their proper owner in accordance with the law. Not until that occurred was the agency proceeding completed. Whether the district court had control of the property or not is simply a rerun of Senffner's first argument, which we have already rejected.

280 F.3d at 761.

Hopper also presented a complicated factual backdrop involving the defendants' attempts to avoid paying taxes. 177 F.3d at 827-29. As is pertinent here, an Assistant United States Attorney, representing the IRS, obtained a judgment in federal court for unpaid taxes, which the defendants sought to satisfy with a phony instrument, id. at 828-29, leading to

charges under § 1505 for obstructing a proceeding before a department or agency of the United States, i.e., the IRS. The defendants argued that their actions may have obstructed the judgment of a federal court, but because federal courts are not "departments" or "agencies," they should not have been charged under § 1505. Id. at 830. The Ninth Circuit was unconvinced: "If accepted, the phony [instrument] would have precluded collection of the tax debt and the enforcement of the IRS tax liens. Until the debt behind those liens was satisfied, the collection proceeding before the IRS continued." Id. Specifically addressing the contention that the obstruction affected only the court, not the IRS, the Ninth Circuit said:

> [I]n this case, the IRS was a party to the judicial proceeding, and the phony [instrument] had the "natural and probable" effect of obstructing collection of delinquent taxes by the IRS. Additionally, enforcement of tax liens by the IRS is an IRS proceeding. The fact that the IRS was required to enforce its lien in federal court does not change the IRS's involvement. It was an IRS tax lien, prosecuted by an Assistant United States Attorney representing the IRS, and any money collected would have been paid to the IRS.
> . . .
> Because collection of delinquent taxes is an IRS proceeding, the [defendants] were properly convicted under 18 U.S.C. § 1505.

Id. at 831.

Other leading cases stress the broad scope of § 1505, without necessarily discussing enforcement actions. In Kelley, an employee of the United States Agency for International Development (USAID) conspired to solicit kickbacks from contractors on agency projects, and then conspired to conceal his activities. 36 F.3d at 1120. As is pertinent here, he was charged with obstruction under § 1505 for attempting to deceive investigators from USAID's Inspector General's Office. Id. at 1123. On appeal, the defendant-employee challenged his § 1505 conviction, arguing that the government failed to establish the existence of a "proceeding." Id. at 1127. Specifically, he claimed that § 1505 applies only to adjudicatory or rule-making

activities, not wholly investigatory activity. Id. The D.C. Circuit noted that other courts had held that agency investigative activities are proceedings within the scope of § 1505. "In those cases, the investigations typically have involved agencies with some adjudicative power, or with the power to enhance their investigations through the issuance of subpoenas or warrants." Id. The court acknowledged that for an investigation to be considered a proceeding, it must be more than a "mere police investigation." Id. But courts had held that investigations by an agency with the authority to issue subpoenas and administer oaths in conjunction with the investigation would qualify as a § 1505 proceeding. Id. The Kelley court explained:

> The Inspector General's office of AID is charged with the duty of supervising investigations relating to the proper operation of the agency. See 5 U.S.C. app. 3 § 2. In addition, the Inspector General is empowered to issue subpoenas and to compel sworn testimony in conjunction with an investigation of agency activities. Accordingly, the Inspector General's inquiries, albeit preliminary, constitute a "proceeding" within the meaning of § 1505.

Id.

In Kirst, the defendant lied to the National Transportation Safety Board (NTSB) during its investigation of a plane crash, leading to charges under § 1505. On appeal, he challenged his conviction, arguing that the NTSB investigation was not a "proceeding" within the meaning of § 1505. 54 F.4th at 612. Specifically, he argued that proceedings under § 1505 include only proceedings where an agency has regulatory or adjudicative authority, both of which the NTSB lacks during an accident investigation. Id. at 619. The court rejected his argument, noting that it is "settled law in this circuit that, as a general matter, an administrative investigation is a 'proceeding' within the meaning of § 1505." Id. at 620. Relying on Kelley, the court held that the NTSB's investigation was not a "mere police investigation" because the NTSB had the power to issue subpoenas and compel testimony under oath. Id. at 621. Relying on Aguilar and

Marinello, the dissenting judge in Kirst argued that the NTSB investigation was not a proceeding because the agency lacked enforcement power.[7] Id. at 622. But the majority saw nothing in those cases restricting the statute to:

> obstruction of enforcement as distinct from obstruction of an investigation that might, or might not, lead to enforcement. It is sufficient under Marinello that a defendant be charged with obstructing "a particular investigation."
>
> Neither Aguilar nor Marinello supports our colleague's conclusion that in order for obstruction of an investigation to constitute a violation of § 1505, the investigation must be by an agency that has enforcement authority against a party to the investigation.

