**No. 26-2440**

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

HANNAH C. DUGAN,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Eastern District of Wisconsin, No. 25-cv-00089

# APPENDIX OF DEFENDANT-APPELLANT HANNAH C. DUGAN

Oral Argument Requested

STEVEN M. BISKUPIC
STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com
(414) 828-7233

PAUL D. CLEMENT
*Counsel of Record*
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

September 8, 2026

## TABLE OF CONTENTS

Criminal Complaint (Apr. 24, 2025) (R.1) ....................A1

Transcript of Initial Appearance (Apr. 28, 2025) (R.5) ....................A14

Indictment (May 13, 2025) (R.6) ....................A20

Magistrate Judge's Report and Recommendation on Defendant's Motion to Dismiss (July 7, 2025) (R.43) ....................A22

Decision and Order on Motions in Limine (Nov. 25, 2025) (R.72) ....................A59

Government's Exhibit and Witness List (Dec. 19, 2025) (R.93) ....................A80

Defendant's Exhibit List (Dec. 19, 2025) (R.93-1) ....................A86

Jury Instructions (Dec. 18, 2025) (R.94) ....................A101

Excerpts of Trial Transcript – Vol. 1 (Dec. 15, 2025) (R.103) ....................A126

Direct Examination of Erin Lucker (pp.50-55, 71-72, 104-05, 116-17) ....................A129

Direct Examination of Anthony Nimtz (pp.193, 213, 218-19) ....................A141

Cross Examination of Anthony Nimtz (pp.223-24) ....................A145

Direct Examination of Jeffrey Baker (pp.245-48) ....................A147

Excerpts of Trial Transcript – Vol. 2 (Dec. 16, 2025) (R.104) ....................A151

Direct Examination of Phillip Jackling (pp.319, 322-23) ....................A154

Direct Examination of Joseph Zuraw (pp.356-58, 367-68) ....................A157

Direct Examination of Joseph Andrew Vasconcellos (pp.388-89, 391, 403-06, 416-17) ....................A162

Direct Examination of Judge Kristela Cervera (pp.448-54, 458-59) ....................A171

Cross Examination of Judge Kristela Cervera (pp.475-77) ....................A180

Direct Examination of Cassandra Kubiszewski (p.515) ....................A183

Direct Examination of Bryan Ayers (pp.540-45)....................A184

Cross Examination of Bryan Ayers (pp.552-53) ....................A190

Excerpts of Trial Transcript – Vol. 3 (Dec. 17, 2025) (R.105) ....................A192

Direct Examination of Chief Judge Carl Ashley (pp.594-99) ....................A195

Cross Examination of Chief Judge Carl Ashley (pp.623-26)....................A201

Redirect Examination of Chief Judge Carl Ashley (pp.626-27) ....................A204

Direct Examination of Alan Freed, Jr. (pp.662-63, 668, 674)....................A206

Cross Examination of Alan Freed, Jr. (pp.679-82, 685-86) ....................A210

Direct Examination of Mercedes De La Rosa (pp.711-12, 723-25)....................A216

Cross Examination of Mercedes De La Rosa (pp.729-32)....................A221

Direct Examination of Walter Piel, Jr. (pp.736-37)....................A225

Cross Examination of Walter Piel, Jr. (p.747) ....................A227

Direct Examination of Joan Butz (pp.761-67) ....................A228

Excerpts of Trial Transcript – Vol. 4 (Dec. 18, 2025) (R.106) ....................A235

Direct Examination of Laura Gramling Perez (pp.792-94)....................A237

Cross Examination of Laura Gramling Perez (pp.802-04)....................A240

Government Closing Arguments (pp.822-23, 828-36, 882-85, 887, 892) ....................A243

Jury Question and Response Regarding Count 1 (pp.909, 918) ....................A260

Jury Question and Response Regarding Count 2 (pp.919, 926) ....................A262

Verdict (p.927) ....................A264

Government Exhibit 1A (GX-1A) ....................A265

Government Exhibit 6 (GX-6) ........ A266

Government Exhibit 7 (GX-7) ........ A270

Government Exhibit 8 (GX-8) ........ A274

Government Exhibit 9 (GX-9) ........ A278

Government Exhibit 47 (GX-47) ........ A282

Defense Exhibit 201 (DX-201) ........ A283

Excerpts of Sentencing Transcript (July 8, 2026) (R.144) (pp.21-27) ........ A285

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

I hereby certify that the Separate Appendix herein includes all of the materials required by Circuit Rule 30(a) and (b).

September 8, 2026

s/Paul D. Clement
Paul D. Clement

CLERK'S OFFICE
A TRUE COPY
Apr 24, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

United States of America
v.
Hannah C. Dugan
DOB: (XX/XX/1959)

*Defendant(s)*

Case No. 25-M-397 (SCD)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 18, 2025 in the county of Milwaukee in the Eastern District of Wisconsin, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1505 | Obstructing or impeding a proceeding before a department or agency of the United States |
| 18 U.S.C. § 1071 | Concealing an individual to prevent his discovery and arrest |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Lindsay Schloemer, Special Agent, FBI
*Printed name and title*

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. 4.1

Date: 04/24/2025

[signature]
*Judge's signature*

City and state: Milwaukee, Wisconsin

Stephen C. Dries, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Lindsay Schloemer, being first duly sworn, hereby depose and state as follows:

**I. Background and Experience.**

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since 2014. I am currently assigned to the Milwaukee Field Office. As such, I am an investigative or law enforcement agent of the United States authorized under Title 18, United States Code, Section 3052, that is, an officer of the United States who is empowered by law to conduct investigations, to make arrests, and to collect evidence for various violations of federal law. I am also a Certified Public Accountant ("CPA") and worked as a CPA for seven years before my employment with the FBI.

2. I am currently assigned to a White-Collar Crimes Squad, which investigates public corruption crimes, civil rights crimes, and financial crimes. During my tenure with the FBI, I have participated in investigations involving the corruption of public officials, to include facilitation payments and kickbacks. I have participated in all aspects of investigations including, among other things, executing arrest warrants.

3. I base this affidavit upon personal knowledge and upon information reported to me by other federal law enforcement officers during and as part of their official duties, all of whom I believe to be truthful and reliable. In this affidavit, "case agents" refers to me and other FBI Special Agents who directly have participated with me in this investigation. I also base this affidavit upon information provided by citizen witnesses and other information as described below.

**II. Purpose of Affidavit.**

4. I make this affidavit in support of a criminal complaint charging **HANNAH C. DUGAN (b. 1959)**: with (1) obstructing or impeding a proceeding before a department or agency

of the United States, in violation of Title 18, United States Code, Section 1505; and (2) concealing an individual to prevent his discovery and arrest, in violation of Title 18, United States Code, Section 1071.

5. This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and does not set forth my complete knowledge regarding this matter.

**III. Probable cause.**

**A. Background.**

6. I am aware from a review of public records that on March 18, 2025, Eduardo Flores-Ruiz ("Flores-Ruiz") (b. 1994) was charged in Milwaukee County Circuit Court Case Number 2025CM000814 with three counts of Battery-Domestic Abuse-Infliction of Physical Pain or Injury.

7. Agents from the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE ERO") identified Flores-Ruiz as an individual who was not lawfully in the United States. A review of Flores-Ruiz's Alien Registration File ("A-File") indicated that Flores-Ruiz is a native and citizen of Mexico and that Flores-Ruiz had been issued an I-860 Notice and Order of Expedited Removal by United States Border Patrol Agents on January 16, 2013, and that Flores-Ruiz was thereafter removed to Mexico through the Nogales, Arizona, Port of Entry. There is no evidence in the A-File or DHS indices indicating that Flores-Ruiz sought or obtained permission to return to the United States.

8. The Milwaukee ICE ERO Office determined through biometric fingerprint comparison that the fingerprints of the individual charged in Milwaukee County Case Number 2025CM000814 match those in the A-File for the Eduardo Flores-Ruiz removed from the United

States as described above. On or about April 17, 2025, an authorized immigration official found probable cause to believe Flores-Ruiz was removable from the United States and issued a warrant for his arrest. The warrant provided, "YOU ARE COMMANDED to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien [Flores-Ruiz identified on warrant]." Upon his arrest, Flores-Ruiz would be given a Notice of Intent/Decision to Reinstate Prior Order. He would then have an opportunity to contest the determination by making a written or oral statement to an immigration officer.

9. The Milwaukee ICE ERO Office was aware that on April 18, 2025, Flores-Ruiz was scheduled to attend a hearing in his criminal case. The hearing was set to take place in Courtroom 615, in front of Milwaukee County Circuit Court Judge **HANNAH C. DUGAN.** Based on the above information, on April 18, 2025, members of the Milwaukee ICE ERO Task Force traveled to the Milwaukee County Courthouse, with Flores-Ruiz's arrest warrant in hand, for the purpose of executing the warrant.

10. I am aware that law enforcement routinely executes warrants and makes arrests in the public areas of buildings such as the Milwaukee County Courthouse. The reasons for this include not only the fact that law enforcement knows the location at which the wanted individual should be located but also the fact that the wanted individual would have entered through a security checkpoint and thus unarmed, minimizing the risk of injury to law enforcement, the public, and the wanted individual. As such, members of the Milwaukee ICE ERO Task Force developed a plan to arrest Flores-Ruiz in a public area outside of Courtroom 615 following his scheduled criminal court appearance before **Judge DUGAN**.

11. I am aware that two prior arrests in public areas of the Milwaukee County Courthouse Complex of individuals who were not lawfully present in the United States had

received public attention. Both incidents involved individuals who had been charged with criminal offenses but who were not in custody and appearing for scheduled hearings in their criminal cases. I also am aware that pursuant to its policies, which had been made known to courthouse officials, the Milwaukee ICE ERO Task Force was focusing its resources on apprehending charged defendants making appearances in criminal cases – and not arresting victims, witnesses, or individuals appearing for matters in family or civil court.

**B. Arrival of arrest teams at the Milwaukee County Courthouse and notification of intended arrest.**

12. Six members of the Milwaukee ICE ERO Task Force planned to take part in the arrest of Flores-Ruiz on April 18, 2025. This included ICE ERO Deportation Officer A, Customs and Border Protection Officer A, FBI Special Agents A and B, and Drug Enforcement Administration ("DEA") Special Agents A and B. The agents were generally dressed in plain clothes and intended to effectuate the arrest in as low-key and safe of a manner as possible.

13. At approximately 8:00 am on April 18, 2025, Deportation Officer A and CBP Officer A arrived at the Milwaukee County Courthouse, presented identification to a security guard, and explained that they were present to make an arrest. Deportation Officer A and CBP Officer A were asked to show not only their credentials but also their badges. The security guard stated that she needed to speak with a supervisor. A shift sergeant with Milwaukee County Sheriff's Office was contacted and spoke to Deportation Officer A. They discussed the details of the planned arrest, including in which courtroom Flores-Ruiz was set to appear. The sergeant asked that any arrest wait until after the completion of the scheduled hearing before **Judge DUGAN**. As this was standard practice, Deportation Officer A and CBP Officer A agreed, and they were allowed to proceed unescorted to the public hallway outside of Courtroom 615.

14. The other members of the arrest team were already present in the sixth floor public hallway when Deportation Officer A and CBP Officer A arrived. Before Deportation Officer A and CBP Officer A arrived outside of Courtroom 615, FBI agents A and B had advised the courtroom deputy for Courtroom 615 that law enforcement was there to arrest Flores-Ruiz. FBI Agent A displayed his credentials to the courtroom deputy and informed him that they were there to assist ICE in arresting Flores-Ruiz. They agreed that the arrest would take place after Flores-Ruiz's court appearance. The agents then left the courtroom and took positions at different locations in the public hallway.

15. Case agents have interviewed the courtroom deputy present in Courtroom 615 on April 18, 2025, who corroborated the above information. The courtroom deputy had opened the doors to the courtroom at approximately 8:15 am and reported that individuals began checking in for the list of matters scheduled for that morning. The courtroom deputy had received a list of individuals appearing that day, and the courtroom deputy checked in defendants while attorneys checked in with the clerk.

16. The courtroom deputy explained that at approximately 8:15 am, FBI agents advised that they were working with ICE and were planning to arrest Flores-Ruiz. The courtroom deputy asked that the agents wait outside and arrest Flores-Ruiz after the hearing. The agents agreed and left the courtroom.

17. The courtroom deputy told case agents that after an ICE arrest in the courthouse earlier that month, a shift sergeant had asked bailiffs to alert a supervisor at the Milwaukee County Sheriff's Office if ICE agents were in the building. Accordingly, the courtroom deputy notified a shift sergeant.

18. Arrest team members reported that while waiting outside of the courtroom, a woman approached and took photos of arrest team members. DEA Agent B, who was inconspicuously seated away from the group, was not photographed. The individual taking photographs of the agents has been identified by multiple witnesses as an attorney employed by the State of Wisconsin Public Defenders Office ("Attorney A").

19. Team members observed Flores-Ruiz arrive on the 6th floor of the courthouse at approximately 8:43 a.m. He was greeted by his attorney, and the two entered Courtroom 615 together.

### C. Judge DUGAN learns of ICE's presence and confronts members of the arrest team.

20. Witnesses have described **Judge DUGAN's** response to learning of ICE's presence. For example, the courtroom deputy indicated that when Flores-Ruiz arrived, **Judge DUGAN** already was on the bench and conducting proceedings (unrelated to the Flores-Ruiz matter). The courtroom deputy observed Attorney A (the individual who had photographed the agents) enter and approach **Judge DUGAN's** clerk. Attorney A stated that there appeared to be ICE agents in the hallway. Attorney A told the clerk where the agents were seated and what they were wearing.

21. The courtroom deputy reported that the clerk then got up and talked with **Judge DUGAN**. **Judge DUGAN** became visibly angry, commented that the situation was "absurd," left the bench, and entered chambers. At the time, Flores-Ruiz was seated in the gallery of the courtroom.

22. Another individual, Attorney B, was working as an Assistant District Attorney in **Judge DUGAN's** courtroom on April 18, 2025. According to Attorney B, there were

approximately eight criminal cases, including Flores-Ruiz's case, scheduled for pretrial hearings that morning. Attorney B was aware that the victims from Flores-Ruiz's criminal case were in court. While Attorney B was busy preparing for that morning's docket, Attorney B heard someone announce, "ICE is here." Shortly thereafter, Attorney B heard **Judge DUGAN** say that she was going to call the Chief Judge before leaving the courtroom.

23. Members of the arrest team reported the following events after **Judge DUGAN** learned of their presence and left the bench. **Judge DUGAN** and Judge A, who were both wearing judicial robes, approached members of the arrest team in the public hallway. Judge A's courtroom is located adjacent to **Judge DUGAN's** courtroom. Witnesses uniformly reported that **Judge DUGAN** was visibly upset and had a confrontational, angry demeanor. **Judge DUGAN** addressed Deportation Officer A and asked if Deportation Officer A was present for a court appearance. When Deportation Officer A responded, "no," **Judge DUGAN** stated that Deportation Officer A would need to leave the courthouse. Deportation Officer A stated that Deportation Officer A was there to effectuate an arrest. **Judge DUGAN** asked if Deportation Officer A had a judicial warrant, and Deportation Officer A responded, "No, I have an administrative warrant." **Judge DUGAN** stated that Deportation Officer A needed a judicial warrant. Deportation Officer A told **Judge DUGAN** that Deportation Officer A was in a public space and had a valid immigration warrant. **Judge DUGAN** asked to see the administrative warrant and Deportation Officer A offered to show it to her. **Judge DUGAN** then demanded that Deportation Officer A speak with the Chief Judge. **Judge DUGAN** then had a similar interaction with FBI Agent B and CBP Officer A. After finding out that they were not present for a court appearance and that they were with ICE, **Judge DUGAN** ordered them to report to the Chief Judge's office.

24. Judge A then escorted members of the arrest team away from Courtroom 615, down the hall, and through a set of double doors towards the reception area for the Chief Judge's office. DEA Agent B, who was not recognized by **Judge DUGAN** and Judge A as being part of the arrest team, remained behind outside of Courtroom 615.

25. The courtroom deputy reported observing a portion of the above-described events in the hallway. According to the courtroom deputy, shortly after **Judge DUGAN** was advised of ICE's presence, the courtroom deputy left the courtroom to look for an unrelated defendant (whom the courtroom deputy was seeking to arrest for an open warrant). The courtroom deputy saw **Judge DUGAN** in her robe in the public hallway telling one of the federal agents that he needed to go talk to the Chief Judge. **Judge DUGAN** appeared visibly angry and was walking quickly. As soon as the agent entered the Chief Judge's vestibule area, the courtroom deputy saw **Judge DUGAN** walk south down the hallway and enter a locked door near Courtroom 615. I am familiar with the floor plan for the sixth floor of the courthouse and believe the door **Judge DUGAN** entered led to a non-public hallway from which she could access her courtroom and chambers.

26. DEA Agent B, who had remained in the hallway and had not been recognized as a member of the arrest team, reported that **Judge DUGAN** walked around the hallway and appeared to be looking for additional agents before she returned to her courtroom.

27. Once inside the office of the Chief Judge, Deportation Officer A showed Judge A his credentials and the administrative warrant. Judge A asked the Chief Judge's clerk to make a copy of the warrant and asked whether the Chief Judge was available. The clerk advised that the Chief Judge was not in the building but later advised that he was on the phone. At that point, Judge A left, and Deportation Officer A went inside a more private area of the Chief Judge's office to speak with him on the phone. During their conversation, the Chief Judge stated he was working

on a policy which would dictate locations within the courthouse where ICE could safely conduct enforcement actions. The Chief Judge emphasized that such actions should not take place in courtrooms or other private locations within the building. Deportation Officer A asked about whether enforcement actions could take place in the hallway. The Chief Judge indicated that hallways are public areas. When the Chief Judge expressed interest in talking to ICE ERO management about this policy, Deportation Officer A provided him with contact information for ICE ERO's Assistant Field Office Director.

28. While Deportation Officer A was speaking with the Chief Judge, DEA Agent A, CBP Officer A, and FBI Agents A and B waited in the vestibule area outside the Chief Judge's Office. DEA Agent A departed the area after a short while. **Judge DUGAN's** courtroom deputy then approached the remaining arrest team members and stated that the courtroom deputy was not the one who had notified **Judge DUGAN** about their arrest plans. The courtroom deputy also made a comment about **Judge DUGAN** "pushing" Flores-Ruiz's case through, which the arrest team interpreted to mean that **Judge DUGAN** was attempting to expedite Flores-Ruiz's hearing.

**D. Judge DUGAN escorts Flores-Ruiz through a "jury door" to avoid his arrest.**

29. Multiple witnesses have described their observations after **Judge DUGAN** returned to her courtroom after directing members of the arrest team to the Chief Judge's office. For example, the courtroom deputy recalled that upon the courtroom deputy's return to the courtroom, defense counsel for Flores-Ruiz was talking to the clerk, and Flores-Ruiz was seated in the jury box, rather than in the gallery. The courtroom deputy believed that counsel and the clerk were having an off-the-record conversation to pick the next court date. Defense counsel and Flores-Ruiz then walked toward each other and toward the public courtroom exit. The courtroom deputy then saw **Judge DUGAN** get up and heard **Judge DUGAN** say something like "Wait, come with me."

Despite having been advised of the administrative warrant for the arrest of Flores-Ruiz, **Judge DUGAN** then escorted Flores-Ruiz and his counsel out of the courtroom through the "jury door," which leads to a nonpublic area of the courthouse. These events were also unusual for two reasons. First, the courtroom deputy had previously heard **Judge DUGAN** direct people not to sit in the jury box because it was exclusively for the jury's use. Second, according to the courtroom deputy, only deputies, juries, court staff, and in-custody defendants being escorted by deputies used the back jury door. Defense attorneys and defendants who were not in custody never used the jury door.

30. Attorney B similarly explained that after returning to the courtroom, **Judge DUGAN** forcefully motioned for Flores-Ruiz's attorney and a male she did not know (Attorney B had never met Flores-Ruiz) to approach. Flores-Ruiz's attorney appeared to be confused by the judge's gesture but complied with her directive. Judge DUGAN commanded Flores-Ruiz's attorney and the male to leave through a backdoor of the courtroom. Attorney B then saw **Judge DUGAN** escort Flores-Ruiz's attorney and the male through a non-public door near the courtroom's jury box. Shortly thereafter, **Judge DUGAN** came back to the courtroom and conducted hearings on that morning's docket. Later that morning, Attorney B realized that Flores-Ruiz's case had never been called and asked the court about it. Attorney B learned that Flores-Ruiz's case had been adjourned. This happened without Attorney B's knowledge or participation, even though Attorney B was present in court to handle Flores-Ruiz's case on behalf of the state, and even though victims were present in the courtroom.

31. A Victim Witness Specialist (VWS) employed by the Milwaukee County District Attorney's Office was present in Courtroom 615 on April 18, 2025. The VWS made contact with the victims in Flores-Ruiz's criminal case, who were also in court. The VWS was able to identify Flores-Ruiz based upon the victims' reactions to his presence in court. The VWS observed **Judge**

**DUGAN** gesture towards Flores-Ruiz and an unknown Hispanic woman. The VWS stated she believed the Hispanic woman may have been an interpreter. However, based on the VWS's description of the woman and other witness statements, I believe the Hispanic woman to which the VWS referred was Flores-Ruiz's attorney. The VWS stated that **Judge DUGAN** then exited through the jury door with Flores-Ruiz and the Hispanic woman. The VWS was concerned because Flores-Ruiz's case had not yet been called, and the victims were waiting.

32. Another attorney ("Attorney C"), who was in Courtroom 615 on April 18, 2025, to represent a client, also advised case agents that he observed **Judge DUGAN** forcefully direct two individuals, a man and a woman, to leave through the jury door. Attorney C indicated that this was done with a "stern" tone.

**E. Ruiz makes it out of the courthouse and is arrested after a foot chase.**

33. After leaving the Chief Judge's vestibule and returning to the public hallway, DEA Agent A reported that Flores-Ruiz and his attorney were in the public hallway. DEA Agent B also observed Flores-Ruiz and his attorney in the hallway near Courtroom 615 and noted that Flores-Ruiz was looking around the hallway. From different vantage points, both agents observed Flores-Ruiz and his counsel walk briskly towards the elevator bank on the south end of the sixth floor. I am familiar with the layout of the sixth floor of the courthouse and know that the south elevators are not the closest elevators to Courtroom 615, and therefore it appears that Flores-Ruiz and his counsel elected not to use the closest elevator bank to Courtroom 615. DEA Agent A followed Flores-Ruiz and his attorney towards the south elevator bank. At approximately 8:50 a.m., DEA Agent A alerted other members of the arrest team that DEA Agent A was on the elevator with Flores-Ruiz. While on the elevator, Flores-Ruiz and his attorney spoke to each other in Spanish,

which DEA Agent A did not understand. They exited the elevator on one of the bottom floors of the courthouse and used the Ninth Street public entrance/exit to leave the building.

34. Having received the above-referenced information from DEA Agent A, other members of the arrest team scrambled to locate Flores-Ruiz and arrest him. DEA Agent B and FBI Agents A and B took another elevator down to one of the bottom floors of the courthouse and quickly exited the building onto 9th Street. After DEA Agent A notified the team that Flores-Ruiz was in the front of the courthouse near the flagpole, the agents ran towards the front of the courthouse. FBI Agent B and DEA Agent A approached Flores-Ruiz and identified themselves as law enforcement. Flores-Ruiz turned around and sprinted down the street. A foot chase ensued. The agents pursued Flores-Ruiz for the entire length of the courthouse and ultimately apprehended him near the intersection of W. State Street and 10th Street. Flores-Ruiz was handcuffed and detained. Around 9:05 a.m., or approximately 22 minutes after the arrest team first spotted Flores-Ruiz on the sixth floor of the courthouse, FBI Agent A communicated to the surveillance team that Flores-Ruiz had been arrested. Deportation Officer A and CBP Officer A were notified that Flores-Ruiz was in custody while they were still inside the courthouse speaking with the Chief Judge on the phone.

**IV. Conclusion.**

35. Based on the above information, I have probable cause to believe that **Judge DUGAN** violated Title 18, United States Code, Section 1505, and Title 18, United States Code, Section 1071.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Case No. 25-MJ-397 |
| v. | ) | Milwaukee, WI |
| HANNAH C. DUGAN, Defendant. | ) | April 25, 2025 10:32 a.m. |

TRANSCRIPT OF INITIAL APPEARANCE
BEFORE THE HONORABLE STEPHEN C. DRIES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff UNITED STATES OF AMERICA:

United States Dept. of Justice (ED-WI)
By: MS. KELLY BROWN WATZKA
MR. KEITH S. ALEXANDER
Office of the US Attorney
517 E. Wisconsin Ave., Rm. 530
Milwaukee, WI 53202
Ph: 414-297-1775
kelly.watzka@usdoj.gov
keith.alexander@usdoj.gov

For the Defendant HANNAH DUGAN: (Present)

Mastantuono Coffee & Thomas, SC
By: MR. CRAIG MASTANTUONO
219 N. Milwaukee St., Ste. 520
Milwaukee, WI 53202
Ph: 414-276-8662
cmast@cmrc-law.com

U.S. Official Transcriber: JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by electronic recording, transcript produced by computer-aided transcription.

TRANSCRIPT OF PROCEEDINGS

(Transcribed from audio recording.)

THE CLERK: 25-MJ-397, United States of America versus Hannah Dugan, here for an initial appearance on a criminal complaint. May I have the appearances, please, first for the Government.

MS. WATZKA: Good morning, your Honor. For the United States, Assistant United States Attorneys Kelly Watzka and Keith Alexander.

MS. BEHNKE: Good morning, your Honor. Hannah Behnke with pretrial services.

MR. MASTANTUONO: Good morning, your Honor. Hannah Dugan appears in person. Attorney Craig Mastantuono on her behalf for purposes of this hearing and as friend of the Court for the time being, Judge.

THE COURT: All right. Good morning to all of you and welcome. This is an initial appearance on a criminal complaint. The defendant knows this already, but I'll remind the defendant that in federal court you have two very important rights. One is the right to remain silent, and that simply means no one can force you to talk. But if you do decide to speak, anything you say may be used against you. You also -- excuse me -- you also have the right to have a lawyer help you at all stages of these proceedings. If you can't afford one, we'll provide one at no charge.

So now I'll ask if one of our prosecutors could briefly go over what's alleged in that complaint.

MS. WATZKA: Certainly, your Honor. Judge Dugan is charged in a two-count criminal complaint which alleges violations of Title 18 United States Code Section 1071, which is concealing an individual to prevent his discovery and arrest, and a violation of Title 18 United States Code Section 1505, which is obstruction of proceedings before departments and agencies.

If she were to be convicted of a violation of Section 1071, she would be punishable up to one year in prison. She would face a $100,000 fine, up to one year of supervised release, and a $25 special assessment. If she were to be convicted of a violation of Section 1505, that is punishable by up to five years in prison, a $250,000 fine, up to three years of supervised release, and a $100 special assessment.

THE COURT: All right. Thank you very much.

The next question is future court dates. We need to set this for an arraignment and plea hearing. Does the Government have an opinion on when that might make sense?

MS. WATZKA: Your Honor, we do intend to present this matter to the grand jury on a date to be determined, which obviously, I may not disclose. However, if the Court were to schedule a preliminary hearing for either May 15th or 16th, I would imagine we might be able to convert that hearing to an

arraignment.

THE COURT: All right. If we said 9:00 o'clock on the 15th, that's a Thursday, would that work?

MS. WATZKA: That's fine with the Government.

MR. MASTANTUONO: Yes.

THE COURT: All right. We'll call that a preliminary hearing, possibly an arraignment and plea hearing.

The last question is what happens with the defendant between now and future court dates. I assume the Government isn't seeking anything unusual here today, but let me ask Ms. Watzka.

MS. WATZKA: That's correct, your Honor. We are not seeking detention.

THE COURT: All right. And I don't even think it's a detention-eligible case. But I assume we can release the defendant on personal recognizance.

MS. WATZKA: We would --

THE COURT: Do we need to hear from Ms. Behnke? I don't think so.

All right. We'll release the defendant on that basis, then.

Anything further from the Government here today?

MS. WATZKA: No, your Honor.

THE COURT: All right. And from the defense?

MR. MASTANTUONO: Judge Dugan wholeheartedly regrets

and protests her arrest. It was not made in the interests of public safety and we ask that the Court allow her release.

THE COURT: All right. So the defendant will be released on her own recognizance.

And that concludes all matters for this hearing this morning. Thanks, everyone.

(At 10:36 a.m. the hearing ended.)

C E R T I F I C A T E

I, JENNIFER L. STAKE, RDR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Dated this 28th day of April, 2025.
Milwaukee, Wisconsin.

Jennifer L. Stake, RDR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 324
Milwaukee, WI 53202

Jennifer_Stake@wied.uscourts.gov

ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
Official Court Reporter, RDR, CRR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED
2025 MAY 13 P 5:21
CLERK OF COURT

UNITED STATES OF AMERICA,

Plaintiff,

v.

HANNAH C. DUGAN,

Defendant.

Case No. 25-CR- 25-CR-089

ADELMAN

[18 U.S.C. §§ 1071 & 1505]

**INDICTMENT**

**COUNT ONE**

**THE GRAND JURY CHARGES THAT:**

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

knowingly concealed E.F.R, a person for whose arrest a warrant and process had been issued under the provisions of a law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R.

In violation of Title 18, United States Code, Section 1071.

**COUNT TWO**

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

a. confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b. upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c. addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d. directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e. advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of Title 18, United States Code, Section 1505.

A TRUE BILL:

[redacted]

FOREPERSON

Dated: 5-13-25

RICHARD G. FROHLING
Acting United States Attorney

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.** **Case No. 25-CR-89**

**HANNAH C. DUGAN,**

**Defendant.**

---

**REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION TO DISMISS**

---

On May 13, 2025, a grand jury sitting in the Eastern District of Wisconsin returned a two-count indictment against Milwaukee County Circuit Court Judge Hannah C. Dugan. (Docket # 6.) Dugan is charged in Count One with knowingly concealing a person for whose arrest a warrant and process had been issued, in violation of 18 U.S.C. § 1071. She is charged in Count Two with obstruction of the United States Department of Homeland Security's removal proceedings, in violation of 18 U.S.C. § 1505. Dugan was arraigned on the charges and entered a plea of not guilty. (Docket # 17.) A jury trial before the Honorable Judge Lynn Adelman will be scheduled after resolution of pretrial motions.

Dugan moves to dismiss the indictment under Fed. R. Crim. P. 12(b) on the grounds that she, as a judge, is immune from criminal prosecution for judicial acts, that her prosecution violates the limits of federal power under the Tenth Amendment, and that the indictment could be dismissed under the canon of constitutional avoidance. (Docket # 21.) Additionally, two parties seek leave to file amicus curiae briefs. (Docket # 25; Docket # 32.)

The government opposes Dugan's motion (Docket # 28) and objects to the filing of both amicus briefs (Docket # 29; Docket # 39).

For the reasons explained below, I recommend that Dugan's motion to dismiss be denied. Further, the parties' requests for leave to file amicus briefs are granted.

**BACKGROUND**

The indictment charges as follows:

Count One

On or about April 18, 2025, Dugan knowingly concealed E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R., in violation of 18 U.S.C. § 1071;

Count Two

On or about April 18, 2025, Dugan did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

a) confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b) upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of

the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c) addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d) directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e) advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of 18 U.S.C. § 1505. (Docket # 6.)

## LEGAL STANDARD

Fed. R. Crim. P. 12(b)(1) provides that a party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. When deciding a motion to dismiss a criminal indictment, the court assumes that the indictment's factual allegations are true and must "view all facts in the light most favorable to the government." *United States v. Calhoun*, 710 F. Supp. 3d 575, 579 (N.D. Ill. 2024) (citing *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)). The Federal Rules of Criminal Procedure, however, "do not provide a mechanism analogous to the motion for summary judgment in the Federal Rules of Civil Procedure." *United States v. Abramson*, No. 18 CR 681, 2023 WL 349842, at *3 (N.D. Ill. Jan. 20, 2023). Thus, if the "defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion." *Id.* (citing *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018)).

## ANALYSIS

Dugan moves to dismiss the indictment on three grounds. First, she argues that as a state court judge acting within the scope of her official duties, prosecution is barred by judicial

immunity. Second, Dugan argues that under the allocation of power retained by the states under the Tenth Amendment, this federal prosecution violates the Constitution's separation of powers. And third, she argues the indictment should be dismissed under the canon of constitutional avoidance.

*1. Judicial Immunity*

Because the parties differ in their views on the applicable law, it is instructive to begin with a survey of the law on judicial immunity before turning to Dugan's arguments and to the application of the law to this case.

1.1 The History of Judicial Immunity in Civil Lawsuits

Judicial immunity is a long-recognized concept dating back over 400 years to English common law, insulating the judiciary from civil liability. *See* Jeffrey M. Shaman, *Judicial Immunity from Civil and Criminal Liability*, 27 San Diego L. Rev. 1, 3 (1990) (citing *Floyd v. Barker*, 77 Eng. Rep. 1305 (Star Chamber 1607)). Prior to the creation of the right to appeal, a losing litigant would seek nullification of a false judgment and a fine against the judge who rendered it. *Id*. However, once an appeals system was put into place, giving a dissatisfied litigant an avenue for redress, the concept of judicial immunity arose and was gradually accepted under the common law. *Id*.

1.1.1 The Early Years

The seminal case, *Floyd v. Barker*, decided by Lord Coke in 1607, addressed the question of whether a judge presiding over a murder trial could be prosecuted in another court for criminal conspiracy. *See* Note, *Judicial Immunity at the (Second) Founding: A New Perspective on § 1983*, 136 Harv. L. Rev. 1456, 1464 (2023). Lord Coke concluded that judges were immune from such prosecutions, stating: "a Judge, for any thing done by him as Judge, by

the authority which the King hath committed to him, and as sitting in the seat of the King (concerning his justice) shall not be drawn in question before any other Judge . . . ." 77 Eng. Rep. at 1307. In other words, Lord Coke pronounced a rule of absolute immunity for all judicial acts.

*Floyd* is also important for articulating for the first time what are now considered some of the modern policies that underlie the doctrine of judicial immunity. Shaman, 27 San Diego L. Rev. at 3. Judicial immunity serves the following purposes according to Lord Coke: (1) it ensures the finality of judgments; (2) it protects judicial independence; (3) it avoids continual attacks upon judges who may be sincere in their conduct; and (4) it protects the system of justice from falling into disrepute. *Id.*

The first major application of judicial immunity by the United States Supreme Court occurred in *Randall v. Brigham*, 74 U.S. 523 (1868). In *Randall*, an attorney was accused of obtaining an agreement from a client that was "unconscionable and extortionate, and therefore grossly unprofessional" and was removed from his office as an attorney-at-law. *Id.* at 525–26. In response, the attorney sued the presiding judge for unlawful removal. *Id.* The Court, citing *Floyd*, stated that "it is a general principle applicable to all judicial officers, that they are not liable to a civil action for any judicial act done within their jurisdiction." *Id.* at 535. The Court left open a possible exception to this absolute immunity, however, "where the acts, in excess of jurisdiction, are done maliciously or corruptly." *Id.* at 536.

Three years later in *Bradley v. Fisher*, 80 U.S. 335 (1871), the Court made clear that civil judicial immunity applies even for malicious or corrupt acts. In *Bradley*, Attorney Joseph Bradley was a member of the bar of the Supreme Court of the District of Columbia and Judge George Fisher was one of the justices of that court. *Id.* at 344. While representing a party

during a trial before Judge Fisher, Attorney Bradley allegedly "accosted" the judge in a "rude and insulting manner." *Id.* After Judge Fisher effectively disbarred Bradley for his behavior, Bradley sued Judge Fisher for monetary damages. *Id.* at 344–45.

Invoking *Floyd*, the Court noted that the "principle . . . which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions . . . has been the settled doctrine of the English courts for many centuries . . . and has never been denied . . . in the courts of this country." *Id.* at 347. The Court further stated the exemption of judges from civil liability cannot be affected by the motives with which their judicial acts were performed—"The purity of their motives cannot in this way be the subject of judicial inquiry." *Id.* Thus, even though Bradley accused Judge Fisher of "'wantonly, corruptly, arbitrarily, and oppressively intending to remove [Bradley] from his office as an attorney-at-law," *id.* at 338, the Court concluded that judges were not liable in civil actions for their judicial acts, even when such acts were taken in excess of their jurisdiction, *id.* at 351.

#### 1.1.2 The Modern Era

In *Pierson v. Ray*, 386 U.S. 547 (1967), the Court granted certiorari to consider whether a local judge was liable for damages under 42 U.S.C. § 1983 for an unconstitutional conviction. *Id.* at 551. Section 1983 allows individuals to civilly sue State actors for depriving them of their rights, privileges, or immunities secured by the Constitution. 42 U.S.C. § 1983. The plaintiffs were members of a group of white and African-American Episcopal clergymen who attempted to use segregated facilities at an interstate bus terminal. 386 U.S. at 549. They sued local police officers and a municipal police justice for false imprisonment after they were

convicted of disturbing the peace. *Id.* The plaintiffs alleged that the judge's findings of guilt and sentences were based upon racial discrimination. *Id.* at 551.

The *Pierson* Court had "no difficulty" finding that the judge was immune from liability for damages for his role in the convictions as "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction," citing *Bradley* in support. *Id.* at 553–54. The Court stated that immunity "applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Id.* at 554 (internal quotation and citation omitted).

Shortly over a decade later, the Supreme Court again addressed judicial immunity in *Stump v. Sparkman*, 435 U.S. 349 (1978). In *Stump*, the mother of a fifteen-year-old girl presented a document entitled "Petition To Have Tubal Ligation Performed On Minor and Indemnity Agreement" to Judge Harold Stump for signature. *Id.* at 351. Judge Stump approved the petition, despite the fact that the petition "was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian ad litem." *Id.* at 360. The minor was sterilized without her knowledge under the pretext of having an appendectomy. *Id.* at 353. After learning the true nature of the surgery years later, the daughter sued multiple parties, including her mother and Judge Stump, for violation of her constitutional rights. *Id.* at 352.

The Court concluded Judge Stump was immune from civil liability. The Court reiterated that the "necessary inquiry" in determining immunity is "whether at the time [the judge] took the challenged action he had jurisdiction over the subject matter before him," as a judge "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Id.* at 356–57 (internal quotation and citation omitted). The Court found that because the court over which Judge Stump presided was one of general jurisdiction, neither the procedural errors he may have committed nor the lack of a specific statute authorizing his approval of the petition in question made him liable. *Id.* at 359–60. Nor did the informality of the proceedings render Judge Stump's actions non-judicial. *Id.* at 361. Rather, the factors determining whether a judge's act is "judicial" relate to the nature of the act itself and the expectations of the parties—"whether it is a function normally performed by a judge" and "whether [the parties] dealt with the judge in his judicial capacity." *Id.* at 362. And in this case, the Court concluded that because Judge Stump performed the type of act normally performed only by judges and did so in his capacity as a circuit court judge; he was immune from civil liability, despite the "unfairness to litigants that sometimes results." *Id.* at 363.

Two years later, in *Dennis v. Sparks*, 449 U.S. 24 (1980), the Court was again faced with the question of judicial immunity for damages under § 1983. In *Dennis,* a state court judge enjoined the production of minerals from certain oil leases owned by the plaintiffs. *Id.* at 25. The appellate court subsequently dissolved the injunction as having been illegally issued. *Id.* The plaintiffs sued the judge for monetary damages under § 1983, alleging that the injunction had been corruptly issued as the result of a conspiracy between the judge and other defendants

to deprive plaintiffs of their property, i.e., two years of oil production, without due process of law. *Id.* at 25–26. The court of appeals upheld the district court's finding that the judge was immune from liability under § 1983, whether or not the injunction was issued as the result of a corrupt conspiracy. *Id.* at 26. The Supreme Court affirmed, stating again that the Court has consistently adhered to the rule that judges defending against § 1983 actions enjoy absolute immunity from damages liability for acts performed in their judicial capacities. *Id.* at 27. However, while the judge was immune from suit, the Court concluded that the conspiring parties could still be held liable under § 1983. *Id.* at 28.

The judge's co-conspirators argued that if the case went to trial, "the charge of conspiracy and judicial corruption will necessarily be aired and decided, the consequence being that the judge, though not a party and immune from liability, will be heavily involved, very likely as a witness forced to testify about and defend his judicial conduct." *Id.* at 30. The Court concluded, however, that there was no constitutionally based privilege immunizing judges from being required to testify about their judicial conduct in third-party litigation. *Id.* "Nor has any demonstration been made that historically the doctrine of judicial immunity not only protected the judge from liability but also excused him from responding as a witness when his co-conspirators are sued." *Id.* The Court concluded that judicial immunity was not "designed to insulate the judiciary from all aspects of public accountability," such as the normal obligation to respond as a witness when he has information material to a criminal or civil proceeding. *Id.* at 31 (citing *United States v. Nixon*, 418 U.S. 683, 705–707 (1974)). It explained that the concerns underpinning the concept of judicial immunity, a judge's independence and judicial performance, are not similarly found when a judge is required to testify against co-conspirators, noting that "a proceeding in which he cannot be held liable for

damages and which he need not defend, is not of the same order of magnitude as the prospects of being a defendant in a damages action from complaint to verdict." *Id.*

In *Forrester v. White*, 484 U.S. 219 (1988), the Court again was tasked with determining what constitutes a judicial act for immunity purposes. Under Illinois law, a circuit court judge has the authority to hire adult probation officers, who were removable at his discretion. *Id.* at 221. Judge White hired Cynthia Forrester as an adult and juvenile probation officer. *Id.* Judge White subsequently demoted Forrester and then terminated her employment, which Forrester alleged was an act of discrimination based on her sex in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* 221–22. After a jury granted an award in Forrester's favor, Judge White moved for a new trial, which was granted, and then moved for summary judgment on the ground that he was entitled to judicial immunity from a civil damages suit. *Id.* at 222. Both the district court and court of appeals agreed that Judge White was immune from damages.

The Supreme Court reversed. In so doing, it noted that "[r]unning through our cases, with fair consistency, is a 'functional' approach to immunity questions" in which the court examines the "nature of the functions with which a particular official or class of officials has been lawfully entrusted" and seeks "to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Id.* at 223. The Court stated that difficulties have arisen in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by a judge. *Id.* at 227. The Court reiterated that "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches" but also noted that the Court "has never undertaken to articulate a precise and general definition of the class of acts entitled

to immunity." *Id.* The Court found, however, that the cases "suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.*

Thus, the Court found that judicial immunity did not apply to acts such as promulgating a code of conduct for attorneys, which is not an act of adjudication but one of rulemaking. *Id.* at 228. It concluded that in this case, Judge White was acting in an administrative capacity when he demoted and discharged Forrester. *Id.* at 229. The Court stated that while those acts may be quite important in providing the necessary conditions of a sound adjudicative system, the decisions at issue, however, "were not themselves judicial or adjudicative." *Id.* The Court stated that absolute immunity is a "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Id.* at 230 (alteration in original). And in this case, the danger was "not great enough." *Id.* The Court further found that it was not significant that under Illinois law, only a judge could hire or fire probation officers, finding that: "To conclude that, because a judge acts within the scope of his authority, such employment decisions are brought within the court's 'jurisdiction,' or converted into 'judicial acts,' would lift form above substance." *Id.* Thus, the Court concluded that Judge White was not entitled to absolute immunity for the decision to demote and discharge Forrester. *Id.*

Three years later, in *Mireles v. Waco*, 502 U.S. 9 (1991), the Court again considered whether a judge acted within his jurisdiction, and whether the alleged conduct was a judicial act. *Id.* at 11. The plaintiff was a public defender who was scheduled to appear before the judge. *Id.* at 10. After counsel failed to appear, the judge allegedly ordered law enforcement to forcibly and with excessive force seize and bring the attorney to the courtroom. *Id.* The

Court stated that case law makes clear that immunity is overcome in only two sets of circumstances—actions not taken in the judge's judicial capacity and actions taken in the complete absence of all jurisdiction. *Id.* at 11–12. As to the first circumstance, in determining whether an act falls within the judge's judicial capacity, the Court clarified that the relevant inquiry must be the nature and function of the act rather than the act itself. *Id.* at 13. In other words, one must look to the particular act's relation to the general function normally performed by a judge. *Id.*

For instance, in this case, the judge's direction to the court officers to bring a person who is in the courthouse before him is a function normally performed by a judge; however, a judge's direction to carry out a judicial order with excessive force is not. *Id.* at 12. The Court concluded, however, that it cannot scrutinize only the particular act in question, because any mistake of a judge in excess of his authority would become nonjudicial as no improper act is "normally performed" by a judge. *Id.* The Court further explained that because judicial immunity is immunity from suit, not just from damages, judicial immunity is not overcome by allegations of bad faith or malice, which ordinarily cannot be resolved without discovery and trial. *Id.* at 11.

As to the second circumstance, the Court concluded that if the judge authorized and ratified the police officers' use of excessive force, he acted in excess of his authority; however, such an action—taken in the very aid of the judge's jurisdiction over a matter before him—cannot be said to have been taken in the absence of jurisdiction. *Id.* at 13. Thus, the Court found the judge immune.

In sum, the doctrine that a judge enjoys absolute immunity from civil lawsuits for monetary damages when engaging in judicial acts is solidly established. *But see Pulliam v. Allen*,

466 U.S. 522 (1984) (concluding that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity under § 1983, nor does it bar an award of attorney's fees under § 1988). This is not, however, a civil lawsuit; Dugan has been criminally charged under federal statutes. Thus, the question is whether the clearly established principles governing judicial immunity in civil lawsuits applies to the criminal prosecutions of judges.

### 1.2 Judicial Immunity from Criminal Prosecution

As discussed above, *Floyd* was a criminal case. Thus, the first mention of judicial immunity in the context of a criminal case goes back to *Floyd*. As cited above, the Supreme Court's first major application of judicial immunity was in the two post-Civil War era cases of *Randall v. Brigham* and *Bradley v. Fisher*. And as authority for judicial immunity in the civil context, the *Randall* and *Bradley* Courts invoked *Floyd*. However, although the Supreme Court looked to Lord Coke's pronouncements as a starting point for judicial immunity in civil cases, in the 154 years since *Bradley* was decided, Dugan does not cite, and I have not found, cases where the Supreme Court invoked *Floyd* for the proposition that judicial immunity bars the criminal prosecution of judges for judicial acts.

The most we have gleaned from the Supreme Court about judicial immunity in the context of criminal cases have been in reference to 18 U.S.C. § 242, which is not charged in this case. Section 242, the criminal analogue to 42 U.S.C. § 1983, allows for criminal prosecution for the deprivation of constitutional rights while acting under color of state law. This criminal statute was passed as section 2 of the Civil Rights Act of 1866. *See* 136 Harv. L. Rev. at 1467. Although the language of the statute itself does not address its applicability to judges, the legislative history of the bill is clear that its applicability to state actors, including

judges, was of express concern to the drafters. In fact, in vetoing the bill, President Andrew Johnson was concerned that section 2 would subject judges to criminal prosecution if they "render judgments in antagonism with its terms," asserting that the provision "invades the judicial power of the State." CONG. GLOBE, 39th Cong., 1st Sess. 1680 (1866), *available at* https://www.congress.gov/congressional-globe/page-headings/39th-congress/(last visited July 7, 2025).

Upon reconsidering the bill after veto, the bill's sponsor, Senator Lyman Trumbull, responded that "a judge, if he acts corruptly or viciously in the execution or under color of an illegal act, may be and ought to be punished; but if he acted innocently the judge would not be punished." CONG. GLOBE, 39th Cong., 1st Sess. 1758. Similarly, Representative William Lawrence of Ohio stated that "it is better to invade the judicial power of the State than permit it to invade, strike down, and destroy the civil rights of citizens. A judicial power perverted to such uses should be speedily invaded." CONG. GLOBE, 39th Cong., 1st Sess. 1837.

Subsequent to the Act's passage, the Supreme Court upheld a judge's prosecution for a constitutional violation in *Ex parte Virginia*, 100 U.S. 339 (1880). In this case, a state court judge was criminally charged for excluding Black jurors from jury selection in violation of the Thirteenth and Fourteenth Amendments. *Id.* at 344. The judge argued that Congress could not punish a state judge for his official acts and by selecting a jury, he was performing an official judicial act. *Id.* at 348. The Court disagreed, stating that the duty of selecting jurors is a ministerial act; however, even if the act was judicial, the judge had no authority to select jurors in violation of the Constitution. *Id.* at 348–49.

Approximately 100 years later, while addressing judicial immunity in the civil context of § 1983, the Court invoked the threat of judicial prosecution under § 242 in response to arguments that civil immunity provides no recourse against corrupt judges. *See O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) ("On the contrary, the judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress.") (internal quotation and citation omitted); *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. s 242, the criminal analog of s 1983."); *Dennis*, 449 U.S. at 31 ("But judicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from § 1983 damages actions, but they are subject to criminal prosecutions as are other citizens.").

In sum, although the 17th Century English case of *Floyd* declared judges immune from criminal prosecution for judicial acts, the Supreme Court has only cited *Floyd* in civil cases for the proposition that judges are immune for purpose of civil damages. The only context in which the Supreme Court has spoken on judicial immunity from criminal prosecution is regarding § 242, and the Court found that judges are *not* immune from criminal prosecution under this statute.

1.3 Dugan's Arguments

Dugan argues that English law and subsequent American common law begins with the position of absolute judicial immunity save for very limited, specifically articulated exceptions, such as Congress' statements in passing § 242. She contends that without Congress similarly expressing an intent to abrogate the common law of judicial immunity for

criminal prosecution of judges under §§ 1071 and 1505, it follows that she is immune from prosecution under those statutes.

Guided by this history, Dugan contends that only three exceptions have been made in which judges can be criminally prosecuted, none of which applies to her case. First, she argues that a judge can be prosecuted for her wholly unofficial acts. Second, she argues that a judge can be prosecuted for criminal deprivation of a constitutional right under § 242. And third, she argues that a judge can be prosecuted if she conducts an official act, but the act is coupled with an ordinary crime for the pursuit of self-enrichment or self-gratification. (Docket # 21 at 13–14.)

#### 1.3.1 Common Law

*Floyd* is at the foundation of Dugan's argument for the existence of absolute immunity to criminal prosecution for judicial acts. *Floyd* does pronounce such a rule. However, while review of the history of judicial immunity supports that Lord Coke's pronouncements have taken root in American common law regarding judicial immunity in *civil* cases, the same cannot be said regarding criminal prosecutions. As discussed above, the only time the Supreme Court has cited to *Floyd* has been in support of judicial immunity in a civil case. I am not persuaded, therefore, that *Floyd* has taken root in American common law to shield judges from criminal prosecution for judicial acts as Dugan asserts.

Dugan cites to several more recent (i.e., the 19th Century) lower court cases, where, in the context of a civil case against a judge, the court cited the general proposition that since common law, judges are exempt from "a civil suit, or indictment, for any act done, or omitted to be done by him, sitting as a judge." *Hamilton v. Williams*, 26 Ala. 527, 530 (1855); *see also Yates v. Lansing*, 1810 WL 1044, at *7 (N.Y. Sup. Ct. 1810) ("The doctrine which holds a

judge exempt from a civil suit or indictment, for any act done, or omitted to be done by him, sitting as judge, has a deep root in the common law."). She also cites an Eighth Circuit case from two years ago, *Rockett v. Eighmy*, 71 F.4th 665 (8th Cir. 2023), in which the court states that "[j]udicial immunity continues to apply today, not only in prosecutions like *Floyd*, but in civil-rights actions brought under 42 U.S.C. § 1983." *Id.* at 669. But again, these are not criminal cases and the court's brief invocation of immunity from both "civil suit and indictment" provides weak support for the existence of a well-established principle of judicial immunity for judicial acts in criminal cases.

Dugan further cites several 20th Century cases that she again argues advances the concept that judges are immune from criminal prosecution for their official acts not involving constitutional rights. (Docket # 38 at 6.) These cases, however, are similarly unconvincing. She cites *Com. v. Tartar*, 239 S.W.2d 265 (Ky. 1951), a case addressing whether a judge is criminally immune for conducting "misfeasance in office." (Docket # 21 at 9–10.) The court in *Tartar* concluded that "misfeasance of a judicial officer, acting in his official capacity, did not constitute a criminal offense under the common law." 239 S.W.2d at 266. "Malfeasance or misfeasance in office," which some states make criminal either by statute or common law rule, precludes criminal liability by judicial immunity unless the malfeasance or misfeasance is accompanied by bad faith. Shaman, 27 San Diego L. Rev. at 18–19. But Dugan is not charged under a state statute or common law prohibition on malfeasance or misfeasance in office, she is charged under federal criminal statute for general offenses not related to malfeasance or misfeasance in office. Thus, *Tartar* is inapposite.

Dugan also cites to *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944) in support of her argument. (Docket # 21 at 10.) In *Chaplin*, a judge was indicted for criminal conspiracy

to deprive civil rights in violation of a precursor to 18 U.S.C. § 242. The court concluded that the judge was criminally immune because he was acting within the scope of his judicial duties. While the court acknowledged the Supreme Court's holding in *Ex parte Virginia*, it distinguished the case based on the fact that the *Ex parte Virginia* judge was performing a ministerial rather than a judicial act in selecting jurors. *Id.* at 933. While the *Ex parte Virginia* Court did find the judge was conducting a ministerial act, the Court also stated that even if the selection of jurors could be considered a judicial act, the judge had no authority to exclude jurors on the basis of their race. 100 U.S. at 348–49. Furthermore, to the extent any doubt remained after *Ex parte Virginia* whether judges could be prosecuted for a criminal deprivation of constitutional rights, all doubt was removed by the Supreme Court's subsequent pronouncements in *O'Shea*, *Imbler*, and *Dennis*.

In short, I am unconvinced that these cases establish settled law on judicial immunity from criminal prosecutions related to official judicial acts as exists in the context of a civil lawsuit for monetary damages.

#### 1.3.2 Dugan's § 242 Argument

Dugan contends that without Congress expressing an intent to abrogate the common law of judicial immunity for criminal prosecution of judges under §§ 1071 and 1505 as it did for prosecutions under § 242, it follows that she is immune from prosecution under those statutes. This argument assumes the truth of two underlying premises—(1) that judicial immunity from criminal prosecution is established in American common law and (2) that § 242 is an exception to that rule. As discussed above, the case for a common law judicial immunity in criminal cases rests on *Floyd* and *Floyd* has only been cited by the Supreme Court

in civil cases. Thus, there is weak evidence for the existence of a common law judicial immunity from criminal prosecution for official judicial acts.

Moreover, arguing that the lack of judicial immunity from prosecution for a violation of § 242 establishes that judges are immune from criminal prosecution under every other criminal statute overlooks the specific historical context in which § 242 was passed. And as the government argues, must Congress comb through every federal criminal statute to indicate which statutes apply to judges and which do not? I am unconvinced that the absence of judicial immunity for violations of § 242 establishes that judges are immune for judicial acts under all other criminal statutes.

1.3.3 Dugan's Three Exceptions to Judicial Immunity

Again, Dugan asserts that there are only three categories of cases for which judges are not immune from criminal prosecutions. First, a judge can be prosecuted for his wholly unofficial acts. Second, a judge can be prosecuted for criminal deprivation of a constitutional right under § 242. And third, a judge can be prosecuted if he conducts an official act, but the act is coupled with an ordinary crime for the pursuit of self-enrichment or self-gratification. (Docket # 21 at 13–14.)

The first category, wholly unofficial acts, does not merit discussion. The parties do not dispute that judges are not immune from prosecution for criminal acts wholly unrelated to their official duties. (Docket # 21 at 11.) Dugan cites, as an example, a state court judge in California who was recently convicted of murdering his wife as they watched television at home. (*Id.* at 14 n.6.) No one contends that this judge could reasonably invoke judicial immunity as a defense in that case.

Dugan's second category, criminal deprivation of constitutional rights under § 242, is discussed in depth above. Dugan is not charged under § 242 and agrees that judges are not immune from prosecution under § 242. (*Id.* at 9.) Thus, I will not address this category further.

Dugan's third category of cases, where judges are prosecuted for actions related to their duties as judges but are coupled with self-serving criminal activity such as accepting bribes or kickbacks, warrants further discussion. Dugan argues that these cases are distinguishable from other crimes for immunity purposes because of their self-serving nature. She contends that she, in contrast, was acting selflessly (Docket # 38 at 10) with "no hint of self-dealing" (Docket # 21 at 21). But whether a judge seeks his own self-gratification or self-enrichment is not the distinguishing feature for immunity. What matters is whether the judge, even in performing her official duties, is accused of committing a crime.

Take, for example, the infamous "Kids for Cash" scheme in which two Pennsylvania judges, Judges Michael Conahan and Mark Ciavarella, accepted kickbacks for sending juveniles to particular private detention centers. *Wallace v. Powell*, No. CIV.A 3:09-CV-0291, 2009 WL 4051974, *1 (M.D. Pa. Nov. 20, 2009). The judges were alleged to have used their influence as judicial officers to select the Pennsylvania Child Care and Western Pennsylvania Child Care as detention facilities, and intentionally filled those facilities with juveniles to earn their co-conspirators excessive profits. *Id.* Judges Conahan and Ciavarella were paid approximately $2.6 million for their influence. *Id.*

Conahan was specifically alleged to have done, amongst other things, remove funding from the Luzerne County budget from the Luzerne County facility; sign a secret "Placement Guarantee Agreement" with the Pennsylvania Child Care on behalf of Luzerne County; and grant an injunction which prevented the results of an audit of the Pennsylvania Child Care

facility from being disclosed to the public. *Id.* Ciavarella was alleged to have sentenced thousands of juveniles to detention in violation of their constitutional rights. *Id.* Both judges allegedly pressured court probation officers to make recommendations in favor of incarcerating juvenile offenders; concealed their unlawful proceeds; and failed to disclose their financial relationships with the other defendants. *Id.*

The judges were civilly sued under § 1983 for their actions. The court, considering the Supreme Court's jurisprudence on judicial immunity to date, found that judges have absolute immunity for conduct pursuant to their role as judicial officers. *Id.* at *6. The court determined that judicial immunity applies if a judge has jurisdiction over the dispute and conducted a judicial act, as opposed to an administrative, executive, or legislative one. *Id.* at *7. The plaintiffs argued that because the judges' decisions were made corruptly, or in a predetermined fashion, they were not judicial acts. *Id.* at *8. The court disagreed, stating, for example, that the allegation that Conahan had a corrupt motive for issuing an injunction was no different than the allegations against the judge in *Dennis*, where the Supreme Court found judicial immunity. *Id.* The court stated that Ciavarella's determinations of delinquency and sentences imposed were judicial acts, and the fact they were made corruptly or with malice was irrelevant. *Id.* However, to the extent the judges' actions were not judicial in nature, such as Conahan's signing of a "Placement Agreement" or the budget requests, judicial immunity did not shield this conduct. *Id.*

The court acknowledged that because of judicial immunity, Ciavarella would escape civil liability for the vast majority of his conduct, no matter how corrupt. *Id.* at *9. The court also stated, however, citing *O'Shea*, that the judges were still subject to criminal prosecution, noting that the "judges here have been indicted by a federal grand jury for the conduct for

which damages are sought in this case." *Id.* at *6. And Judges Conahan and Ciavarella were indeed indicted under federal racketeering laws. (*See* Indictment, Docket # 1 in *United States v. Conahan, et al.*, Case No. 09-CR-272 (M.D. Penn. 2009).)

What the "Kids for Cash" case shows is that while judges may be civilly immune for judicial acts, regardless of their motives, it does not follow that they are also criminally immune for their wholly judicial acts. Recall, the court found that Ciavarella's determinations of delinquency and sentences were clearly judicial acts. And while judicial immunity shielded him from civil liability, it did not protect him from criminal prosecution for the same acts.

Dugan cites to *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984) as a "close call" regarding whether a judge is truly conducting wholly official acts in the context of criminal immunity. (Docket # 38 at 3.) In *Claiborne*, a federal judge was indicted for soliciting and receiving $30,000.00 from a Nevada brothel owner in return for being influenced in the performance of official acts, specifically, decisions regarding motions in a pending case. The judge was further accused of accepting money from this same individual in return for promising to secure the reversal of his criminal tax evasion conviction by bribing one or more of the judges of the Ninth Circuit Court of Appeals. *Id.* at 843. In finding the judge was not immune from criminal prosecution, the court stated that the "Constitution does not immunize a sitting federal judge from the processes of criminal law." *Id.* at 845.

The court rejected the argument that judicial independence would be diminished by subjecting judges to criminal prosecution. *Id.* at 848. The court found that judges enjoy the same protection as ordinary citizens from vindictive prosecution and that criminal prosecution "encounters several procedural barriers-such as the indictment, burden of proof, and presumption of innocence." *Id.* The court further concluded that "criminal conduct is not

part of the necessary functions performed by public officials" and punishment for such conduct would not interfere with the operation of a branch of government. *Id.* Rather, it "can scarcely be doubted that the citizenry would justifiably lose respect for and confidence in a system of government under which judges were apparently held to be above the processes of the criminal law." *Id.* at 849.

Dugan argues that in *Claiborne*, the judge, despite conducting the judicial acts of handling motions, "sold his office." (Docket # 38 at 3.) While true, this fact does not make *Claiborne* a "close call" as to whether immunity would apply. Rather, *Claiborne* reiterates the accepted principle that even when performing clearly judicial acts, such as deciding motions in a pending case, a judge is not immune from criminal prosecution for committing crimes while conducting the judicial act. While many of these cases involve crimes where the judge's motivation was financial gain, it does not follow and there is no authority for the proposition that criminal prosecution is limited to such cases.

1.3.4 Dugan's Reliance on *Trump v. United States*

Finally, Dugan cites to the Supreme Court's recent decision in *Trump v. United States*, 603 U.S. 593 (2024), where the Court found the President absolutely immune for criminal prosecution for conduct within his exclusive sphere of constitutional authority. While acknowledging that *Trump* was addressing immunity in the context of the President, Dugan argues that the Court indirectly addresses judicial immunity because, in her view, *Trump*'s pronouncement of Presidential immunity is grounded in the proposition that judges have absolute immunity in criminal cases for judicial acts.

In *Trump*, like here, the parties did not dispute that criminal immunity does not apply to a President's unofficial acts. *See id.* at 615. As to official acts, however, in arguing the

President is absolutely immune from criminal prosecution for acts within the outer perimeter of his official responsibilities, President Trump looked to *Nixon v. Fitzgerald*, a civil case in which the Court concluded that, "In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id*. at 606 (citing *Fitzgerald*, 457 U.S. at 756). Trump argued that given the Court's pronouncement in *Fitzgerald* regarding civil immunity for acts on the "outer perimeter," he must be absolutely immune from criminal prosecution for such acts as well. *Id*.

The Court agreed, finding that the "nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office," and with respect to the exercise of his "core constitutional powers," the immunity must be absolute. *Id*. As to non-core official actions falling within the "outer perimeter" of his official responsibilities, the Court concluded that the President has at least a presumptive immunity from criminal prosecutions. *Id*. at 614. The Court found that the government can overcome this presumption by showing that applying a criminal prohibition to the act would pose no dangers of intrusion on the authority and functions of the Executive Branch. *Id*. at 615.

In coming to this conclusion, the Court reiterated that the President is not above the law. *Id.* at 642. It stated that the "President, charged with enforcing federal criminal laws, is not above them." *Id.* at 614. However, the Court also found that it had to balance two competing interests—the President's ability to execute the duties of his office "fearlessly and fairly" and the fact that federal criminal law seeks to redress a wrong to the public as a whole,

not just to an individual. *Id*. at 614. In finding this balance, the Court concluded that the separation of powers principles necessitate the President having absolute immunity for core constitutional powers and at least a presumptive immunity for all official acts. *Id.* at 642.

Dugan argues that because the *Trump* decision repeatedly relied on *Fitzgerald*, and because *Fitzgerald* was rooted in cases applying absolute judicial immunity, it follows that *Trump*, in fact, simply "clarified that the President is entitled to the same immunity from prosecution for official conduct that judges have long held." (Docket # 21 at 10–11.) While Dugan asserts that *Trump* simply extended to the President the same immunity from prosecution that judges already have, this argument makes a leap too far. *Trump* says nothing about criminal immunity for judicial acts. And in *Fitzgerald*, while the Supreme Court looked to the historical jurisprudence regarding civil judicial immunity, the Court was clear that the grant of absolute immunity for civil damages for "outer perimeter" acts of the President was due to the "special nature of the President's constitutional office and functions." *Fitzgerald*, 457 U.S. at 756. Similarly in *Trump*, the Court noted that the President occupies a unique position in the constitutional scheme as the only person who alone composes a branch of government. 603 U.S. at 610.

Even so, absolute criminal immunity exists only for a President's "core constitutional powers," meaning those powers specifically articulated in the constitution, such as the power to pardon and the power to veto. *See id.* at 634. It is in those limited cases, because of the separation of powers, that a President's motive cannot be considered. *Id.* at 618. Thus, even if a president is accused of taking a bribe to grant a pardon, because a pardon is a "core" power given to the President by the constitution, it would violate the separation of powers for the judicial branch to question it. However, for the non-core powers, the Supreme Court did

not grant the President blanket immunity, instead saying these acts are only presumptively immune and this immunity could be overcome by showing that criminal prohibition posed no dangers of intrusion on the separation of powers. *Id*. at 615.

Perhaps in some future case the Supreme Court will expand the judicial immunity principles it has so firmly established in the civil context to the criminal prosecution of judges as Dugan urges. At this time, however, I am unconvinced that either the common law or the *Trump* decision provide the authority for applying the civil framework of absolute judicial immunity for judicial acts to the prosecution of judges for crimes that relate to official duties.

*2. Summary of the Existing Law on Judicial Immunity*

Having reviewed the law on judicial immunity in both the civil and criminal contexts and having considered the parties' arguments on the existing precedent, the applicable law can be summarized as follows. In the civil context, it is well-established and undisputed that judges have absolute immunity from civil lawsuits for monetary damages when engaging in judicial acts. While it is not always crystal clear what constitutes a "judicial act," the Supreme Court counsels courts to consider whether the act is a function normally performed by a judge and whether the parties dealt with the judge in his judicial capacity. *See Stump*, 435 U.S. at 362. The Court has stated there is an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. *Forrester*, 484 U.S. at 227. The Court has articulated that judicial immunity is not overcome by allegations of bad faith or malice. *Mireles*, 502 U.S. at 11.

In the criminal context, review of the case law supports the following. First, judges are not immune from criminal prosecution for acts wholly outside their official roles as judges. Dugan cites several examples that fit into this category, such as a state court judge who was

convicted of murdering his wife as they watched television at home and a state court judge who was convicted of sexual battery of a female lawyer in his chambers. (Docket # 21 at 14 n.6.)

Second, judges are not immune from prosecution for the criminal deprivation of constitutional rights under 18 U.S.C. § 242.

And third, judges are not shielded by judicial immunity from criminal prosecution for acts, though related to official duties, are in violation of criminal law. *See, e.g.*, *Claiborne*, 727 F.2d 842; *Wallace v. Powell*, 2009 WL 4051974.

*3. Application of Judicial Immunity to the Allegations in the Indictment*

Applying the principles above, does judicial immunity shield Dugan from prosecution because the indictment alleges she violated federal criminal law while performing judicial duties? The answer is no. As discussed above, there is no firmly established absolute judicial immunity barring criminal prosecution of judges for judicial acts. Other than the 17th Century English case of *Floyd*, the United States Supreme Court has only applied the concept of judicial immunity for judicial acts in civil cases. Even before the lower courts, with the exception of the single "malfeasance in office" case cited by Dugan, the cases Dugan cites in support of her argument arise in the civil context.

Further, the category of cases where judges were prosecuted for conduct performed in their official role also answers this question in the negative. For example, in the "Kids for Cash" scheme described above, sentencing juveniles is indisputably within the scope of a judge's official duties. Thus, the *Wallace* court found the judges immune from civil suit. 2009 WL 4051974, at *9. The judges were still, however, prosecuted criminally because even

though the judges were performing official duties, their otherwise criminal conduct did not shield them from prosecution.

As discussed earlier, Dugan tries to distinguish her case by arguing that the charged acts are "devoid of the self-enrichment or self-gratification that marks earlier cases in which judges were convicted for using judicial status as leverage or opportunity for a bribe, kickback, or favor, or to commit another crime." (Docket # 21 at 20.) Again, the distinction that takes these official duty cases out of the shield of immunity is not self-enrichment or the motive of the judge. It is whether the criminal law has been violated. In other words, a judge's actions, even when done in her official capacity, does not bar criminal prosecution if the actions were done in violation of the criminal law.

Furthermore, consider the only case with similar allegations to this case. In *United States v. Joseph*, a judge on the Massachusetts District Court, Judge Shelley Richmond Joseph, was, similar to Dugan here, federally charged with obstruction of justice and obstruction of a federal proceeding in violation of §§ 1512 and 1505. In that case, an ICE officer working for the Department of Homeland Security arrived at the courthouse to take into custody an individual who had been arrested days earlier who was allegedly the subject of an immigration detainer and warrant based on a final order of removal. *United States v. Richmond Joseph*, No. 19-CR-10141, 2020 WL 4288425, at *1 (D. Mass. July 27, 2020). The DHS intended to detain the individual and effect his removal from the United States in the event he was released from state custody. *Id.* Joseph allegedly facilitated this individual's departure from the courthouse using the rear sally port door of the lockup on the courthouse's lower level, rather than through the main door leading from the courtroom to the lobby where the ICE officer was waiting. *Id.*

Joseph moved to dismiss the indictment on judicial immunity grounds and the parties "hotly contest[ed]" whether judicial immunity insulates against criminal liability or was restricted to civil lawsuits. *Id*. at *3. The district court declined to resolve the question, finding that even if judicial immunity did extend to the criminal context, it would only apply where a judge performed judicial acts within her jurisdiction. *Id.* And in this case, the indictment alleged that Joseph acted "corruptly" and such immunity, to the extent it exists, does not shield corruption or bribery. *Id*. The court concluded that it was "not within this Court's province on a motion to dismiss to determine whether judicial immunity, even if its reach encompasses criminal liability, provides a viable shelter for Joseph in the circumstances alleged here." *Id*.[1]

The indictment here, as in *Joseph*, alleges that Dugan acted "corruptly." (Docket # 6 at 2.) And as the *Joseph* court found, to the extent immunity exists in the criminal context, it does not shield against corruption. In my view, this is consistent with the cases where judges were prosecuted for performing official acts that were intertwined with bribery or extortion—even where judges are acting in their official role, when the judicial acts violate criminal law, judicial immunity does not bar prosecution.

I agree with Dugan and the amicus brief of the former judges that a judge plays many roles when sitting on the bench in a courtroom. She must not only interpret and apply the law to the facts, she must also ensure the efficient running of her courtroom. Thus, I agree that

[1] Joseph appealed the district court's denial on judicial immunity grounds. The First Circuit dismissed the appeal, concluding that it lacked jurisdiction to review the district court's dismissal "based on her asserted common-law defense of judicial immunity." *United States v. Joseph*, 26 F.4th 528, 534 (1st Cir. 2022). As Dugan does here, Joseph argued that judicial immunity protected her against not just conviction, but against prosecution. *Id.* at 533. The First Circuit disagreed, finding that "judicial immunity -- even assuming that it applies in this criminal case -- does not provide a right not to be tried that can serve as a basis for interlocutory review." *Id.* The court ultimately concluded that Joseph could not obtain interlocutory review of her judicial immunity defense unless she could show that her claimed right not to be tried was explicitly grounded in a statute or the Constitution, which she could not do, relying instead on common law. *Id.* at 534.

determining whether a warrant establishes probable cause; directing people outside her courtroom to talk with the Chief Judge about a planned arrest; addressing a case off the record; telling people in her courtroom what door to use to re-enter the public hallway; and allowing a party to appear by Zoom are all part of a judge's job. I also agree with Dugan and the former judges that the appellate courts are the proper forum to address disagreements with a trial judge's opinions, errors, or mistakes. However, I do not agree that the case law supports that these judicial acts bar prosecution where the indictment alleges that the acts were done "corruptly" or to facilitate violation of the criminal law.

At bottom, the indictment does not charge Dugan for "opining on the fly," managing her courtroom, or allowing someone to appear by Zoom for future hearings. There are no, and there cannot be, federal statutes criminalizing such conduct. Rather, the indictment charges Dugan with violating federal criminal laws by (1) "knowingly conceal[ing] E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R., in violation of 18 U.S.C. § 107" and by (2) "corruptly endeavor[ing] to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, in violation of 18 U.S.C. § 1505."

This conclusion does not leave judges acting in their official capacities or judicial independence at the mercy of prosecutors. As the Ninth Circuit stated in *Claiborne*, judges enjoy the "same protections as ordinary citizens from vindictive prosecution." 727 F.2d at

848. A prosecutor seeking to charge a judge of a criminal offense, if proceeding by criminal complaint as was the case here, must satisfy the reviewing judge that there is probable cause a federal crime has been committed. Additionally, the prosecutor must then present his case to a grand jury as required by the Fifth Amendment. And ultimately, the prosecutor must prove each of the elements of the charged offense beyond a reasonable doubt to a unanimous jury of twelve citizens.

For these reasons, I recommend that Dugan's motion to dismiss the indictment based on judicial immunity be denied.

*4. Tenth Amendment*

Next, Dugan argues that her prosecution violates the Tenth Amendment's separation of powers. (Docket # 21 at 23–31.) The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Tenth Amendment "restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, . . . is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 156–57 (1992).

Dugan argues that the federal government, through its executive branch, lacks power to exact criminal punishment on a state court judge for "doing in and near her state courtroom as the indictment contends." (Docket # 21 at 26.) The crux of Dugan's argument is that her prosecution under federal law effectively overrides the State of Wisconsin's ability to administer its courts, stating that the Constitution does not allow the federal government "to

superintend the administration and case-by-case daily functioning of state courts as this indictment proposes." (*Id.* at 27.)

In *Joseph*, the Massachusetts judge and her co-defendant courtroom deputy raised a similar Tenth Amendment challenge. They argued that they were being charged for their lawful decision not to assist ICE in administering immigration laws, for the judge's decisions regarding how to manage her courtroom, and for the deputy's exercise of his daily duties. 2020 WL 4288425, at *4. The district court found that addressing these constitutional arguments "require the assessment of disputed facts, characterizations of the events underlying the Indictment, or other evidentiary analysis. Such fact-laden determinations are outside the scope of a motion to dismiss." *Id.*

The same is true here. The indictment alleges Dugan violated two federal statutes, 18 U.S.C. §§ 1071 and 1505, and cites the respective statutory language for both. Whether Dugan violated these statutes as the government accuses, or whether she was merely performing her judicial duties as Dugan asserts, these are questions for a jury that cannot be resolved on a motion to dismiss. Additionally, that the allegations could also be addressed, or are better addressed, by the state's own judicial discipline procedures does not, as a matter of constitutional law, require dismissal of the indictment.[2] For these reasons, I recommend Dugan's motion to dismiss on Tenth Amendment grounds be denied.

*5. The Constitutional Avoidance Doctrine*

Finally, Dugan invokes the canon of constitutional avoidance to support dismissal of the indictment. Dugan's invocation of this canon, however, is misplaced. Constitutional

[2] In fact, the *Joseph* case was ultimately resolved with the government agreeing to drop the criminal case in exchange for Joseph's agreement to self-report to the state judicial discipline body. *See* Massachusetts Judge Faces New Scrutiny for Alleged Role in Immigration Case, *available at* https://courtscast.com/massachusetts-judge-faces-new-scrutiny-for-alleged-role-in-immigration-case/(last visited July 7, 2025).

avoidance is a canon of statutory construction that comes into play when the language of a statute is ambiguous; the canon is "a tool for choosing between competing plausible interpretations" of the statute. *Warger v. Shauers*, 574 U.S. 40, 50 (2014) (internal quotations and citations omitted). It counsels courts to first ascertain whether a construction of the statute is fairly possible to allow avoidance of the constitutional question. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). The canon has "no application," however, "in the absence of . . . ambiguity." *Warger*, 574 U.S. at 50 (internal quotations and citations omitted).

Dugan first invokes the canon to argue that the two statutes under which she is charged—§§ 1071 and 1505—conflict with the Constitution based on the Tenth Amendment argument she raises above and based on the "intersection" between judicial immunity, rooted in the common law, and Congress' enforcement of § 242 against state actors, including judges. (Docket # 21 at 33.) She argues that the Court can avoid constitutional questions by deciding the case on immunity grounds rather than addressing the Tenth Amendment issue. (*Id.* at 33–34.) Again, this is not how the canon of constitutional avoidance is used. Dugan does not allege ambiguity in either statute that would require the Court to consider a plausible interpretation in harmony with the Constitution. She is simply repackaging her Tenth Amendment argument, which, for the reasons explained above, cannot be resolved on a motion to dismiss.

Dugan next invokes the canon to argue that the Court could "easily and rightly" construe §§ 1071 and 1505 to avoid any constitutional concern. (*Id.* at 34.) But Dugan does not raise any constitutional concerns with either statute. She argues that the indictment fails to allege conduct that constitutes "concealment" under § 1071. (*Id.*) This is not a constitutional issue; it is a factual issue to be resolved at trial. She further argues that the

indictment fails to allege a "proceeding" within the meaning of § 1505. (*Id.*) The indictment alleges that Dugan interfered with the removal proceedings of the Department of Homeland Security. While she argues that such removal proceedings cannot, as a matter of law, constitute a "proceeding" for purposes of the statute, once again, she is not arguing that the statute is ambiguous.

Thus, neither of these questions invoke the use of the canon of constitutional avoidance. Dugan raises no questions of ambiguity in the statutes, and I see none to address. Thus, I recommend Dugan's motion to dismiss be denied as to this ground as well.

*6. Factual Disputes Not Properly Resolved on Motion to Dismiss*

In litigating this motion, the parties contest both facts alleged in the indictment and facts beyond what is alleged in the indictment. This too counsels against dismissal. The court cannot resolve disputed questions of fact on a motion to dismiss. *See Abramson*, 2023 WL 349842, at *3. For example, Dugan argues that the federal agents disrupted her courtroom on April 18 to effectuate the arrest (Docket # 15 at 5), while the government asserts that the evidence at trial will show that the agents did not disrupt any proceedings, rather, Dugan affirmatively chose to pause an unrelated case, leave her courtroom, interrupt a colleague's proceedings to get her assistance, and then confront the agents in the public hallway (Docket # 28 at 6–7). Dugan further argues that she had a right to make decisions involving her courtroom and cases, including directing individuals to use a certain door, conducting a case off the record, and opining "off the cuff" on a legal issue and the federal law enforcement agents improperly interfered with her right to make those decisions. (Docket # 38 at 10–12.) The government, however, asserts that Dugan was not simply trying to run her courtroom, but intentionally misdirected the agents to the Chief Judge's office, knowing he was not there,

and then escorted E.F.R. into a non-public hallway with access to a stairwell leading to a courthouse exit to help him evade arrest. (Docket # 28 at 6–7.)

Dugan disputes the government's version of events and the government will have the burden of proving its allegations beyond a reasonable doubt at trial. However, these contested facts cannot be resolved at this juncture.

*7. Arguments of the Amici*

Two separate parties have moved for leave to file amicus curiae (friend of the court) briefs in this case. The first motion was filed by 138 former state and federal judges from across the United States. (Docket # 25.) These judges seek to file an amicus brief in support of granting Dugan's motion to dismiss the indictment. The second motion was filed by the Center for American Rights. (Docket # 32.) This organization seeks to file an amicus brief in support of denial of Dugan's motion to dismiss. Both motions are granted, and I thank the amici for their time and contribution to the consideration of the important issues presented by this motion.

Generally, because amici are not parties to the case, they cannot raise issues not advanced by the parties. *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 n.4 (1991) ("[W]e do not ordinarily address issues raised only by amici"); *Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1144 n.4 (10th Cir. 2023) (finding that because an "amicus is not a party," the court "ordinarily decline[s] to consider arguments raised only by an amicus"); *Dalombo Fontes v. Gonzales*, 498 F.3d 1, 2 (1st Cir. 2007) ("[W]e will not address an issue raised by an amicus that was not seasonably raised by a party to the case."); *Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("Absent exceptional

circumstances, an issue waived by appellant cannot be raised by amicus curiae."). Thus, I have disregarded any challenges articulated by the amici that were not raised by either party.

## CONCLUSION

It is well-established and undisputed that judges have absolute immunity from civil lawsuits for monetary damages when engaging in judicial acts. This, however, is not a civil case. And review of the case law does not show an extension of this established doctrine to the criminal context. Accordingly, I recommend that Dugan's motion to dismiss the indictment on judicial immunity grounds be denied. I also recommend that the court declines her invitation to dismiss the indictment on Tenth Amendment grounds and on the canon of constitutional avoidance. Finally, it is important to note that nothing said here speaks to the merits of the allegations against Dugan. Dugan is presumed innocent, and innocent she remains, unless and until the government proves the allegations against her beyond a reasonable doubt to a jury at trial.

**NOW, THEREFORE, IT IS RECOMMENDED** that Dugan's Motion to Dismiss the Indictment (Docket # 15) be **DENIED**.

**IT IS FURTHER ORDERED** that the motions to file amicus briefs (Docket # 25 and Docket # 32) are **GRANTED**.

The motion for supplemental jury questionnaire (Docket # 24) will be addressed by Judge Adelman.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections

are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 7th day of July, 2025.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.** **Case No. 25-CR-89**

**HANNAH C. DUGAN**
**Defendant.**

---

# DECISION AND ORDER

The government charged defendant Hannah Dugan with concealing a person from arrest, 18 U.S.C. § 1071, and obstructing removal proceedings of the Department of Homeland Security, 18 U.S.C. § 1505. Summarized, the government alleges that on April 18, 2025, defendant, a state court judge, concealed from arrest and obstructed the apprehension of a person (E.F.R.) wanted by federal immigration authorities for removal. The case is set for trial on December 15, 2025. This order addresses the parties' motions in limine.

## I. GOVERNMENT'S MOTIONS

The government filed a consolidated motion in limine making 13 requests, as well as an additional motion to bar defendant's proposed expert testimony. I address each in turn.

### A. Consolidated Motion

#### 1. Potential punishment/collateral consequences

The government moves to preclude defendant from mentioning potential punishment or any collateral consequences flowing from conviction. (R. 56 at 10-11.) Defendant does not object. (R. 65 at 7.) This request is granted.

**2. Jury nullification**

The government moves for an order precluding defendant from presenting evidence or argument designed to induce jury nullification, including but not limited to appeals for the jury to decide the case based on disagreement with immigration policy and enforcement, or based on alleged governmental misconduct. (R. 56 at 11-13) Defendant does not object to the government's request to prohibit her from arguing for jury nullification or appealing to jurors to decide the case based on their personal views of immigration policy and enforcement. (R. 65 at 8.) That request is granted.

**3. Discovery requests**

The government moves to bar discovery requests or commentary regarding discovery in the presence of the jury. (R. 56 at 13-14.) Defendant responds that she is not opposed to the general idea of not arguing discovery disputes in front of the jury. "Obviously, however, both parties will be commenting on discovery throughout the trial. For example, a question, answer, or comment during trial that a document was produced by the government is proper and necessary, as may be the timing of that production." (R. 65 at 8.) With that understanding, the request is granted.

**4. Reasonable doubt**

The government moves to bar the defense from defining "reasonable doubt." (R. 56 at 14-15.) Defendant does not object but notes that she reserves her right to argue the government has not carried its burden. (R. 65 at 8-9.) This request is granted.

**5. Defendant's out-of-court statements**

The government moves to preclude defendant from eliciting her own out-of-court

statements, including a self-serving statement she made to police officers on April 22, 2025, several days after the events at issue. The government argues such statements would be hearsay, and the "rule of completeness" would not require their admission. (R. 56 at 15-16.) Defendant responds that without additional context or a more specific request, it is difficult to respond to this motion. She notes that out-of-court statements are not necessarily hearsay, and that statements offered for a relevant purpose other than the truth are not hearsay at all. (R. 65 at 9.)

A defendant's out-of-court statement, when offered by the defense, is generally hearsay. United States v. Pulliam, 973 F.3d 775, 783 (7th Cir. 2020) (citing United States v. Sanjar, 876 F.3d 725, 739 (5th Cir. 2017)). The Seventh Circuit has also noted that "[d]efendants often try to justify their actions when speaking with FBI agents and other law enforcement officials by disclaiming criminal intent. Such an exculpatory statement has nothing to do with Rule 106 [the rule of completeness]." United States v. Smith, 150 F.4th 832, 849 (7th Cir. 2025). In those circumstances, the appropriate vehicle for the introduction of such evidence is for the defendant to take the stand and testify that she did not think she was doing anything wrong, rather than using Rule 106. Id. (citing United States v. Faruki, 803 F.3d 847, 857 (7th Cir. 2015)).

Without knowing the precise statements defendant may seek to introduce and why, I cannot issue a definitive ruling. Defense counsel should alert the court prior to introducing such statements and be prepared to explain the basis for admission consistent with the standards set forth above.

**6. Motives of law enforcement**

The government moves to bar argument or questioning concerning the motives of law enforcement. "[T]he defense team has claimed to reporters that . . . this case was as an attack

on the independent judiciary and is politically charged. The defense team also told reporters that the government 'rushed to judgment' in issuing charges and then was 'stuck' going forward." (R. 56 at 17.) The government argues that evidence bearing on its decision to prosecute is extraneous and collateral and should be excluded from trial. (R. 56 at 17.)

Defendant objects to this request. She notes that the indictment alleges the agents planned to arrest E.F.R. in a public hallway, but their plans apparently changed, as they ended up arresting him outside the courthouse. This, defendant contends, puts the agents' intentions and motives at issue. (R. 65 at 9.) Defendant further contends that the government made a rushed charging decision, which required the agents to attempt to fit their investigation to the previous charging decision. "To the extent that the agents deny their plan changed (in contradiction to the record evidence), Judge Dugan should be able to demonstrate and explain to the jury why they are motivated to change their stories." (R. 65 at 10.)

I do not understand defendant to argue that she should be permitted to argue to the jury that the prosecution is politically motivated. See United States v. Johnson, 605 F.2d 1025, 1030 (7th Cir. 1979) ("[T]he defendant alleges that the 'indictment was a political instrument in soliciting defendant's cooperation with the FBI probe of the CETA Program and the DEA drug investigations centered upon the black community.' Had the judge in his discretion permitted excursions into extraneous and collateral matters unrelated to the particular drug transactions, the trial would only have been delayed and the issues confused."). Both sides will be allowed to present relevant evidence regarding what happened and why.

**7. Requirement of a judicial warrant**

The indictment alleges that defendant "falsely" told ICE agents they needed a judicial warrant to arrest E.F.R. (R. 6 at 2.) The government argues defendant should be precluded

from arguing that a judicial warrant, as opposed to an administrative warrant, is needed to arrest an alien in a public hallway. (R. 56 at 18.) Indeed, the government contends, the evidence will show that defendant had reason to know that an administrative warrant was sufficient. (R. 56 at 18-19.)

Defendant objects, noting that the government made this an issue by alleging she committed obstruction by "confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R." (R. 65 at 10, quoting R. 6, emphasis added.) The indictment also alleges that defendant knew a warrant had been issued for E.F.R. "Evidence of what Judge Dugan knew will overlap significantly with what was actually true." (R. 65 at 11.)

Defendant does not present contrary authority on the issue of whether a judicial warrant was actually required here.[1] But the indictment does make what defendant knew relevant; both sides should be permitted to present evidence on that point.

**8. Defendant's arrest**

The government seeks to bar evidence or argument concerning defendant's arrest or alluding to alternative means of bringing her to court for an initial appearance, arguing that the only purpose served by introducing such evidence would be to invite jurors to find fault with the government or conclude that defendant already had been punished for her wrongful conduct, encouraging jury nullification. (R. 56 at 19.) Defendant objects, arguing she must be permitted to discredit the caliber of the investigation or the decision to charge her. (R. 65 at 11.)

---

[1]In the briefing on her motion to dismiss, defendant stated: "Assuming she said what the government claims now, Judge Dugan probably was wrong about whether an ICE administrative warrant meets Fourth Amendment muster, but that is not entirely settled." (R. 38 at 11 n.4.)

Defendant should be permitted to challenge the integrity of the investigation. However, it is unclear why this would include evidence about her arrest. Absent further explanation as to how this could be relevant, the government's request will be granted.[2]

**9. Duration of the investigation**

The government moves to bar evidence or comment concerning the duration of the investigation into the events of April 18, 2025, arguing it is not relevant to whether the government has proven its case beyond a reasonable doubt. (R. 56 at 19-20.) The government notes that members of the defense team have told the media that this case was a "rush to judgment." The government contends: "The evidence will speak for itself, and the jury will either agree or disagree that it establishes the defendant's guilt. Evidence or comment about the relatively short interval between the alleged crime and the issuance of charges is not relevant." (R. 56 at 20.)

Defendant objects to this request, noting she must be permitted to discredit the caliber of the investigation or the decision to charge her. "The haste is relevant: it goes to bias, accuracy of factfinding, and the quality and reliability of the investigation." (R. 65 at 11.)

It is difficult to rule on this request in the abstract. As indicated, defendant should be permitted to challenge the integrity of the investigation. However, I am disinclined "to allow this trial to become a trial of the investigation." United States v. Robbins, 197 F.3d 829, 845 (7th Cir. 1999). Under Fed. R. Evid. 403, the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of confusing the issues, misleading the jury,

[2]In her motion in limine, defendant seeks permission to elicit admit statements by the Attorney General and FBI Director about her alleged conduct. (R. 59 at 3.) For the reasons set forth below, I will deny that motion.

undue delay, or wasting time. See United States v. Estell, 641 Fed. Appx. 552, 556 (7th Cir. 2016) ("[T]rial judges have discretion to limit argument on tangential issues that could confuse the jury, and that includes a defendant's complaints about the adequacy of the government's investigation."). The balance will be struck at trial.

**10. Success in preventing E.F.R.'s arrest**

The government moves to bar argument that defendant should not be convicted because she did not succeed in preventing E.F.R.'s arrest. (R. 56 at 20.) "In other words, the defense may attempt to argue 'no harm; no foul.' Such comment should be disallowed because neither of the statutes charged in the indictment requires that the defendant succeed to be convicted or that law enforcement could have changed the location of the arrest." (R. 56 at 21.) The government cites authority that neither of the charging statutes require the defendant succeed in concealing the person or obstructing the proceeding. (R. 56 at 21-22.)

Defendant objects, referring to her proposed jury instructions including an element of "materiality." Additionally, the government alleges that defendant corruptly endeavored to influence, obstruct, and impede a proceeding by committing affirmative acts to assist E.F.R. evade arrest in the public hallway outside of Courtroom 615. Defendant "is going to argue that she's not guilty. One reason she's not guilty, contrary to the indictment, is that at least by the time he emerged into the hallway (and maybe before) there was not a plan to arrest [E.F.R.] in the hallway that she could have corruptly endeavored to obstruct." (R. 65 at 12.)

The arguments that may be made to the jury will depend on the court's instructions, yet to be finalized. Defendant will be permitted to present evidence and argument that she did not endeavor to obstruct the arrest of E.F.R. I will otherwise defer ruling on request # 10 at this time.

**11. Other ICE enforcement actions**

The government moves to bar evidence of other ICE enforcement actions in the Milwaukee County Courthouse or elsewhere, arguing that, "except to impeach a witness or show bias, such collateral evidence has no relevance to the events of April 18, 2025, and should be excluded from the jury's consideration." (R. 56 at 22.) Defendant objects, arguing that previous ICE arrests at the Milwaukee County Courthouse and the evolving policies set forth by the chief judge are directly relevant to her subjective mindset on April 18, 2025. (R. 65 at 12-13.) "Moreover, those arrests prompted emails that the government intends to use at trial. The context of those emails is relevant to how they were understood by their recipients, including Judge Dugan." (R. 65 at 13.)

I agree with defense that such evidence may be relevant to defendant's mental state. This request is denied.

**12. Defendant's alleged "good motives"**

The government moves to bar evidence of defendant's alleged "good motives," arguing such arguments have the potential to mislead the jury because they suggest the defendant was privileged to break the law because of her moral beliefs or "good motives." (R. 56 at 22.) Defendant responds that she does not know what evidence the government seeks to bar here. She intends to elicit evidence and make arguments about her state of mind on April 18, 2025. The government must prove she had corrupt motives or a corrupt intent. Her motives are therefore relevant.

Absent more specifics, I cannot definitively rule on this request. Defendant will be allowed to present relevant evidence touching on her mental state.

**13. Defendant's "prior good acts"**

The government moves to bar evidence of defendant's "prior good acts," noting she may seek to introduce evidence of her past law-abiding conduct. The government argues such evidence is inadmissible under Fed. R. Evid. 404(b). (R. 56 at 23, citing United States v. Hill, 40 F.3d 164, 168 (7th Cir. 1994) (prohibiting admission of "good acts" to prove that a defendant "had a good character and acted in conformity therewith"); United States v. Reese, 666 F.3d 1007, 1020 (7th Cir. 2012) ("Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment."); United States v. Santos, 65 F. Supp. 2d 802, 845-46 (N.D. Ill. 1999) ("A defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions.").)

Defendant "objects to this motion because it's unclear what the government is attempting to exclude here." (R. 65 at 13.) I will defer ruling at this time and consider the issue, if it arises, in the context of specific evidence at trial.

**B. Expert Testimony**

The government moves to exclude proposed expert testimony from an immigration lawyer regarding the meaning of certain statutory and regulatory terms, e.g., "pending proceeding." The government contends that the meaning of the term "proceeding" is a question of law to be decided by the judge in the context of jury instructions. (R. 69 at 3.)

The Seventh Circuit has consistently held that such testimony may be excluded. See United States v. Lupton, 620 F.3d 790, 799-800 (7th Cir. 2010) ("The court was correct in noting that the meaning of statutes, regulations, and contract terms is 'a subject for the court,

not for testimonial experts. The only legal expert in a federal courtroom is the judge.'") (quoting United States v. Caputo, 517 F.3d 935, 942 (7th Cir. 2008) (citation omitted)); see also United States v. Stewart, 433 F.3d 273, 311 (2d Cir. 2006) ("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory.").

Much of defendant's response discusses whether there was a "pending proceeding . . . before . . . the Department of Homeland Security" on April 18, 2025, as alleged in count two. "The Defense does not believe that the government can factually satisfy that requirement. The proffered expert testimony seeks to assert the underlying facts relevant to that inquiry. Those facts include the nature and extent of second-party involvement when an expedited removal proceeding has been completed 12 years earlier, as well as the lack of second-party involvement in the issuance of the warrant." (R. 70 at 9.) Defendant agrees that the court will define the law for the jury, including, apparently, the meaning of the phrase "proceeding before." (R. 70 at 9.) Defendant contends that she instead seeks to develop the factual record as to what pending administrative proceedings would entail. "Just as the government no doubt will seek to introduce the I-200 warrant, the Defense seeks to introduce evidence as to the facts surrounding any second-party involvement in the issuance of that warrant and the subsequent removal of an individual after an expedited removal order was entered 12 years earlier." (R. 70 at 9.)

It is unclear how the proposed expert will provide evidence as to the facts. The government has indicated it will have ICE witnesses provide lay testimony describing where the issuance and execution of the arrest warrant for E.F.R. fit in his overall immigration proceedings. (R. 69 at 8-9.) I will at the final pre-trial discuss with the parties permissible defense testimony, including from the proposed expert, on this issue.

## II. DEFENDANT'S MOTION

In her first motion, defendant seeks an order that the government cannot rely on her lawful official acts to sustain the charges; she also renews her immunity motion. In her second motion, defendant makes 12 additional requests (numbered 2-13).

### A. First Motion

#### 1. Official acts

Defendant argues that, because lawful acts do not and cannot obstruct or hinder under Seventh Circuit caselaw, the government (1) may not rely on or even introduce evidence of these lawful acts. Alternatively, the government (2) may not contest that they were official acts within a Wisconsin state judge's job (even if it is permitted to argue that they were done "corruptly"). (R. 58 at 1-2.) Defendant cites cases holding that an act one has a legal right to undertake does not obstruct or hinder. (R. 58 at 3, citing United States v. Edwards, 869 F.3d 490, 492-99 (7th Cir. 2017); United States v. Matthews, 505 F.3d 698, 705-06 (7th Cir. 2007); see also Arthur Andersen LLP v. United States, 544 U.S. 696, 705-06 (2005).) In these cases, the courts recognized that corrupt interference with an investigation would not exist where, e.g., a mother suggests her son invoke his right against compelled self-incrimination, a wife persuades her spouse not to disclose marital confidences, or a lawyer counsels a client not to turn over documents pursuant to a valid claim of privilege. Edwards, 869 F.3d at 498 (citing Arthur Andersen, 544 U.S. at 704); Matthews, 505 F.3d at 705. Rather, the term "corruptly" requires the person act with consciousness of wrongdoing. Edwards, 869 F.3d at 498 (citing Arthur Andersen, 544 U.S. at 706).[3] Defendant contends that, because she had a legal right

[3]In Matthews, the court stated: "As explained in Arthur Andersen, under limited circumstances, a defendant is privileged to obstruct the prosecution of a crime. That privilege

to do each of the five acts alleged in the indictment—all were within the scope of her authority as a Wisconsin state judge—there necessarily was no consciousness of wrongdoing. (R. 58 at 4.)

> So, Judge Dugan moves to exclude all government evidence that she impeded or in any way hindered, within the scope of Counts 1 and 2, the efforts of federal agents to arrest E.F.R. in a state courthouse's public hallway by engaging in the five lawful acts that the indictment lists. As both the magistrate judge and this Court now have held, without government objection, the five acts alleged in Count 2 were "all part of a judge's job;" each was an official act, in other words. Dkt. 43 at 30 (July 7, 2025); Dkt. 48 (August 26, 2025). She had a legal right to engage in those acts, unlike the police chief in Matthews who for well over two months took repeated steps, including enlisting others, to conceal a gun from federal investigators to help his friend escape legitimate prosecution. Matthews, 505 F.3d at 701–03, 706–07. In sharp contrast, each of the five acts listed in this indictment were ones that Judge Dugan had a legal right to undertake in the minutes after she learned that ICE agents were outside her courtroom. She was within the lawful powers of her job.
> . . .
> So, as to these five named official acts, the evidence the government seeks to offer is not relevant to any proper issue, FED. R. EVID. 401, 402, and only could mislead the jury by inviting it to convict when Judge Dugan had a lawful right to act as she did. That serious risk of mischief and unfair prejudice would far outweigh any indirect or attenuated probative value the evidence might have. FED. R. EVID. 403.
>
> 2. Alternatively, if the Court allows the government to offer evidence of those five acts, the government may not argue or offer evidence contending that they were anything other than official acts. Under this less favored alternative, the government could contend that Judge Dugan did one or more "corruptly," for purposes of Count 2. But it cannot contest that they in fact were acts within the scope of her authority as a Wisconsin judge. Law of the case establishes that clearly here—with nary an objection from the government. Dkt. 43 at 30; Dkt. 48 at 27.

(R. 58 at 5-7.) Finally, defendant renews her motion to dismiss on the basis of judicial immunity.

---

flows from the defendant's enjoyment of a legal right--such as the right to avoid self-incrimination. By including the word 'wrongfully' in the definition of 'corruptly' and criminalizing only the act of 'wrongfully impeding the due administration of justice,' the instructions directed the jury to convict only those who have no legal right to impede justice." 505 F.3d at 706.

(R. 58 at 7-8.)

As the government notes, defendant's motion in limine would in effect confer partial judicial immunity and put much of the government's proof off limits. I agree that the correct approach is to permit the jury to consider all of defendant's conduct on April 18, 2025, in deciding whether she concealed an alien under § 1071 or corruptly endeavored to obstruct a proceeding under § 1505. (R. 67 at 2.)

The cases upon which defendant relies do not suggest a different result. As the government notes, Edwards and Matthews were jury instruction cases, construing the term "corruptly" to require wrongful conduct, not immunity cases placing official judicial acts outside the scope of the statutes. (R. 67 at 3.) As I noted in denying defendant's motion to dismiss, there is no basis for granting immunity simply because some of the allegations in the indictment describe conduct that could be considered part of a judge's job. In the bribery cases, for instance, the defendant-judges used judicial acts or tools as the means to accomplish an unlawful end. As the Seventh Circuit explained in rejecting a similar argument made by a lawyer:

> [I]t is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.

United States v. Cueto, 151 F.3d 620, 631 (7th Cir. 1998); see also United States v. Cintolo, 818 F.2d 980, 992 (1st Cir. 1987) (holding that means, though lawful in themselves, can cross the line of illegality if employed with a corrupt motive).

I decline to reconsider my previous ruling on the immunity motion or to adopt an evidentiary standard based on an official/unofficial distinction inconsistent with that ruling. As

for defendant's secondary request, she will be free to present evidence and argument that the events of April 18, 2025, involved the routine work of a state court and judge, and the government will be allowed to contend that defendant added extraneous activities to her usual duties in order to defeat enforcement of federal immigration law. With that understanding, defendant's first motion in limine is denied.

**B. Second Motion**

**2. Sequestration**

Defendant moves to exclude all non-party witnesses from the courtroom following their introduction to the panel of potential jurors and to order all non-party witnesses not to discuss their proposed or completed testimony with any other potential witness throughout the duration of the trial. (R. 59 at 1.) The government does not object, so long as its case agent is exempted. (R. 67 at 5.) With that exception, the request is granted.

**3. Written instructions**

Defendant requests the jury instructions be provided to the jury panel in written form. (R. 59 at 1.) The government does not object. (R. 67 at 5.) Consistent with my standard practice, this request will be granted.

**4. Character evidence**

Defendant moves to prohibit the government from introducing any character evidence, including other crimes, wrongs, or acts, from witnesses that has not been deemed previously by the court to pertain to an admissible purpose. (R. 59 at 1-2.) To the extent this simply is meant as a request to apply Fed. R. Evid. 404, the government has no objection. (R. 67 at 6.) This request is granted.

**5. Victims' rights**

Defendant moves to prohibit the government from arguing or eliciting testimony that she violated Chapter 950 of the Wisconsin Statutes or Article I, Section 9m of the Wisconsin Constitution (the state's victims' rights provisions), arguing such evidence would not be relevant and would be substantially prejudicial. She further argues that allowing such evidence would create a mini-trial on an irrelevant issue. (R. 59 at 2-3.)

The government agrees there should not be a "mini-trial" about whether defendant violated Marsy's Law. However, how defendant handled E.F.R.'s hearing, and whether it was routine or "business as usual" is, the government contends, relevant to her intent. (R. 67 at 6.) The government indicates that E.F.R. was charged with battery, and his alleged victims were present for the hearing on April 18, 2025. (R. 67 at 6-7.) Defendant handled E.F.R.'s case off the record, without notifying the victims or the prosecutor. "Whether the treatment of E.F.R.'s victims was a routine practice, or an aberration, is relevant to her state of mind. Similarly, whether the treatment of E.F.R.'s victims was consistent with the guidance she received about Marsy's Law is likewise relevant to her intent." (R. 67 at 8.)

I will permit the government to introduce evidence regarding whether defendant handled E.F.R.'s case in a customary fashion. This would seem relevant to her intent and to the position she has taken throughout these proceedings—that all of the charged acts were done in the ordinary course of a judge's duties. However, I will exclude, pursuant to Rule 403, evidence or argument that defendant violated Wisconsin's victims' rights laws. The probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time. Relevant to the risk of confusion, the training memorandum upon which the government relies is equivocal regarding whether

Marsy's Law applies to off-the-record continuances. It also appears the Wisconsin appellate judiciary has not definitively ruled regarding the contours of Marsy's Law in this context. See Finding of Contempt in State v. Simmons, No. 2022AP1396-CR, 2023 Wisc. App. LEXIS 1090, at *17 (Wis. Ct. App. Oct. 17, 2023); see also Wis. Stat. § 906.15(2)(d) (providing that crime victims may not be excluded "unless the judge or circuit court commissioner finds that exclusion of the victim is necessary to provide a fair trial for the defendant").

The government cites United States v. Proano, 912 F.3d 431, 438-39 (7th Cir. 2019), for the proposition that a defendant's training may be relevant to intent. However, the defendant in that case was a police officer charged with willful deprivation of constitutional rights based on a shooting incident. Id. at 434. The Seventh Circuit upheld the admission of training evidence, explaining:

> We have before recognized that evidence of departmental policies can be relevant to show intent in § 242 cases. Other circuit courts have as well. Those decisions, expressly or impliedly, acknowledge that an officer's training can help inform his state of mind in certain circumstances. If, for example, an officer has been trained that officers should do certain things when confronted with tense situations, and he does those things, the fact that he acted in accordance with his training could make it less likely that he acted willfully. And vice versa: If, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully. The district court correctly accounted for both sides of the coin, admitting both Proano's and the government's proposed training-related evidence.

Id. at 439 (internal citations omitted).

The training evidence in Proano bore directly on whether the defendant wilfully deprived the victims of their constitutional rights. The evidence here, conversely, relates to a collateral issue, i.e., whether defendant violated the rights of E.F.R.'s alleged victims on April 18, 2025. Any limited probative value of such evidence is substantially outweighed by the danger of unfair

prejudice (e.g., whether defendant violated other provisions of state law, in addition to the federal laws charged in the indictment), confusion (given the apparent uncertainty as to how the law applies to off-the-record continuances), and delay/waste of time (as each side presents its own evidence on this collateral issue). Defendant's motion is granted, as stated.

**6. Personal beliefs**

Defendant moves to prohibit the government from arguing or questioning any witness as to whether they personally believe she is guilty or that she committed the offenses with which she is charged. (R. 59 at 6.) The government does not object, so long as the defense is prohibited from doing the same. (R. 67 at 9.) This request is granted.

**7. Expert testimony**

Defendant moves to prohibit the government from eliciting undisclosed expert testimony. (R. 59 at 3.) The government does not oppose this motion and does not intend to call an expert to render an opinion on any scientific, technical, or other issue requiring specialized knowledge within the meaning of Rule 702. (R. 67 at 10.) The request is granted.

**8. Administrative warrants**

Defendant moves to prohibit the government from eliciting expert testimony or a legal opinion from lay witnesses regarding administrative warrants, including their validity and who has the authority to issue them. (R. 59 at 3.) The government agrees that no expert opinion would be appropriate on legal issues such as these, which are the proper subject of jury instructions given by the court. (R. 67 at 12.) The government does indicate that it will have witnesses from ICE prepared to testify as to the issuance of the arrest warrant for E.F.R. and where the attempted execution of that warrant fit in the overall immigration process for him.

"That is neither expert testimony nor a legal opinion but instead permissible factual testimony from individuals with knowledge." (R. 67 at 15; see also R. 69 at 8-9.) As the government intends to call no expert witness, this request appears to be moot.

**9. Circuit court procedures**

Defendant moves to prohibit the government from eliciting expert testimony from lay witnesses regarding Milwaukee County Circuit Court procedures. (R. 59 at 3.) The government responds that any testimony from witnesses about "court procedures" will not involve expert testimony on a subject that is outside of the ability of jurors to comprehend but rather factual observations and perceptions, e.g., from lawyers, court personnel, and law enforcement. (R. 67 at 17-18.) "To the extent this type of testimony relates to something the defendant views as 'court procedures,' it clearly would not involve rendering an expert opinion on something requiring scientific, technical, or specialized knowledge. Rather, it would involve factual observations or, in some instances, permissible lay opinions to explain why they took notice of certain conduct and/or why they found it unusual." (R. 67 at 18.) The government further contends that such observations and perceptions are relevant to defendant's intent in this case, given her filings and statements that she did nothing wrong, and that the evidence will show her conduct and the proceedings that day were routine and simply "business as usual." (R. 67 at 18.)

As indicated, I will given the government some leeway to demonstrate that the proceedings in E.F.R.'s case were handled in an unusual fashion. It appears that evidence offered in the form of lay opinion under Fed. R. Evid. 701 may be part of that presentation. As the government intends to call no expert witness on the issue, defendant's in limine request appears to be moot.

**10. Attorney general statements**

Defendant seeks permission to elicit statements made to the media and on social media by the Attorney General and the Director of the FBI about her alleged actions on April 18, 2025. She contends such statements are admissible as statements made by a party opponent, Fed. R. Evid. 801(d)(2), and are relevant because they show bias in the investigation and prosecution. (R. 59 at 3.)

The government responds that, while bias is broadly admissible on issues of credibility, neither the Attorney General nor the FBI Director will testify in this case. (R. 67 at 19.) Without more, I agree with the government defendant should not be permitted to inject national political figures into this trial. Any slight probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time. Fed. R. Evid. 403. Defendant's motion is denied.

**11. Audio recordings and transcripts**

Defendant moves for an order requiring the government to produce the full transcripts of audio recordings and identify the portions of the audio recordings it intends to introduce at trial. The government should also be required to produce those transcripts and enhanced versions of audio recordings and identify which portions it intends to play, ahead of trial, to prevent unfair surprise and prejudice. (R. 59 at 4.)

The government responds that it anticipates producing final versions of the enhanced recordings and a transcript to the defense as soon as those items are finalized—and certainly in advance of the final pretrial conference. The government also will identify relevant excerpts of the recordings in its exhibit list and will seek a stipulation as to the admissibility of the

enhanced recordings and transcript to streamline trial proceedings. For these reasons, the government contends this request should be denied as moot.

I will address this issue at the final pre-trial.

**12. Rule of completeness**

Defendant seeks an order allowing her to introduce the complete recordings or transcripts of audio recordings in response to the government introducing partial versions of recordings and transcripts, under the rule of completeness. (R. 59 at 4-5.) The government responds that it does not object to the introduction of any portion of the recordings inside Courtroom 615 on the morning of April 18, 2025, that satisfy the requirements of Rule 106. (R. 67 at 21.) I will address this issue, to the extent necessary, at trial.

**13. Grand jury materials**

Defendant seeks an order requiring the government to produce grand jury materials at least two weeks before trial. (R. 59 at 5.) The government responds that, before defendant filed her motion, it already had agreed to provide applicable grand jury materials to her counsel by that date. The government also already provided written statements that various witnesses had presented to the grand jury as part of their testimony. The government therefore has no objection to the entry of an order requiring it to provide grand jury materials for the witnesses it intends to call in its case-in-chief at least two weeks before trial. (R. 67 at 21.) This request is granted.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the government's consolidated motion (R. 56) is granted in part and denied in part, as stated herein, and the government's motion to prohibit

expert testimony on the meaning of statutes and regulations (R. 69) is granted in part, as also stated herein.

**IT IS FURTHER ORDERED** that defendant's first motion (R. 58) is denied, and defendant's omnibus motion (R. 59) is granted in part and denied in part, as stated herein.

Dated at Milwaukee, Wisconsin, this 25th day of November, 2025.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

Delete LAST Page

AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

Eastern DISTRICT OF Wisconsin

UNITED STATES OF AMERICA

V.

HANNAH C. DUGAN

## EXHIBIT AND WITNESS LIST

Case Number: 25-CR-89

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Lynn Adelman | Richard G. Frohling<br>Kelly B. Watzka<br>Keith S. Alexander | Steven M. Biskupic<br>Jason D. Luczak<br>Nicole M. Masnica |
| TRIAL DATE (S)<br>December 15, 2025 | COURT REPORTER | COURTROOM DEPUTY |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| 1A | | | | ✓ | Arrest Warrant for Eduardo Flores-Ruiz (Form I-200) |
| 1B | | | | ✓ | Arrest Warrant for Eduardo Flores-Ruiz after execution (Form I-200) |
| 2 | | | | ✓ | Warrant of Removal for Eduardo Flores-Ruiz (Form I-205) |
| 3 | | | | | Notice of Intent / Decision to Reinstate Prior Order of Removal (Form I-871) |
| 4 | | | | | Record of Sworn Statement for Eduardo Flores-Ruiz |
| 5 | | | | | Email chain about registering for session about ICE enforcement in courthouses with Dugan response on April 1, 2025 |
| 6 | | | | | Email chain regarding ICE Taking People into Custody in Public Hallways with Dugan Response on April 8, 2025 |
| 7 | | | | | Email from Chief Judge Ashley (April 8, 2025) with ICE Interim Guidance |
| 8 | | | | | Email from Chief Judge Ashley to Milwaukee County Judges with Draft Policy (April 9, 2025) |
| 9 | | | | | Email from Chief Judge Ashley to Milwaukee County judges with edits in red (April 10, 2025) |
| 10 | | | | | Email from hannahdugan@aol.com to hannah.dugan@wicourts.gov forwarding sign for courtroom door (April 13, 2025) |
| 11 | | | | | Calendar for Courtroom 615 on April 18, 2025 (Office of State Courts) |
| 12 | | | | | Calendar for Courtroom 615 on April 18, 2025, with notes by Joan Butz |
| 13 | | | | | Email from Chief Judge Ashley to C. Kubiszewski with Draft Policy (April 18, 2025) |
| 14 | | | | | Email chain among judges about April 18 arrest with Dugan Response on April 21, 2025 |
| 15 | | | | | Milwaukee County Sheriff's Office Policy 1101 for Court Services |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| vs. | CASE NO. |
|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 16 | | | | | Milwaukee County Sheriff's Office Policy 1103 for Public Safety Officers |
| 17 | | | | | Milwaukee County Sheriff's Office Policy 1106 for Security Screening Station Procedure |
| 18 | | | | | Diagram of Courtroom 615 and Northern Portion of Sixth Floor of Courthouse |
| 19A | | | | | Video of empty Courtroom 615 – Part 1 |
| 19B | | | | | Video of empty Courtroom 615 – Part 2 |
| 19C | | | | | Video of empty Courtroom 615 – Part 3 |
| 20 | | | | | Video of non-public hallway and stairwell |
| 21 | | | | | Video of non-public hallway to Judge Cervera's courtroom |
| 22 | | | | | Photograph of interior of Courtroom 615 |
| 23 | | | | | Photograph of interior of Courtroom 615 |
| 24 | | | | | Photograph of interior of Courtroom 615 |
| 25 | | | | | Photograph of interior of Courtroom 615 |
| 26 | | | | | Photograph of interior of Courtroom 615 |
| 27 | | | | | Photograph of public hallway from elevator toward chief judge's area |
| 28 | | | | | Photograph of public hallway |
| 29 | | | | | Photograph of sign on door to courtroom 615 |
| 30 | | | | | Photograph of sign on door to courtroom 615 |
| 31 | | | | | Photograph of non-public hallway |
| 32 | | | | | Photograph of non-public hallway |
| 33 | | | | | Photograph of area near door 615-1 |
| 34 | | | | | Photograph of area near door 615-1 |
| 35 | | | | | Photograph of entrance door to Chief Judge's area |
| 36 | | | | | Photograph of entrance door to Chief Judge's area |
| 37 | | | | | Photograph of hallway leading to Chief Judge's reception area |
| 38 | | | | | Photograph of public hallway taken from Chief Judge's area |
| 39 | | | | | Email to hannah.dugan@wicourts.gov from Judge Gramling-Perez on April 2, 2025 |
| 40 | | | | | Original DAR recordings from Office of State Courts |

AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| vs. | CASE NO. |
|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 41 | | | | | Volume-adjusted recording Part 1 |
| 41A | | | | | Transcript of volume-adjusted recording Part 1 |
| 42 | | | | ✓ | Volume-adjusted recording Part 2 |
| 42A | | | | | Transcript of volume-adjusted recording Part 2 |
| 42B | | | | | Volume-adjusted recording Part 2 excerpt |
| 43 | | | | ✓ | Volume-adjusted recording Part 3 |
| 43A | | | | | 43A Transcript of volume-adjusted recording Part 3 |
| 44 | | | | ✓ | Email from hannah.dugan@wicourts.gov to hannahdugan@aol.com re digital audio recordings with attachments (April 14, 2025) |
| 45 | | | | ✓ | Field Operations Worksheet (FOW) for Arrest of Eduardo Flores-Ruiz |
| 46A | | | | ✓ | Photographs taken by Maura Gingerich - Photograph of SA Jackling and DO Vasconcellos |
| 46B | | | | \| | Photographs taken by Maura Gingerich - Photograph of SA Jackling and DO Vasconcellos |
| 46C | | | | \| | Photographs taken by Maura Gingerich - Photograph of SA Ayers |
| 46D | | | | \| | Photographs taken by Maura Gingerich - Photograph of Officer Zuraw |
| 46E | | | | \| | Photographs taken by Maura Gingerich - Photograph of SA Baker |
| 46F | | | | \| | Photographs taken by Maura Gingerich - Photograph of SA Ayers (side hallway) |
| 47 | | | published | | Demonstrative Chart |
| 48 | | | | ✓ | Timeline |
| 49 | | | | | NCIC for Eduardo Flores-Ruiz |
| 50 | | | | \| | (08.05.07am to 9.31.23am) Video from North Elevator facing North |
| 50A | | | | \| | (8.05.07am - 8.05.27am) Video of FBI Special Agents Jeff Baker and Phillip |
| 50B | | | | \| | (8.13.14am to 8.13.44am) Video of DEA Special Agent Janene Spitaletto arriving on Sixth Floor |
| 50C | | | | \| | (8.14.49am to 8.15.05am) Video of Walter Piel entering Courtroom 615 |
| 50D | | | | \| | (8.16.06am to 8.16.31am) Video of Special Agents Jackling and Baker entering Courtroom 615 |
| 50E | | | | \| | (8.18.17am to 8.18.43am) Video of Special Agents Baker and Jackling exiting Courtroom 615 |
| 50F | | | | \| | (8.21.08am to 8.21.47am) Video of Officers Vasconcellos and Zuraw arriving and Attorney Gingerich taking photos |
| 50G | | | | \| | (8.23.34am to 8.24.20am) Video of victims of EFR case arriving on Sixth Floor and entering courtroom |

AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| | | | | | |
|---|---|---|---|---|---|
| 50H | | | | | (8.25.04am to 8.26.10am) Video of Stephanie Garbo leaving office and entering elevator |
| 50I | | | | | (8.26.18am to 8.27.40am) Video of Judge Cervera leaving |
| 50J | | | | | (8.33.55am to 8.34.09am) Video of Brittany Ewing arriving on Sixth Floor |
| 50K | | | | | (8.38.54am to 8.39.18am) Video of Stephanie Garbo returning and Attorney de la Rosa arriving to Sixth Floor |
| 50L | | | | | (8.40.11am to 8.40.25am) Video of Judges Cervera and Dugan arriving on Sixth Floor |
| 50M | | | | | (8.43.17am to 8.45.18am) Video of Dugan talking with Special Agent Jackling and Officer Vasconcellos |
| 50N | | | | | (8.47.48am to 8.48.04pm) Video of EFR and Attorney de la Rosa exiting and walking south |
| 50O | | | | | (8.54.12am to 8.55.50am) Video of the arrest of A.M. on the Sixth Floor on April 18, 2025 |
| 50P | | | | | (8.57.01am to 8.57.14am) Video of Attorney Piel exiting Courtroom 615 with his client |
| 50Q | | | | | (8.57.45am to 8.58.14am) Video of Officers Vasconcellos and Zuraw leaving Sixth Floor |
| 51 | | | | | (8.13.24am to 9.30.52am) Video of Northern Most Portion of Sixth Floor |
| 51A | | | | | (8.23.42am to 8.24.13am) Video of Alan Freed talking with Attorney Gingerich |
| 51B | | | | | (8.28.38am to 8.28.42am) Video of Hendrix-Whitmore arriving at Courtroom 615 |
| 51C | | | | | (8.32.02am to 8.32.06am) Video of Hendrix-Whitmore leaving Courtroom 615 |
| 51D | | | | | (8.35.34am to 8.36.16am) Video of Alan Freed looking south down hallway |
| 51E | | | | | (8.43.15am to 8.43.42am) Video of Dugan after entering Sixth Floor |
| 51F | | | | | (8.44.54am to 8.45.16am) Video of Special Agents Baker and Ayers entering Chief Judge's area |
| 51G | | | | | (8.45.34am to 8.49.08am) Video of agents and Judge Cervera leaving Chief Judge's area |
| 51H | | | | | (09.27.22am to 9.30.53am) Video of Brittany Ewing with victims |
| 52 | | | | | (8.05.08am to 9.31.22am) Video from near Courtroom 615 facing South |
| 52A | | | | | (8.43.32am to 8.45.10am) Video of Dugan in southern portion of hallway |
| 52B | | | | | (8.47.42am to 8.48.46am) Video of Special Agents Ayers and Spitaletto following EFR |
| 52C | | | | | (8.38.53am to 8.39.05am) Video of de la Rosa arriving |
| 52D | | | | | (8.41.31am to 8.42.30am) Video of Flores Ruiz arriving and meeting counsel |
| 53 | | | | | (8.05.14am to 9.36.39am) Video from North Elevator facing South |
| 53A | | | | | (8.12.40am to 8.13.16am) Video of Special Agent Ayers and Spitaletto arriving |
| 53B | | | | | (8.14.34am to 8.14.49am) Video of Attorney Piel arriving |
| 53C | | | | | (8.22.21am to 8.22.53am) Video of Gingerich taking photo of Special Agent Ayers |
| 53D | | | | | (8.22.59am to 8.23.35am) Video of victims of EFR case arriving |

✎AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| | | | | | |
|---|---|---|---|---|---|
| 53E | | | | | (8.23.27am to 8.23.51am) Video of Officer Zuraw taking seat on bench |
| 53F | | | | | (8.25.46am to 8.26.12am) Video of Gingerich taking photo of Officer Zuraw |
| 53G | | | | | (8.33.46am to 8.33.58am) Video of Brittany Ewing arriving |
| 53H | | | | | (8.38.43am to 8.39.00am) Video of Attorney de la Rosa arriving |
| 53I | | | | | (8.39.51am to 8.40.12am) Video of Judge Cervera returning and Dugan arriving |
| 53J | | | | | (8.41.52am to 8.42.23am) Video of EFR arriving on Sixth Floor |
| 53K | | | | | (8.43.58am to 8.44.58am) Video of Dugan confronting Officer Zuraw |
| 53L | | | | | (8.47.15am to 8.49.33am) Video of EFR leaving and agents following |
| 53M | | | | | (9.34.33am to 9.36.02am) Video of Brittany Ewing and Nile Hendrix-Whitmore discussion |
| 54 | | | | | (8.15.07am to 9.36.10am) Video from far South Camera facing North |
| 54A | | | | | (8.48.22am to 8.49.11am) Video of agents following EFR |
| 55A | | | | | (7.30.39am to 7.31.30am) Video of Alan Freed entering private hallway at Door 615-1 |
| 55B | | | | | (8.10.56am to 8.11.23am) Video of Joan Butz entering private hallway at Door 615-1 |
| 55C | | | | | (8.40.14am to 8.40.26am) Video of Judges Cervera and Dugan entering private hallway at Door 615-1 |
| 55D | | | | | (8.43.16am to 8.43.31am) Video of Judges Dugan and Cervera exiting through Door 615-1 |
| 55E | | | | | (8.47.46am to 8.47.58am) Video of EFR and Attorney de la Rosa exiting private hallway |
| 56 | | | | | (8.38.52am to 8.39.33am) Video of E.F.R. entering the Milwaukee County Courthouse |
| 57 | | | | | (8.49.30am to 8.50.14am approx.) Video of E.F.R. and Attorney de la Rosa leaving past security check point with Special Agent Ayers following |
| 58 | | | | | (8.52.05am to 8.52.31am) Video of Special Agents Jackling, Baker, and Spitaletto leaving past a security check point |
| 59 | | | | | (8.56.28am to 8.56.50am approx.) Video of EFR fleeing from agents outside Courthouse |
| 60 | | | | | (8.56.43am to 8.59.15am) Video of the arrest of EFR across the street from the Courthouse |

AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| vs. | CASE NO. |
|---|---|
| | |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |





To delete this page return to the top of the first page and click the "Delete LAST Page" button.

[redacted]

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
*Plaintiff,*

v. Case No. 25-cr-89

HANNAH C. DUGAN,
*Defendant.*

## DEFENDANT'S EXHIBIT LIST

| PRESIDING JUDGE<br>Judge Lynn Adelman | ATTORNEYS FOR PLAINTIFF<br>Richard G. Frohling<br>Kelly B. Watzka<br>Keith S. Alexander | ATTORNEYS FOR DEFENDANT<br>Steven M. Biskupic<br>Jason D. Luczak<br>Nicole M. Masnica |
|---|---|---|

**Trial Date(s) : December 15, 2025**

| Admitted | Published | Date | Pltf. No. | Ex. No. | Description | Witness |
|---|---|---|---|---|---|---|
| | ✓ | | | **1004A** | Audio from Courtroom Channel 3 Mic, 21m47s to 22m20s) | |
| | ✓ | | | **1004B** | Audio from Courtroom Channels 1,2,3,4,5 Mics, 4m47s to 5m20s | |
| | ✓ | | | **1005** | Transcript Comparison of Gov. Excerpt (GX 42A) | |
| | ✓ | | | **1006** | Transcript of excerpt - DX1004A (Audio from Mic 3) | |
| | ✓ | | | **1008** | Transcript Comparison of DX1006 and Gov. Ex 42A | |
| | | | | **1004C** | Audio from Channel 4 Mic, 7 min, 13 sec to 7 min, 32 sec | |
| ✓ | | | | **201** | Ashley Email with Press Release, 4.4.25 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| ✓ | | | | 202 | Kegel email re arrest in gallery 4.8.25 | |
| | | | | 203 | Judge Perez email re salient points 4.2.25 | |
| ✓ | | | | 204 | San Francisco Policy | |
| | | | | 205 | Email re Out of Office - Acting Chief App | |
| | | | | 206 | Vasconcellos Report | |
| | | | | 206A | Vasconcellos Report (Excerpt) | |
| | | | | 207 | Photograph of agent outside Cervera court | |
| ✓ | | | | 208 | Ashley Cell phone Screenshots | |
| | | | | 209 | Email to Kubiszewski with attachment | |
| ✓ | | | | 210 | National Judicial Network Powerpoint | |
| | | | | 211 | Carl Ashley email attachment (ICE Interim Guidance), 04.08.2025 - DOJ-DOC-PROD-001589 | |
| | | | | 212 | CJ email and Revised Draft Policy | |
| | | | | 213 | PP Ice Policy Slide (Policy 11072.3 re Civil Enforcement at Courthouses) | |
| | | | | 214 | County Courthouse Layouts | |
| | | | | 215 | Cervera entering vestibule with agents-8.44.16-8.44.37 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ✓ | X | X | 12/15 | | **216** | EFR exit and arresting agents hallway pursuit - Camera 4 (looking north) | Lucker |
| ✓ | X | X | 12/15 | | **217** | EFR exit and arresting agents hallway pursuit - Camera 10 (looking north) | Lucker |
| | | | | | **218** | EFR exit and arresting agents hallway pursuit - Camera 14 (looking south) | |
| | | | | | **218A** | Zoom to Spitaletto | |
| | | | | | **219** | Mueller reacting to Agents leaving the hallway-Camera 10-8.44.42 | |
| | | | | | **220** | Mueller reacting to Agents leaving the hallway-Camera 14-8.45.11 | |
| | ✓ | ✓ | | | **221** | Video - Jury door to main hallway | |
| | | | | | **222** | Text - Vasconcellos to Slajus | |
| | | | | | **223** | 302 - Re-interview of Ashley - 12.08.2025 | |
| | | | | | **224** | 302 - Re-interview of Ayers - 12.02.2025 | |
| | | | | | **225** | 302 - Re-interview of Baker - 12.02.2025 | |
| | | | | | **226** | 302 - Re-interview of Buss - 12.08.2025 | |
| | | | | | **227** | 302 - Re-interview of Butz - 12.04.2025 | |
| | | | | | **228** | 302 - Re-interview of Cervera - 12.03.2025 | |
| | | | | | **229** | 302 - Re-interview of DeSmet - 12.05.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **230** | 302 - Re-interview of Gavin - 12.01.2025 | |
| | | | | **231** | 302 - Hendrix-Whitmore - 12.09.2025 | |
| | | | | **232** | 302 - Re-interview of Kubiszewski -12.09.2025 | |
| | | | | **233** | 302 - Re-interview of Nimtz - 12.03.2025 | |
| | | | | **234** | 302 - Spitaletto DEA Report of Investigation - 12.02.2025 | |
| | | | | **235** | 302 - Re-Interview of Vasconcellos - 12.01.2025 | |
| | | | | **236** | 302 - Re-Interview of Vasconcellos 12.09.2025 | |
| | | | | **237** | 302 - Re-Interview of Zuraw - 12.03.2025 | |
| | | | | **238** | 302 - Re-Interview of Jackling - 12.02.2025 | |
| | | | | **239** | 302- Re-Interview of Pook - 12.03.2025 | |
| | | | | **240** | 2025CM000205 Cruz Garcia | |
| | | | | **241** | WORCS Cruz Garcia | |
| | | | | **250** | FD302 - Interview - Ayers- 04.23.2025 | |
| | | | | **251** | FD302 - Interview exhibit - Ayers-04.23.2025 | |
| | | | | **252** | FD302 - Interview - Ayers- 04.28.2025 | |
| | | | | **253** | FD302 - Interview exhibit - Ayers-04.28.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 254 | FD302 - Interview - Ayers-09.15.2025 | |
| | | | | 255 | FD302 - Interview - Baker-04.18.2025 | |
| | | | | 256 | FD302 - Interview - Baker-09.15.2025 | |
| | | | | 257 | FD302 - Interview - Jackling-04.18.2025 | |
| | | | | 258 | FD302 - Interview - Jackling-04.24.2025 | |
| | | | | 259 | FD302 - Interview - Jackling-09.15.2025 | |
| | | | | 260 | FD302 - Interview - Spitaletto-04.23.2025 | |
| | | | | 261 | FD302-Interview exhibits-Spitaletto-04.23.2025 | |
| | | | | 262 | FD302 - Interview - Spitaletto-09.16.2025 | |
| | | | | 263 | FD302 - Interview - Vasconcellos-04.18.2025 | |
| | | | | 264 | FD302 - Interview - Vasconcellos-09.15.2025 | |
| | | | | 265 | FD302 - Interview - Zuraw-04.22.2025 | |
| | | | | 266 | FD302 - Interview exhibit - Zuraw-04.22.2025 | |
| | | | | 267 | FD302 - Interview - Zuraw-09.15.2025 | |
| | | | | 268 | FD302 - Interview - Buss-04.21.2025 | |
| | | | | 269 | FD302-Interview exhibits-Buss-04.21.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 270 | FD302 - Interview - Buss-09.10.2022 | |
| | | | | 271 | FD302 - Interview - Hendrix Whitmore-04.22.2025 | |
| | | | | 272 | FD302 - Interview - Hendrix Whitmore-05.01.2025 | |
| | | | | 273 | FD302 - Interview - Milder-04.22.2025 | |
| | | | | 274 | FD302 - Interview exhibit - Milder-04.22.2025 | |
| | | | | 275 | FD302 - Interview - Muller-04.23.2025 | |
| | | | | 276 | FD302 - Interview - Krejci-04.23.2025 | |
| | | | | 277 | FD302 - Interview - Toran-04.23.2025 | |
| | | | | 278 | FD302 - Interview - DeSmet-04.23.2025 | |
| | | | | 279 | FD302 - Interview - Plaisted-04.23.2025 | |
| | | | | 280 | FD302 - Interview - Ewing-04.23.2025 | |
| | | | | 281 | FD302 - Interview exhibit - Ewing-04.23.2025 | |
| | | | | 282 | FD302 - Interview - Forrestal-04.23.2025 | |
| | | | | 283 | FD302 - Interview - Amaya-04.23.2025 | |
| | | | | 284 | FD302-Interview exhibit 1-Amaya-04.23.2025 | |
| | | | | 285 | FD302-Interview exhibit 2-Amaya-04.23.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 286 | FD302 - Interview - Amaya-09.18.2025 | |
| | | | | 287 | FD302 - Interview - Piel-04.23.2025 | |
| | | | | 288 | FD302 - Interview - Piel-09.11.2025 | |
| | | | | 289 | FD302 - Interview - Valverde-04.24.2025 | |
| | | | | 290 | FD302 - Interview - Freed-04.24.2025 | |
| | | | | 291 | FD302-Interview exhibits-Freed-04.24.2025 | |
| | | | | 292 | FD302 - Interview - Freed-05.13.2025 | |
| | | | | 293 | FD302 - Interview - Freed-06.11.2025 | |
| | | | | 294 | FD302 - Interview - Fabian-04.29.2025 | |
| | | | | 295 | FD302 - Interview - Ashley-05.02.2025 | |
| | | | | 296 | FD302-Interview exhibits-Ashley-05.02.2025 | |
| | | | | 297 | FD302 - Interview - Conlon-05.05.2025 | |
| | | | | 298 | FD302 - Interview - Butz-05.05.2025 | |
| | | | | 299 | FD302 - Interview exhibit - Butz-05.05.2025 | |
| | | | | 300 | FD302 - Interview - Butz-05.27.2025 | |
| | | | | 301 | FD302 - Interview - Cervera-05.06.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **302** | FD302 - Interview exhibit 1-Cervera-05.06.2025 | |
| | | | | **303** | FD302 - Interview exhibit 2-Cervera-05.06.2025 | |
| | | | | **304** | FD302 - Interview exhibit 3-Cervera-05.06.2025 | |
| | | | | **305** | FD302 - Interview - Flores Ruiz-05.08.2025 | |
| | | | | **306** | FD302 - Interview exhibit - Flores Ruiz-05.08.2025 | |
| | | | | **307** | FD302 - Interview - Pook-05.28.2025 | |
| | | | | **308** | Declaration-de la Rosa-05.12.2025 | |
| | | | | **309** | FD302 - Interview - de la Rosa-06.03.2025 | |
| | | | | **310** | FD302 - Interview exhibit - de la Rosa-06.03.2025 | |
| | | | | **311** | FD302 - Interview - Kubiszewski-09.18.2025 | |
| | | | | **312** | FD302 - Interview - Garbo-10.02.2025 | |
| | | | | **313** | Declaration-Gingerich-05.12.2025 | |
| | | | | **314** | Declaration-Mathias-05.12.2025 | |
| | | | | **315** | Declaration-Mueller-05.12.2025 | |
| | | | | **316** | FD302 - Interview - Kubiszewski-04.24.2025 | |
| | | | | **317** | FD302 - Interview - Desmet-11.07.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 318 | FD302 - Interview - Gavin- 10.29.2025 | |
| | | | | 319 | FD302 - Interview - Milton- 10.29.2025 | |
| | | | | 320 | FD302-Interview - Ewing - 11.19.2025 | |
| | | | | 321 | FD302-Interview - Gavin - 11.19.2025 | |
| | | | | 322 | FD302-Interview - Hendrix-Whitmore - 11.20.2025 | |
| | | | | 323 | FD302-Interview - Milton - 11.25.2025 | |
| | | | | 324 | FD302-Interview - Nimtz - 11.18.2025 | |
| | | | | 325 | DEA6 - Spitaletto - 4.25.2025 | |
| | | | | 326 | FD302-Phone screenshot-Ayers-04.23.2025 | |
| | | | | 327 | FD302-Signal-Ayers-04.23.2025 | |
| | | | | 328 | FD302-Signal-Baker-04.21.2025 | |
| ✓ | | | | 329 | FD302-Signal-Jackling-04.18.2025 | |
| | | | | 330 | FD302-Signal-Zuraw-04.22.2025 | |
| | | | | 331 | FD302-Phone screenshots-Zuraw-04.22.2025 | |
| | | | | 332 | FD302-Text-Ayers to Spitaletto-04.23.2025 | |
| ✓ | | | | 333 | FD302-Text-Baker to Vasconcellos-04.21.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 334 | FD302-Text-Baker to Jackling-04.21.2025 | |
| | | | | 335 | FD302-Text-Baker to Dring-04.21.2025 | |
| | | | | 336 | FD302-Text-Jackling to Baker-04.18.2025 | |
| | | | | 337 | FD302-Text-Spitaletto to Vasconcellos-04.23.2025 | |
| | | | | 338 | FD302-Text-Vasconcellos to Baker-04.18.2025 | |
| | | | | 339 | FD302-Text-Vasconcellos to Spitaletto-04.18.2025 | |
| | | | | 340 | Phone screenshot-Ayers-04.23.2025 | |
| | | | | 341 | Photographs-Public defenders-04.18.2025 | |
| | | | | 342 | Photographs-FBI courthouse-04.24.2025 | |
| | | | | 343 | Photographs-FBI courthouse-04.24.2025 | |
| | | | | 344 | Photographs-Courtroom sign & 609 vestibule-04.21.2025 | |
| | | | | 345 | Hendrix-Whitmore approaching Judge Ramos' court-Camera 4-8.47.23-8.48.46 | |
| | | | | 346 | Hendrix-Whitmore approaching Judge Ramos' court-Camera 14-8.47.20-8.48.43 | |
| | | | | 347 | Hendrix-Whitmore entering Judge Ramos' court-Camera 3-8.47.40-8.51.30 | |
| | | | | 350 | Arrest Warrant Language | |

✓ 348 photo - chief judge's office door

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 351 | Report, DEA-Ayers-04.18.2028 | |
| | | | | 352 | Report, CBP-Zuraw-Undated | |
| | | | | 353 | FBI report-Arrest of Judge Dugan-04.25.2025 | |
| | | | | 354 | FD302-Records from Amaya-04.23.2025 | |
| | | | | 355 | Records-Proffer letter-Butz-05.27.2025 | |
| | | | | 356 | Records-Proffer letter-Cervera-05.06.2025 | |
| | | | | 357 | Records-Proffer letter-Flores Ruiz-05.08.2025 | |
| | | | | 358 | FD302-Records-Walther-04.25.2025 | |
| | | | | 359 | Court records-Search warrant-Dugan email-04.30.2025 | |
| | | | | 360 | Court records-Search warrant affidavit-Dugan email-04.30.2025 | |
| | | | | 361 | Court records-Arrest warrant-Flores-Ruiz-04.23.2025 | |
| | | | | 362 | Court records-Criminal complaint-EFR-04.23.2025 | |
| | | | | 363 | Court records-Arrest warrant-Judge Dugan-04.24.2025 | |
| | | | | 364 | Court records-Criminal complaint-Judge Dugan-04.24.2025 | |
| | | | | 380 | Audio-Courtroom recording, origin, 04.18.2025-1 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 381 | Audio-Courtroom recording, original, 04.18.2025-2 | |
| | | | | 382 | Audio-Courtroom recording, 04.18.2025-3 | |
| | | | | 383 | Audio-Courtroom recording, second, 04.18.2025-1 | |
| | | | | 384 | Audio-Courtroom recording, second, 04.18.2025-2 | |
| | | | | 385 | Audio-Courtroom recording, second, 04.18.2025-3 | |
| | | | | 386 | Audio-Courtroom excerpt-615-1 | |
| | | | | 387 | Audio-Courtroom excerpt-615-2 | |
| | | | | 388 | Audio voicemail from Amaya-04.23.2025 | |
| | | | | 389 | EFR exit and arresting agents hallway pursuit - Camera 4 (looking north) | |
| | | | | 390 | EFR exit and arresting agents hallway pursuit - Camera 10 (looking north) | |
| | | | | 391 | Milwaukee County Circuit Court Local Rules | |
| | | | | 392 | Screenshots - Garbo Cell phone 4.18.2025 | |
| X | published X | 12/15 | | 393 | Milwaukee Police Districts Map | Nimtz |
| | | | | 394 | Sub Ex - Milwaukee Police Districts Map w EFR Address Marked | |
| | | | | 395 | Theodore Chadwick CV | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 396 | Theodore Chadwick Rule 16 Opinion, US v. Dugan | |
| | | | | 397 | Article - 620WTMJ - ICE Arrest 2 in MKE County Buildings 4.4.2025 | |
| | | | | 398 | Article - 620WTMJ - MKE County leaders create action plan 4.8.2025 | |
| | | | | 399 | Article - CJP - Details Emerge aabout MKE Courthouse Arrests 4.9.2025 | |
| | | | | 400 | Article - Urban MKE - Elected Officials decry ICE Courthouse Arrests 4.8.2025 | |
| | | | | 401 | Article - WPR - MKE Officals Discuss Response to ICE Courthouse Arrests 4.15.2025 | |
| ✓ | | | | 402 | Email - de la Rosa-Buss re EFR Plea Offer w attachment 4.17.2025 | |
| | | | | 403 | Judge Dugan entering with key lanyard-04.18.2025_08.40.16 | |
| | | | | 404 | Photo - 6th Floor Hall - Ayers Perspective 1 | |
| | | | | 405 | Photo - 6th Floor Hall - Ayers Perspective 2 | |
| | | | | 406 | Photo - 6th Floor Hall - Spitaletto Perspective 1 | |
| | | | | 407 | Photo - 6th Floor Hall - Spitaletto Perspective 2 | |
| | | | | 408 | Photo - 6th Floor Hall - Spitaletto Perspective 3 | |
| | | | | 409 | Vasconcellos - back - 04.18.2025 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **410** | Vasconcellos - front 1 - 04.18.2025 | |
| | | | | **411** | Vasconcellos - front 2 - 04.18.2025 | |
| | | | | **412** | Amaya notifies agents thru agents departing vestibule-Camera 12-08.45.39-08.49.00.mp4 | |
| | | | | **412A** | Zoom to Chief Judge's Doors | |
| | | | | **414** | Judges Dugan and Cervera entering 6th floor-Camera 14-08.40.03-08.40.18.mp4 | |
| | | | | **415** | Video - 6th Floor Hall - Ayers Perspective.mov | |
| | | | | **416** | Video - 6th Floor Hall - Spitaletto Perspective.MOV | |
| | | | | **417** | EFR victims arrival-Camera 10-08.23.30 | |
| | | | | **418** | EFR victims arrival-Camera 14-08.23.12 | |
| | | | | **420** | Courtroom Audio, All Mics, Full ~32 Minutes (15db gain boost) | |
| | | | | **421** | Courtroom Audio, Mic 1, Full ~32 minutes, 15db gain boost | |
| | | | | **422** | Courtroom Audio, Mic 2, Full ~32 minutes, 15db gain boost | |
| | | | | **423** | Courtroom Audio, Mic 3, Full ~32 minutes, 15db gain boost | |
| | | | | **424** | Courtroom Audio, Mic 4, Full ~32 minutes, 15db gain boost | |
| | | | | **425** | Courtroom Audio, Mic 5, Full ~32 minutes, 15db gain boost | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 426 | 426_(Extraction_10.1) 6th Floor Full Video.g64x | |
| | | | | 427 | 427_(Extraction_12.1) 6th Floor Full Video.g64x | |
| | | | | 428 | 427_(Extraction_14.1) 6th Floor Full Video.g64x | |
| | | | | 429 | Slow Walk Splice FULL (HMC) | |
| | | | | 430 | Still from 412 at 8.46.21 | |
| | | | | 431 | Still from 412 at 8.48.09 | |
| | | | | 432 | Still from 412 at 8.48.15 | |
| | | | | 433 | Still from 412 at 8.48.24 | |
| | | | | 434 | Still from 412 at 8.48.53 | |
| | | | | 435 | Still from 412 at 8.48.54 | |
| | | | | | | |

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.** **Case No. 25-CR-89**

**HANNAH C. DUGAN**
**Defendant.**

## JURY INSTRUCTIONS

## FUNCTIONS OF COURT AND JURY

Members of the jury, I will now instruct you on the law that you must follow in deciding this case. I will also give each of you a copy of these instructions to use in the jury room. You must follow all of my instructions about the law, even if you disagree with them. This includes the instructions I gave you before the trial, any instructions I gave you during the trial, and the instructions I am giving you now.

As jurors, you have two duties. Your first duty is to decide the facts from the evidence that you saw and heard here in court. This is your job, not my job or anyone else's job.

Your second duty is to take the law as I give it to you, apply it to the facts, and decide if the government has proved the defendant guilty beyond a reasonable doubt.

You must perform these duties fairly and impartially. Do not let sympathy, prejudice, fear, or public opinion influence you. In addition, do not let any person's race, color, religion, national ancestry, or gender influence you.

You must not take anything I said or did during the trial as indicating that I have an opinion about the evidence or about what I think your verdict should be.

**THE CHARGES**

The charges against the defendant are in a document called an indictment. You will have a copy of the indictment during your deliberations.

The indictment in this case charges that the defendant committed the crimes of: (1) concealing an individual for whom an administrative arrest warrant had been issued; and (2) endeavoring to influence, obstruct, or impede federal agency proceedings. The defendant has pled not guilty to the charges.

The indictment is simply the formal way of telling the defendant what crimes she is accused of committing. It is not evidence that the defendant is guilty. It does not even raise a suspicion of guilt.

## PRESUMPTION OF INNOCENCE/BURDEN OF PROOF

The defendant is presumed innocent of each and every one of the charges. This presumption continues throughout the case, including during your deliberations. It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case.

The defendant is never required to prove her innocence. She is not required to produce any evidence at all.

## THE EVIDENCE

You must make your decision based only on the evidence that you saw and heard here in court. Do not consider anything you may have seen or heard outside of court, including anything from the newspaper, television, radio, the Internet, social media, text messages, e-mails, or any other source.

The evidence includes only what the witnesses said when they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers agreed to. A stipulation is an agreement that certain facts are true or that a witness would have given certain testimony.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. If what a lawyer said is different from the evidence as you remember it, the evidence is what counts. The lawyers' questions and objections likewise are not evidence.

A lawyer has a duty to object if he or she thinks a question is improper. If I sustained objections to questions the lawyers asked, you must not speculate on what the answers might have been.

If, during the trial, I struck testimony or exhibits from the record, or told you to disregard something, you must not consider it.

## CONSIDERING THE EVIDENCE

Give the evidence whatever weight you decide it deserves. Use your common sense in weighing the evidence, and consider the evidence in light of your own everyday experience.

People sometimes look at one fact and conclude from it that another fact exists. This is called an inference. You are allowed to make reasonable inferences, so long as they are based on the evidence.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

You may have heard the terms "direct evidence" and "circumstantial evidence." Direct evidence is evidence that directly proves a fact. Circumstantial evidence is evidence that indirectly proves a fact.

You are to consider both direct and circumstantial evidence. The law does not say that one is better than the other. It is up to you to decide how much weight to give to any evidence, whether direct or circumstantial.

**NUMBER OF WITNESSES**

Do not make any decisions simply by counting the number of witnesses who testified about a certain point.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

What is important is how truthful and accurate the witnesses were and how much weight you think their testimony deserves.

## DEFENDANT'S DECISION NOT TO TESTIFY OR PRESENT EVIDENCE

A defendant has an absolute right not to testify or present evidence. You may not consider in any way the fact that the defendant did not testify or present evidence. You should not even discuss it in your deliberations.

**CREDIBILITY OF WITNESSES**

Part of your job as jurors is to decide how believable each witness was, and how much weight to give each witness's testimony. You may accept all of what a witness says, or part of it, or none of it.

Some factors you may consider include:

- the intelligence of the witness;

- the witness' ability and opportunity to see, hear, or know the things the witness testified about;

- the witness' memory;

- the witness' demeanor;

- whether the witness had any bias, prejudice, or other reason to lie or slant the testimony;

- the truthfulness and accuracy of the witness' testimony in light of the other evidence presented; and

- inconsistent or consistent statements or conduct by the witness.

## ATTORNEY INTERVIEWING WITNESS

It is proper for an attorney to interview any witness in preparation for trial.

## CHARACTER EVIDENCE REGARDING DEFENDANT

You have heard testimony about the defendant's character for honesty. You should consider this testimony together with and in the same way you consider the other evidence.

**RECORDED CONVERSATIONS / TRANSCRIPTS**

You have heard recorded conversations and seen video recordings. This is proper evidence that you should consider together with and in the same way you consider the other evidence.

You were also given transcripts of the conversations on the audio recordings to help you follow the recordings as you listened to them. The recordings are the evidence of what was said and who said it. The transcripts are not evidence. If you noticed any differences between what you heard in a conversation and what you read in the transcripts, your understanding of the recording is what matters. In other words, you must rely on what you heard, not what you read. And if you could not hear or understand certain parts of a recording, you must ignore the transcripts as far as those parts are concerned.

I am providing you with the recordings, a device to play them with instructions on its use, headphones, and a copy of the transcripts to assist you. It is up to you to decide whether to listen to the recordings during your deliberations. You may, if you wish, rely on your recollections of what you heard during the trial.

## SUMMARIES RECEIVED IN EVIDENCE

Certain summaries or charts were admitted in evidence. You may use those summaries and charts as evidence.

## DEMONSTRATIVE SUMMARIES/CHARTS NOT RECEIVED IN EVIDENCE

Certain summaries and charts were shown to you to help explain other evidence that was admitted. These summaries and charts are not themselves evidence or proof of any facts so you will not have these particular demonstrative exhibits during your deliberations.

## SEPARATE CONSIDERATION—ONE DEFENDANT CHARGED WITH MULTIPLE CRIMES

The defendant has been accused of more than one crime. The number of charges is not evidence of guilt and should not influence your decision.

You must consider each charge separately. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any other charge.

## PUNISHMENT

In deciding your verdict, you should not consider the possible punishment for the defendant. If you decide that the government has proved the defendant guilty beyond a reasonable doubt, then it will be my job to decide on the appropriate punishment.

## DEFINITION OF KNOWINGLY

A person acts "knowingly" if she realizes what she is doing and is aware of the nature of her conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

## COUNT ONE - CONCEALING FROM ARREST - ELEMENTS

Count one charges the defendant with concealing an individual from arrest. In order for you to find the defendant guilty of this charge, the government must prove each of the following four elements beyond a reasonable doubt:

1. a federal warrant or process had been issued for the arrest of an individual;

2. the defendant knew that the federal warrant or process had been issued for the individual's arrest;

3. the defendant actually harbored or concealed the individual; and

4. the defendant intended to prevent the individual's discovery or arrest.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty of count one.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt, then you must find the defendant not guilty of count one.

## COUNT ONE - DEFINITIONS

A “federal warrant” includes federal administrative arrest warrants, such as Department of Homeland Security Form I-200 (“Warrant for Arrest of Alien”) signed by an Authorized Immigration Officer.

The actual harboring or concealing element requires some affirmative, physical action by the defendant to hide, secrete, or keep out of sight.

Mere failure to disclose the location of a fugitive is not concealing.

## COUNT TWO - OBSTRUCT PROCEEDINGS - ELEMENTS

Count two charges the defendant with endeavoring to influence, obstruct, or impede federal proceedings. In order for you to find the defendant guilty of this count, the government must prove each of the following four elements beyond a reasonable doubt:

1. There was a proceeding pending before a department or agency of the United States;

2. The defendant knew of the pending proceeding;

3. The defendant endeavored to influence, obstruct or impede the pending proceeding; and

4. The defendant did so corruptly, that is, with the purpose of wrongfully impeding the proceeding.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty of count two.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt, then you must find the defendant not guilty of count two.

**COUNT TWO - DEFINITIONS**

The Department of Homeland Security (DHS) is a department of the United States and Immigration and Customs Enforcement (ICE) is an agency within DHS. In addition, "pending proceeding" simply means any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its inception to its conclusion.

"Endeavored" means having acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding. An "endeavor" need not be successful.

"Corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement.

**JURY DELIBERATIONS**

Once you are all in the jury room, the first thing you should do is choose a foreperson. The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard. You may discuss the case only when all jurors are present.

Once you start deliberating, do not communicate about the case or your deliberations with anyone except other members of your jury. You may not communicate with others about the case or your deliberations by any means. This includes oral or written communication, as well as any electronic method of communication, such as telephone, cell phone, computer, text messaging, instant messaging, the Internet, chat rooms, blogs, websites, or services like Facebook, LinkedIn, YouTube, Instagram, Snapchat, Twitter, or any other method of communication.

If you need to communicate with me while you are deliberating, send a note through the court security officer. The note should be signed by the foreperson or by one or more members of the jury. To have a complete record of this trial, it is important that you do not communicate with me except by a written note. I may have to talk to the lawyers about your message, so it may take me some time to get back to you. You may continue your deliberations while you wait for my answer. Please be advised that transcripts of trial testimony are not available to you. You must rely on your collective memory of the testimony.

If you send me a message, do not include the breakdown of any votes you may have conducted. In other words, do not tell me that you are split 6–6, or 8–4, or whatever your vote happens to be.

**VERDICT FORM**

A verdict form has been prepared for you. You will take this form with you to the jury room.

[Read the verdict form.]

When you have reached unanimous agreement, your foreperson will fill in, date, and sign the verdict form, and each of you will sign it.

Advise the court security officer once you have reached a verdict. When you come back to the courtroom, I will read the verdicts aloud.

**UNANIMITY/DISAGREEMENT AMONG JURORS**

The verdict must represent the considered judgment of each juror. Your verdict, whether it is guilty or not guilty, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with each other, express your own views, and listen to your fellow jurors' opinions. Discuss your differences with an open mind. Do not hesitate to re-examine your own view and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence just because of the opinions of your fellow jurors or just so that there can be a unanimous verdict.

The twelve of you should give fair and equal consideration to all the evidence. You should deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror.

You are impartial judges of the facts. Your sole interest is to determine whether the government has proved its case beyond a reasonable doubt.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Volume 1 |
| Plaintiff, | ) | Case No. 25-CR-89 |
| v. | ) | Milwaukee, WI |
| HANNAH C. DUGAN, | ) | December 15, 2025 9:07 a.m. |
| Defendant. | ) | |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:

United States Dept. of Justice (ED-WI)
By: MR. RICHARD G. FROHLING
MS. KELLY BROWN WATZKA
MR. KEITH S. ALEXANDER
Office of the US Attorney
517 E. Wisconsin Ave., Rm. 530
Milwaukee, WI 53202
Ph: 414-297-1775
richard.frohling@usdoj.gov
kelly.watzka@usdoj.gov
keith.alexander@usdoj.gov

For the Defendant
HANNAH C. DUGAN:
(Present)

Steven Biskupic Law Office, LLC
By: MR. STEVEN M. BISKUPIC
PO Box 456
Thiensville, WI 53092
Ph: 414-828-7233
bisklaw@outlook.com

Gimbel, Reilly, Guerin & Brown
By: MR. JASON D. LUCZAK
MS. NICOLE M. MASNICA
330 E. Kilbourn Ave., Ste. 1170
Milwaukee, WI 53202
Ph: 414-224-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com



U.S. Official Court Reporter: JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript produced by computer-aided transcription.

# I N D E X


| OPENING STATEMENTS: | PAGE: |
| --- | --- |
| by Mr. Alexander | 7 |
| by Mr. Biskupic | 28 |


## WITNESSES


| ALL WITNESSES: | PAGE: |
| --- | --- |
| For the Government: | |
| ERIN LUCKER: | |
| Direct Examination by Mr. Frohling | 45 |
| Cross-Examination by Mr. Luczak | 143 |
| Redirect Examination by Mr. Frohling | 183 |
| ANTHONY NIMTZ: | |
| Direct Examination by Ms. Watzka | 190 |
| Cross-Examination by Ms. Masnica | 223 |
| Redirect Examination by Ms. Watzka | 235 |
| JEFFREY BAKER: | |
| Direct Examination by Mr. Frohling | 240 |


## EXHIBITS


| EXHIBIT RECEIVED: | PAGE: |
| --- | --- |
| For the Government: | |
| Nos. 1-39 | 6 |
| Nos. 42 & 43 | 6 |
| No. 44 | 121 |
| No. 45 | 197 |
| Nos. 46A-F | 6 |
| No. 48 | 141 |
| No. 50 | 6 |
| Nos. 50A-Q | 6 |
| Nos. 51-60 | 6 |

**I N D E X (Cont'd.)**

**EXHIBITS**



| **EXHIBIT RECEIVED:** | **PAGE:** |
|---|---|
| For the Defense: | |
| No. 216 | 167 |
| No. 217 | 172 |

"undocumented" or doesn't have lawful status, or the statutes use the term "alien?"
A. That's correct.
Q. That's what the legal statutes say?
A. Yes.
Q. And are those generally the same thing?
A. Generally, yes.
Q. And will those terms be used interchangeably during the testimony?
A. Yes, they will.
Q. As part of your work and review of exhibits that have already been admitted into evidence in this case, are you familiar with an individual named Eduardo Flores-Ruiz?
A. Yes.
Q. Are you aware whether Mr. Flores-Ruiz was facing any criminal charges as of April 18th of 2025?
A. Yes, he was.
Q. What were those charges?
A. They were three counts of battery domestic violence.
Q. Had Mr. Flores-Ruiz been arrested by a local law enforcement agency?
A. Yes.
Q. And his fingerprints were taken?
A. Yes.
Q. As a result of that, did his identity and case come to the

attention of the ICE ERO task force?
A. Yes.
Q. Was Mr. Ruiz set to have a hearing on April 18th?
A. Yes.
Q. In front of whom was that going to be?
A. In front of the defendant.
Q. Okay. Was there a particular courtroom or court number assigned to the defendant's courtroom?
A. It was Milwaukee County Courthouse Courtroom 615.
Q. All right. You indicated you'd received or gathered evidence from various sources including documents; correct?
A. Yes.
Q. Did that include obtaining records from the Director of State Courts for the State of Wisconsin?
A. Yes.
Q. Did that include a calendar for court cases that day?
A. Yes.
Q. I'm going to show what's been admitted into evidence as Exhibit 11, bring that up. Do you see that in front of you?
A. Yes, I do.
Q. What is that?
A. That is the courtroom calendar for Courtroom 615 that we obtained.
Q. Does it include a lot of matters set for 8:30 that morning?
A. Yes, it does.

Q. I'm going to direct your attention to the fifth row down and ask you to take a look at that and just walk the jury through what hearing that entry relates to.
A. That relates to Eduardo Flores-Ruiz, and it is a pretrial conference scheduled to begin on -- or scheduled for April 18th at 8:30 a.m.
Q. Okay. I'm going to turn your attention to the fifth column over from the left. Is there an indication of an attorney for Mr. Flores-Ruiz?
A. Yes.
Q. Who is that?
A. Mercedes de la Rosa.
Q. And you said that was for a pretrial conference?
A. Yes.
Q. All right. I'm going to turn to the second page of Exhibit 11 and direct your attention to the fourth row from the bottom. Do you recognize that entry?
A. Yes.
Q. What case is that an entry for?
A. That is for Robert James Hruska, also scheduled for April 18th at 8:30 a.m. in Courtroom 615.
Q. Okay. So same type of -- or same type of hearing, a pretrial conference; is that correct?
A. Yes, that's correct.
Q. And the attorney for Mr. Hruska is who again?

A. Walter Piel.
Q. Based on the fact that Mr. Flores-Ruiz had a court hearing for 8:30 on April 18th, did the ICE ERO task force make any plans to arrest?
A. Yes, they did.
Q. You indicated that you had experience both -- you had training with arrests; correct?
A. Yes.
Q. And have you had experience making arrests?
A. Yes.
Q. In your experience, are courthouse arrests a good practice?
A. Yes, they are.
Q. Why is that?
A. Everyone who -- or citizens who go into the courthouse are going through security screening, so they are screened for prohibited items such as firearms, knives, and things of that nature.
Q. It's a controlled setting?
A. Yes.
Q. And you know that anyone other than court staff and law enforcement will have been screened as you just described; correct?
A. Correct, yes.
Q. Was there an arrest planned at the courthouse for Mr. Flores-Ruiz?

A. Yes, there was.
Q. Are you familiar with the identity of the task force members who were scheduled to participate in that arrest?
A. Yes, I am.
Q. Okay. Could you walk the jury through that.
A. Yes. It was ERO Officer Joseph Vasconcellos, CBP Officer Joseph Zuraw, FBI Agent Phillip Jackling, FBI Agent Jeffrey Baker, DEA Special Agent Bryan Ayers, and DEA Special Agent Janene Spitaletto.
Q. Okay. And you mentioned CBP, is that Customs & Border Protection?
A. Yes, it is.
Q. And is that another component of the Department of Homeland Security?
A. Yes, it is.
Q. I'm going to have you take a look at what's been admitted as Exhibit 1A and ask do you recognize that?
A. Yes.
Q. What is that?
A. That is the I-200 warrant for arrest of alien.
Q. Is this the arrest warrant for Mr. Eduardo Flores-Ruiz?
A. Yes.
Q. And what does it command the agents to do? Why is the arrest being made?
A. It says right there, "You are commanded to arrest and take

into custody for removal proceedings under the Immigration and Nationality Act of the above-named alien."
Q. And does it indicate it was signed by an authorized immigration officer?
A. Yes.
Q. I'll go a little higher on the form. You mentioned it's for Mr. Flores-Ruiz.
A. Yes, that's correct.
Q. Could you just read the sentence that starts with "I have determined."
A. "I have determined that there is probable cause to believe that Flores-Ruiz, Eduardo is removable from the United States, and this determination is based upon."
Q. And there are various indications checked?
A. Yes.
Q. Okay. And does one of those include biometric information?
A. Yes.
Q. What is that?
A. Biometric confirmation would be things like fingerprints.
Q. Before we turn to the events of April 18th, I thought it might be helpful just to walk the jurors through the setting a little bit. Is that okay?
A. Yep.
Q. Did you spend some time on the sixth floor of the courthouse over the last seven-plus months?

areas to Judge Cervera's chambers and courtroom without going into the public hallway; is that correct?
A. That's correct.
Q. All right. We're going to go through that Door No. 4 and sort of make a U-turn back down. What area is shown by No. 8?
A. That is the restricted hallway.
Q. I'm going to show you what's been admitted into evidence as Exhibit 31, ask you if you could identify that.
A. Yes. So that is a photograph of the restricted hallway, again, if you are coming out of the kind of jury door of the defendant's courtroom, make a U-turn, and you are looking down the hallway towards the entrance to the public hallway.
Q. Okay. And show you what's been admitted as Exhibit 32, ask if you can identify that.
A. Yeah. So that is that far end of the restricted hallway. On the left there is a door with an exit sign. Those are -- that's the door to the exit to the public stairwell. And the door to the right would be the door to the public hallway.
Q. Okay. So the door to a stairwell and the door back into the public hallway are located close together at the end of No. 8 on the diagram, that restricted hallway?
A. Yes, that's correct.
Q. If someone is in that restricted hallway No. 8 and wants to enter those stairs on the left through that door, are they able to do so?

A. Yes, they can.
Q. Is it locked or unlocked?
A. It is not locked from inside this restricted hallway.
Q. Okay. What about if you're in the public stairwell, can you get into this restricted hallway without a key?
A. No, you cannot.
Q. I'm going to show you what's been admitted as Exhibit 20, ask you to take a look at that. Do you recognize this video?
A. Yes.
Q. What is it?
A. So this is a video that begins inside Courtroom 615 and will exit out through the jury door.
Q. I'm going to start the video.

(The video recording was played.)

I'm going to stop there just for a second. You come through that door. What are we looking at straight ahead in this frame of the video?
A. That is another exit that goes outside or to the roof area. It does not take you to any other public areas of the courthouse.
Q. Okay.

(The video recording was played.)

I'm going to stop it again. I see a set of stairs here. Do you see that?
A. Yes.

Q. So those were two of the ICE ERO task force members who have engaged with Judge Dugan at that point; correct?
A. Yes.
Q. Okay. Are there others located off of this frame further down the hall off to the left?
A. Yes.
Q. Who is remaining there?
A. CBP Officer Zuraw, FBI Special Agent Baker, and DEA Agent Ayers.
Q. Who do we see coming through the video here?
A. That is Officer Zuraw.
Q. All right. I'm going to direct your attention down out in front of Courtroom 615. Who came out of the courtroom at that point?
A. Attorney Mueller and the clerk, Alan Freed.
Q. Mr. Freed is on the right here?
A. Yes, that's correct.
Q. And who is coming into the frame on the left?
A. That is Agent Baker.
Q. The defendant is walking towards Deputy Clerk Freed; is that correct?
A. Yes, that's correct.
Q. And what's the time -- time frame?
A. 8:44:58.
(The video recording was played.)

Q. Okay. Did the defendant make a gesture back down the hallway?
A. Yes, she waved.
Q. And is there another agent in the frame here?
A. Yes. In -- kind of on the right-hand side in the gray sweatshirt is Agent Ayers.
Q. So would that be five agents now who've come down the hallway?
A. Yes, that's correct.
(The video recording was played.)
Q. And they're heading into the chief judge's area?
A. Yes.
Q. And who is left in the hallway here with his hand on his forehead?
A. That is Attorney Mueller.
Q. Did he make a gesture?
A. Yeah, he makes a fist pump.
Q. I'm going to turn your attention to 53K. The time frame, could you identify that for the jurors.
A. 8:43:58.
Q. And who is seated on the bench?
A. That is Officer Zuraw.
Q. I'm going to have you pay attention to when someone comes into the frame and whether -- who that is and whether they make any hand gestures.

information.
Q. Is Laura GP a reference to Laura Gramling Perez?
A. Yes.
Q. Thank you, Special Agent Lucker.
This morning we listened to some audio from Courtroom 615 before the defendant left the courtroom and went into the hallway. I'm going to turn your attention back to the courtroom and pull up Exhibit 42. In the transcript, it's Exhibit 42A Page 4. And we're going to start with audio after the judge -- the judges have been in the hallway and the defendant returns to her courtroom. I'm going to start about three minutes and 27 seconds in.
(The audio recording was played.)
Okay. I stopped for a second. Do you hear someone speaking Spanish?
A. Yes.
Q. Who is that?
A. Attorney de la Rosa.
Q. Did you hear a creaking sound?
A. Yes.
Q. Are you familiar with what that is?
A. Yes.
Q. What's that?
A. That is the public door entry to Courtroom 615 creaks when you open it.

Q. Did we hear that in Exhibit 19A this morning?
A. Yes, we did.
Q. Okay.
(The audio recording was played.)
Did you hear someone ask, "Which client is it?"
A. Yes.
Q. Who is that?
A. The defendant.
Q. And does the defendant say anything after that?
A. She's then says, "We'll call it right away."
Q. Does the defendant address Mr. Piel at all, the attorney who is at the table?
A. Yes.
Q. What does the defendant advise Mr. Piel?
A. She tells him to step back.
(The audio recording was played.)
Q. So whose voice do we hear saying, "Get a date off the record. Stay right there"?
A. The defendant.
Q. Does the defendant indicate whether Ms. de la Rosa should, in fact, leave and take her client out?
A. She does later on, yes.
(The audio recording was played.)
Q. Okay. Go to the next page of the transcript, Page 5.
(The audio recording was played.)

A. Yes, I was aware.
Q. And did those charge include allegations of violence against others?
A. Yes.
Q. As someone that has those two factors, no status and a pending criminal matter involving violence, is someone like that someone that is going to be the focus of an enforcement action typically?
A. Typically, yes.
Q. Why is that?
A. The public safety nexus that the charge -- the criminal charges were violent in nature.
Q. And what is -- we've been talking about an enforcement action. What is an enforcement action?
A. An arrest.
Q. Okay. And following an arrest, what's the ultimate goal?
A. Ultimate goal is removal.
Q. Particularly for someone like Mr. Flores-Ruiz who had previously been removed?
A. Yes.
Q. Okay. And in terms of identifying an individual as a potential subject of an enforcement action, is that something that you had experienced doing when you were a deportation officer?
A. Yes, both as an immigration enforcement agent and as a

A. It's a -- if -- basically it's a claim of fear of persecution or torture if removed to their country of origin.
Q. Okay. And not every person in your custody is going to make an asylum claim; correct?
A. No.
Q. But they could potentially following their arrest?
A. Yes.
Q. And what happens if somebody raises that concern, raises a concern about a fear of returning to their country?
A. We would provide them with what's called an M-488. It's a notice of referral for reasonable fear proceedings. And that -- that individual would read that document and we would refer it to US Citizenship and Immigration Services, USCIS, for adjudication.
Q. Can an individual in Milwaukee ERO's custody be removed from the country before an asylum claim is fully adjudicated?
A. No. It has to be adjudicated.
Q. Okay. That third bullet point talks about 8 USC Section 1326 eligibility; right?
A. Yes.
Q. What is that?
A. That's illegal reentry of a previously deported or removed alien.
Q. Is it a crime for somebody to return to the country without permission if they've previously been ordered removed?

Q. Okay. And he's certifying that he has read the contents of this notice in Spanish to Mr. Flores-Ruiz; correct?
A. Correct.
Q. Were you working on April 18th, 2025?
A. I was not.
Q. Were you on leave that day?
A. I was.
Q. Did you designate another individual within your office to be the acting supervisor on April 18th?
A. Yes.
Q. Who was that?
A. Deportation Officer Michael Gavin.
Q. I'm going to show you what has been marked as Exhibit 3 and ask you what this is.
A. That is a notice of intent or decision to reinstate a prior order of removal.
Q. Is this also known as the I-871?
A. Yes.
Q. Okay. And what is -- is this also a form that would have been completed following Mr. Flores-Ruiz's arrest?
A. Yes, following the arrest.
Q. Okay. And what is -- what is this notice advising him of?
A. It's advising him that we're reinstating his previous -- his prior order of removal. In this case, it was from January 16th, 2013 by the Border Patrol in Arizona.

Q. Okay. So January 16, 2013 was the date on which Mr. Flores-Ruiz was originally ordered -- or was originally removed from the United States?
A. Ordered and removed, yes.
Q. Okay. All right. And does this form indicate whether or not Mr. Flores-Ruiz is entitled to contest the original order?
A. Yes.
Q. And does it indicate here sort of in the middle of the page you can make that -- you can contest that making either a written or an oral statement to the immigration officer?
A. Yes.
Q. Okay. And this form was signed by Officer Vasconcellos?
A. Yes.
Q. And does it indicate whether or not Mr. Flores-Ruiz signed the form?
A. He -- looks like he refused to sign.
Q. And he's checked a box here; correct?
A. Correct.
Q. Or somebody has checked a box here?
A. Uh-huh.
Q. What box is checked?
A. That he did not wish to make a statement contesting that determination.
Q. Directing your attention to the bottom of this page, there's a section entitled "Decision, Order and Officer

Q. And do you know when that occurred?
A. I believe it was November 13th of this year.
Q. Okay. All these forms we've been talking about, the I-200, the I-205, the I-871, those are all forms that you previously discussed when we were walking through all those steps in the ERO removal process; correct?
A. Correct.
Q. And so is it accurate to say that for ERO's purposes, the process of identifying Mr. Flores-Ruiz as -- for an enforcement action and his removal initiated in April of 2025 and it concluded in November of 2025?
A. Yes.
MS. WATZKA: I don't have any further questions for the witness.

CROSS-EXAMINATION

BY MS. MASNICA:

Q. All right. Mr. Nimtz, looking at that I-205 that we just saw, if we could put that up, Government's trial Exhibit 2. So this document, this is something that could have been used actually in Mr. Flores-Ruiz's case, and you never actually had to do an I-200; is that true?
A. That's true.
Q. Why was an I-200 form done in this case if you didn't need to do that?
A. Because the I-200 is a warrant of arrest, to arrest and

initiate removal proceedings.
Q. So it's to initiate removal proceedings, but those proceedings had already concluded in Mr. Flores-Ruiz's case; correct?
A. His previous ones from 2013?
Q. Yes.
A. Yes.
Q. And when Mr. Ruiz had come in -- Flores-Ruiz had come in in January of 2013, had you had an opportunity to review the immigration paperwork and all of the details of that?
A. At -- I'm sorry, at --
Q. Well, prior to issuing your warrant.
A. At the time of when he illegally reentered or prior to our arrest? I'm sorry.
Q. At the time you were -- so on April 17th, the day before the arrest when you start reviewing documents --
A. Uh-huh.
Q. -- and approve, essentially, his arrest warrant, did you take a look at his prior information related to his removal or anything like that?
A. Yes.
Q. Okay. And Mr. Flores-Ruiz had actually been arrested in the evening hours of January 15th and deported on January 16th of 2013; is that right?
A. I -- according to the 871, he was arrested -- or I'd have

jurors whether you recognize it.
A. I recognize that as a 200, which is administrative warrant that I am provided with before arrests. This is a common occurrence. I'm provided with these as well as the FOW.
Q. And does it relate to a particular person?
A. Yes.
Q. Who is that?
A. It's Eduardo Flores-Ruiz.
Q. Were you a member of the task force that was assigned to assist with that arrest on April 18th?
A. Yes.
Q. Who else was assigned?
A. That day, my partner from the FBI, Special Agent Jackling, Custom Border Patrol Officer Joseph Zuraw, ERO Officer Joseph Vasconcellos, DEA Agent Bryan Ayers, and DEA Agent Jean -- Janene Spitaletto.
Q. Okay. Indicated that there was a court date coming up for Mr. Flores-Ruiz. Have you made courthouse arrests yourself before this?
A. Yes.
Q. Do you consider courthouse arrests safe or unsafe?
A. Safe.
Q. Why is that?
A. Individuals that are coming into court are -- they go through metal detectors. At that point, any weapons, any

contraband that is on them will be taken if that -- if that happens. There's a set time that an individual is supposed to show up for court, which helps us prepare for an arrest that we might initiate at a courthouse, so the safety is the biggest factor.
Q. Safety. And is that for the same individuals you said before?
A. Absolutely.
Q. Agents, yes?
A. Yes.
Q. The individual being arrested and the public; is that right?
A. Yes.
Q. Was there any sort of -- we're going to turn to that day, April 18th. Was there any sort of meeting or briefing held with respect to the planned arrest operation?
A. Yes.
Q. When would that have been held?
A. It was that morning approximately 7:00 a.m. that morning.
Q. And did you attend that?
A. I did.
Q. After that briefing, did you actually go over to the courthouse?
A. Yes.
Q. Did you know when Mr. Flores-Ruiz's hearing was scheduled?

A. I did.
Q. When what that?
A. It was 8:30 a.m.
Q. Was there a particular courtroom you were heading to?
A. Yes.
Q. What was that?
A. 615.
Q. Did you know the judge presiding in that courtroom at the time?
A. I did not.
Q. Could you tell the jurors how you were dressed. Were you in some sort of uniform or plain clothes?
A. I was plain clothesed.
Q. Were you armed?
A. Yes.
Q. Was your firearm showing?
A. No.
Q. You had mentioned Special Agent Jackling before, and I think you mentioned him as your partner. Did you travel with him?
A. I did.
Q. Did you arrive at the courthouse together?
A. Yes.
Q. Did you go through security?
A. We went around -- yes, went to a security checkpoint, yes.

Q. Okay. You went to a security checkpoint?
A. Correct.
Q. Did you need to go through the metal detector?
A. No.
Q. Why is that?
A. Because I'm a federal officer. I made my -- I presented my credentials to the sheriffs working the security detail that day and made them aware who I was, and we were allowed to carry our firearm into the courthouse.
Q. Was there any sort of issue for you at security?
A. No.
Q. Did you make your way to the sixth floor?
A. Yes.
Q. What was your plan -- what were you going to do when you got to the sixth floor?
A. My partner and I, Phillip -- Special Agent Jackling were the first ones to arrive. It is a common practice for us to talk to the bailiffs that are working the courtroom of the individual that we're trying to arrest. So being the first one there, I addressed -- talked to the bailiff, made him aware that we were there to initiate an arrest.
Q. Okay. Were you there before court had started for the day?
A. Yes.
Q. And was court even open at the time you arrived?
A. No.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Volume 2 |
| | ) | Case No. 25-CR-89 |
| v. | ) | Milwaukee, WI |
| HANNAH C. DUGAN, Defendant. | ) | December 16, 2025 9:01 a.m. |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff UNITED STATES OF AMERICA:
United States Dept. of Justice (ED-WI)
By: MR. RICHARD G. FROHLING
MS. KELLY BROWN WATZKA
MR. KEITH S. ALEXANDER
Office of the US Attorney
517 E. Wisconsin Ave., Rm. 530
Milwaukee, WI 53202
Ph: 414-297-1775
richard.frohling@usdoj.gov
kelly.watzka@usdoj.gov
keith.alexander@usdoj.gov

For the Defendant HANNAH C. DUGAN: (Present)
Steven Biskupic Law Office, LLC
By: MR. STEVEN M. BISKUPIC
PO Box 456
Thiensville, WI 53092
Ph: 414-828-7233
bisklaw@outlook.com

Gimbel, Reilly, Guerin & Brown
By: MR. JASON D. LUCZAK
MS. NICOLE M. MASNICA
330 E. Kilbourn Ave., Ste. 1170
Milwaukee, WI 53202
Ph: 414-224-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com



U.S. Official Court Reporter: JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript produced by computer-aided transcription.

# I N D E X

## WITNESSES


| ALL WITNESSES: | PAGE: |
|---|---|
| For the Government: | |
| JEFFREY BAKER: | |
| Cross-Examination by Ms. Masnica | 275 |
| Redirect Examination by Mr. Frohling | 307 |
| PHILLIP JACKLING: | |
| Direct Examination by Ms. Watzka | 312 |
| Cross-Examination by Mr. Luczak | 331 |
| Redirect Examination by Ms. Watzka | 343 |
| Recross-Examination by Mr. Luczak | 347 |
| JOSEPH ZURAW: | |
| Direct Examination by Mr. Frohling | 348 |
| Cross-Examination by Mr. Luczak | 376 |
| Redirect Examination by Mr. Frohling | 383 |
| JOSEPH ANDREW VASCONCELLOS: | |
| Direct Examination by Mr. Alexander | 387 |
| Cross-Examination by Ms. Masnica | 418 |
| Redirect Examination by Mr. Alexander | 437 |
| KRISTELA CERVERA: | |
| Direct Examination by Ms. Watzka | 440 |
| Cross-Examination by Mr. Biskupic | 475 |
| Redirect Examination by Ms. Watzka | 483 |
| Recross-Examination by Mr. Biskupic | 485 |
| Redirect Examination (Cont'd.) by Ms. Watzka | 485 |
| DAVID DeSMET: | |
| Direct Examination by Mr. Frohling | 486 |
| Cross-Examination by Mr. Luczak | 504 |
| Redirect Examination by Mr. Frohling | 510 |
| Recross-Examination by Mr. Luczak | 511 |
| CASSANDRA KUBISZEWSKI: | |
| Direct Examination by Ms. Watzka | 512 |
| Cross-Examination by Ms. Masnica | 528 |
| BRYAN AYERS: | |
| Direct Examination by Mr. Frohling | 529 |
| Cross-Examination by Mr. Luczak | 547 |
| Redirect Examination by Mr. Frohling | 554 |
| Recross-Examination by Mr. Luczak | 555 |

# I N D E X (Cont'd.)

## WITNESSES


| ALL WITNESSES: | PAGE: |
| --- | --- |
| For the Government: | |
| NILE HENDRIX-WHITMORE: | |
| Direct Examination by Mr. Alexander | 556 |
| Cross-Examination by Ms. Masnica | 568 |
| Redirect Examination by Mr. Alexander | 570 |


## EXHIBITS


| EXHIBIT RECEIVED: | PAGE: |
| --- | --- |
| For the Defense: | |
| No. 329 | 333 |
| No. 333 | 422 |

A. Officer Vasconcellos.
Q. Okay. And of the two judges who were addressing you, who was doing most of the talking?
A. Judge Dugan.
Q. Okay. What do you recall hearing Judge Dugan say when she first addressed Officer Vasconcellos?
A. She asked him why he was there.
Q. Okay. And how did he respond?
A. He said to make an arrest.
Q. Okay. And was Judge Dugan satisfied with that response?
A. No. She asked him if it was a judicial warrant.
Q. Okay. And did Officer Vasconcellos respond to that?
A. He said it was not a judicial warrant.
Q. Okay. What -- what happened next in the conversation?
A. Do you have a document that I could view to review that.
Q. Well, let me ask you a better question. Let me back it up a little bit here.
As you are sitting there listening to Judge Dugan interact with Officer Vasconcellos, how would you describe her tone?
A. Very direct, and she seemed upset.
Q. Okay. Did there come a point in time -- let me just play actually the video here.
(The video recording was played.)
Okay. Did you see Judge Dugan making some gestures toward Officer Vasconcellos?

door is, and then what happens?
A. I went back into the hallway.
Q. Okay. You were in the area that we're calling the vestibule, that long hallway area?
A. Yes.
Q. And did Officer Vasconcellos remain behind the glass door with the other judge?
A. Yes.
Q. Can you see or hear the discussion between them at that time?
A. No.
Q. Okay. Where was Judge Dugan?
A. I don't know.
Q. She didn't follow you to come talk about the warrant into the chief judge's area?
A. No.
Q. At any point for the duration of that morning, did you see Judge Dugan again?
A. No.
Q. Did there come a point in time when other members of your team joined you in that vestibule area?
A. Yes.
Q. Who joined you?
A. CBP Agent Zuraw, Special Agent Baker, and DEA Agent Ayers.
Q. Okay. So you -- you now have Officer Vasconcellos, who's

behind the glass doors in the chief judge's area. You have four members of your team in the vestibule area. And there's one remaining member of the team, right, Agent Spitaletto?
A. Correct.
Q. Do you know where Agent Spitaletto is at this time?
A. I do not.
Q. She hasn't joined you in the vestibule; correct?
A. Correct.
Q. So presumably she's somewhere out in the hall still?
A. Presumably.
Q. Okay. Did you have a concern about the fact that the team had been divided up?
A. Caused me to have a little bit of uncertainty about what was going to happen next.
Q. It wasn't part of the plan for you guys to be in different places; right?
A. That's correct.
Q. Were you able -- did you know where Mr. Flores-Ruiz was at that time?
A. No.
Q. Had you seen him before you entered the chief judge's area enter Courtroom 615?
A. Yes.
Q. Once you were in the chief judge's area, were you able -- were you able to know where he was?

A. Deportation Officer Vasconcellos.
Q. You didn't have a phone conversation with anyone?
A. I did not talk on that phone, no.
Q. After that conversation, were you allowed to proceed into the courthouse?
A. Yes.
Q. Were you escorted?
A. No.
Q. You were allowed to continue on your way?
A. Correct.
Q. I'm going to turn your attention to your arrival on the sixth floor. Do you recall arriving there that morning?
A. Yes.
Q. What approximate time would that have been?
A. I think 8:15 to 8:30.
Q. What do you do when you arrive?
A. Excuse me. I came off of the elevators and made a right turn and took a seat on some benches that were just south of the elevator bank.
Q. Did you see other members of your team on the sixth floor?
A. Yes.
Q. Do you recall generally where they were located?
A. Yes. Phil Jackling was right across from the elevators or closest to it -- to the elevators than I was. Special Agent Baker was south down the hallway. Special Agent Spitaletto was

north in the hallway, and Bryan Ayers was south as well.
Q. And so if you're coming off the elevator on the sixth floor, south is to the right?
A. To the right. Sorry.
Q. And north is to the left?
A. Correct.
Q. At some point, did members of the team exchange messages about an individual taking photographs?
A. Yes.
Q. Could you describe what happened.
A. About the messages being sent?
Q. Yeah. Let me back up. That's a better -- not a great question.
Did someone appear to start taking photographs of members of the team?
A. Yes. That was what was put out in the group chat.
Q. And did you see that yourself?
A. I didn't see the person taking pictures, but based on -- based on their movement past me, I assumed that they were taking my picture as well.
Q. I'm going to show you what's been admitted as Exhibit -- Exhibit 53F. Do you see that?
A. I do.
Q. Could you read the time stamp, please.
A. 8:25:46 a.m.

(The video recording is playing.)

Q. Do you recognize anyone in that frame?

A. Yes. I'm seated at the bench to the center of the screen. Special Agent Baker is on the third bench, second bench down on the same side of the hallway.

Q. Down in that area?

A. Correct.

Q. Do you see the individual standing in front of you?

A. Yes.

Q. Do you recognize that individual?

A. I do.

Q. Who is that?

A. I don't know them by name, but I -- I know them by -- by her appearance that I've seen on -- on the sixth floor previously and in other interactions in the courthouse, other arrests that we've made.

Q. Okay. So you've encountered that individual before?

A. Yes.

Q. The video ends. Is that individual down by another member of the task force?

A. Yes.

Q. And who's that?

A. That's Jeff Baker.

Q. After members of the task force were approached by that person, did you communicate about it?

Q. The defendant's addressing you as she approaches. She asked you that first question, you respond. She tells you to get out, and then you start -- do you respond then, or is it only after there's additional questions?
A. No, it was right away.
Q. Do you comply?
A. Yes.
Q. Did you know why you were being sent to the chief judge's office?
A. At that moment, no.
Q. Did it sound like a request to you to go?
A. No, not at all.
Q. What did it sound like?
A. It sounded like I was being ordered to get off of the bench that I was sitting on and go somewhere else.
Q. Had that ever happened to you during prior enforcement operations at a courthouse?
A. No, sir.
Q. Has it happened to you since?
A. No.
Q. Had you ever seen a judge in a robe in the hallway in the courthouse before?
A. No.
Q. Were you the only one sent to the -- or that ended up in the chief judge's office?

A. No.
Q. Who else ends up there?
A. Jeff Baker is approached next in the video and told to go there as well. And shortly after that, Special Agent Ayers arrives.
Q. Do you comply and go to the chief judge's area; is that correct?
A. That's correct.
Q. Okay. What -- what do you see when you're there? Who is there?
A. So there's a first set of double doors that's nonsecured, you can walk through and then a vestibule area prior to a secured office area. And when I got through the first set of doors, the other judge was there. I believe she was on her way out. Phil Jackling was there. Deportation Officer Vasconcellos was just past that secure door in the photo now.
Q. Okay. I'm showing you what's been admitted as Exhibit 37. What area does that show?
A. That is the secure door leading to the chief judge's offices.
Q. When you arrived, Officer Vasconcellos is where?
A. Past that door inside.
Q. Are you aware whether that's a door that the public can just walk through?
A. No, it is not.

Q. I'm going to turn your attention now to Eduardo Flores-Ruiz. Do you recall him?
A. Yes, sir, I do.
Q. First, what I'm going to do is ask you questions that walk you through the steps of the process you went for his case, okay. Does your agency have a number of -- a number of databases that contain information about potential subjects?
A. Yes, sir, they do.
Q. Did you search those databases with regard to Mr. Flores-Ruiz?
A. Yes, sir, I did.
Q. What did you learn about Flores-Ruiz by searching those databases?
A. I learned that he had been previously removed from the United States in 2013, and I had also learned that he had been arrested in Milwaukee County.
Q. You said that you learned he was arrested in Milwaukee County. How did you know that he was the same person that was arrested 12 year earlier -- or removed, excuse me, 12 years earlier?
A. Through biometric confirmation from his fingerprints that --
Q. Can you explain to the jurors what biometric confirmation is.
A. So when Mr. Flores-Ruiz was arrested by Milwaukee County,

they took his fingerprints when he was booked in. Those fingerprints matched the fingerprints that he had been -- that had been taken at the border in 2013.
Q. What about his immigration status since his removal in 2013? Were you able in those databases to search what immigration status, if any, he had in the United States?
A. Yes, sir, I was.
Q. What did you discover?
A. I discovered that he had no legal status in the United States since being removed.
Q. So after learning that he had been arrested in Milwaukee County, had no legal status in the United States, and had been previously removed 12 years earlier, what documents did you prepare next?
A. I -- excuse me -- I generated a field operations worksheet and a I-200 warrant of arrest of alien.
Q. I'm going to show you what's been previously admitted as Exhibit 1A. Can you take a look at that, please.
A. Yes, sir.
Q. Do you know what that is?
A. Yes, sir.
Q. What is it?
A. That is the I -- form I-200 for Mr. Flores-Ruiz.
Q. Did you complete this?
A. Yes, sir, I generated it.

Q. And why did you check this box?
A. Because due to record checks, Mr. Flores-Ruiz had been removed from the United States previously, lacking immigration status within the United States.
Q. Okay. I'm going to focus your attention on another box that you didn't check. "The pendency of ongoing removal proceedings against the subject," do you see that?
A. Yes, sir.
Q. Why didn't you check that box at this time?
A. Because at the time I generated Form I-200, there were no removal proceedings against Mr. Flores-Ruiz.
Q. Okay. And by that you mean there wasn't a -- any hearings for an immigration -- immigration-related hearings pending at that point in time?
A. Correct, sir.
Q. Okay. So after gathering information about Flores-Ruiz and completing this warrant for arrest, who did you send the document to?
A. My supervisor, Mr. Anthony Nimtz.
Q. Was he an authorized immigration officer who had the authority to approve the warrant?
A. Yes, sir, he is.
Q. What determination did he make?
A. He determined that there was probable cause to believe that Mr. Flores-Ruiz is removable from the United States.

hearing.
Q. I'm going to show you what's been admitted as Exhibit 50M.
(The video recording was played.)
Do you remember this encounter?
A. Yes, sir, I do.
Q. Of the two people in the judicial robes there, who did most of the talking with you?
A. The person on the left.
Q. Would that be the defendant?
A. Yes, sir.
Q. What did the defendant first ask you?
A. She asked if we were present for a hearing or a trial.
Q. What did you tell her?
A. No.
Q. After you told her no, what did she say?
A. She instructed me and my partner to leave.
Q. After being -- after she told you to leave, what did you say to her?
A. I told her no, that he were there to effect an arrest.
Q. And how did she respond to that?
A. She instructed me to go to the chief judge's chambers.
Q. Did she ask if you had a warrant?
A. She asked if I had a signed judicial warrant.
Q. And what did you say?
A. I said no, I had an administrative warrant.

Q. So after you told her that you had an administrative warrant, you said that she -- where did she direct you to go?
A. To the chief judge -- to the chief judge's chambers.
Q. Did she give you any opportunity to show that warrant to her?
A. No, sir, she did not.
Q. How was her demeanor during your conversation with her -- and tone?
A. She seemed very stern and upset.
Q. Did -- in this course of this conversation, did the defendant ask you whether you had identified yourself with security?
A. No, sir, she did not.
Q. Did the defendant ask you whether you had checked in or any members of your team had checked in with the -- her bailiff?
A. I do not recall.
Q. Okay. I want to keep playing this video.

(The video recording was played.)

Did you comply with her -- was it a direction, or was it a request? How did you take it?
A. I took it as direction.
Q. Did you comply with her direction?
A. Yes, sir, I did.
Q. Did you know at that point in time where the chief judge's office was?

A. No, sir, I did not.
Q. Who show showed you where to go?
A. Judge Cervera.
(The video recording was played.)
Q. Had you had other experiences of arresting other individuals in the courthouses with an administrative arrest warrant?
A. Yes, sir, I have.
Q. Had you ever been approached by judges in robes in the public hallway before?
A. No, sir, I had not.
Q. I'm going to show you what's been marked as exhibit -- or admitted as Exhibit 37. What is this?
A. That's the hallway that leads to the chief judge's chambers, or his foyer.
Q. And did Judge Cervera lead you to that far door?
A. Yes, sir, she did.
Q. Did you need to get buzzed in to get through that door?
A. Yes, sir, we did.
Q. How about to get out, did you learn that had you to get buzzed to get out, as well?
A. Yes, sir, I did.
Q. What did Judge Cervera ask you for when you were in the back area here?
A. She asked me for a -- to take a copy of the warrant, the

form I-200. I also showed Judge Cervera my credentials.
Q. Did you have any concerns providing the warrant to her?
A. Absolutely not, no, sir.
Q. After -- after she took a copy of the warrant, what did Judge Cervera do?
A. She exited the chief judge's chambers.
Q. Was the chief judge in the office that morning?
A. No, sir, he was not.
Q. So were you placed on a call with -- with her?
A. Yes, sir.
Q. Was it on a speakerphone?
A. It was on a speakerphone, yes, sir.
Q. Do you recall who -- who had the speakerphone out?
A. All I can recall is that it was a female.
Q. Now, initially with Judge Cervera, were there any other members of your arrest team in that door, beyond that glass door, with you?
A. No, sir, there was not.
Q. By the -- by the time that you're starting this call with the chief judge, was there anybody else with you?
A. Yes, sir. I had waved CBPO Zuraw into the foyer with me.
Q. And why did you do that?
A. I wanted a witness to the phone call between myself and Chief Judge Ashley.
Q. Now, the phone call, does it begin in this -- where does

Q. Did he ever in the process express any fear about going back to Mexico?
A. No, sir, he did not.
Q. If somebody would have done that, what would happen next?
MS. MASNICA: Objection, relevance.
THE COURT: I'll allow it.
A. I would begin the credible fear process. I would serve the subject the M-444, read through that form with them, make sure they understand it. They would sign and date it, and then I would sign it as well.
BY MR. ALEXANDER:
Q. Let me show you what's been marked and admitted as Exhibit 2. What is Exhibit 2?
A. Exhibit 2 is a warrant of removal and deportation.
Q. Who signed this?
A. The acting supervisor at the time, Michael Gavin.
Q. I'm going to show you now what's been marked as Exhibit 3. What is -- what is this?
A. This is form I-871. It's the notice of intent, a decision to reinstate a prior order.
Q. And this -- did you give -- is this -- did you read this to him in the Spanish language?
A. Yes, sir, I did.
Q. Okay. Did he have an opportunity to contest this?
A. Yes, sir, he did.

Q. Did he choose to contest it?
A. He did not.
Q. Did he agree to sign it?
A. He refused to sign the form, sir.
Q. If somebody were to contest it, what would happen next?
A. I would hand them a piece of paper and instruct them to write down how and what they were contesting in regard to their prior removal.
Q. Now, this, as you said, is reinstating a prior order of removal. Is that a different proceeding than -- than others who wouldn't have that -- somebody who hadn't been previously removed?
A. Yes, sir, it is.
Q. And how so?
A. In this case specifically, Mr. Flores-Ruiz had already been removed from the United States. Had he not been removed from the United States, he would not been served the form I-871.
Q. And during the process, did you tell him anything about his other -- his ability to contact anybody?
A. Yes, sir. I availed him of the opportunity to contact a Mexican consulate, which he declined. I also gave him a list of free legal services, which he could use at any point while in our custody to contact an immigration lawyer.
Q. Did you get information from him such as his fingerprints or biological information?

A. No.
Q. Why not?
A. I just assume they're going to exit through the main entrance.
Q. Okay. Thinking back to the morning of April 18th, do you recall what the weather was like that morning?
A. Yes, a little bit.
Q. And was there some significant weather event that was brought to your attention?
A. There was. We received an e-mail by the district court administrator around 8:25 a.m. that softball or baseball-sized hail was predicted, and she suggested moving our cars. We park in a surface lot next to the courthouse. And in light of that prediction, she suggested that we move our vehicles.
Q. And did you take her up on that advice?
A. I did.
Q. Okay. So you left your courtroom and went out to move your car?
A. I did.
Q. At some point while you were out taking care of your car, did you run into Judge Dugan?
A. I did. We -- I think she did the same. I'm not sure, but we did run into each other.
Q. And then did you both accompany each other back to the Sixth Floor of the Milwaukee County Courthouse?

A. Yes.
Q. Let me show you Exhibit 50L. Before I start this video, I'm going to direct your attention to these two gentlemen sitting on the public bench there. At that -- at this point in the morning, which the time stamp says is 8:40:10 a.m., at that point in the morning as you're returning to the courthouse, did you know who these gentlemen were?
A. No.
Q. Did there come a point in time later in the morning where you and Judge Dugan would have some interaction with them?
A. Yes.
Q. Okay. Let me just play the video.
(The video recording was played.)
I'll stop you right there. Is that -- do you recognize who's just entered the frame?
A. Yes.
Q. Who is that?
A. It's myself and Judge Dugan.
Q. Okay. And I'll just continue playing that.
(The video recording was played.)
I'll stop there. Are you -- it's accurate to say that you've just walked by those gentlemen, and they did not appear to attract your attention?
A. Right. That's accurate.
Q. Okay. And then is that you heading towards Door 615-1 that

we were just chatting about?
A. It is.
Q. Okay. Where did you go next?
A. I proceeded to my chambers. I put on my robe. And I wanted to get started with the calendar because we had 8:30 hearings scheduled, so I went into my courtroom, sat on the bench to get started.
Q. And at this point, I think we just talked about this, this video shows you returning from moving your car at about 8:40ish a.m.?
A. That's right.
Q. So you're already a little bit behind your 8:30 mark --
A. Yes.
Q -- and you want to get moving. So did you go to -- return to your bench?
A. I did.
Q. And begin conducting court business?
A. Right.
Q. Did there come a point in time when you saw Judge Dugan again that morning?
A. Yes.
Q. Can you describe when that was.
A. It was not long after I returned to the courtroom. I don't think I was even able to start calling any cases. She came in, and motioned that I -- that I come with her.

Q. Okay. She motioned in your direction?
A. Yes.
Q. Let me actually back it up. How did she -- how did she come into your courtroom?
A. There's -- the jury door, there's an entrance for jurors very much like in this courtroom to the side or my side, my right. And she had come in through that door and walked in a few steps into the courtroom.
Q. How was she dressed at the time?
A. She was wearing her robe.
Q. And I think you've talked about a motion of some sort. Can you demonstrate for the jurors what you're talking about?
A. Yes. She motioned with her finger for me to come to her.
(Indicating.)
Q. Okay. And just for the record, you're indicating she's using her pointer finger to kind of gesture towards you?
A. Yes, using her pointer finger. That's correct.
Q. Okay. And did you have a reaction to being summoned by Judge Dugan in that manner?
A. I did. I thought something bad had happened, and it was embarrassing to be summoned that way.
Q. Did you -- did you nevertheless comply with her directive?
A. Yes.
Q. Okay. What happened next?
A. I had to go into my chambers to meet her, so I unlocked the

-- I had to let her into my chambers because the door was locked. I used to keep it locked at that point in time. And she came into my chambers. I started to unzip my robe, and she said, "Leave your robe on."
Q. Okay. She -- so she -- you're starting to unzip your robe, and she tells you to stop, keep it on. Do you do that?
A. Yes.
Q. Okay. And what does she next say to you?
A. She says, "ICE is here. We need to check a warrant." She starts to walk, and so I asked her, "Should I take my key," because everything happened so quickly. And she didn't answer she was -- I don't know if she heard me. She proceeded to walk back towards the restricted hallway. I was following her. I heard the name something about Flores, and I proceeded to follow her. She was speaking as we were walking and talking. It was a little hard to hear her in that hallway based on the acoustics and the speed because we were walking very quickly.
Q. Okay. So at this point, is she walking in front of you?
A. Yes.
Q. And at a quick pace?
A. At a quick pace.
Q. And you're following as best you can?
A. I am, right.
Q. And do I understand you to say that you -- you hear that she is speaking, but you're having a hard time understanding

what she's saying?
A. Right. I was a little confused.
Q. Okay. Did -- at this point, did you understand why she had involved you in this?
A. No. I heard that name, and I -- I -- or a name, and I said, "Is that someone on my docket?" She didn't answer me. But we proceeded to walk into the hallway, and we were still in our robes.
Q. Okay. Before we get into the hallway, let me ask you this: As you're -- as you are having that encounter with Judge Dugan at your chambers door and then through the restricted hallway, how would you describe her demeanor?
A. She seemed -- it was urgent. She seemed irritated at this point.
Q. Okay. I'm going to show you Exhibit 55D. And I'm going to play a little bit -- actually let me ask you, Judge Cervera, what is the time stamp at the top of this radio?
A. 8:43 a.m.
Q. So this is, in fact, just a few minutes after you had originally reentered the courtroom with Judge Dugan that morning?
A. Right.
Q. The hallway, I should say. Okay. Let me play this.
(The video recording was played.)
Okay. Is that you and Judge Dugan exiting from the

restricted hallway out into the public hallway?
A. Yes.
Q. Now, and it appears that Judge Dugan walks out first?
A. Right.
Q. And -- and do we see you hesitating?
A. Yes.
Q. Why are you hesitating?
A. I didn't want to walk into the hallway with my robe on.
Q. Why not?
A. It's not something that was common.
Q. Okay. Were you uncomfortable wearing your judicial robe into the public hallway?
A. I was.
Q. Let me ask you: In your experience, when -- when do judges in the Milwaukee County Courthouse typically wear their robes?
A. In my experience, it's usually during ceremonial functions, if another judge is going to be sworn in, or investiture. We will line up in the hallway usually on the Fifth Floor of the historic courthouse and that's the time that we're wearing our robes, because we usually line up and then walk into the courtroom. I can't think of another time in my experience when a robe is worn into the hallway for any other reason.
Q. Okay. And those -- that investiture or that swearing in ceremony, that is something that is -- is that a rare or a common occurrence?

get a response to that.
Q. Okay. And when you say everything was happening so quickly, what do you mean?
A. The interaction was pretty straightforward and -- and -- and quick.
Q. Okay.
A. It didn't last -- he said he had one. She then sent him to the chief judge's office.
Q. Okay. So after the discussion of the warrant, she quickly tells him to go to the chief judge's office?
A. That's right.
Q. Okay. And I think you indicated that you -- you -- your impression was maybe he did need a judicial warrant?
A. Right.
Q. Okay. Did you at that time consider yourself to be well-versed in the difference between administrative warrants and judicial warrants?
A. No, not in immigration law.
Q. Okay. After Judge Dugan directed Officer Vasconcellos to the chief judge's area, did you offer to help show him the way?
A. He stood up. He looked at me and said, "Well, I don't know where that is," so I proceeded to point toward the doors. And I said, "It's just past those double doors. You can go right through there." He then, I think, walks around and looks at me again and says, "Well, I don't know where that is," and at this

point -- because I agree it looks a little confusing. You can't really tell on the video here, but it does appear as if you can't just enter. So I offered to escort him to the chief's office.

Q. From this distance, you're right, it is hard to tell. There's a set of double wooden doors, and somebody who is not familiar with the area might think that you're not supposed to go back there?

A. I think so.

Q. Okay. And so did you then show Officer Vasconcellos where to go?

A. Yes, I did.

Q. Okay. Well, let me continue playing the video here.

(The video recording was played.)

I'm going to stop it right there. At this point, you now realize that there's a second officer that's joining you?

A. Actually, I didn't realize it right away.

Q. When did you -- when did you -- you're holding the door, so when did you realize it?

A. Well, I suppose at -- probably at that point.

Q. Okay.

A. But the only officer I was expecting to follow me was Officer Vasconcellos.

Q. What did you understand the purpose to be of having Officer Vasconcellos go to the chief judge's office?

Q. Let me just stop you there. Who did you understand Carl to be?
A. The chief, chief judge.
Q. Carl Ashley?
A. Yes. Chief Judge Carl Ashley.
Q. Okay. So she said she was in the doghouse with Carl, and did she tell you why she was in the doghouse with Carl?
A. She said something to the effect of, "Because I tried to help that guy."
Q. And what did she help that guy do?
A. From what I understood, she demonstrated a little bit that she had directed him to go through the restricted hallway to exit her courtroom.

MS. WATZKA: That's all the questions I have for you.

THE WITNESS: Okay.

CROSS-EXAMINATION

BY MR. BISKUPIC:

Q. Judge, you hold off-the-record hearings; right?
A. Yes.
Q. Hundreds?
A. Many, yes. I don't know if it's hundreds, but...
Q. How long have you been a judge?
A. Four years now.
Q. Okay. Do you need anyone's permission to hold -- to decide that a case is held off the record?

A. No.
Q. Have you --
A. I've only started that practice much more frequently more recently.
Q. Okay.
A. So that's why I couldn't say that it was hundreds yet.
Q. Okay. And did you have to get anyone's permission to start that process?
A. No.
Q. What about having parties appear by Zoom? Do you let people do that?
A. Yes, I do.
Q. Do you have to ask anyone's permission to do that?
A. No.
Q. You described this private hallway. You have let lawyers go down that hallway; correct?
A. Officers of the court, attorneys, yes.
Q. Okay. And did you have to ask anyone's permission to do that?
A. No.
Q. You have said that you could let a defendant walk down there if the circumstances required; correct?
A. I have said it would be a unique set of circumstances, but yes.
Q. You wouldn't have to ask anyone's permission; correct?

A. No.
Q. Were you aware or made aware of the two prior ICE arrests on March 20th and April 3rd?
A. I had heard.
Q. You were aware your fellow judges were upset by that?
A. Yes.
Q. Were you told the details of what happened on March 20th and April 3rd?
A. I learned a little bit about what happened in one of the instances.
Q. What did you learn about that instance?
A. That the person was apprehended prior to a hearing even taking place, is what I believe, and that the agent or officer was refusing to identify him or herself to a judge who was -- who I believe was wearing a robe at the time.
Q. And which judge was that?
A. Judge Kori Ashley.
Q. Is she related to Carl Ashley?
A. Yes.
Q. How are they related?
A. She is his niece.
Q. These interactions you had with the public defenders, did you ever tell them that you felt uncomfortable about it?
A. I'm sorry, can you repeat that?
Q. Sure. You've testified about the public defenders who came

A. Yes.
Q. And at that point, was Mr. Flores-Ruiz subject to some additional processing?
A. Yes.
Q. Okay. Let me ask you a few questions about ICE ERO's operations in courthouses. First of all, how -- how long has ICE ERO been involved in making arrests at courthouses?
A. We used to do arrests when I first start started in 2008, so it's been going on for many years.
Q. And are you familiar with Milwaukee County's policy on ICE detainers?
A. Yes.
Q. What is it?
A. They do not honor detainers.
Q. Is Milwaukee County generally not cooperative with ICE?
A. They used to be back in the day. When I first started with immigration, they did. They worked with us on a regular basis. I want to say around 2013 is when they stopped working with immigration and stopped honoring detainers. I don't know the exact date.
Q. Is the -- is -- is the need to conduct enforcement -- at least -- is one of the needs to conduct enforcement operations within a courthouse in Milwaukee County related to the ICE -- the detainer issue?
A. Yes.

Q. After you're in that area, does someone from Milwaukee County Sheriff's Office come into the vestibule area?
A. Yes.
Q. Do you speak to that individual?
A. He spoke to us.
Q. What did he say?
A. He kind of made a joke about us not being very covert and then made some sort of statement along the lines of she's trying to speed him through.
Q. After you hear that, what do you do?
A. I go back out into the hallway.
Q. When you go out to the hallway, where do you go?
A. I felt like the best place to position myself would be by the elevators, so I kind of went down the hallway a little bit towards the elevators.
Q. After you're back out in the hallway by the elevators, do you see Eduardo Flores-Ruiz enter the public hallway?
A. Yes.
Q. Does he walk past you?
A. Yes.
Q. Is he alone?
A. He was with his defense attorney.
Q. And what do you do?
A. I kind of stayed on my phone for a second not to make him think I was following him, and then I slowly started to follow

him.
Q. Why did you slowly start to follow him?
A. I didn't want to be obvious.
Q. Why not?
A. I didn't want him to know I was with ICE or run.
Q. You were concerned if you identified yourself he might run?
A. Correct.
Q. When he's walked past you and you're in that hallway, are there other members of the arrest team in the hallway?
A. Just one.
Q. Who is that?
A. Janene.
Q. And where is she?
A. She's far down the hallway by the vestibule doors sitting on the ground next to the trash cans.
Q. What about the other members of the arrest team?
A. They're all in the vestibule. Or in Joe V.'s case, he was speaking with the secretary.
Q. So they're not with you when Mr. Flores-Ruiz walks past?
A. No.
Q. Do you alert anyone that Mr. Flores-Ruiz is leaving?
A. Yes.
Q. What do you do?
A. I -- I believe I texted -- or, no, I tried to call Joe V. And I also sent a text out in the message thread that I was on

the elevator with him.
Q. Okay. So you followed Mr. Flores-Ruiz. You actually got on an elevator with him?
A. Correct.
Q. Did you main contact -- well, let me back up.
Did you make any contact with Special Agent Spitaletto after Mr. Flores-Ruiz walked past you?
A. Yes.
Q. What did you do?
A. I called her after Joe V. didn't pick up, just to let her know I was on the elevator.
Q. Joe V. is Deportation Officer Vasconcellos?
A. Correct.
Q. Had you attempted to wave to Special Agent Spitaletto to also join you or follow you?
A. Yes.
Q. You get in the elevator with Flores-Ruiz?
A. Correct.
Q. Who else in the elevator?
A. It was just myself, Mr. Ruiz, and his defense attorney.
Q. Did you make your presence known to them at that point?
A. No.
Q. Why not?
A. I did not want to give up my identity as being with ICE.
Q. Why not?

A. I didn't have anybody else with me to take him into custody.
Q. The arrest plan involved six individuals at the beginning. Would you agree that the greater number of individuals involved in an arrest operation can make it safer?
A. Correct.
Q. Why is that?
A. In law enforcement, you always want to stack the odds in your favor. If you have more bodies, you can, you know, get cuffs on easier. And just present yourself as a bigger force, people are less likely to try to fight.
Q. The -- as you're going down the elevator -- well, let me back up. You get in the elevator, where do you go?
A. Down.
Q. Do you know -- let me back up. You get down. You're still maintaining contact with other members of the arrest team?
A. Yes.
Q. In what way?
A. I sent out that text, and then I believe I was on the phone with Janene.
Q. Did you maintain that phone call with Special Agent Spitaletto as you were following Flores-Ruiz?
A. Yes.
Q. Okay. Are you relaying your positions?
A. Yes.

Q. At some point do you exit the courthouse?
A. Yes.
Q. Where do you go?
A. We exited onto the Ninth Street exit. It was kind of covered by like a -- a bridge.
Q. Are you still maintaining -- attempting to maintain contact with the other members of the arrest team?
A. Yes.
Q. At some point, are the other members of the arrest team able to catch up with you?
A. Yes.
Q. Where does that take place?
A. I believe they finally -- Janene and the two FBI agents finally saw me as I was making the turn onto 10th from Wells by the flagpole entrance/exit.
Q. At some point, do agents identify themselves or make their presence known?
A. Yes.
Q. How does that happen?
A. I believe FBI Special Agent Phil Jackling was the first one, and stated, "Mr. Ruiz, FBI."
Q. After Special Agent Jackling says, "Mr. Ruiz, FBI," what happens?
A. He took off running.
Q. Did you give chase?

A. Yes.
Q. Were you able to catch him?
A. Correct.
Q. Who caught up to Mr. Ruiz first?
A. I did.
Q. What happens when you catch up to Mr. Ruiz?
A. I kind of knocked him off of balance on the corner of 10th and State, and we fell into a big mud puddle.
Q. At some point, do other agents arrive?
A. Yeah. Special Agent Phil Jackling was the second one to arrive, and we used my handcuffs.
Q. To place Mr. Ruiz in custody?
A. Correct.
Q. Does Mr. Ruiz's defense attorney also arrive on scene?
A. Yes.
Q. And do you have contact with her following the arrest?
A. Yes. She was saying something along lines of this was a mistake, and we kind of started to talk to her.
Q. Did anyone show her a copy of the warrant for Mr. Flores-Ruiz?
A. Yes.
Q. Who did that?
A. Phil was trying to pull it up on his phone and wasn't able to, and then I was able to get it up digitally on my phone, and I handed it to her to review.

BY MR. LUCZAK:
Q. Right. And she was commanding to go to the chief judge's office to check in; correct?
A. I -- I kept hearing, "Are you here for court, are you here for court," from where I was.
Q. Okay. And you all weren't there for a court hearing; correct?
A. No.
Q. You were there to effectuate an ICE arrest; right?
A. Correct.
Q. With an administrative warrant; correct?
A. Correct.
Q. And you never received -- you were not a party to any text messages that said, "Follow him"; correct?
A. I believe Janene had talked to Joe from ICE and gotten confirmation they want you to follow him, and I kind of got that confirmation in the elevator.
Q. Okay. But whenever you -- whenever you're by that trash can, like you're kind of standing down the hall by a trash can; correct?
A. Correct.
Q. And you knew that -- and you actually never indicated in any of your reports or anything which door you saw Eduardo Flores-Ruiz exit; correct?
A. I believe I -- I believe I wrongly said I thought he exited

the courtroom.
Q. Yeah. So the door that he walked out of was so close that it was hard from your vantage point being in the hallway to tell whether he walked out the -- the side door there or the main entrance and exit to the courtroom; correct?
A. I didn't know what door he exited until I saw the video, yes.
Q. But you knew that he walked into the public hallway; correct?
A. When he passed me, yes, I did.
Q. And there was an agent to his right and an agent, yourself, to his left; correct?
A. Yes.
Q. And at that point, there was nothing stopping you from stopping Mr. Eduardo Flores-Ruiz and saying, "Excuse me, sir," and confronting him in any way; correct?
A. I just believe -- nothing was physically stopping me, but I was waiting on confirmation that everything was good to go from Joe, the operational leader.
Q. And you never received that because he was talking to Chief Judge Ashley; correct?
A. Him and the team were tied up talking, yes.
Q. Well, he was the one talking, but the other -- the two FBI agents were in the vestibule; correct?
A. Yes. They were asked to come to the vestibule, yes.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Volume 3 |
| | ) | Case No. 25-CR-89 |
| v. | ) | Milwaukee, WI |
| HANNAH C. DUGAN, Defendant. | ) | December 17, 2025 9:02 a.m. |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:

United States Dept. of Justice (ED-WI)
By: MR. RICHARD G. FROHLING
MS. KELLY BROWN WATZKA
MR. KEITH S. ALEXANDER
Office of the US Attorney
517 E. Wisconsin Ave., Rm. 530
Milwaukee, WI 53202
Ph: 414-297-1775
richard.frohling@usdoj.gov
kelly.watzka@usdoj.gov
keith.alexander@usdoj.gov

For the Defendant
HANNAH C. DUGAN:
(Present)

Steven Biskupic Law Office, LLC
By: MR. STEVEN M. BISKUPIC
PO Box 456
Thiensville, WI 53092
Ph: 414-828-7233
bisklaw@outlook.com

Gimbel, Reilly, Guerin & Brown
By: MR. JASON D. LUCZAK
MS. NICOLE M. MASNICA
330 E. Kilbourn Ave., Ste. 1170
Milwaukee, WI 53202
Ph: 414-224-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com



U.S. Official Court Reporter: JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript produced by computer-aided transcription.

# I N D E X

## WITNESSES


| ALL WITNESSES: | PAGE: |
|---|---|
| For the Government: | |
| STEPHANIE GARBO: | |
| Direct Examination by Ms. Watzka | 578 |
| Cross-Examination by Mr. Biskupic | 588 |
| Redirect Examination by Ms. Watzka | 590 |
| Recross-Examination by Mr. Biskupic | 591 |
| Redirect Examination (Cont'd.) by Ms. Watzka | 592 |
| CARL ASHLEY: | |
| Direct Examination by Mr. Alexander | 592 |
| Cross-Examination by Mr. Biskupic | 618 |
| Redirect Examination by Mr. Alexander | 626 |
| Recross-Examination by Mr. Biskupic | 628 |
| MELISSA BUSS: | |
| Direct Examination by Ms. Watzka | 628 |
| Cross-Examination by Mr. Luczak | 641 |
| Redirect Examination by Ms. Watzka | 652 |
| Recross-Examination by Mr. Luczak | 654 |
| ALAN FREED, JR.: | |
| Direct Examination by Mr. Frohling | 655 |
| Cross-Examination by Ms. Masnica | 679 |
| Redirect Examination by Mr. Frohling | 692 |
| Recross-Examination by Ms. Masnica | 693 |
| BRITTNEY EWING: | |
| Direct Examination by Mr. Alexander | 695 |
| Cross-Examination by Ms. Masnica | 706 |
| MERCEDES DE LA ROSA: | |
| Direct Examination by Mr. Frohling | 708 |
| Cross-Examination by Mr. Biskupic | 726 |
| Redirect Examination by Mr. Frohling | 733 |
| WALTER PIEL, JR.: | |
| Direct Examination by Mr. Alexander | 735 |
| Cross-Examination by Mr. Biskupic | 746 |
| JOAN BUTZ: | |
| Direct Examination by Ms. Watzka | 752 |
| Cross-Examination by Ms. Masnica | 771 |
| Redirect Examination by Ms. Watzka | 772 |

**I N D E X (Cont'd.)**

**EXHIBITS**


| EXHIBIT RECEIVED: | PAGE: |
|---|---|
| For the Government: | |
| No. 12 | 755 |
| For the Defense: | |
| No. 201 | 619 |
| No. 204 | 624 |
| No. 208 | 618 |
| No. 348 | 589 |
| No. 402 | 646 |

from you?
A. It is.
Q. And when was that e-mail sent?
A. April 3rd, 6:30 p.m.
Q. Who did you send that e-mail to?
A. I sent it to my colleagues.
Q. All the Milwaukee County judges?
A. And -- yes, that's correct.
Q. Can you just -- it's a short e-mail. Can you just read for the jury the -- the e-mail and what -- and I'll flip it to the fourth page as well.
A. "Colleagues: Please be aware that ICE has taken at least two people into custody in the courthouse and Safety Building public hallways. The first incident occurred on March 20th in the courthouse after an injunction hearing ended where the respondent was detained, and the second occurred today in the Safety Building before the defendant's hearing, both in the public hallways.

"If these detentions occurred in the courthouse, I believe it would have directly" -- strike that -- "if these detentions occurred in the courtroom, I believe it would have directly interfered with our judicial process. I'm not sure if we have the authority to intervene in what happens in the public highway -- hallway.

"I have reached out to corporation counsel and the

director's office for their input. Please let me know if you are aware of other ICE activity in the courthouse complex. Thanks, CJA."

Q. Thank you. So you're describing prior ICE arrests in the courthouse on March 20th and April 3rd; is that correct?

A. That's correct.

Q. Were -- did you personally observe those arrests at all?

A. Did not.

Q. So you were sharing that information with your colleagues based on what you had heard from others; is that fair?

A. That is correct.

Q. Based on that, where did you understand those arrests occurred?

A. In the public areas of either the courthouse or the Safety Building.

Q. In the public hallways?

A. Correct.

Q. Okay. You said in your e-mail, "I'm not sure we have the authority to intervene in what happens in a public hallway." Does the judiciary have the authority to intervene in what happens in a public hallway?

A. Well, my initial review of that is that we are not able to prevent something happening in a public area. But that was something I also wanted to discuss with my colleagues.

Q. I understand that. Does the -- does the judiciary have the

authority to intervene in the public hallway, what happens in the public hallway?
A. I do not believe so.
Q. So now I'm going to look at some of the replies you received to this e-mail that you sent out. And I'm going to focus your attention on the third page of this exhibit. Did you receive a response that was sent to all the judges from a Judge Laura Gramling Perez?
A. I did.
Q. I'm going to zoom in on that for you. Does she reference attending a presentation called the National Judicial Network -- or put on by the National Judicial Network? Do you see that?
A. I do.
Q. Did she share with her colleagues the two quick takeaways from that?
A. She did.
Q. Can you read the first one. It's on the second paragraph there where it says, "Two quick takeaways."
A. "One, ICE can legally conduct enforcement, i.e., take people into custody, in public areas of the courthouse. Two, there are statutory and policy limitations to such enforcement, including a federal law prohibit -- prohibition against conducting enforcement in courthouses against victims appearing in cases involving a protective order, child custody, or cases

related to DV, sex assault, trafficking, stalking, and certain other crimes."

Q. So the first one that says the -- ICE can legally conduct enforcement in public areas of the courthouse, is that -- was that your understanding, too, the judiciary couldn't intervene with ICE in the public hallways of the courthouse?

A. That is something she represented from that presentation.

Q. And you agree that the judiciary doesn't have that authority; correct?

A. I do.

Q. Okay. And then the second takeaway, it says it's -- there's ICE -- federal policy limitations against enforcement actions against victims. Do you see that?

A. I do.

Q. Is there anything in that takeaway that appears to criminal defendants?

A. No.

Q. And she sent this -- when did she send this e-mail, what day?

A. Friday, April 4th, 10:12 a.m.

Q. And she makes a suggestion, too, that you develop a court-wide policy governing ICE actions. Do you see that?

A. I do.

Q. Did other judges make a suggestion, as well, that you develop a court-wide policy?

A. Yes.
Q. I'm going to now focus your attention on the first page of that exhibit. Which -- who sent this e-mail here on the first page at the top?
A. Judge Hannah Dugan.
Q. Zoom in here. Did she thank Judge Laura Gramling Perez for her information?
A. She does.
Q. Does she, in this e-mail, share some of the concerns that she has about ICE enforcement in the courthouse?
A. She did.
Q. And what did she say optimally you would provide?
A. Optimally, it would be great to have a -- at least a draft of written protocols for the Safety Building...
Q. And the courthouse and the children's court as well?
A. That's correct.
Q. Okay. And when did -- when did she send that e-mail?
A. April 8th, 12:46.
Q. In this e-mail, too, she suggests a judges meeting as soon as possible as well?
A. That is correct.
Q. I'm going to turn your attention now to Exhibit 7. What is Exhibit 7?
A. That is an e-mail that I sent to my colleagues.
Q. And what are you scheduling for your colleagues in this

e-mail?
A. In this e-mail, I'm indicating to my colleagues I was scheduling a meeting for Wednesday morning at 7:45 to 8:30 to discuss addressing warrants at the courthouse complex.
Q. When did you send that e-mail out?
A. I sent that on Tuesday, April 8th.
Q. So about less than an hour from the e-mail from Judge Dugan, does that sound right?
A. That is correct.
Q. You set up the meeting for the next morning via Zoom. Would that allow somebody to attend remotely?
A. Correct.
Q. You attached -- what did you attach to this e-mail?
A. I attached the US Immigration & Custom Enforcement memorandum with respect to civil immigration enforcement actions in or near courthouses.
Q. Why did you attach that document to this e-mail?
A. Because at that time, that was the most recent memorandum regarding activities or what the US Immigration & Custom Enforcement expected.
Q. Okay. I'm going to turn your attention now to Exhibit 8. Do you see that?
A. I do.
Q. And what is -- what is Exhibit 8, what do you see here?
A. Well, that is another communication with my colleagues

A. All right. 1393, got it. I'm there.
Q. Okay. Am I correct that the -- and I'd ask it can be published -- the changes in red are the ones that were added after the zoom meeting?
A. That's correct.
Q. Okay. I want to focus in on the paragraph underneath "the agents will certify," that paragraph. Do you see the sentence that has the quotation, "I do not consent." Would you please read that quote.
A. "I do not consent; but because I have no choice at this time, I will not interfere with your order."
Q. Okay. You wanted that specific language to be circulated so that court employees would have something to say to ICE agents if they attempted to go into nonpublic areas?
A. Correct.
Q. I'm going to show you what's been marked as Exhibit 204 and ask if you recognize this.
A. Yes.
Q. This is the San Francisco policy that you used to get that quotation; right?
A. Yes.
MR. BISKUPIC: Your Honor, I'd move Exhibit 204.
MR. ALEXANDER: Objection, relevance. This is a different county.
MR. BISKUPIC: Judge, cross-examination.

THE COURT: I'll allow it.

(Exhibit No. 204 was received in evidence.)

BY MR. BISKUPIC:

Q. Could you take a look at that paragraph. And, again, I want to focus -- and, I'm sorry, it's not in your binder, it's the 204 -- but I want you to have your binder in front of you with the quote that I had you read. And on 204, I want to focus the paragraph with the same precise quote, okay?

So if you look at the paragraph on the first page of 204 and you compare it to 1393 of Exhibit 9, that's -- that's the exact quote; right?

A. Is that a question?

Q. Yeah, I'm asking you to confirm that the quotation in the San Francisco policy is identical to the quotation that you put in the Milwaukee draft policy that you circulated.

A. That's correct.

Q. Okay. I want you to take a look at that full paragraph of both, because you changed a little bit of the language, do you see that? Like if you put them side by side -- and it's on your screen -- you changed "court employees" to "court personnel," do you see that, at the top, the first sentence?

A. Yes.

Q. Okay. And if you see the later part of the paragraph, you changed -- you changed some of the wording as well; right?

A. Correct.

Q. You took out a sentence, didn't you?
A. Yes.
Q. I'd like to highlight the sentence that you took out of the San Francisco policy and did not put in the Milwaukee policy. Would you please read that sentence.
A. "Immigration enforcement agents are allowed to conduct their operations in the court's public areas."
Q. So the San Francisco policy had an explicit statement that immigration enforcement agents were allowed to conduct their operations in the court public areas. You took that sentence out, didn't you?
A. I did.
Q. Your policy could have said explicitly that immigration enforcement agents were allowed in the court's public areas, and you chose to take that out, didn't you?
A. It's not in my policy.
Q. That was a conscious decision that you made when you circulated your policy to the Milwaukee County judges, wasn't it?
A. It was not included.
MR. BISKUPIC: Thank you. Those are the questions I have, your Honor.
MR. ALEXANDER: Your Honor, I have a few questions on redirect.

REDIRECT EXAMINATION

BY MR. ALEXANDER:

Q. Do you remember you were asked quest -- you were asked to read your press statement on April 6th?
A. Correct.
Q. Is it fair to say that you had concerns about ICE enforcement in the courthouse?
A. I did.
Q. And you expressed those concerns to the public?
A. I did.
Q. And you -- that's why you wanted to create a policy; is that right?
A. Correct.
Q. And you wanted to have it vetted by all the system partners; is that right?
A. That's correct.
Q. You wanted to have the input from Immigration & Customs Enforcement; is that fair?
A. Correct.
Q. So you took it seriously; right?
A. I did.
Q. You wanted to get it right?
A. Correct.
Q. And you wanted to make sure it was lawful; correct?
A. Correct.
Q. And so which is why none of the policies that you -- the

draft policy that you sent out prohibited ICE from arresting in the public hallway; is that fair?

A. That's correct.

Q. Your press release references the importance of being impartial. Do you remember that?

A. Yes.

Q. I'm just flipping to it here. You refer to the integrity and impartiality of the judicial system; is that fair?

A. That's fair.

Q. So does your disagreement with the federal policy or law give someone the authority to stop a lawful arrest in a public place?

MR. BISKUPIC: Objection, your Honor, argumentative.

THE COURT: I'll allow it.

A. Could you repeat the question.

BY MR. ALEXANDER:

Q. Sure. Does your disagreement with the federal policy give you the authority to stop a lawful arrest in a public place?

A. It does not.

Q. Okay. In fact, despite your concerns when you spoke with the ICE deportation officer on the phone on the morning of April 18th, did you tell him he could not arrest in the public hallway?

A. I did not.

MR. ALEXANDER: I don't have anything further.

(The audio recording was played.)

Mr. Freed, do you recognize voices on that recording?

A. Yes.

Q. Did you advise the judge that there were five ICE guys in the hallway?

A. I did.

Q. In response, does the judge suggest calling someone?

A. Yes.

Q. Is that Denita?

A. Yes.

Q. Do you know who the reference to Denita would be?

A. I think -- I think she's one of the chief judge's assistants.

Q. Okay. Do you know who the current sheriff of Milwaukee County is?

A. I have no idea.

Q. And you suggest calling the chief judge; is that right?

A. At first, yes.

Q. Okay. And are you directed to call the chief judge?

A. At first, yes.

Q. Okay. What about after that?

A. I -- I'm --

Q. Do you call the chief judge?

A. No.

Q. Why not?

A. Because I was told by Judge Dugan not to.
Q. And then told to stay there; right?
A. Correct.
Q. After that conversation, do you see Judge Dugan leave?
A. Yes.
Q. Did you see what door she exited?
A. I believe she walked through her chambers door.
Q. I'm going to jump ahead in the recording to about the two minute, 40 second mark. And for the jurors, the transcript would be about a quarter of the way down on Page 3.

(The audio recording was played.)

Mr. Freed, at the beginning of that clip of audio, did you hear yourself advising someone that Judge Dugan was calling the chief judge?
A. I think so.
Q. Were you able to hear that?
A. Yes.
Q. Okay. Do you know who you were talking with at that point?
A. I'm not sure, maybe Mr. Piel. I'm not sure.
Q. Okay. Are you familiar with a state public defender named Robert or Jack Mueller?
A. Yes.
Q. Okay. Would you recognize his voice?
A. Maybe.
Q. Regardless of whom you're talking to, does that individual

A. Ask that again, please.
Q. Yeah. So if a matter is going to be handled off the record and get a new date --
A. Uh-huh.
Q -- from whom would they get a new date?
A. From me.
Q. And would a defense attorney stay at the defense table or would they walk to your area?
A. It could be either.
Q. In that audio clip there was a direction from the judge to Ms. de la Rosa to "Take your client out and come back and get a date." Did you hear that?
A. Yes.
Q. Were you aware of any reason, other than ICE's presence, for directing an attorney to leave the courtroom and come back by herself?
A. I would be speculating.
Q. Well, what -- okay. What -- why would that happen?
MS. MASNICA: Objection, your Honor. Calls for speculation.
THE COURT: He can answer if he can.
A. Ask the question again, please.
BY MR. FROHLING:
Q. Sure. From your perspective, was there any reason to direct an attorney to leave the courtroom and come back without

Q. Okay. Mr. Freed, I'm going to see if there is something that might refresh your recollection, okay?
A. Okay.
Q. Mr. Freed, I'm going to show you a report and interview, have you read it to yourself and see if that refreshes your recollection.
A. Where do you want me to stop?
Q. Have you read enough to refresh your recollection?
A. I have.
Q. Do you recall seeing Ms. de la Rosa and Eduardo Flores-Ruiz leave through the jury door that morning?
A. I don't recall if I saw them at the moment that they went through the jury door, but I do recall that they went through the jury door.
Q. Okay. Had you ever seen a defendant go through that jury door before?
A. Not that I recall.
Q. And you've been in matters involving over -- I think you said thousands of cases; right?
A. Yes.
Q. And that was the only time you've seen a criminal defendant go through that door?
A. Correct.
Q. Could an attorney or criminal defendant go through that door without permission?

A. Up to the bench?
Q. Yes. Or -- or to -- to make sure that the ADA was participating in the hearing.
A. The judge would typically ask the ADA if they have been compliant with victim notification requirements.
Q. That's something that would be addressed, the ADA would be part of the process.
A. Correct.
Q. And if a case was rescheduled off the record, the Court would make sure that the ADA was okay with those new dates; right?
A. The Court would typically ask if the -- if the victims could appear on that next date.
MR. FROHLING: No further questions.

CROSS-EXAMINATION

BY MS. MASNICA:

Q. All right. Mr. Freed, I just want to start there. So are there occasions in which essentially that a victim is present is missed in misdemeanor court?
A. Occasionally.
Q. Sometimes it's not known to the judge; correct?
A. Correct.
Q. And sometimes the district attorney doesn't know; is that true?
A. Correct.

Q. In this case, in this circumstance, did Melissa Buss tell you that there were victims present at any point that morning?
A. Not that I recall.
Q. Do some district attorneys make that their practice, actually inform you before a case is called that there's victims for a certain case so they don't miss it?
A. Usually there's a victim witness advocate present in court, and they will either notify the court or the ADA that there are alleged victims present.
Q. Okay. And then the ADA is to notify the court, correct, that's the process?
A. That is the process.
Q. Okay. Now, in a situation where there are victims present, I mean, it's still possible and okay to call a case off the record; correct?
A. Correct.
Q. And that occurs in cases both before Judge Dugan and in other cases you've handled when you've covered as a clerk for other judges?
A. Correct.
Q. And we've heard a lot about off-the-record conversation -- or, I'm sorry, off-the-record appearances. That morning on April 18th for the 8:30 calendar, isn't it true that there were ten cases called off the record?
A. In reviewing materials for my testimony, I looked at the

calendar for that day, and I counted nine cases. There was one case that had the same defendant on multiple case numbers.
Q. Okay. So nine defendants, but that one person had two separate cases; correct?
A. I believe it was three or four, actually.
Q. Oh, okay, so a number of matters. All right. So, I mean, even that morning, off-the-records for the 8:30 calendar was not unusual.
A. Not at all.
Q. Okay. Now, at the beginning of that exchange, we saw the transcript up there and we've listened to it a number of times, Judge Dugan starts off and says, "We'll call it right away"; correct?
A. Correct.
Q. And then she asks Ms. de la Rosa, "What's the name of the client? Do we need an interpreter?" You remember just hearing that right now?
A. Yes.
Q. And you say, "Yes." You actually have access to a special dashboard from the Circuit Court Access Program on your computer; correct?
A. Correct.
Q. As a court clerk, you know and there's a special label that's kind of bolded or sticks out that if somebody needs an interpreter, you know that information.

A. Yes. It's in bright yellow at the top of the case.
Q. Okay. So you knew that information right away when Judge Dugan asked because you had pulled the case.
A. Correct.
Q. Okay. And in this circumstance, you had actually even spoken to the interpreter because you were getting prepared for your day before the cases get called on the record -- or, sorry, before the cases get called at all before Judge Dugan gets there, you actually spoke with the interpreter; correct?
A. I may have, but I can't recall specifically whether I did.
Q. Okay. And, I mean, is it fair to say that in Milwaukee County there's a shortage of Spanish-speaking interpreters?
A. Absolutely.
Q. There are many Spanish-speaking defendants and only two or three circuit court certified interpreters; true?
A. No, there are more than that.
Q. Okay. So but in this one, I mean -- or just generally in Milwaukee County, I mean, is it sometimes difficult to get an interpreter there right away?
A. Yes. And sometimes you can't get them at all.
Q. Okay. And in circumstance where there are things that even need to be done off the record, are there examples -- I don't need you to provide them -- but are there situations in which a case even gets completely rescheduled because they don't have an interpreter available for something that needs to be called

Q. Okay. And in Mr. Piel's case, we never heard that audio, but do you recall that morning that Mr. Piel's case did occur on the record, and it actually took quite a while for them to actually schedule the trial because ADA Melissa Buss had to make a phone call to the lab to make sure that that analyst was available?
A. Yes.
Q. And that would have held up, potentially, other cases with maybe public defenders or very busy attorneys that need to get all over the courthouse had that one been called first?
A. Um, yes.
Q. Okay. And that was sometimes what Judge Dugan would do, call cases that were going to be fast first?
A. I don't want to say always, but typically, yes.
Q. And since Judge Dugan and you have not been -- I mean, you have not been Judge Dugan's clerk since April 18; correct? She's not in the courthouse right now; is that true?
A. Well, I believe she was in the courthouse until her arrest --
Q. Okay.
A. -- so...
Q. All right. So for one more week, she was there. But since then, have you been working as a clerk for a number of other judges and even judges that have come over from other counties?
A. Yes.

Q. Okay. And do those judges hold off-the-record court appearances?
A. All the time.
Q. Okay. So this is not something unusual for Judge Dugan or any other judge to call a case off the record?
A. Some judges prefer to call almost everything on the record, other judges prefer to call a lot of cases off the record.
Q. Okay. Now, later on when Judge Dugan was asking -- I mean, we heard about Mr. Piel's case. But Judge Dugan was asking Ms. de la Rosa what the case was for, and she said that it was just another date for a status conference. Is that the type of case that Judge Dugan would have typically -- or would have considered handling off the record?
A. Yes.
Q. And especially if it's a first appearance?
A. If it's a pretrial conference, not necessarily. But if it's a second appearance like a status, yes.
Q. Okay. And when an attorney comes, they have -- you know, the defendant has an attorney, they have discovery, that's something that often happens off the record?
A. If they have those things, yes.
Q. Okay. Now, at any point that morning on April 18th, did anyone tell you that there was a warrant for Eduardo Flores-Ruiz? I mean, did you learn that?
A. At some point, yes.

A. Yes.
Q. Okay. Do you recall who that was?
A. Yes.
Q. Who was that?
A. Connor Mathias.
Q. What does Connor Mathias do for a living?
A. He is a public defender with my office.
Q. Okay. So one of your colleagues?
A. Yes.
Q. Did you ask Mr. Mathias anything?
A. I remember asking him where, and he said he didn't know.
Q. Did you know at the time whether your client was primarily Spanish speaking or English speaking?
A. Yes.
Q. Which -- which language was his first language?
A. Spanish.
Q. Did the fact that your client's first language was Spanish and ICE was present cause you any concern?
A. Yes.
Q. What was that?
A. When -- when my client is a Spanish speaker, I always approach ICE with a little bit of caution. I try not to ask my clients their immigration information and so, in general, just kind of go off of that anybody, even if they are a citizen themselves, would be a little bit afraid or concerned about ICE

being present.
Q. And did you share that concern? I mean, your clients may be concerned, and you are concerned; is that accurate?
A. I would say that was accurate, yes.
Q. After you made contact with your client, do you both enter the courtroom?
A. Yes.
Q. Was Judge Dugan on the bench at that point?
A. Not that I recall.
Q. When you enter the courtroom with your client, where did you go?
A. We -- I had him sitting in the back row, and I was talking to him and explaining to him what a status conference was and just kind of -- it was the first time I had met him at the courthouse, so kind of just explaining how these things go.
Q. Okay. Was there anyone seated at the defense table when you went into the courtroom with your client?
A. Yes.
Q. Was there already someone there?
A. Yes.
Q. Okay. You didn't push your way to the front and ask that person to move?
A. No, I don't think so.
Q. Is that something you would do?
A. Probably not.

yes.
Q. And you had sort of made a face there, your reaction. Were -- what -- you had just had an experience where you knew ICE was in -- somewhere on the sixth floor; correct?
A. Yes.
Q. And you were concerned because you had a Spanish-speaking client; right?
A. Yes.
Q. And then you're waved through a door into an area where you've never been?
A. Yes.
Q. Okay. Were you -- what was your reaction at that point?
A. Not graceful. I kind of remember being scared and freaked out because, to the best of my memory, when we use side doors it's either that you don't -- it was unusual, and so I was freaked out. I didn't know what was going to be on the other side of the door.
Q. And this is after your client's hearing or matter has already been addressed in court; right?
A. Correct.
Q. Had you ever had a judge directing you somewhere after your case was concluded?
A. Yes.
Q. In a situation where ICE is in the hallway?
A. Sorry, I'm thinking back over the last two years. I don't

believe so. I don't -- not ICE specifically. Other instances, yes, but not ICE.

Q. Other instances of law enforcement being present?

A. I -- I'm going to say no. I don't remember everything perfectly from the last two years prior and the two -- like this year even, but I would say probably not.

Q. Okay. You indicated you were freaking out a bit at that point; is that right?

A. Yes. My brain was spinning. I -- I'd been speaking in two languages and then also it was -- it was Good Friday, so I hadn't had any coffee or food that day; so, yeah, fair to say I was a little freaked out.

Q. So there was a lot going on and an unusual day for you?

A. Yes.

Q. And were you at one point told by Judge Dugan to listen to her when she's talking to you?

A. Yes. I think at the beginning when I wasn't very good at responding to her when she said my name, like --

Q. Was that in the hallway?

A. Yes, I think so, as we were like going through.

Q. Okay. So that wasn't in the courtroom during the hearing when you weren't responding to your name, it was in the hallway or when you were going through the door when Judge Dugan said to listen to her; right?

A. Yes, that's right.

Q. When you're in the hallway, does Judge Dugan mention Zoom to you?
A. I think so. I think she said, "You -- everybody can use Zoom," something like that.
Q. So you're going through the jury door that day, and you're advised that you can use Zoom; is that right?
A. Yes.
Q. Does Judge Dugan accompany you down the hallway at all?
A. Like a couple steps.
Q. Doesn't go all the way down the hallway with you though?
A. No.
Q. And you indicated you exit back out into the public hallway; is that right?
A. Yes.
Q. As of April 18th, did you know that there was an entrance to the stairs from that private hallway?
A. No.
Q. Did you think that was another office or some other area?
A. Yes.
Q. When you get out into the public hallway, what do you do?
A. I was immediately trying to identify if his ride was there, and then we exited down the elevators and out through the building.
Q. Okay. And you were hoping his ride was there because you had concerns because ICE was there; is that right?

Q. Okay. I want to look at 1008, and this is the comparison of Government Exhibit 42A that includes the conversation at the same time about down the stairs.
A. Yes.
Q. Were you a part of any conversation about going downstairs?
A. No.
Q. Did anyone ever tell you to go downstairs?
A. No.
Q. Did anyone ever communicate to you that there were stairs?
A. No.
Q. When you were in the hallway with Judge Dugan, did she point -- you said she was being demonstrative.
A. Yes. She pointed down the hallway with like a straight hand.
Q. Okay. Did she ever indicate that you should turn left?
A. No.
Q. Now, when you were having this conversation about off the record in the courtroom, could you hear -- could you hear the judge on the microphone?
A. On the record, yes.
Q. I mean --
A. But --
Q. There's a speaker system in the courtroom; right?
A. Yes.
Q. The hearing was technically off the record, but it's the

same speaker; right?
A. Correct.
Q. Did you do anything to exclude the assistant district attorney?
A. No. No.
Q. You were asked about your experience with alternative exits, and you sort of said you had something in Racine?
A. Yes.
Q. What did that involve?
A. I -- I remember in Racine at least once having -- so I'm a defense attorney. I had a very emotional alleged victim. They had come up to give a speech, and they kind of -- I don't remember exactly what happened, if they lunged or something, but to keep decorum what the judge did is he had defense get up from the table and escorted us out the side door in the Racine County Courthouse. And that was to keep us separate, and the deputies were, you know, managing the situation in the courtroom.
Q. Okay. I want to go back into the private hallway, okay. And I want -- I want to play for you a visual of Exhibit 221, which I believe you've been shown before regarding the walk down the hallway, okay?
A. Okay.
MR. BISKUPIC: And, Judge, if I could publish that to the jury.

MR. FROHLING: No objection.

(The video recording was played.)

MR. BISKUPIC: Okay. I want to stop, and you can go back. Can we replay it.

BY MR. BISKUPIC:

Q. And could you tell us to the best of your recollection how far down the hall Judge Dugan went with you.

A. Sure.

(The video recording is playing.)

Like right about here at the most.

Q. Okay.

A. I don't even think she made it to this window.

Q. To the next window?

A. Yeah, to the -- I'm assuming this is a window here because it's -- there's a light.

Q. And what are you guys talking about in the hallway?

A. So I don't remember every word by word; but I remember, you know, kind of a -- I took it as a mentoring moment of like, hey --

Q. Let me stop you there. Why did you take it as a mentoring moment?

A. I was a new attorney, and I had known Judge Dugan from AWL.

Q. What's AWL?

A. Association of Women Lawyers.

Q. Okay. And you had interacted with her at that

organization?
A. Yes. She'd been a mentor there and had been a mentor to many like young women attorneys.
Q. And did you believe that your experience in the hallway was similar to her other mentoring efforts with you?
A. I would say so. You know, when I've had addressed before ways that I could improve or like things like that, rather than having it in front of a whole courtroom, sometimes my judge in Racine would pull me to the side and say, "Hey, don't do it like this, do it like that."
Q. Why did you think it was a mentoring moment?
A. Because I -- because I had kind of shown myself to be in a hurry, and then I think as she was -- I took it as: Don't tell me you're in a hurry and you've got to go and then not be ready on the spot.
Q. When you went out into the hallway, did you take any effort to run or flee?
A. No. I'm not good at running, so definitely not.
Q. Did you -- did you see any agents?
A. Not that I recognized.
Q. Okay. You later came to know that there were agents there?
A. Yes.
Q. You've had to meet with the FBI a bunch of times; right?
A. Yes.
Q. Can you tell us how many hours you've had to spend with the

Q. A lot or more than 50 times or so or how many times?
A. Yeah, I think more than -- I've been in front of her more than 50 times, I think.
Q. I want to turn your attention now to the morning of April 18th. Were you scheduled to be before Judge Dugan that morning?
A. I was.
Q. Do you remember for what reason?
A. It was a status, I think, a status or they sometimes call it a pretrial conference in Milwaukee.
Q. And did you have to be somewhere else that morning as well?
A. I did. I had to be in Dane County in a sentencing hearing for a felony case at 10:00 a.m.
Q. So did you want to get called first that morning?
A. I did. I left early so I could get -- try to get called first.
Q. Do you remember approximately when you arrived that morning, then?
A. Sometime between, you know, 8:00 and 8:15 I'm thinking.
Q. And did your case get called that morning first initially?
A. It did initially get called first where I was asked to step up to the bench.
Q. Okay.
A. Or to the table, not the bench, I'm sorry.
Q. I'm going to play for you about forty seconds of a -- of an

audio.

(The audio recording was played.)

Did you hear Judge Dugan address you that morning?
A. I did.
Q. And did you hear her say, "Okay. We'll call that case."
A. I did.
Q. What did you expect was going to happen next?
A. I thought that our case would be called.
Q. After that, did you hear a conversation between her clerk and Judge Dugan --
A. I --
Q. -- at that time?
A. I don't know if I heard the conversation. I don't remember hearing any other conversation.
Q. Do you remember her leaving the bench shortly after she said she'd call your case?
A. I do.
Q. And what did you do after that? Did she -- she left the bench. Where were you sitting at that time?
A. I think I was still sitting at counsel table at that point. And then at some point, I was told to step back.
Q. You -- do you remember approximately how long you were there at counsel table?
A. It was just -- it wasn't more than minutes, I'm assuming a few minutes.

Q. You want to get there first to get your case called first; right?
A. I want to, yeah. It doesn't always happen that way.
Q. Okay.
A. In many courts, sometimes there's other cases that are pressing more than mine, so...
Q. Okay. Have there times where you've jumped ahead of others?
A. I have.
Q. And there are times -- other times where others have jumped ahead of you?
A. Absolutely.
Q. Did you tell Judge Dugan you needed to be in Madison?
A. I didn't.
Q. How many off-the-records do you think you've done in Milwaukee County in your 31, 32 years?
A. I can't count how many. We've done a lot.
Q. Hundreds?
A. Hundreds, yeah. Different judges do different things, you know, so, yeah, I've done, you know, hundreds off the record. I've probably done three this week.
Q. Have -- you said you've -- you personally have gone out the side entrance that was identified on the pictures; correct?
A. Yeah, I have. If you ask me to remember when I did it, I couldn't tell you that, but I have.

Q. Okay. Were you concerned about someone hearing the conversation about down the stairs?
A. Perhaps.
Q. Okay. Who was the first person to bring up the stairs?
A. The judge.
Q. Okay. And you respond -- is it accurate to say you respond sort of positively to that suggestion?
A. It was more directionally.
Q. What does that mean?
A. Like where?
Q. She says something about down the stairs, and you go, "Oh, yeah, yeah, down the stairs."
A. Right.
Q. How would you describe that reaction?
A. To clarify.
Q. What were you trying to clarify?
A. That she meant the stairway leading to the downstairs versus the hallway.
Q. Okay. So you can access stairs that go down via a door in the nonpublic jury -- the restricted hallway; right?
A. Yes.
Q. And, in fact, there's only one door behind the courtroom that leads to a stairwell that goes down; isn't that a fact?
A. Correct.
Q. There's some stairs that go up to a jury room, but there's

only one door that leads to stairs that go down.
A. Correct.
Q. Did you hear yourself -- did you hear yourself offer to show somebody -- "Do you want me to show them, or does she know," do you recall that?
A. Yes.
Q. Who are you talking about?
A. The people that she was discussing with. At that moment, I hadn't digested their names.
Q. Okay. And so you -- are you talking about -- describe who you think that you're talking about.
A. Her -- the attorney and her client.
Q. Which attorney?
A. At the time I did not know her name.
Q. Do you now?
A. Now I know that it is Attorney de la Rosa.
Q. Okay. So as you're talking about down the stairs and you ask Judge Dugan, "Do you want me to show them, or does she know," you're referring to Ms. de la Rosa -- Attorney de la Rosa?
A. Yes.
Q. Okay. Was Attorney de la Rosa a relatively new defense attorney in --
A. Correct.
Q -- in Milwaukee?

Okay. I know you're anxious to answer correctly. We've got to be -- as a court reporter you should know, we've got to take time. And if you could answer after I'm finished with my question, that would be great.

She's a relatively new defense attorney at that time?

A. She was.

Q. And so when you're offing to show her, what are you offering to show Ms. de la Rosa?

A. Which direction to go.

Q. To where?

A. To downstairs.

Q. Okay. And the concern is she might not know, as a new attorney in the Milwaukee County Courthouse, which door to go out?

A. Correct.

Q. And why was that a concern?

MS. MASNICA: Objection, relevance.

THE COURT: I'll allow it.

A. Can you rephrase it?

BY MS. WATZKA:

Q. Sure. Why would you be concerned about Ms. de la Rosa going out the wrong door?

A. I was being helpful.

Q. Okay. And the wrong door would be which door?

A. The hallway door.

Q. The door to the public hallway would be the wrong door?
A. Sure. Yes.
Q. Well, yes or no?
A. Yes.
Q. Okay. And the door to the stairs would be the right door?
A. Yes.
Q. And what's wrong about the door to the public hallway?
A. At that moment, I did not know.
Q. Well, you're volunteering to show her so she doesn't go out the wrong door.
A. To show someone to the door, whatever door is needed.
Q. Okay. What were you concerned might happen if they went out the wrong door?
A. They could meet the ICE people.
Q. I'm going to continue with the recording.

(The audio recording was played.)

Let me just stop it there. So that's the second time that you're asking Judge Dugan, "Do you want me to show them. I don't know what she knows. She might go out the wrong door." Right?
A. Correct.
Q. And you're seeking Judge Dugan's permission to show them the right door?
A. Yes.
Q. And, again, what's the wrong door?

A. The door that doesn't lead downstairs.
Q. And did you hear -- how did Judge Dugan respond to your offer to show them the right door?
A. She said she would.
Q. She said she would, and she'd get the heat; right?
A. Yes.
Q. And then you respond, and you kind of laugh and say, "I'd rather get in trouble"; right?
A. Yes.
Q. What -- what's the concern about getting in trouble?
MS. MASNICA: Objection, relevance.
THE COURT: I'll allow it.
A. Repeat it, please.
BY MS. WATZKA:
Q. Why would you be concerned about getting in trouble for showing somebody the right door?
A. At the time, I just wanted to show whatever needed to be done.
Q. But this isn't about being helpful at this point. This is about avoiding -- either avoiding trouble or getting in trouble for showing them the right door. So why would you get in trouble for showing them the right door, the one that goes down the stairs?
MS. MASNICA: Objection, speculation.
MS. WATZKA: She can answer to her own state of mind.

THE COURT: Yeah, I'll allow it.
A. My own state of mind truly was directionally.
BY MS. WATZKA:
Q. You knew ICE was in the public hallway; right?
A. But that wasn't my concern at the moment.
Q. What was your concern at the moment?
A. To get my work done and get things moving.
Q. But that's not what you said; right? You said twice, "Can I show them? I don't know what she knows. She might go out the wrong door." That was an important concern of yours; right?
A. Yes.
Q. Because it would be a concern and a problem if they went out the wrong door; right?
A. Sure. Yes.
Q. And the wrong door would lead them into the public hallway where ICE was?
A. Yes.
Q. And that could be a concern?
A. Yes.
Q. So you wanted to make sure you twice volunteered, you twice sought permission from Judge Dugan to take them to the right door; correct?
A. Correct.
Q. The door -- the right door that goes down the stairs and

away from the ICE agents?
A. Fair.
Q. And you offered to do it --
MS. MASNICA: Your Honor, I'm going to object at this point to leading. This is direct examination.
THE COURT: Can you avoid that.
MS. WATZKA: Sure.
BY MS. WATZKA:
Q. What were you hoping to avoid by showing them the right door?
MS. MASNICA: Your Honor, I'd object. This is cumulative. She's been asked probably five times the same question.
THE COURT: Sustained.
MS. WATZKA: I don't believe I've had an answer to this.
BY MS. WATZKA:
Q. What trouble were you trying to avoid?
MS. MASNICA: Objection, same.
THE COURT: Yeah, sustained.
BY MS. WATZKA:
Q. All right. After this whispering conversation about going down the stairs, what did Judge Dugan do with respect to the person you now know to be Ms. de la Rosa and her client?
A. She led them around the corner to the hallway.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Volume 4 |
| | ) | Case No. 25-CR-89 |
| v. | ) | Milwaukee, WI |
| HANNAH C. DUGAN, Defendant. | ) | December 18, 2025 9:05 a.m. |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff UNITED STATES OF AMERICA:
United States Dept. of Justice (ED-WI)
By: MR. RICHARD G. FROHLING
MS. KELLY BROWN WATZKA
MR. KEITH S. ALEXANDER
Office of the US Attorney
517 E. Wisconsin Ave., Rm. 530
Milwaukee, WI 53202
Ph: 414-297-1775
richard.frohling@usdoj.gov
kelly.watzka@usdoj.gov
keith.alexander@usdoj.gov

For the Defendant HANNAH C. DUGAN: (Present)
Steven Biskupic Law Office, LLC
By: MR. STEVEN M. BISKUPIC
PO Box 456
Thiensville, WI 53092
Ph: 414-828-7233
bisklaw@outlook.com

Gimbel, Reilly, Guerin & Brown
By: MR. JASON D. LUCZAK
MS. NICOLE M. MASNICA
330 E. Kilbourn Ave., Ste. 1170
Milwaukee, WI 53202
Ph: 414-224-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com



U.S. Official Court Reporter: JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript produced by computer-aided transcription.

# I N D E X

## WITNESSES


| ALL WITNESSES: | PAGE: |
|---|---|
| For the Defense: | |
| KATIE KEGEL: | |
| Direct Examination by Mr. Biskupic | 779 |
| Cross-Examination by Mr. Alexander | 783 |
| LAURA GRAMLING PEREZ: | |
| Direct Examination by Mr. Biskupic | 786 |
| Cross-Examination by Mr. Alexander | 795 |
| MAURA GINGERICH: | |
| Direct Examination by Mr. Biskupic | 805 |
| Cross-Examination by Mr. Frohling | 807 |
| Redirect Examination by Mr. Biskupic | 810 |
| THOMAS BARRETT: | |
| Direct Examination by Mr. Biskupic | 811 |
| Cross-Examination by Mr. Frohling | 814 |


## EXHIBITS


| EXHIBIT RECEIVED: | PAGE: |
|---|---|
| For the Defense: | |
| No. 202 | 780 |
| No. 210 | 788 |
| **CLOSING ARGUMENTS:** | **PAGE:** |
| by Ms. Watzka | 817 |
| by Mr. Luczak | 841 |
| by Mr. Frohling | 875 |
| **JURY INSTRUCTIONS:** | **PAGE:** |
| by the Court | 894 |
| **JURY QUESTIONS:** | **PAGE:** |
| by the Court | 908 |
| by the Court | 909 |
| by the Court | 919 |
| **VERDICT RECEIVED:** | **PAGE:** |
| by the Court | 927 |

Q. And is that -- the PowerPoint that you're referring to is that the same PowerPoint I just presented to you, Exhibit 210?

A. Yes. The PowerPoint was one of various things at that link.

Q. Okay. Why don't we -- since we've heard about it already, can you read the second paragraph.

A. Sure. "Two quick takeaways: One, ICE can legally conduct enforcement, i.e., take people into custody, in public areas of the courthouse. Two, there are statutory and policy limitations to such enforcement, including a federal law prohibition against conducting enforcement in courthouses against victims appearing in cases involving a protective order, child custody, or cases related to DV, sex assault, trafficking, stalking, and certain other crimes."

Q. And the last paragraph?

A. "It sounds like the detentions described by the chief fall within the law and policies. However, I would strongly advise that we develop a court-wide policy governing ICE actions in both of our courthouses, including requiring that ICE agents check in with the chief judge before conducting any enforcement. Such a requirement is consistent with current federal ICE policy, which requires ICE actions in courthouses to be taken collaboratively with court staff. That policy was enacted on January 21st, 2025, i.e., by the current administration."

Q. Okay. If you would then page forward. We've already heard about the e-mails of the other two people, and it seems at some point the e-mail chain kind of branches off. I want to look -- direct your attention to the e-mail from Judge Stark.
A. Yes.
Q. Milwaukee County judge; right?
A. Yes.
Q. Okay. Would you please read her e-mail.
A. "Thank you, Laura, for the link to the presentation and for highlighting important points from it. Thank you, Carl, for issuing a statement about this issue. Carl, what are your thoughts about Laura's suggestion that we develop a court-wide policy governing ICE actions in both of our courthouses, including requiring that ICE agents check in with the chief judge before conducting any enforcement? Regards, Carolina."
Q. Okay. And then the e-mail on top of that is Judge Kies -- "Kies"?
A. "Kies," uh-huh.
Q. It's "Kies"; right?
A. "Kies."
Q. Okay. And would you please read her e-mail.
A. "I forgot an item in my car. I walked out to get the item and saw an ICE squad parked on Tenth Street in front of the courthouse a little while ago. Jean Kies."
Q. Okay. And then if we go to the front page of the exhibit,

you have a response from Hannah Dugan; correct?
A. Yes.
Q. Okay. Would you please read that into the record.
A. Sure. "Good morning. Thanks for the information about incidents and concerns about ICE in the courthouse. And thanks to Laura GP for her information and to CJ Ashley for the public statement. In the various e-mails, state arrests in the courthouse have been discussed as different, but even they have qualifications and at least under -- at least understood and informal, if not required, protocols. The ICE detentions are a different animal, and currently the historic protocols are now shifting quickly.

"I have seen in my court more people not showing up for court dates. I have had two immigration attorneys asking me just today what the prot -- what protocols are in place. I am suggesting that a judge's meeting be called with corporation counsel as soon as possible. It would be helpful to me and I hope other judges and by extension to the public and other county staff and electeds to have a discussion with each other about the outstanding issues, identify the concerns to be addressed, and develop a consistent set of protocols to be implemented and followed in the Milwaukee circuit courts.

"Optimally, it would be great to have at least a draft of written protocols for the Safety Building, the courthouse, and for children's court. We are in some uncharted waters with

8th at 12:46; correct?
A. That is what it says, yes.
Q. And she and others, including yourself, asked that maybe we develop a draft policy; correct?
A. I had asked that previously, yes.
Q. Okay. And Judge Ashley the next morning at 6:30 sends out a draft policy in Exhibit 8 in front of you there; is that correct?
A. It looks like he did. Again, I was gone that week, so I didn't see it at the time.
Q. I understand. And then in Exhibit 9, he sends a revised draft policy. Do you see that?
A. I do, yes.
Q. Okay. You've read through this draft policy?
A. I took a quick read through it when I returned from vacation. I haven't -- I don't think I've read through it since then.
Q. You thanked the chief judge for it, didn't you?
A. I did.
Q. You told him it was a solid policy, didn't you?
A. I did. I said thanks for putting it in place, I think it's a decent policy.
Q. Okay.
A. I don't know if I used the word "solid," but I said something like that.

Q. Is there anything in this policy that prohibits ICE from conducting an arrest in the public hallway?
A. I'd have to read through the -- I don't know. I'd have read through the whole thing.
Q. You don't know?
A. I mean, not at this point. I -- this -- this policy was never actually put in place, so I can tell you I haven't really focused on it since the draft was circulated. Again, I was encouraging the chief judge to put a policy in place, so I responded basically to say, hey, thanks for putting this draft policy together. But this was never made the policy, so I just haven't focused on it since then.
Q. Okay. But you told him it was a solid policy; correct?
A. Something like that.
Q. I'm going to zoom in to a portion of that policy. Do you remember the questions I asked earlier about whether the Milwaukee County Courthouse would allow ICE arrests in nonpublic areas? Do you remember me asking you that?
A. Yes, I do.
Q. Okay. Can you read the first portion -- well, here, I'll just ask you: Does it say in the portion that I zoomed in, "Court personnel may not authorize the entry of immigration agency personnel into the nonpublic areas of any court facility." Is that accurate statement of the policy?
A. I mean, that's what that sentence read.

Q. Okay. And if they do, they must promptly refer immigration personnel to their immediate supervisor or manager. Do you see that?
A. That is what it says, yes.
Q. Okay. So based on this draft policy, immigration enforcement cannot -- or the Milwaukee County Courthouse will not allow ICE to arrest in a nonpublic area; is that accurate?
A. It says court personnel may not authorize the entry of immigration agency personnel into nonpublic areas of any court facility.
Q. Okay.
A. And says that they should be referred to their immediate supervisor or manager. That -- it -- I think the -- yeah. I mean, I -- that's what those words say.
Q. Okay. And this policy is not in effect currently; correct?
A. This policy was never finalized, no.
Q. There's no policy currently?
A. The chief judge hasn't issued a policy. Again, the county issued a policy. I'm not sure who exactly at the county, and that governs -- my understanding is that that governs activities on county property. We haven't really had a discussion about exactly how that affects the courts.
MR. ALEXANDER: I have nothing further, your Honor.
MR. BISKUPIC: Nothing further, Judge.
THE COURT: Thank you. You're excused.

the coast was clear.

Second, the escape route. After rushing Mr. Flores-Ruiz's case through, she provided an escape route for him out of her courtroom. She ushered a criminal defendant through a back door and a restricted hallway, one that is never used by the public or defendants like Mr. Flores-Ruiz, a hallway that offered an escape route via the stairwell or the restricted access door.

The reality is the defendant's crimes were complete the minute she ushered Mr. Flores-Ruiz and his attorney into that hallway, where they most certainly were out of sight, especially after she made sure every member of the arrest team that she had identified was otherwise occupied and away from her courtroom. It simply does not matter what happened next.

Finally, Count 1 requires proof that the defendant intended to prevent Mr. Flores-Ruiz's arrest. This gets to the why issue I mentioned before. And, frankly, there is a lot of overlapping evidence that I will discuss with you in greater detail regarding the defendant's state of mind. For now, let me highlight some of the things that prove her intent to help Mr. Flores-Ruiz avoid arrest.

Mr. Alexander told you in opening statements that April 18th was not a routine day in Judge Dugan's court, and that is certainly true. This was a rush job. After the agents roundup, she returns to her courtroom on a mission. Listen to

the recording. She's out of breath. She's speaking very quickly, sometimes talking over people. She's insistent that things move fast.

This was a case that would a normally require an interpreter, but there was no time to wait for one to arrive. She doesn't bother to involve the assistant district attorney, one of the parties to the case. She doesn't take the time to ask about victim notifications, even though three counts of battery means there must have been victims. In fact, they were sitting in the back of her courtroom where they waited for an hour not understanding why the case had not been called.

And you heard recordings that less than 15 minutes after she ushers Mr. Flores-Ruiz out the door, she tells an Attorney Valverde to make sure to check with ADA Buss about whether his case needed to be called because she makes sure that the cases are called when victims are present. That's how cases involving victims were usually handled in Judge Dugan's court.

And then we have this exchange: "Okay" -- here's where my eyes fail me; I have to do this to read -- "Okay. Get a date off the record right now. Ms. de la Rosa, get a date off the record. Stay right there. Ms. de la Rosa, take your client out and come back and get another date."

When things weren't moving fast enough, she directed Attorney de la Rosa to take her client out and come back and get a date. Why would she say such a thing? Her court staff

is sufficient. She knew Officer Vasconcellos had a warrant. She may not have seen the warrant, because she didn't really give Officer Vasconcellos an opportunity to present it to her. And she certainly didn't walk into the chief judge's office to examine it. But she clearly knew he had an administrative warrant because that was the focus of her interaction with Officer Vasconcellos, and that was what she told her clerk, Alan Freed, later that morning.

Next, we must prove that the defendant endeavored to influence, obstruct, or impede the pending proceeding. And I believe Judge Adelman will tell you that "endeavored" means simply acting purposefully with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding and that an endeavor need not be successful.

So what was the endeavor that the defendant was trying to obstruct? The arrest team's ability to execute the I-200 warrant. And how did she do it? Well, first, she purposefully interfered with their arrest plan. Mr. Flores-Ruiz was exactly the type of person that ICE ERO targeted for courthouse enforcement actions. He had previously been removed from the United States. He was back, and he was now charged with committing violent crimes against three individuals.

Officer Vasconcellos assessed, and his supervisor Anthony Nimtz agreed, that the arrest warranted the participation of six officers and agents and that that size was not unusual for

this type of operation. You heard time and time again, perhaps too frequently in hindsight, that safety was their top priority. But those of us who have never been in the shoes of someone like Officer Vasconcellos really have no business second-guessing that call. Someone who had been stabbed, shot at, and sustained other serious injuries from suspects who have resisted or fled is in the best position to decide what's best for the arrest plan for someone like Mr. Flores-Ruiz.

So this is their team. And this is how she methodically redirected them away from her courtroom and ultimately succeeded in separating them. First, Officer Vasconcellos is ordered out of the hallway, then Special Agent Jackling, next Officer Zuraw -- who as you may recall was told to get out -- then Special Agent Baker, finally, Special Agent Ayers, leaving behind Special Agent Spitaletto, who was the only agent who was not identified by the defendant.

She not only physically separated them from their planned area of arrest and each other, she sowed confusion. She ordered at least one of them to leave. She told them they couldn't be in the public hallway. She suggested they weren't authorized to arrest there, even though for reasons we'll discuss later, she knew that wasn't true.

Defense counsel has suggested that the arrest team canceled their plans and that there really was no longer a plan to arrest. That's nonsense, and you should reject that argument.

The -- the arrest team members were reacting in real time to a very fluid situation created by the defendant. Their plan was to arrest, if possible, notwithstanding the defendant's interference. To the extent they had doubts about whether it would happen, those doubts were caused by the defendant's obstruction.

You will no doubt hear that Special Agent Ayers could have arrested Mr. Flores-Ruiz when he walked past him with his attorney. Again, that is a call only a law enforcement officer can make in the moment. Federal officers and law enforcement agents don't arrest alone unless they absolutely have to. They wait for backup. There were other members of the public in the hallway at that time, and there was no way that Special Agent Ayers could guarantee he could control the situation if Flores-Ruiz had fought or if he fled.

And by the time agent Spitaletto caught up with Agent Ayers, he was already on the elevator with Mr. Flores-Ruiz and his attorney. The defendant not only endeavored, she succeeded in obstructing this arrest. Those agents and officers were most certainly obstructed. A foot chase outside in the pouring rain with Mr. Flores running into moving traffic and the agents following suit was not only not what they had planned, it was dangerous, very dangerous.

And then after this, she rushes Mr. Flores-Ruiz's matter. She whispers about taking him out a back door and directing him

down the stairs and ushering through a back door into a restricted hallway. All of those facts are also evidence of the defendant's endeavor to obstruct this arrest.

The final element of Count 2 requires proof that the defendant acted corruptly, that is, with a purpose of wrongfully impeding the proceeding. "Corruptly" means acting with an improper purpose, personally or by influencing another, including by making a false or misleading statement.

Once again, this relates to the why of it all. The defense would have you believe that the defendant's actions were the result of confusion, anger, and even paranoia, which were the words Mr. Biskupic used in his opening statement. I'll agree with him about the anger. But the evidence has shown that the defendant was not a confused or paranoid judge who was simply doing her best to live up to the expectations of the chief judge. Rather, she was a frustrated and angry judge, who was fed up, and decided to corruptly take matters into her own hands.

Let me go back. While ICE enforcement activities at the courthouse caused considerable concern and debate, it's clear that ICE was authorized to arrest in the public places within the courthouse, and the defendant knew it. Just 16 days prior to the events of April 18th, her colleague, Judge Gramling Perez, forwarded an e-mail to her which discussed the benefits of developing a court-wide protocol. And in that e-mail, Judge

Gramling Perez suggested Milwaukee County could determine whether ICE officials are limited to being in public spaces or whether we would prefer to take them into nonpublic areas to arrest. In other words, they're already allowed to arrest in the public spaces; but maybe we should consider more or something different?

Just 14 days before April 18th, the same judge forwarded information about training she had taken, including the takeaway that ICE can legally conduct enforcement in public areas of the courthouse. It could not be more clear. There's a second sentence of that letter. You can take a look at it. It suggests that there were some limitations on when they could do that. All of those limitations applied to circumstances not relevant here. All of those limitations apply to circumstances when ICE or if ICE would seek to arrest a victim of crime. Mr. Flores-Ruiz was a criminal defendant.

We know that Judge Dugan received that information because a few days later, she thanked her colleague for providing it, but then went on to express her dissatisfaction and her concerns about the situation. She wrote an impassioned e-mail outlining her concerns and requesting a meeting with all of the judges. No confusion here, just frustration.

You heard a lot of talk about draft policies in this case. And defense counsel has tried to suggest to you in their opening statement and in their lines of questioning that there

was some sort of interim policy in effect, that there were certain requirements in place that the defendant was merely trying to comply with.

You heard no such evidence in this case. In fact, the opposite is true. There was no policy in effect on April 18th, nor was there an interim policy or anything in place that required the defendant to do anything, much less direct all members of an ICE arrest team to the chief judge's office. There was also no law that prevented law enforcement, including ICE, from arresting in public spaces. That was true on April 18th, and it's true now. Judge Ashley knew that. District Court Administrator Stephanie Garbo knew that. Milwaukee County Sheriff's Sergeant Dave DeSmet knew that. Judge Gramling Perez knew that, and the defendant knew that.

So how else do we know that the defendant acted corruptly? Well, you need look no further than her words and her actions. After her clerk told her that ICE was in the hallway, the defendant didn't take up the offer he made to contact the chief judge or others. Instead, she made a decision. And once she locked in on what she wanted to do, she was on a mission. This wasn't confusion. This wasn't a misunderstanding. This was a plan, and she was going to enforce her will, and she wasn't going to wait any longer for the chief judge to do something about ICE.

So what happened next? She commandeered an unwitting

participant in her plan, Judge Cervera. She disrupted proceedings in Judge Cervera's courtroom, directed her to come off the bench, told her to keep her robe on, said something about ICE, Flores, and checking for a warrant, and then roped her into confronting agents in the hallway. And why? Because two robes were certainly better than one, and the defendant was interested in her own show of force.

Judge Cervera was confused. Is this someone on my docket? Why does this concern me? You can see it in her hesitation in entering the hallway in her robe. You can see it in how she lags behind the defendant who leads her into the hallway and to the officers. And you can tell from her demeanor here in court she was genuinely unsure of why she had been put in the middle of all of this. But she was nevertheless trying to be helpful and tone the situation down.

She told you that her heart sank when she realized she would be going into the public hall in her judicial robe. She understood the kind of attention that would draw, and she was not looking to cause a scene. Nobody wears judicial robes in the public hallways, except on rare special circumstances.

Judge Cervera and all of the arresting members who testified were universal in their assessment of the defendant's demeanor and tone. She was stern, angry, and issuing orders. And she literally abandoned Judge Cervera. She used her to occupy the officers' attention in the chief judge's area so she

could simultaneously rush Mr. Flores-Ruiz's case.

If -- ask yourselves this: If the defendant is legitimately confused about protocol and policy, she had the perfect opportunity that morning to address it. She could have walked right into the chief judge's office, spoken with the chief judge, spoken with the district court administrator, spoken with the officers. They could have hashed it all out right there. She certainly had a captive audience.

So why doesn't she do that? Why doesn't she accompany everyone to the chief judge's office? Why doesn't she ask to see the warrant for herself? The answer is simple. That wasn't her concern. She was too busy hightailing it back to her courtroom to facilitate Mr. Flores-Ruiz's escape.

"I'll do it. I'll get the heat." Those are not the words of someone who thought she was following the guidance of the chief judge. Those are the words of someone who knew in that moment she was crossing the line. "I'm in the doghouse with Carl because I tried to help that guy." Those are not the words of someone who earnestly thought she had only done what was expected of her. Those are the words of someone who understood she had done something wrong.

Importantly, the defendant spoke those words without ever having talked to the chief judge about the events of April 18th. You may recall there was some testimony about the chief judge reaching out, she doesn't respond, and then eventually he

changes her mind -- changes his mind and says, never mind, I don't need to talk to you anymore. They never even spoke about the events, but she didn't need to talk to him. She knew.

And what did she do? What did she try to help that guy do? Do what judges shouldn't do, help defendants avoid arrest. All of this evidence points to one conclusion: She acted corruptly. Nothing in the evidence before you supports the conclusion that the defendant didn't have enough information or guidance to understand what ICE was authorized to do in the public hallway.

Sure, she wanted a policy. She made that clear. We also know that she felt very strongly about this issue. And it seems she didn't think that Chief Judge Ashley was acting quickly enough. But I submit to you it was also becoming increasingly clear to her she wasn't going to get the policy that she wanted. No policy was ever going to say ICE can't come in the courthouse. It's a public building. She knew that.

That wasn't a point of confusion. She just didn't agree with it. It frustrated her, made her angry because she didn't like ICE. And she is 100 percent entitled to those opinions. What she is not entitled to do, especially as a judge who took an oath to uphold the law, is to commit acts designed to circumvent and undermine federal law enforcement officers who were lawfully present in a public place peacefully attempting

in this case.

And why do we know about that at trial? Oh, it's because the agents preserved their communications and they were provided to the defense. Oh, about those text messages, too, did you know some of them had logos or photos associated with them? I think you recall the questions were to Special Agent Jackling about photos that other members of that text chain used, including one that looked really nefarious, looked like a skull with maybe some things crossed. Take a look at that on the exhibits. It's a pill bottle and some syringes. It's the logo of the Milwaukee Opioid Task Force, which is what Special Agent Ayers told you. Just another distraction.

You heard the FBI should have used -- tested the microphones. And today: It would have been so easy to adjust things up or down. Well, let's not say "adjust things up and down." Let's say "manipulated" or "enhanced" in air quotes. There is no testimony, no evidence, that those recordings are anything other than what was said in that courtroom.

And more importantly, none of that has any bearing on what the defendant did and what the evidence shows regarding her conduct and intent on April 18th. So that one's out, too.

Next one, judges get to decide things like what cases are called in what order. It's true. Judges do get to do that. They can decide which case to call, who can use a hallway, whether arrests can be made in their courtroom, who can cut the

line. But that doesn't shed any light on the elements of the offenses that these instructions from Judge Adelman will give you, because it doesn't say can you do those things -- you can't do those things if you intend for those things to be accomplishing an improper and wrongful purpose. And that's the difference. You can do those things without essentially the intent to obstruct or intent to conceal, and that's the key, the key point here.

What else did we hear? Oh, the bailiff never told me and Chief Judge Ashley didn't tell me, so I couldn't have known. And then -- and then in closing, I -- Judge Cervera must be lying because she thought she heard the name Flores. Well, you did also hear a couple things. You heard Alan Freed, who did not seem particularly happy to be here, testify that the first thing he did that morning was print out a copy of the calendar and the court's docket and put it on the judge's bench. And you can see Exhibit 11, Exhibit 12 Eduardo Flores-Ruiz's name is on that very first page. And we know it wouldn't take long to look, and we know that the defendant would be able to tell things quickly.

Think of when the discussion happens later after Flores-Ruiz was gone and the issue of interpreters came up. Alan Freed says, "Should we do other interpreter cases first?" And the judge says, "Do we have anyone else who looks" -- and then is cut off.

And even if Judge Cervera's mistaken, that the name wasn't said, that doesn't change what the defendant knew and did. She goes in the hallway. She knows there's a warrant. She comes back in. Which client is it? Eduardo Flores-Ruiz.

We next get to the assistant district attorney. She must have heard what was going on, she should have paid better attention, she's right there. Take a listen to how Mr. Flores-Ruiz's case is handled, and then take a listen to Exhibit 43 when Mr. Piel's client's case is called with Hruska. There's a formal announcement and party appearances. That's when the ADA is present.

You've also heard this is a busy courtroom and the ADA has lots of things going on and lots of conversations going at the same time. Ask yourself, using that common sense, whether it's possible she didn't know that Mr. Flores-Ruiz's case was going to be rushed and that he was going to be let out that back door.

We also heard that the ADA shouldn't have joked about not checking her calendar for a Saturday hearing that the court miscalendared. She shouldn't have considered a DPA for Eduardo Flores-Ruiz. And whoever charged the case in her office didn't charge strangulation. Another series of distractions that have nothing to do with the elements in this case.

Then we get to mentoring. There is one issue that we agree with the defense today. It is inconsistent with our theory

that that was a mentoring moment. I'll give them that one. You're telling me that was a mentoring moment after they're both concerned that ICE is there and needing to get that client out? We're going to take the time in that hallway to talk about, you know, how to improve performance? That's not what was going on.

That was the defendant saying, "Ms. de la Rosa, listen to me when I'm talking to you." Of course, Ms. de la Rosa's head is spinning, she's freaked out, she's trying to get out of there. And it's the judge saying, "Listen to me, this way, this way." That's right, she uses an air -- described it as like describing -- or guiding an airplane out, that pointing down that hallway which leads to two doors, the public hallway and the stairs.

But it wasn't a mentoring moment about using Zoom. Why would you use Zoom or mention Zoom? It can be used for lots of legitimate things, and it's true that people can have Zoom hearings. But in that context, it tells you one thing. There's going to be -- I think there's going to be another hearing for this person, and next time he can appear by Zoom because I'm trying to get him out.

The Cervera text. She not only texted her sister, did you know she Googled the identity of the immigration officer that she dealt with that day, the immigration officer who she spent more time with than Judge Dugan that day? Yeah, that's right.

"knowledge." That's what those apply to. It's not some sort of willfulness where I have to know the elements of obstruction and I'm going to do it anyway. The defendant knew what she was doing was wrong and did it anyway. But she doesn't have to know the law or have a mistake as to what the elements of the law are.

Before, a couple of things that -- too, as long as things about instructions, pending proceedings, you're going to get that instruction from the Court. It's any stage or step in a matter in front of, before, or by -- you'll get the exact language from the Court -- the Department of Homeland Security. There's no confusion there. That proceeding is not the prior removal or prior reinstatement or some sort of immigration court proceeding. It's the proceedings to remove Eduardo Flores-Ruiz after he's been identified as someone who's not lawfully present and who's subject to removal.

His fingerprints hit in that database, as you heard. And it starts a process for the agents and the task force to investigate that matter, arrest him; and if it's appropriate, remove him. And that's what was going on here. And whether they used a particular form or not, an I-200 or an I-205 doesn't matter. What matters is the defendant stepped in at the point when they were attempting to arrest that individual as part of those proceedings and one stage and step in it.

All right. So what have we heard, and what have we seen

because she knows she's just sent someone to an area that has a stairwell and there might be ICE agents on another floor.

Speaking of the stairs, down the stairs, you can take a listen to that and see who says it first. And then Joan Butz says, "Do you want me to show them?" If Joan Butz has brought it up, why would she be asking the judge if she wants the judge to have her show them? "No, I'll do it." That's a window into her intent and a window into what the defendant was thinking. It is the first time out of a thousand cases -- thousands of cases that Alan Freed has seen -- that a criminal defendant was allowed to use that door, was directed out that door.

And the fact that Attorney de la Rosa might not have heard the reference to the stairs and certainly didn't take those stairs doesn't matter. Again, the elements of the crime have been completed, as soon as he is concealed, as soon as the defendant has taken any act to obstruct that arrest.

But then we've heard a lot about it's 11 feet, ten inches, and you saw the graphic. 11 feet, ten inches, it's so close the agents couldn't even tell which door Eduardo Flores came out of. I didn't list that as a distraction, because that's not a distraction. That proves her intent. If it's so close, just 11 feet, ten inches -- 11 feet, ten inches, smaller than the jury box -- if that is so close and doesn't matter, with an agent to the left and an agent to the right, why use that hallway in the first place? Every other defendant has used the

MS. WATZKA: A little bit.

MR. BISKUPIC: I don't think there's agreement between the parties of how to answer.

MR. ALEXANDER: I want to give it some more thought here.

THE COURT: Okay. Well, I'll -- let me. The next question from the jury, about ten minutes to 5:00: As per Page 19, Bullet Point No. 2, we desire clarity as to whether or not Judge Dugan needed to know the identity of the subject of the arrest warrant, for example, his specific name. And it's signed by the foreperson.

So anybody want to chime in on what the answer should be?

MS. MASNICA: Well, your Honor, it's our position, the defense, that it -- that so the Count 1 -- this is referencing Count 2, but it's related -- Count 1 requires that there be knowledge that a federal warrant was issued for an individual, I mean, so that individual needs to be identified. Then Count 2 is that the defendant knew that the federal warrant had been issued for that person.

This was something that we had raised previously as a potential issue that may come up but that the law supports and the law requires that Ms. Dugan would have known that the warrant was issued for Eduardo Flores-Ruiz. Otherwise, there would not, in fact, be an obstruction. Because if you didn't know that the warrant had been issued for a specific person,

MR. FROHLING: It's not the specific identity. The idea is that they're all tied together. It has to be all the same -- has to be for the same individual, all of those parts.

MS. MASNICA: I mean, what they asked is: Does Judge Dugan need to know the identity of the subject of the arrest warrant? The answer and legal answer and the correct answer is yes, so why don't we just answer it that way?

MR. FROHLING: The -- the distinction, I think, is the identity and the person. You have to know it's the same person. You don't need to know the person's identity.

THE COURT: Well, look, we're not -- I don't know if we've reached -- I guess we haven't reach an exact -- an agreement, but I think we're pretty close. Let's go with this. If they have more problems, they can ask.

In order -- in order to commit the offense charged in Count 1, the defendant needed to know the identity the subject of the warrant.

MS. MASNICA: Thank you.

THE COURT: Okay. Thank you.

(A short recess was taken.)

THE COURT: Well, we inquired of the jury as to their agenda, and their agenda is to order pizza and keep going.

MS. WATZKA: Sounds good. Where's ours?

THE COURT: So --

MS. WATZKA: We'll take off.

MR. FROHLING: Thanks, Judge.

(A recess was taken.)

THE COURT: Please be seated. So, you know, the jury asked: As per Page 21, Element No. 2, we desire clarity as to whether or not Judge Dugan needed to know the identity of the subject of the pending proceeding.

MR. FROHLING: Yeah. This is an easy one. The answer is no. There's not even an individual -- the statute doesn't require an individual. The statute requires knowledge of a pending proceeding.

MS. MASNICA: Your Honor, I would just state the way the case was specifically charged, I mean, the elements -- or, I'm sorry, the actual allegation in the indictment matters, because it provides a defendant notice of what they are defending against. Here, the actual proceeding was charged as the administrative arrest of EFR for purposes of removal proceedings conducted by the United States Department of Homeland Security. And then the affirmative acts she allegedly committed were all listed on there as acts that were obstructing or making more difficult EFR's arrest.

So in this case, in the acts when you apply the law to the facts, which is what the jury has to do, they do have to, in fact, conclude that the administrative arrest of EFR was taking place and that she knew that the administrative arrest of EFR was taking place. That is the pending proceeding that has been

the defendant needed to have sufficient knowledge about the nature of the proceeding.

Anybody want to tell us why that's good or bad?

MR. FROHLING: That's -- that's acceptable to us.

MS. MASNICA: Your Honor, I mean, I would maintain my arguments that previously were made about reading in the actual language that had been used into Count 1 to specifically identify the pending proceeding, but I understand the Court's ruling.

THE COURT: Okay. Okay.

MR. BISKUPIC: Judge, could your clerk read that one more time, so we could --

THE COURT: Yeah.

THE CLERK: To know of, and the word "of" is underlined, the pending proceeding the defendant needed to have sufficient knowledge about the nature of the proceeding.

MR. BISKUPIC: Thank you.

(A recess was taken.)

THE COURT: I'm advised by the CSO that the jury informed her that they had a verdict; correct?

COURT SECURITY OFFICER: Yes, your Honor.

THE COURT: Are we -- is everybody here that needs to be here?

MR. BISKUPIC: Yes, from the defense.

MR. FROHLING: Yes.

THE COURT: All right.

COURT SECURITY OFFICER: All rise for the jury.

(The jury entered the courtroom.)

THE COURT: Mr. Foreman, jury's reached a unanimous verdict?

THE FOREPERSON: We have.

THE COURT: You want to pass it up to me. Thank you. Please be seated.

United States of America versus Hannah C. Dugan, Case No. 25-CR-89, verdict Count 1: We, the jury, find the defendant, Hannah C. Dugan, not guilty of the offense charged in the indictment in violation of Title 18, US Code Section 1071.

Count 2: We, the jury, find the defendant, Hannah C. Dugan, guilty of the offense charged in the indictment in violation of Title 18, US Code Section 1505, dated at Wisconsin this 18th of December. Appears to be proper as to form.

Any -- anything from either party?

MR. FROHLING: Not from the Government, your Honor. Thank you.

MR. BISKUPIC: Not from the defense.

THE COURT: Well, thank you. It's been a very hard case, and we appreciate your attention. With respect to the future, I'm sure you'll be asked by either counsel or by the media about the case. And the case is over now. You're -- you're free to not answer or to not participate. But you're

**U.S. DEPARTMENT OF HOMELAND SECURITY** **Warrant for Arrest of Alien**

File No. 205 583 354

Date: 04/11/2025

**To:** **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that FLORES-RUIZ, EDUARDO is removable from the United States. This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☑ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

ANTHONY M NIMTZ Digitally signed by ANTHONY M NIMTZ Date: 2025.04.17 15:04:46 -05'00'

(Signature of Authorized Immigration Officer)

A 7094 NIMTZ - SDDO

(Printed Name and Title of Authorized Immigration Officer)

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at ______________________
(Location)

on FLORES-RUIZ, EDUARDO on ______________________, and the contents of this
(Name of Alien) (Date of Service)

notice were read to him or her in the ______________________ language.
(Language)

______________________ ______________________
Name and Signature of Officer | Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

#530.1

**From:** "Hannah Dugan" <Hannah.Dugan@WICOURTS.GOV>
**To:** "Jean Kies" <Jean.Kies@WICOURTS.GOV>, "Carolina Stark" <Carolina.Stark@WICOURTS.GOV>, "Nidhi Kashyap" <Nidhi.Kashyap@WICOURTS.GOV>, "Christopher Dee" <Christopher.Dee@WICOURTS.GOV>, "Laura Perez" <Laura.Perez@WICOURTS.GOV>, "Danielle Shelton" <Danielle.Shelton@WIcourts.gov>, "Carl Ashley" <Carl.Ashley@WICOURTS.GOV>
**Cc:** "Judges-Milwaukee" <Judges-Milwaukee@WIcourts.gov>, "Stephanie A. Garbo" <Stephanie.Garbo2@WIcourts.gov>
**Subject:** Proposing Judges meeting re:: ICE Taking People into Custody in the Public Hallways in the Courthouse Complex
**Date:** Tue, 08 Apr 2025 12:46:57 -0500
**Importance:** Normal

---

Good morning,

Thanks for the information about incidents and concerns about ICE in the courthouse. And thanks to Laura G-P for her information and to CJ Ashley for the public statement.

In the various emails state arrests in the courthouse have been discussed as different, but even they have qualifications and (at least under stood and informal if not required) protocols. The ICE detentions are a different animal—and currently the historic protocols are now shifting quickly.

I have seen in my court more people not showing up for court dates. I have had two immigration attorneys asking me just today about what protocols are in place.

I'm suggesting that a judges' meeting be called with corporation counsel as soon as possible.

It would be helpful to me and I hope other judges – and by extension to the public and other county staff and electeds - to have a discussion with each other about the outstanding issues, identify the concerns to be addressed, and develop a consistent set of protocols to be implemented and followed in the Milwaukee circuit courts.

Optimally, it would be great to have at least a draft of written protocols for the Safety Building, the Courthouse and for Children's Court. We are in some uncharted waters with some very serious and even potentially tragic community interests at risk in the balance. Given the effects on the justice system, all the parties, witnesses, jurors, litigants and the individual cases each of us hears it would be helpful to be clear on the new parameters within which we are to work and which a fair and efficient justice system can operate.

Hannah Dugan

P.S. having asked for this, FYI that about 8 of us are going to be at judicial ed from tonight until Friday at noon in Door County. I am willing to meet on the weekend if necessary.

---

**From:** Jean Kies <Jean.Kies@WICOURTS.GOV>
**Sent:** Tuesday, April 8, 2025 11:17 AM
**To:** Carolina Stark <Carolina.Stark@WICOURTS.GOV>; Nidhi Kashyap <Nidhi.Kashyap@WICOURTS.GOV>; Christopher Dee <Christopher.Dee@WICOURTS.GOV>; Laura Perez <Laura.Perez@WICOURTS.GOV>; Danielle Shelton <Danielle.Shelton@WIcourts.gov>; Carl Ashley <Carl.Ashley@WICOURTS.GOV>
**Cc:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-

#1254.1

Milwaukee@WIcourts.gov>; Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; 'Anna Hodges'
**Subject:** RE: ICE Taking People into Custody in the Public Hallways in the Courthouse Complex

I forgot an item in my car. I walked out to get the item and saw an ICE squad parked on 10th Street in front of the courthouse a little while ago. Jean Kies

---

**From:** Carolina Stark <Carolina.Stark@WICOURTS.GOV>
**Sent:** Tuesday, April 8, 2025 10:43 AM
**To:** Nidhi Kashyap <Nidhi.Kashyap@WICOURTS.GOV>; Christopher Dee <Christopher.Dee@WICOURTS.GOV>; Laura Perez <Laura.Perez@WICOURTS.GOV>; Danielle Shelton <Danielle.Shelton@WIcourts.gov>; Carl Ashley <Carl.Ashley@WICOURTS.GOV>
**Cc:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>; Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; 'Anna Hodges'
**Subject:** RE: ICE Taking People into Custody in the Public Hallways in the Courthouse Complex

Thank you, Laura, for the link to the presentation and for highlighting important points from it.

Thank you, Carl, for issuing a statement about this issue.

Carl, what are your thoughts about Laura's suggestion that we develop a court-wide policy governing ICE actions in both of our courthouses, including requiring that ICE agents check in with the Chief Judge before conducting any enforcement?

Regards,
Carolina

---

**From:** Nidhi Kashyap <Nidhi.Kashyap@WICOURTS.GOV>
**Sent:** Tuesday, April 8, 2025 9:05 AM
**To:** Christopher Dee <Christopher.Dee@WICOURTS.GOV>; Laura Perez <Laura.Perez@WICOURTS.GOV>; Danielle Shelton <Danielle.Shelton@WIcourts.gov>; Carl Ashley <Carl.Ashley@WICOURTS.GOV>
**Cc:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>; Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; 'Anna Hodges'
**Subject:** RE: ICE Taking People into Custody in the Public Hallways in the Courthouse Complex

Thank you for the information Laura. While arrests by state law enforcement agencies may be routine at the courthouse, immigration enforcement at courthouses is hardly routine and it is worthy of our attention. I am glad that the Chief Judge Ashley is looking into this matter.

Nidhi Kashyap

---

**From:** Christopher Dee <Christopher.Dee@WICOURTS.GOV>
**Sent:** Friday, April 4, 2025 12:15 PM
**To:** Laura Perez <Laura.Perez@WICOURTS.GOV>; Danielle Shelton <Danielle.Shelton@WIcourts.gov>; Carl Ashley <Carl.Ashley@WICOURTS.GOV>
**Cc:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>; Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; 'Anna Hodges'
**Subject:** RE: ICE Taking People into Custody in the Public Hallways in the Courthouse Complex

In the past, other law enforcement agencies have entered my courtroom to arrest someone. It doesn't sound like that's what's happening here, but when I'm aware, I will ask them to wait until I've concluded the proceeding. They have obliged.

--CDee

---

**From:** Laura Perez <Laura.Perez@WICOURTS.GOV>
**Sent:** Friday, April 4, 2025 10:12 AM
**To:** Danielle Shelton <Danielle.Shelton@WIcourts.gov>; Carl Ashley <Carl.Ashley@WICOURTS.GOV>
**Cc:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>; Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; 'Anna Hodges'
**Subject:** RE: ICE Taking People into Custody in the Public Hallways in the Courthouse Complex

Danielle, the presentation by the National Judicial Network that Ramona Gonzalez pointed us to early this week provided some really good, practical information on ICE enforcement activity in courthouses. I'd urge anyone who's interested to review the power point or watch the recording of the presentation; both are available at https://niwaplibrary.wcl.american.edu/ice2025courthousepolicies/

Two quick takeaways: 1. ICE can legally conduct enforcement (ie, take people into custody) in public areas of the courthouse. 2. There are statutory and policy limitations to such enforcement, including a federal law prohibition against conducting enforcement in courthouses against victims appearing in cases involving a protective order, child custody, or cases related to DV, sex assault, trafficking, stalking, and certain other crimes.

It sounds like the detentions described by the Chief fall within the law and policies. However I would strongly advise that we develop a court-wide policy governing ICE actions in both of our courthouses, including requiring that ICE agents check in with the Chief Judge before conducting any enforcement. Such a requirement is consistent with current federal ICE policy, which requires ICE actions in courthouses to be taken collaboratively with court staff. (That policy was enacted on January 21, 2025, i.e. by the current administration.)

Laura

---

**From:** Danielle Shelton <Danielle.Shelton@WIcourts.gov>
**Sent:** Friday, April 4, 2025 7:55 AM
**To:** Carl Ashley <Carl.Ashley@WICOURTS.GOV>
**Cc:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>; Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; Victoria Lupo <Victoria.Lupo@WIcourts.gov>; Anna Hodges <Anna.Hodges@WIcourts.gov>; Mary Ferwerda <Mary.Ferwerda@WICOURTS.GOV>; Robert Rondini <Robert.Rondini@WIcourts.gov>; Melanie Fleischmann <Melanie.Fleischmann@WIcourts.gov>; Angel Johnson <johnsona@opd.wi.gov>; Kent Chief DDA Lovern <Kent.Lovern@da.wi.gov>; Jeff Altenburg <Jeffrey.Altenburg@da.wi.gov>; stylerp@opd.wi.gov; Audrey Skwierawski <Audrey.Skwierawski@WICOURTS.GOV>; Donna Anderson <Donna.Anderson@WICOURTS.GOV>
**Subject:** Re: ICE Taking People into Custody in the Public Hallways in the Courthouse Complex

Does this mean Milwaukee County is cooperating with ICE?

On Apr 3, 2025, at 6:30 PM, Carl Ashley <Carl.Ashley@wicourts.gov> wrote:

Colleagues,

Please be aware that ICE has taken at least two people into custody in the Courthouse and Safety Building Public hallways. The first incident occurred on March 20 in the Courthouse after an injunction hearing ended where the

respondent was detained and the second occurred today in the Safety Building before the defendant's hearing; both in public hallways. If these detentions occurred in the courtroom, I believe it would have directly interfered with our judicial process. I'm not sure if we have the authority to intervene in what happens in a public hallway. I have reached out to Corporation Counsel and the Director's Office for their input. Please let me know if you're aware of other ICE activity in the Courthouse complex.

Thanks,

CJA

**From:** "Carl Ashley" <Carl.Ashley@WICOURTS.GOV>
**To:** "Judges-Milwaukee" <Judges-Milwaukee@WIcourts.gov>, "Judicial-Commissioners-Milwaukee" <Judicial-Commissioners-Milwaukee@WIcourts.gov>, "Family-Commissioners-Milwaukee" <Family-Commissioners-Milwaukee@WIcourts.gov>
**Cc:** "Stephanie A. Garbo" <Stephanie.Garbo2@WIcourts.gov>, "Donna Anderson" <Donna.Anderson@WICOURTS.GOV>, "Nyla Kimble" <Nyla.Kimble@WICOURTS.GOV>
**Subject:** Warrant Discussion
**Date:** Tue, 08 Apr 2025 13:28:07 -0500
**Importance:** Normal
**Attachments:** 2025.01_ICE_Courthouse_Enforcement_Guidance_11072.3.pdf

---

Good afternoon Colleagues,

I'm scheduling a zoom meeting for tomorrow morning Wednesday, April 9th from 7:45 to 8:30 to discuss addressing warrants at the Courthouse Complex. You'll receive the invite shortly.

CJA

Policy Number: 11072.3

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

**U.S. Immigration and Customs Enforcement**

MEMORANDUM FOR: All ICE Employees

FROM: Caleb Vitello
Acting Director

SUBJECT: Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses

---

Purpose

This memorandum provides interim guidance governing U.S. Immigration and Customs Enforcement (ICE) civil immigration enforcement actions in or near courthouses. In accordance with Memorandum from the Acting Secretary of Homeland Security Benjamine Huffman, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025),[1] the April 27, 2021, *Civil Immigration Enforcement Actions in or near Courthouses* memorandum from Acting ICE Director Tae Johnson and Acting U.S. Customs and Border Protection Commissioner Troy Miller is now rescinded for ICE and is superseded by this interim guidance.

This guidance is effective immediately and remains in effect until superseded.

Background

Federal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses because many individuals appear in courthouses for unrelated criminal or civil violations. Individuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband. Accordingly, when ICE engages in civil immigration enforcement actions in or near courthouses it can reduce safety risks to the public, targeted alien(s), and ICE officers and agents. Finally, enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody.

[1] The Acting Secretary's Memorandum also supersedes and rescinds Alejandro Mayorkas's October 27, 2021 memorandum entitled, Guidelines for Enforcement Actions in or Near Protected Areas.

## Implementation

For purposes of this guidance, a civil immigration enforcement action is any action taken by an ICE officer or agent to apprehend, arrest, interview, or search an alien in connection with enforcement of administrative immigration violations. This policy does not apply to criminal immigration enforcement actions inside courthouses.

### *Aliens Subject to Enforcement Actions*

Generally, ICE's civil immigration enforcement actions in or near courthouses include actions against targeted aliens, including but not limited to:

- National security or public safety threats;
- Specific aliens with criminal convictions;
- Gang members;
- Aliens who have been ordered removed from the United States but have failed to depart; and/or
- Aliens who have re-entered the country illegally after being removed.

Other aliens encountered during a civil immigration enforcement action in or near a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, may be subject to civil immigration enforcement action on a case-by-case basis considering the totality of the circumstances.[2]

### *Procedures*

ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location, and where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place. ICE officers or agents must coordinate with the relevant local Office of the Principal Legal Advisor (OPLA) office before conducting enforcement actions in or near courthouses to determine whether jurisdiction-specific legal limitations apply.

Additionally, civil immigration enforcement actions in or near courthouses should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits. When practicable, ICE officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings.

---

[2] ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with U.S. Department of Homeland Security and ICE policy.

*Non-Criminal or Specialized Courts*

ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (e.g., family court, small claims court). When an enforcement action in the above situations is operationally necessary, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required prior to conducting the enforcement action.

*Responsibilities*

Each FOD or SAC, in consultation with OPLA, must ensure that all employees under their supervision comply with this policy by providing guidance to officers and agents on the approval process and procedures for civil immigration enforcement actions in or near courthouses within their area of responsibility. This includes ensuring all civil immigration enforcement actions in or near courthouses are properly documented[3] and recorded in the applicable ICE system of record, which can be searched and validated.

As with any planned enforcement action, ICE officers and agents should exercise sound judgment when enforcing federal law and make substantial efforts to avoid unnecessarily alarming the public or disrupting court operations. ICE officers and agents will make every effort to limit their time at courthouses while conducting civil immigration enforcement actions.

No Private Right

This memorandum provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

[3] ICE officers and agents will document the physical address of planned civil immigration enforcement actions in accordance with standard procedures for completing operational plans, noting that the target address is a courthouse.

**From:** "Carl Ashley" <Carl.Ashley@WICOURTS.GOV>
**To:** "Judges-Milwaukee" <Judges-Milwaukee@WIcourts.gov>, "Judicial-Commissioners-Milwaukee" <Judicial-Commissioners-Milwaukee@WIcourts.gov>, "Family-Commissioners-Milwaukee" <Family-Commissioners-Milwaukee@WIcourts.gov>
**Cc:** "Stephanie A. Garbo" <Stephanie.Garbo2@WIcourts.gov>, "Donna Anderson" <Donna.Anderson@WICOURTS.GOV>, "Nyla Kimble" <Nyla.Kimble@WICOURTS.GOV>
**Subject:** RE: Warrant Discussion
**Date:** Wed, 09 Apr 2025 06:32:52 -0500
**Importance:** Normal
**Attachments:** Draft_Ice_Policy_Statement.docx

---

Good morning Colleagues,

I am attaching a draft policy for our meeting this morning. I realize you won't have had an opportunity to review the document, but this is just the initial discussion regarding the potential policy that must be vetted with our system partners.

CJA

---

**From:** Carl Ashley
**Sent:** Tuesday, April 8, 2025 1:28 PM
**To:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>
**Cc:** Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; Donna Anderson <Donna.Anderson@WICOURTS.GOV>; Nyla Kimble <Nyla.Kimble@WICOURTS.GOV>
**Subject:** Warrant Discussion

Good afternoon Colleagues,

I'm scheduling a zoom meeting for tomorrow morning Wednesday, April 9th from 7:45 to 8:30 to discuss addressing warrants at the Courthouse Complex. You'll receive the invite shortly.

CJA

#1282.1

Date: April ____, 2025

**From: Chief Judge Carl Ashley, Milwaukee County, District 1**

Milwaukee County Courthouse
901 N.9th Street, Room 609
Milwaukee, WI 53233
Email: carl.ashley@wicourts.gov
Phone 414-278-5116

**Responding to Immigration Enforcement Agency request for Information and/or Immigration Enforcement Facility Policy in Milwaukee County Courthouse/Court Complexes**

**I. POLICY STATEMENT:**

U.S. Immigration and Customs Enforcement (ICE) agents detaining individuals within the courthouse complex pose significant concerns regarding the integrity and impartiality of the judicial system. Courthouses are traditionally places where individuals can seek justice and legal recourse without fear of retribution or apprehension.

Milwaukee County's Courtroom/Courthouses handles non-criminal, family, juvenile, and/or civil law matters. Under ICE Policy 11072.3 (January 2025), "ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses, that are wholly dedicated to non-criminal proceedings".

Additionally, civil immigration enforcement against victims of domestic violence, sexual assault, stalking, child abuse, battering, extreme cruelty, human trafficking, or any other U and T visa covered crimes when the victim is at court in connection with any protection order, custody, or any other civil or criminal case related to their victimization is prohibited by the following ICE Policies and federal statutes:

• 8 U.S.C. 1229(e) and 8 U.S.C. 1367(c)

• ICE Policy Number 11005.4 Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits (January 31, 2025)

• Department of Homeland Security (DHS) Instruction No. 002-02-001, Rev. 00.1: Implementation of Section 1367 Information Provisions (May 28, 2019).

When an immigration enforcement action is taken against a victim at or near a courthouse, the enforcement official is required to prove that the enforcement action complies with the requirements of 8 U.S.C. 1367's prohibitions against the enforcement action relying solely on information furnished by or tips provided by the perpetrator, the perpetrators family member, or another person acting on the perpetrator's behalf. Immigration officials are required to check the DHS Central Index System (CIS) for the "COA 384" flag that identifies cases filed under Violence Against Women Act and Trafficking Victim

#1328.1

Protection Act provisions and ICE policies require that DHS employees will be "sensitive to the fact that the alien at issue may be a victim and the victim-abuse dynamic may be at play." Immigration officials who violate the terms of 8 U.S.C. 1367 or 8 U.S.C. 1229(e) may be subject to disciplinary action and/or civil penalties. Before proceeding with an enforcement action against a victim of crime or abuse at this courthouse, please confirm for the court that the DHS CIS system was checked, that supervisory approval was obtained, and describe any other steps taken to ensure compliance with protocols.

When an enforcement action in the above situations is operationally necessary, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required prior to conducting the enforcement action." Please provide the judge or court staff with a document evidencing that the required supervisory approval has been obtained.

Court personal may not authorize the entry of immigration agency personnel into the nonpublic areas of any Court facility; and must promptly refer immigration agency personnel to their immediate supervisor or manager. If an immigration enforcement officer insists on access to a non-public area, the employee should not resist but should say, "I do not consent, but because I have no choice at this time, I will not interfere with your order" and immediately contact their supervisor about the officer's order, prepare a written statement about the encounter, and submit it to their supervisor.

As used in this policy, nonpublic areas of the Court include those secured or restricted areas designated for use by judicial officers, Court personnel, security personnel, and persons with Court authorization. Nonpublic areas of the Court include: judicial chambers, corridors behind courtrooms, jury deliberation rooms, administrative offices, staff offices, employee break rooms, conference rooms, and custody holding cells.

**II. RESPONSIBILITY**

All employees are responsible for complying with this policy. Managers are expected to notify their Court Operations Officers/Management of any immigration enforcement activity at their courthouse. Site or Supervising Judge who in turn will notify the District Court Administrator and the Chief Judge of any immigration activity at their Courthouse.

**III. DEFINITIONS**

**Administrative Subpoena**

A document that requests the production of documents or other evidence, and (in the immigration enforcement context) is issued by an immigration enforcement officer. The administrative subpoena will contain the following information: file number, subpoena number, mailing address to which to mail the requested information, a list of the regulations that apply, the request for information, and the signature(s) of the agent(s).

**Administrative Warrant**

An Immigration and Customs Enforcement (ICE) administrative warrant authorizes an immigration enforcement officer to arrest a person suspected of violating immigration laws. Any authorized ICE

#1328.2

officer can issue an administrative warrant without a showing of probable cause that the subject of the warrant is guilty of a criminal offense. An ICE warrant does not compel courthouse personnel to cooperate with the requests of immigration enforcement officers, including requests to access nonpublic areas of a court facility or to search confidential or sealed court records.

**Court Order**

In the immigration enforcement context, is an order issued by a U.S. District Court judge or magistrate judge authorizing a specified action.

**Federal Judicial Warrant**

Issued by a district judge or a magistrate judge of a U.S. District Court, based on a finding of probable cause, to authorize the search or seizure of property, the entry into a nonpublic place to arrest a person named in an arrest warrant or the arrest of a named person. 1. A federal search and seizure warrant authorizes the search and/or seizure of property. 2. A federal arrest warrant allows an immigration enforcement officer to enter into a nonpublic place (if necessary) to arrest a person named in the warrant.

**Notice to Appear (NTA)**

A charging document issued by ICE, U.S. Customs and Border Protection (CBP), or the United States Customs and Immigration Service (USCIS) seeking to commence formal removal proceedings against an individual before an immigration court. An NTA contains allegations about a person's immigration status and notifies an individual that they are expected to appear before an immigration judge on a certain date. An NTA does not authorize an individual's arrest by immigration enforcement authorities or local law enforcement authorities. **An NTA does not authorize access to nonpublic areas of the court facility or require court staff to allow immigration enforcement authorities to search confidential or sealed court records.**

**From:** "Carl Ashley" <Carl.Ashley@WICOURTS.GOV>
**To:** "Judges-Milwaukee" <Judges-Milwaukee@WIcourts.gov>, "Judicial-Commissioners-Milwaukee" <Judicial-Commissioners-Milwaukee@WIcourts.gov>, "Family-Commissioners-Milwaukee" <Family-Commissioners-Milwaukee@WIcourts.gov>
**Cc:** "Stephanie A. Garbo" <Stephanie.Garbo2@WIcourts.gov>, "Donna Anderson" <Donna.Anderson@WICOURTS.GOV>, "Nyla Kimble" <Nyla.Kimble@WICOURTS.GOV>, "Victoria Lupo" <Victoria.Lupo@WIcourts.gov>
**Subject:** RE: Warrant Discussion
**Date:** Thu, 10 Apr 2025 07:30:15 -0500
**Importance:** Normal
**Attachments:** Draft_Ice_Policy_Statement_IV.docx

---

Good morning Colleagues,

Please find attached a revised draft (additions in red) based on our meeting yesterday. The draft will be circulated with our system partners for their review/input.

CJA

---

**From:** Carl Ashley
**Sent:** Wednesday, April 9, 2025 6:33 AM
**To:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>
**Cc:** Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; Donna Anderson <Donna.Anderson@WICOURTS.GOV>; Nyla Kimble <Nyla.Kimble@WICOURTS.GOV>
**Subject:** RE: Warrant Discussion

Good morning Colleagues,

I am attaching a draft policy for our meeting this morning. I realize you won't have had an opportunity to review the document, but this is just the initial discussion regarding the potential policy that must be vetted with our system partners.

CJA

---

**From:** Carl Ashley
**Sent:** Tuesday, April 8, 2025 1:28 PM
**To:** Judges-Milwaukee <Judges-Milwaukee@WIcourts.gov>; Judicial-Commissioners-Milwaukee <Judicial-Commissioners-Milwaukee@WIcourts.gov>; Family-Commissioners-Milwaukee <Family-Commissioners-Milwaukee@WIcourts.gov>
**Cc:** Stephanie A. Garbo <Stephanie.Garbo2@WIcourts.gov>; Donna Anderson <Donna.Anderson@WICOURTS.GOV>; Nyla Kimble <Nyla.Kimble@WICOURTS.GOV>
**Subject:** Warrant Discussion

Good afternoon Colleagues,

I'm scheduling a zoom meeting for tomorrow morning Wednesday, April 9th from 7:45 to 8:30 to discuss addressing warrants at the Courthouse Complex. You'll receive the invite shortly.

CJA

#1036.1

Date: April ____, 2025

**From: Chief Judge Carl Ashley, Milwaukee County, District 1**

Milwaukee County Courthouse
901 N.9th Street, Room 609
Milwaukee, WI 53233
Email: carl.ashley@wicourts.gov
Phone 414-278-5116

**Responding to Immigration Enforcement Agency request for Information and/or Immigration Enforcement Facility Policy in Milwaukee County Courthouse/Court Complexes which includes the Vel R. Phillips Juvenile Justice Center.**

**I. POLICY STATEMENT:**

U.S. Immigration and Customs Enforcement (ICE) agents detaining individuals within the courthouse complex pose significant concerns regarding the integrity and impartiality of the judicial system. Courthouses are traditionally places where individuals can seek justice and legal recourse without fear of retribution or apprehension.

Milwaukee County's Courtroom/Courthouses handles non-criminal, family, juvenile, and/or civil law matters. Under ICE Policy 11072.3 (January 2025), "ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses, that are wholly dedicated to non-criminal proceedings".

Additionally, civil immigration enforcement against victims of domestic violence, sexual assault, stalking, child abuse, battering, extreme cruelty, human trafficking, or any other U and T visa covered crimes when the victim is at court in connection with any protection order, custody, or any other civil or criminal case related to their victimization is prohibited by the following ICE Policies and federal statutes:

• 8 U.S.C. 1229(e) and 8 U.S.C. 1367(c)

• ICE Policy Number 11005.4 Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits (January 31, 2025)

• Department of Homeland Security (DHS) Instruction No. 002-02-001, Rev. 00.1: Implementation of Section 1367 Information Provisions (May 28, 2019).

When an immigration enforcement action is taken against a victim at or near a courthouse, the enforcement official is required to prove that the enforcement action complies with the requirements of 8 U.S.C. 1367's prohibitions against the enforcement action relying solely on information furnished by or tips provided by the perpetrator, the perpetrators family member, or another person acting on the perpetrator's behalf. Immigration officials are required to check the DHS Central Index System (CIS) for

the "COA 384" flag that identifies cases filed under Violence Against Women Act and Trafficking Victim Protection Act provisions and ICE policies require that DHS employees will be "sensitive to the fact that the alien at issue may be a victim and the victim-abuse dynamic may be at play." Immigration officials who violate the terms of 8 U.S.C. 1367 or 8 U.S.C. 1229(e) may be subject to disciplinary action and/or civil penalties. Before proceeding with an enforcement action against a victim of crime or abuse at this courthouse, please confirm for the court that the DHS CIS system was checked, that supervisory approval was obtained, and describe any other steps taken to ensure compliance with protocols.

When an enforcement action in the above situations is operationally necessary, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required prior to conducting the enforcement action." Please provide the judge or court staff with a document evidencing that the required supervisory approval has been obtained.

The Agents will certify that the have followed their agency protocols prior to any enforcement action taking place.

Court personal may not authorize the entry of immigration agency personnel into the nonpublic areas of any Court facility; and must promptly refer immigration agency personnel to their immediate supervisor or manager. If an immigration enforcement officer insists on access to a non-public area, the employee should not resist but should say, "I do not consent, but because I have no choice at this time, I will not interfere with your order" and immediately contact their supervisor about the officer's order, prepare a written statement about the encounter, and submit it to their supervisor.

As used in this policy, nonpublic areas of the Court include those secured or restricted areas designated for use by judicial officers, Court personnel, security personnel, and persons with Court authorization. Nonpublic areas of the Court include: judicial chambers, corridors behind courtrooms, jury deliberation rooms, administrative offices, staff offices, employee break rooms, conference rooms, and custody holding cells.

The Chief Judge for Milwaukee County, District 1 and the District Court Administrator for Milwaukee County will be informed prior to arriving at Courthouse/Courthouse Complex including the Vel R. Phillips Juvenile Justice Center when an immigration enforcement action is to take place.

U.S. Immigration and Customs Enforcement (ICE) agents will provide identification to Court personnel so we know who is taking enforcement action.

**II. RESPONSIBILITY**

All employees are responsible for complying with this policy. Managers are expected to notify their Court Operations Officers/Management of any immigration enforcement activity at their courthouse. Site or Supervising Judge who in turn will notify the District Court Administrator and the Chief Judge of any immigration activity at their Courthouse.

**III. DEFINITIONS**

**Administrative Subpoena**

A document that requests the production of documents or other evidence, and (in the immigration enforcement context) is issued by an immigration enforcement officer. The administrative subpoena will contain the following information: file number, subpoena number, mailing address to which to mail the requested information, a list of the regulations that apply, the request for information, and the signature(s) of the agent(s).

**Administrative Warrant**

An Immigration and Customs Enforcement (ICE) administrative warrant authorizes an immigration enforcement officer to arrest a person suspected of violating immigration laws. Any authorized ICE officer can issue an administrative warrant without a showing of probable cause that the subject of the warrant is guilty of a criminal offense. An ICE warrant does not compel courthouse personnel to cooperate with the requests of immigration enforcement officers, including requests to access nonpublic areas of a court facility or to search confidential or sealed court records.

**Court Order**

In the immigration enforcement context, is an order issued by a U.S. District Court judge or magistrate judge authorizing a specified action.

**Federal Judicial Warrant**

Issued by a district judge or a magistrate judge of a U.S. District Court, based on a finding of probable cause, to authorize the search or seizure of property, the entry into a nonpublic place to arrest a person named in an arrest warrant or the arrest of a named person. 1. A federal search and seizure warrant authorizes the search and/or seizure of property. 2. A federal arrest warrant allows an immigration enforcement officer to enter into a nonpublic place (if necessary) to arrest a person named in the warrant.

**Notice to Appear (NTA)**

A charging document issued by ICE, U.S. Customs and Border Protection (CBP), or the United States Customs and Immigration Service (USCIS) seeking to commence formal removal proceedings against an individual before an immigration court. An NTA contains allegations about a person's immigration status and notifies an individual that they are expected to appear before an immigration judge on a certain date. An NTA does not authorize an individual's arrest by immigration enforcement authorities or local law enforcement authorities. **An NTA does not authorize access to nonpublic areas of the court facility or require court staff to allow immigration enforcement authorities to search confidential or sealed court records.**

# POTENTIAL STEPS IN ERO REMOVAL PROCESS

- Check Databases
- Identify Target
- Confirm Immigration Status
- Determine Criminal History
- Prepare Arrest Operation Plan (e.g. FOW)
- Draft and Submit Warrant (e.g. Form I-200, Arrest Warrant)
- Authorized Immigration Officer determines whether probable cause exists and, if so, signs Arrest Warrant (Form I-200)
- Arrest Target
- Serve and Sign I-200 Certificate of Service
- Complete Record of Sworn Statement
- Complete and Serve Charging Document (e.g. Form I-871, Notice of Intent/Decision to Reinstate Prior Removal Order)
    - Contest prior removal? (Supervisor or OPLA adjudicates)
    - Asylum claim? (Refer to USCIS for adjudication)
    - 8 U.S.C. § 1326 eligible? (Refer to USAO for prosecution)
- Decision, Order, and Certification Reinstating Prior Removal Order by Authorized Deciding Official (Form I-871)
- Authorized Immigration Officer signs Warrant of Removal (Form I-205)
- Fingerprinting, Verification, and Removal

EXHIBIT
25-CR-89
47

**From:** "Carl Ashley" <Carl.Ashley@WICOURTS.GOV>

**To:** "Judges-Milwaukee" <Judges-Milwaukee@WIcourts.gov>, "Judicial-Commissioners-Milwaukee" <Judicial-Commissioners-Milwaukee@WIcourts.gov>, "Family-Commissioners-Milwaukee" <Family-Commissioners-Milwaukee@WIcourts.gov>, "Stephanie A. Garbo" <Stephanie.Garbo2@WIcourts.gov>, "Victoria Lupo" <Victoria.Lupo@WIcourts.gov>, "Anna Hodges" <Anna.Hodges@WIcourts.gov>, "Mary Ferwerda" <Mary.Ferwerda@WICOURTS.GOV>, "Robert Rondini" <Robert.Rondini@WIcourts.gov>, "Melanie Fleischmann" <Melanie.Fleischmann@WIcourts.gov>, "'Johnson, Angel'" <johnsona@opd.wi.gov>, "Kent - Chief DDA Lovern" <Kent.Lovern@da.wi.gov>, "'Altenburg, Jeff'" <Jeffrey.Altenburg@da.wi.gov>, "'stylerp@opd.wi.gov'" <stylerp@opd.wi.gov>, "Audrey Skwierawski" <Audrey.Skwierawski@WICOURTS.GOV>, "Holly B. Szablewski" <Holly.Szablewski2@WIcourts.gov>

**Cc:** "Audrey Skwierawski" <Audrey.Skwierawski@WICOURTS.GOV>, "Donna Anderson" <Donna.Anderson@WICOURTS.GOV>, "Crowley, David" <David.Crowley@milwaukeecountywi.gov>, "MaryJo.Meyers@milwaukeecountywi.gov" <MaryJo.Meyers@milwaukeecountywi.gov>, "'denita.ball@milwaukeecountywi.gov '" <Denita.Ball@milwaukeecountywi.gov>, "Barkow, Brian" <Brian.Barkow@milwaukeecountywi.gov>, "Dobson, Aaron" <Aaron.Dobson@milwaukeecountywi.gov>, "Hertzberg, Aaron" <Aaron.Hertzberg@milwaukeecountywi.gov>, "Knutson, Alec" <Alec.Knutson@milwaukeecountywi.gov>, "Ashley, Kyle" <Kyle.Ashley@milwaukeecountywi.gov>, "'hehoug@milwaukee.gov'" <hehoug@milwaukee.gov>, "Brown, Scott" <Scott.Brown@milwaukeecountywi.gov>, "Holly B. Szablewski" <Holly.Szablewski2@WIcourts.gov>, "Nyla Kimble" <Nyla.Kimble@WICOURTS.GOV>, "'Norman, Jeffrey'" <jnorma@milwaukee.gov>

**Subject:** RE: Press Release Regarding Immigration and Customs Enforcement (ICE) agents detaining individuals within the Milwaukee Courthouse Complex.

**Date:** Sun, 06 Apr 2025 16:41:17 -0500

**Importance:** Normal

**Attachments:** ICE_Press_Release_III.docx

---

Good afternoon,

Please find attached Chief Judge Carl Ashley's press release regarding U.S. Immigration and Customs Enforcement (ICE) Agents detaining individuals within the Milwaukee Courthouse Complex.

CJA

DEFENSE
TRIAL EXHIBIT
201

Press Release From Chief Judge Carl Ashley dated April 6, 2025

U.S. Immigration and Customs Enforcement (ICE) agents detaining individuals within the courthouse complex pose significant concerns regarding the integrity and impartiality of the judicial system. Courthouses are traditionally places where individuals can seek justice and legal recourse without fear of retribution or apprehension. The following points highlight the issues at stake:

1. Chilling Effect on Access to Justice: The presence of ICE agents can deter individuals, particularly immigrants and marginalized communities, from attending court hearings, seeking legal assistance, or reporting crimes. This undermines the fundamental right to access the courts and seek legal remedies.

2. Erosion of Trust in the Judicial System: When individuals perceive courthouses as unsafe due to the fear of detention, trust in the judicial system erodes. This can lead to a reluctance to engage with law enforcement, legal representation, and the courts, ultimately hindering the administration of justice.

3. Confusion over Legal Protections: Many individuals may not be aware of their rights or the protections afforded to them within the courthouse. The presence of ICE can create confusion and misinformation, impacting their ability to navigate the legal system effectively.

In summary, allowing ICE agents to operate within courthouse complexes has the potential to significantly damage the integrity of the court system. It undermines the principles of justice, fairness, and equality before the law, and ultimately jeopardizes the rights of individuals seeking to navigate the legal process. Courts must remain safe havens for all individuals, free from the threats of immigration enforcement.

Chief Judge Carl Ashley, Milwaukee District #1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Case No. 25-CR-89 |
| v. | Milwaukee, WI |
| HANNAH C. DUGAN, Defendant. | July 8, 2026 11:15 a.m. |

# TRANSCRIPT OF SENTENCING HEARING BEFORE THE HONORABLE LYNN ADELMAN UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff UNITED STATES OF AMERICA:

United States Dept. of Justice (ED-WI)
By: MR. RICHARD G. FROHLING
MS. KELLY BROWN WATZKA
MR. KEITH S. ALEXANDER
Office of the US Attorney
517 E. Wisconsin Ave., Rm. 530
Milwaukee, WI 53202
Ph: 414-297-1775
richard.frohling@usdoj.gov
kelly.watzka@usdoj.gov
keith.alexander@usdoj.gov

For the Defendant HANNAH C. DUGAN: (Present)

Steven Biskupic Law Office, LLC
By: MR. STEVEN M. BISKUPIC
PO Box 456
Thiensville, WI 53092
Ph: 414-828-7233
bisklaw@outlook.com

APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Defendant HANNAH C. DUGAN: (Present) | Gimbel, Reilly, Guerin & Brown<br>By: MR. JASON D. LUCZAK<br>MS. NICOLE M. MASNICA<br>330 E. Kilbourn Ave., Ste. 1170<br>Milwaukee, WI 53202<br>Ph: 414-224-1440<br>jluczak@grgblaw.com<br>nmasnica@grgblaw.com |
| ALSO PRESENT: | MR. JAMES P. FETHERSTON,<br>US Probation. |

US Official Court Reporter: JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript produced by computer-aided transcription.

consequences, and they're ones that maybe aren't unexpected when someone abuses a position of trust. We just ask that the Court's sentence reflect not only the personal consequences to the defendant but the broader institutional harm that this caused when a judge obstructs the administration of justice.

And that's really what we have to say. And we'll leave the matter, as we've indicated in our submission, to the Court's discretion. Thank you.

THE COURT: Okay. Thank you.

Okay. In imposing sentence, I consider the factors in 3553(a). They include the nature and circumstances of the offense, history and characteristics of the defendant, needs of the public and the victims, sentencing guidelines and policy statements, and the avoidance of unwarranted disparity. And then I impose a sentence sufficient but not greater than necessary to satisfy the purposes of sentencing.

The underlying facts of this case are by now well known. I discussed them in detail in my decisions denying defendant's posttrial motions. I don't have to repeat them all now.

On April 18th, 2025, ICE task force agents traveled to the Milwaukee County Courthouse to arrest a defendant who was appearing in defendant's courtroom related to battery charges. And on learning of their presence, the defendant engaged in a course of conduct that the jury found wrongfully to impede those efforts.

Defendant is 67 years old with a otherwise distinguished history as a lawyer, judge, and public servant. She has no prior record. I -- I don't think she has any correctional treatment needs. She has a lifetime of service to others, as summarized on Pages 2 to 4 of the defense memorandum, particularly, those who are needy or vulnerable.

I've received numerous positive character letters. This is, in short -- this is a person who's done a lot of good in our community. And as the Supreme Court noted in *Pepper vs. United States*, 562 US 476, 2011, it's been uniform and consistent and constant in the federal judicial tradition for sentencing judges to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue. And underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.

As indicated, the guidelines call for a prison term in this case. Of course, the guidelines are advisory. And the sentencing court has discretion to individualize the sentence to the offense and the offender, as long as the Court's reasoning is consistent with 3553(a), see *US vs. Cook*, 108 F.4th 574 at 580, Seventh Circuit, 2024.

For several reasons, prison is not necessary to satisfy the statutory purposes of sentencing. First of all, the Government

properly highlights the seriousness of a judge or other public servant obstructing the administration of justice. It's important to note what this case is not about. There's no indication that defendant acted for personal or private gain or personal favor. This isn't like cases of public corruption where an official sells her office. I think instead, this is a situation where an otherwise good person upset by immigration enforcement in this country, a sentiment widely shared, made a bad decision in the moment.

And the Government stresses the defendant's statement, "I'll do it, I'll get the heat," and her later comment about being "in the doghouse because I tried to help that guy" as evidence that she appreciated the wrongfulness of her conduct. But this is nevertheless a few minutes of conduct for someone who has dedicated her life to service of the poor and needy as a lawyer and the public as a judge. It's, to use a more legalistic phrase, aberrant behavior, a marked deviation from an otherwise law-abiding life.

Government further notes that the crime impacted Flores-Ruiz's victims and misused Judge Cervera. The conduct also made the arrest of Flores-Ruiz more dangerous. I doubt that defendant had these things in mind at the time, but they are nevertheless effects I can consider in evaluating the offense.

On the other hand, as the defense has noted, Flores-Ruiz

ended up emerging into the hall just a few feet away from the courtroom door. An agent spotted him, and he was arrested just outside the courthouse. These are also relevant considerations in evaluating the seriousness of the offense.

Second, in ignoring the punishment that's required here, I can't really ignore the collateral consequences that have flowed from the conviction: Loss of job, standing in the community, being a convicted felon. The Government acknowledges that these are relevant considerations. For someone who has dedicated her life to the law, this amounts to significant punishment regardless of what I do today.

As discussed on Page 11 of the defense memo, defendant has also experienced threats. She's been required to move and to stop attending community functions. And this goes beyond what normally happens to people who are subject to federal criminal law.

Third, any judge or other public servant seeing what happened to defendant here, arrested in her place of work, handcuffed, brought to court, charged with and convicted of a felony leading to a loss of position would be deterred from obstruction. It's hard to see how adding any prison time to that would add meaningful general deterrence.

The Government argues that defendant's conduct undermined public confidence in the judicial process, and the sentence must reaffirm that no one is above the law. Again, I doubt

anybody familiar with defendant's very public arrest and ensuing prosecution would forget that lesson. This conviction affirms that no one is above the law.

Fourth, there's no need for prison to protect the public from defendant given her clean record, age, and otherwise positive background. As she's resigned her position as a judge, she won't be in a position to do anything like this again. For similar reasons, prison isn't required for purposes of specific deterrence.

The Government suggests defendant's refusal to acknowledge the wrongfulness of her conduct raises concerns, but I see no realistic possibility that she'll reoffend. In sum, there's no need for prison to provide just punishment given the particular circumstances of this obstruction and the collateral consequences to protect the public from the defendant, given her otherwise outstanding character and history, or to deter others, given the example demonstrated by this prosecution.

The Government addressing the need to avoid unwarranted disparity notes that defendants sentenced under Guideline 2J1.2 usually receive prison terms. I think it's sufficient to say that this case is an outlier, unlike most of those obstruction cases. Further, the manner in which it was charged had a big impact on the guidelines, as noted on Page 9 of the defense memo.

Ordinarily, when a federal court decides prison isn't

necessary to satisfy the purposes of sentencing, the alternative is probation. However, as I think I said before, defendant has no correctional treatment needs that would be addressed by probation, nor is supervision by a probation officer necessary to protect the public or to deter the defendant from further violations of the law.

Pursuant to 18 USC 3572, the Court is authorized to impose a fine on consideration of the factors in 3553(a), the defendant's financial resources, the burden a fine would impose on the defendant, and other factors not specifically relevant here. On review of defendant's financial condition and evaluating the seriousness of the offense, the need to promote respect for the law, and the need to deter others, I will impose a fine of $5,000. This is consistent with the defendant's ability to pay, places no undue burden, and takes into account the collateral consequences consistent with the factors set forth in Guideline 5E1.2(d). The special assessment's $100, which that's been paid. The $5,000 fine is due immediately.

This sentence is based on 3553(a), would be the same regardless of the guidelines and my resolution of the objections.

Ms. Dugan, you have the right to appeal if you believe that this conviction or sentence is unlawful. Counsel has a duty to advise you of your rights. Any notice of appeal must be filed

within 14 days of the entry of judgment. If you want to appeal and can't afford to, you can ask for leave to appeal as a poor person.

I thank everybody for their participation.

MR. FROHLING: Thank you.

(At 11:58 a.m. the hearing ended.)