Id. at 623 (internal citation omitted).

Finally, Schwartz involved complicated facts involving illegal arms shipments. 924 F.2d at 413-16. As is pertinent here, two of the defendants attempted to ship rifles and ammunition from the United States to Poland, making false statements about the flight plan to customs officials investigating the shipment, id. at 415-16, leading to charges under § 1505 for obstructing the customs investigation, id. at 422. On appeal, the defendants argued that the Customs Service's interview with them was not an "agency proceeding" within the meaning of § 1505. Id. at 422. The Second Circuit noted that the term "any proceeding" as used in § 1505 has been defined broadly, encompassing both the investigative and adjudicative functions of a federal agency. Id. at 423. The court accordingly held that "the Customs Service's investigation into whether it should formally seize the arms detained at Kennedy Airport was a 'proceeding' under § 1505. Consequently, we conclude the Customs Service's interview of Berg and Schwartz falls within the meaning of a 'proceeding' under § 1505." Id.

---

[7] The ability to suspend a pilot's license, which also happened in Kirst, rests with the FAA. Id. at 614.

To be sure, there are cases imposing limits on the reach of § 1505. For instance, in United States v. McDaniel, No. 2:12-CR-0028, 2013 U.S. Dist. LEXIS 110475, at *4 (N.D. Ga. Jan. 29, 2013), adopted, 2013 U.S. Dist. LEXIS 109379 (N.D. Ga. Aug. 5, 2013), the court held that an FBI criminal investigation is not a "proceeding" for purposes of § 1505. The court acknowledged the term "proceeding" is defined broadly. But "[e]ven a broad definition has limits and in this instance, courts have generally found that only agencies that engage in rulemaking, adjudicative, or civil enforcement activities conduct 'proceedings' for purposes of § 1505." Id. at *6. The court collected cases finding the statute did not apply to purely criminal investigations by federal law enforcement agencies. Id. at *6-9. "Even in cases where the courts found that agency investigations were 'proceedings' under § 1505, the courts distinguished investigations conducted by agencies with adjudicative, rulemaking, or civil enforcement authority, such as the Internal Revenue Service ("IRS"), the Securities and Exchange Commission ("SEC"), or the Food and Drug Administration ("FDA"), from criminal investigations performed by law enforcement agencies without such authority, such as the FBI." Id. at *10-11.

**3. Hernandez Does Not Support Reconsideration**

The present case arose in a somewhat different factual context than Hernandez, one that makes it impossible to rely on the majority's resolution of the government's first argument (even if otherwise persuasive). Recall that in Hernandez, the EOIR had already ordered Zeledon be removed; after learning of his arrest, ICE issued a warrant of removal and took him into custody; a few days before his scheduled removal, Zeledon escaped. The majority rejected the government's attempt to include ICE's efforts to complete the deportation within the earlier EOIR proceeding, which had already reached the point of decision with a final order of removal. The majority distinguished Senffner and Hopper because in those cases the agency's

enforcement actions facilitated an existing proceeding: the agency's effort to determine if individuals had violated federal law. 173 F.4th at 101-02.

In the present case, ICE undertook an investigation to determine whether Flores-Ruiz was in the country unlawfully, as discussed above. After the agency determined there was probable cause, a warrant for his arrest issued. After the arrest occurred, Flores-Ruiz was given an opportunity to contest the prior order of removal and/or make an asylum claim. Only after he declined to do so was the removal order reinstated and the warrant of removal signed. In other words, the arrest defendant obstructed was part of ICE's investigation seeking to determine whether Flores-Ruiz had violated federal law by returning to the United States without permission. Unlike in Hernandez, at the time of the obstructive conduct in this case there was no final order of removal (assuming the correctness of the panel majority's conclusion that entry of such an order marks the end of a removal proceeding).[8]

In rejecting the government's second argument—that ICE enforcement actions are themselves "proceedings"—the majority read § 1505 to cover adjudications and factual

[8]The Hernandez majority's apparent conclusion that one agency cannot assist another with enforcement as part of the same "proceeding" is hard to reconcile with Senffner. As the Seventh Circuit explained:

> The SEC, as a government agency, can only act through individuals or other instrumentalities using the enforcement mechanisms it has available. These mechanisms may be internal or involve other entities, including the federal courts. Therefore, whenever an entity acting for or at the direct request of an agency has been obstructed, the agency itself has also been obstructed. . . . The fact that an agency cannot perform a particular function itself or through its own labor is of no moment; rather the question is whether the agency proceeding affirmatively, by its specific actions, seeks to have the particular function performed as part of the proceeding.

280 F.3d at 760 (emphasis added). An ICE removal action seeking to enforce an EOIR order would seem to fit comfortably within this framework.

investigations that enable the adjudicative process, but not enforcement actions. See 174 F.4th at 102-04. However, aside from one definition from Black's Law Dictionary, id. at 103, the majority cited no authority for the blanket exclusion of enforcement. As indicated above, the caselaw, including from the Seventh Circuit, is to the contrary. See Senffner, 280 F.3d at 760 (referring to the "investigation and enforcement" of securities laws violations); Hopper, 177 F.3d at 831 ("Additionally, enforcement of tax liens by the IRS is an IRS proceeding.").

The Hernandez majority attempted to distinguish what it called "pure enforcement actions"—actions seeking to enforce an order previously issued by another agency or court—from the enforcement activity at issue in Senffner and Hopper. See 173 F.4th at 103. As indicated in note 8, supra, Senffner does not appear to support this distinction. In any event, ICE was not in this case seeking to enforce an order already issued by a different agency; rather, as discussed above, ICE conducted its own investigation, issued an arrest warrant, then reinstated the previous order of removal, and, finally, removed Flores-Ruiz from the country. To use the majority's language, ICE's enforcement action here "extended from the agency's investigation[]." Id. at 103. This was not the "isolated . . . execution of a warrant of removal." Id. at 104.[9]

---

[9]The Hernandez majority also likened ICE enforcement actions to "mere police" activity, 173 F.4th at 102, but it must be noted that ICE, like other agencies whose investigations have been found to be proceedings for purposes of § 1505, can issue subpoenas and administrative warrants. See Kelley, 36 F.3d at 1127; Kirst, 54 F.4th at 621; see also McDaniel, 2013 U.S. Dist. LEXIS 110475, at *10-11 (noting that "courts distinguished investigations conducted by agencies with adjudicative, rulemaking, or civil enforcement authority . . . from criminal investigations performed by law enforcement agencies without such authority"). The majority noted that in a removal action ICE does not wield these powers to further an adjudicative process, 174 F.4th at 103, but that may vary from case to case. In the present case, for instance, ICE issued a warrant as part of its investigation and adjudication of Flores-Ruiz's removal. Moreover, courts have not required such investigative tools be used for adjudication or enforcement. See Kelley, 36 F.3d at 1127 ("[T]he Inspector General's inquiries, albeit

In sum, the Hernandez majority opinion provides no persuasive justification for excluding the ICE proceeding at issue in this case from the coverage of § 1505. Reading Hernandez more broadly—to exclude all ICE enforcement and removal operations, regardless of the stage, from § 1505—cannot be reconciled with the plain language of the statute ("any pending proceeding") or the existing caselaw. See Senffer, 280 F.3d at 761 (holding that an SEC proceeding continues until the funds are returned to their proper owner); Hopper, 177 F.3d at 830 (holding that an IRS proceeding continues until the debt is collected). Perhaps the Seventh Circuit will pare back its obstruction caselaw based on the authorities defendant cites, but it is not for this court to anticipate such a change.

At oral argument, defendant noted that ICE goes out every day to try to arrest people on the street. Given the estimated 10 million undocumented persons in the United States, does that mean there are 10 million pending proceedings? Defendant insists that there needs to be some formality, i.e., a proceeding before an agency involving parties trying to come to a determination, an adjudication. (Oral Arg. Tr. at 6-7.)

The problem for the defense is that this case did not involve some random encounter on the street. It was a targeted operation, conducted pursuant to agency procedures, including the issuance of an arrest warrant for a specific person, Eduardo Flores-Ruiz. After the arrest of Flores-Ruiz, ICE followed its procedures for reinstatement of the previous order of removal, determining that he should be removed from the country. While this did not involve a contested hearing in front of an immigration judge or other authority, that is because Flores-Ruiz declined

---

preliminary, constitute a 'proceeding' within the meaning of § 1505."); see also Kirst, 54 F.4th at 623 (holding that obstructing an investigation qualifies, whether or not it leads to enforcement).

to challenge the previous order or make a claim for asylum.

Defendant also compares what happened in this case to mere police activity, similar to what law enforcement does every day, e.g, obtaining warrants and then arresting suspects. (Oral Arg. Tr. at 7, 26, 29.) Defendant argues that ICE was acting as a law enforcement agency here. But this ignores the fact that, unlike, say, the FBI, ICE can issue its own warrants and adjudicate and effectuate a removal, as it did with Flores-Ruiz, without the involvement of a court. This makes a difference under § 1505. See Kelley, 36 F.3d at 1127.

## IV. CONCLUSION

For all of these reasons, defendant cannot satisfy the burden required for reconsideration.

**THEREFORE, IT IS ORDERED** that defendant's motion for reconsideration (R. 119) is denied.

Dated at Milwaukee, Wisconsin, this 16th day of June, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge