UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 26-2440

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

HANNAH C. DUGAN,
Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
Case No. 25-CR-89

THE HONORABLE LYNN ADELMAN,
UNITED STATES DISTRICT JUDGE, PRESIDING

# BRIEF OF PLAINTIFF-APPELLEE

JONATHAN H. KOENIG
Assistant United States Attorney
Attorney for Plaintiff-Appellee

530 United States Courthouse
517 E. Wisconsin Ave
Milwaukee, WI 53202
(414) 297-1700

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... iv
INTRODUCTION .......... 1
JURISDICTIONAL STATEMENT .......... 2
STATEMENT OF THE ISSUES .......... 3
STATEMENT OF THE CASE .......... 4
I. Factual Background .......... 4
II. Procedural History .......... 19
SUMMARY OF THE ARGUMENT .......... 22
STANDARDS OF REVIEW .......... 24
ARGUMENT .......... 26
I. Dugan's position as a state-court judge does not immunize her against criminal liability. .......... 26
A. The doctrine of judicial immunity applies to civil suits but does not shield judges from liability for criminal acts. .......... 26
B. According to the Supreme Court, judicial immunity does not shield judges from criminal liability. .......... 27
C. Consistent with Supreme Court authority, courts have entertained criminal cases against judges for a wide range of criminal conduct, including obstruction. .......... 29
D. Dugan's contention that history supports judicial immunity *from criminal prosecution* lacks merit. .......... 31
1. 17th Century England .......... 31
2. 19th Century America .......... 32
3. The few cases that Dugan cites from the 20th and 21st centuries do not advance her argument for criminal judicial immunity .......... 34
4. Dugan's abrogation argument is a red herring .......... 38

5. Even if judicial criminal immunity applied, it would only immunize "judicial acts" from prosecution. ..... 39

II. Dugan's conviction comports with the Tenth Amendment. ..... 41

III. Dugan endeavored to obstruct a "proceeding" because ICE removal operations are "proceedings" under Section 1505. ..... 46

A. Nearly unanimous precedent holds that "proceeding" in Section 1505 is "rather broadly defined" ..... 46

B. The ordinary meaning of "proceeding" is broad. ..... 48

C. "Proceeding" is not limited to adjudicative matters. ..... 49

D. The jury instructions did not impermissibly broaden the scope of Section 1505 ..... 51

E. This Court should not create a special rule excluding agency enforcement actions from the term "proceeding." ..... 53

F. In addition to being wrongly decided, *Hernandez* is factually distinguishable ..... 55

IV. The district court's response to the jury's question about the second element of Section 1505 did not "negate" the nexus requirement of the statute, as to which the jury was properly instructed. ..... 57

A. The district court's jury instruction on the elements of Section 1505 and its answer to the jury's question concerning the second element. ..... 57

B. The district court's answer did not undermine the nexus requirement. ..... 58

C. Dugan's proposed answer to the jury's question would have added an element not found in the law and could lead to absurd results ..... 60

V. The district court rightly declined to instruct the jury that Dugan could not be found guilty based on her "lawful acts as a state-court judge." ..... 61

CONCLUSION ..... 64

CERTIFICATE OF COMPLIANCE ..... 65

CERTIFICATE OF SERVICE ..... 66

## TABLE OF AUTHORITIES

Cases Page(s)

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993) .......... 41
*Arizona v. United States*, 567 U.S. 387 (2012) .......... 45
*Arthur Andersen, LLP v. United States*, 544 U.S. 696 (2005).......... 63, 64
*Bond v. United States*, 572 U.S. 844 (2014) .......... 43
*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) .......... 40
*Commonwealth v. Addison*, 4 U.S. (4 Dall.) 225 (Pa. 1801) .......... 33
*Commonwealth v. Dandridge*, 4 Va. 408 (Va. Gen. Ct. 1824) .......... 32
*Commonwealth v. Tartar*, 239 S.W.2d 265 (Ky. Ct. App. 1951) .......... 35
*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) .......... 53
*Dennis v. Sparks*, 449 U.S. 24 (1980) .......... 26, 39, 52
*Ex. Parte Virginia*, 100 U.S. 339 (1879).......... 26, 27, 28, 40
*Fischer v. United States*, 603 U.S. 480 (2024) .......... 52
*Forrester v. White*, 484 U.S. 219 (1988) .......... 40
*Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999) .......... 42
*Goldstein v. Galvin*, 719 F.3d 16 (1st Cir. 2013) .......... 40
*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .......... 41, 42, 43
*Hamilton v. Williams*, 26 Ala. 527 (1855) .......... 32
*Imbler v. Pachtman*, 424 U.S. 409 (1976) .......... 28, 34, 39
*Jackson v. Virginia*, 443 U.S. 307 (1979) .......... 24
*Kousisis v. United States*, 145 S. Ct. 1382 (2025) .......... 51
*Kugler v. Helfant*, 421 U.S. 117 (1975) .......... 29
*Lange v. Benedict*, 73 N.Y. 12 (1878) .......... 32, 33
*Marinello v. United States*, 584 U.S. 1 (2018).......... 52, 53
*McDonnell v. United States*, 579 U.S. 550 (2016) .......... 49
*Mireles v. Waco*, 502 U.S. 9 (1991) .......... 26
*Murphy v. NCAA*, 584 U.S. 453 (2018).......... 42, 43
*Musacchio v. United States*, 577 U.S. 237 (2016) .......... 24
*New York v. United States*, 505 U.S. 144 (1992) .......... 42
*O'Shea v. Littleton*, 414 U.S. 488 (1974).......... 28, 34
*Pope v. United States*, 323 U.S. 1 (1944).......... 40
*Printz v. United States*, 521 U.S. 898 (1997) .......... 42
*Rice v. United States*, 356 F.2d 709 (8th Cir. 1966) .......... 46, 51
*Rockett v. Eighmy*, 71 F.4th 665 (8th Cir. 2023) .......... 34, 36
*Ryan v. United States Immigration & Customs Enforcement*, 974 F.3d 9 (1st Cir. 2020).......... 21

*Sanders v. Jackson*, 209 F.3d 998 (7th Cir.2000) ... 48
*Spalding v. Vilas*, 161 U.S. 483 (1896) ... 33
*Stump v. Sparkman*, 435 U.S. 349 (1978) ... 40
*United States v. Adams*, 472 F. Supp. 2d 811 (W. Va. 2007) ... 49, 50, 51
*United States v. Aguilar*, 515 U.S. 593 ... 58, 59, 61, 62
*United States v. Bass*, 404 U.S. 336 (1971) ... 43
*United States v. Baumgartner*, 581 F. App'x 522 (6th Cir. 2014) ... 29
*United States v. Benz*, 282 U.S. 304 (1931) ... 40
*United States v. Browning, Inc.*, 572 F.2d 720 (10th Cir. 1978) ... 48
*United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944) ... 34
*United States v. Cintolo*, 818 F.2d 980 (1st Cir. 1987) ... 63
*United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984) ... 27, 29
*United States v. Cochran*, 682 F. App'x 828 (11th Cir. 2017) ... 29
*United States v. Cueto*, 151 F.3d 620 (7th Cir. 1998) ... 63
*United States v. Foy*, 50 F.4th 616 (7th Cir. 2022) ... 24
*United States v. Fruchtman*, 421 F.2d 1019 (6th Cir. 1970) ... 48
*United States v. Gillock*, 445 U.S. 360 (1980) ... 45
*United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) ... 29
*United States v. Guertin*, 581 F. Supp. 3d 90 (D.D.C. 2022) ... 51
*United States v. Hamdan*, 910 F.3d 351 (7th Cir. 2018) ... 24, 25
*United States v. Hastings*, 681 F.2d 706 (11th Cir. 1982) ... 29, 38
*United States v. Hernandez*, 173 F.4th 94 (4th Cir. 2026) ... passim
*United States v. Hofschulz*, 105 F.4th 923 (7th Cir. 2024) ... 24
*United States v. Hopper*, 177 F.3d 824 (9th Cir. 1999) ... 47, 55
*United States v. Joseph*, No.19-cr-10141-LTS, 2020 WL 4288425 (D. Mass. July 27, 2020) ... 30
*United States v. Leo*, 941 F.2d 181 (3d Cir. 1991) ... 47
*United States v. Linwood*, 142 F.3d 418 (7th Cir. 1998) ... 25
*United States v. Patel*, 778 F.3d 607 (7th Cir. 2015) ... 48
*United States v. Rainey*, 757 F.3d 234 (5th Cir. 2014) ... 47
*United States v. Sarno*, 37 F.4th 1249 (7th Cir. 2022) ... 24
*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ... 48
*United States v. Senffner*, 280 F.3d 755 (7th Cir. 2002) ... 46, 47
*United States v. Sutherland*, 921 F.3d 421 (4th Cir. 2019) ... 49
*United States v. Trump*, 603 U.S. 593 (2024) ... 37
*United States v. Vixie*, 532 F.2d 1277 (9th Cir. 1976) ... 48
*Wallace v. Powell*, No. CIV. A, 3:09-CV-0291, 2009 WL 4051974 (M.D. Pa. Nov. 20, 2009) ... 30
*Yates v. Lansing*, 5 Johns. 282 (N.Y. Sup. Ct. 1810) ... 32, 33

Statutes

8 U.S.C. § 1326 .......... passim
18 U.S.C. § 201 .......... 49
18 U.S.C. § 242 .......... 34, 35, 38
18 U.S.C. § 1071 .......... 19, 52
18 U.S.C. § 1505 .......... passim
18 U.S.C. § 1512 .......... 53
18 U.S.C. § 1512(c) .......... 30
18 U.S.C. § 1512(c)(2) .......... 30
26 U.S.C. § 7212 .......... 53

Rules

Fed. R. Crim. P. 33(a) .......... 24
Fed. R. Crim. P. 29 .......... 19, 24

Other Authorities

Civil and Criminal Liability,
27 SAN DIEGO L. REV. 1 (1990) .......... 32
Redressing Judicial Misbehavior: An Integrated Approach to Judicial Immunity,
58 U.C. DAVIS L. REV. 1165 (2024) .......... 32

## INTRODUCTION

The defendant-appellant, Hannah Dugan ("Dugan"), is a former state-court judge who tried to thwart an arrest by Immigration and Customs Enforcement ("ICE") agents at the courthouse where she worked. A jury convicted her of corruptly endeavoring to obstruct "the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States," in violation of 18 U.S.C. § 1505. On appeal, Dugan argues that judicial immunity and the Tenth Amendment place her obstructive actions beyond the reach of this statute. Alternatively, she maintains that she is entitled to a new trial because an "isolated enforcement activity" such as an arrest is not a "proceeding" within the meaning of Section 1505.

This Court should hold that Dugan may be held accountable for violating Section 1505, notwithstanding her state judicial post, and that she is not entitled to an acquittal or a new trial based on a narrow and almost unprecedented interpretation of the statute. It should reject her remaining arguments and permit the jury's verdict to stand.

## JURISDICTIONAL STATEMENT

Dugan's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

I. Did Dugan's position as a judge immunize her from criminal prosecution?

II. Does the Tenth Amendment preclude a federal prosecution against a state court judge?

III. In denying Dugan's post-trial motions, did the district court correctly determine that defendant obstructed a "proceeding" within the meaning of Section 1505?

IV. Did the district court's response to the jury's question about the second element of Section 1505 (knowledge of the proceeding) "negate" the nexus requirement of the statute?

V. Did the district court rightly decline to give a series of proposed defense instructions that would have insulated Dugan from liability for her "lawful acts as a state-court judge?"

## STATEMENT OF THE CASE

### I. Factual Background

*Eduardo Flores-Ruiz*

On March 14, 2025, Eduardo Flores-Ruiz ("Flores-Ruiz") was arrested on domestic-violence charges, including felony strangulation and suffocation and misdemeanor battery offenses, all in violation of Wisconsin law. Tr. 187, 239, 393.[1] He was charged in Milwaukee County Circuit Court with three domestic violence-related misdemeanors. Tr. 50, 631. His case was scheduled for a pretrial conference before Dugan, a county circuit-court judge, at 8:30 a.m. on April 18, 2025, in Courtroom 615. Exhs. 11, 12; Tr. 630.

Meanwhile, officers from the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), identified Flores-Ruiz as someone who previously had been removed and who was not lawfully in the country. Accordingly, ICE Deportation Officer Joseph Vasconcellos began a series of administrative steps to initiate a removal proceeding by preparing a field operations worksheet (FOW) and drafting an administrative arrest warrant (I-200). Exhs. 1A, 1B, 45. On April 17, 2025, Anthony Nimtz, an authorized DHS

[1] "R." refers to a district court docket entry, "Tr." refers to the trial transcript (R. 103-106), "Exh." refers to a government trial exhibit, and "Br." refers to Dugan's opening brief.

immigration official, reviewed the FOW and related materials and found probable cause to believe Flores-Ruiz was removable. Tr. 197, 215-17, 391. Officer Nimtz signed the administrative arrest warrant, which directed that Flores-Ruiz be taken into custody "for removal proceedings" before DHS. *Id.*

ICE's removal process involves steps both before and after an administrative arrest. As Officer Nimtz explained at trial, these steps are as follows:

1. Check databases
2. Identify target
3. Confirm immigration status
4. Determine criminal history
5. Prepare arrest operation plan (*i.e.*, FOW)
6. Draft and submit arrest warrant (*i.e.*, Form I-200, Arrest Warrant)
7. Authorized Immigration Officer determines whether probable cause exists and, if so, signs Arrest Warrant (Form I-200)
8. Arrest target
9. Serve and sign Form I-200 Certificate of Service
10. Complete and serve charging document (*i.e.*, Form I-871, Notice of Intent/Decision to Reinstate Prior Removal Order)
    a. Does individual contest prior removal? (Supervisor adjudicates w/ concurrence from Office of Principal Legal Advisor)
    b. Does individual seek asylum? (Refer to U.S. Customs and Immigration Services for adjudication prior to any removal)
    c. Is individual a candidate for federal prosecution under 8 U.S.C. § 1326 eligible? (Refer to U.S. Attorney)
11. Decision, Order, and Certification Reinstating Prior Removal Order by Authorized Deciding Official (Form I-871)
12. Authorized Immigration Officer signs Warrant of Removal (Form I-205)
13. Fingerprinting, verification, and removal

Exh. 47; Tr. 210-22.

These agency proceedings thus included all steps from identification of Flores-Ruiz in April 2025 through his eventual removal in November 2025. Exh. 47; Tr. 208-12, 525-27.[2] Dugan intervened at step 8 in the above chronology—the step following issuance of an administrative warrant but preceding reinstatement of Flores-Ruiz's order of removal.

Officer Vasconcellos planned the arrest (step 8) for April 18, 2025, at the courthouse. Because Flores-Ruiz and other visitors were required to go through security, the courthouse was a safe location to conduct an arrest. *See* Tr. 245-46. The ICE Task Force members assigned to assist Officer Vasconcellos were from three other federal agencies: CBP Officer Zuraw, FBI Special Agents Baker and Jackling, and DEA Special Agents Spitaletto and Ayers. *See* Tr. 54.

*Prior Courthouse Enforcement Actions*

The Task Force had made two prior arrests of criminal defendants at the courthouse. Tr. 278-80, 308. In each case, agents had notified a courtroom deputy that they were there to execute an administrative arrest warrant and then conducted the arrest in the public hallway after the individual's hearing. *Id.*

[2] Flores-Ruiz was prosecuted under Section 1326 in *United States v. Flores-Ruiz*, No. 25-CR-80 (E.D. Wis.).

Although other counties made private spaces available for ICE arrests at their courthouses to minimize disruptions, Milwaukee County did not do so. Tr. 205-06, 515-17.

Dugan paid close attention to ICE's enforcement actions in the courthouse. On April 1, 2025, she tried to register for a training session on "Minimizing Impact of Courthouse Enforcement Consistent with 2025 ICE Policies." Exh. 5. Because the registration was closed, Dugan asked anyone who attended to share information. *Id.* On April 2, 2025, Judge Laura Perez sent Dugan a link to the presentation materials. Judge Perez explained that ICE was permitted to conduct immigration enforcement actions in public spaces at courthouses against targeted individuals (like criminal defendants). Exh. 39. In the same email chain, Judge Perez suggested to Chief Judge Carl Ashley and others that a court-wide protocol might help "ensure that we all are following federal law and allowing ICE to conduct lawful enforcement." *Id.*

On April 3, 2025, Chief Judge Ashley sent an email to all Milwaukee judges and others advising that ICE had made two arrests in public hallways. He indicated that although he wasn't sure that state or local officials had any authority to intervene in the hallways, detentions in the courtrooms would disrupt court operations. *See* Exh. 6.

This led to a discussion of the need for a courthouse policy. On April 4, 2025, Judge Perez provided the recipients of Chief Judge Ashley's email with the training materials noted above, explaining that "ICE can legally conduct enforcement (i.e., take people into custody) in public areas of the courthouse," a view shared by Chief Judge Ashley. *Id.*; Tr. 597. Judge Perez also explained that the courts could consider making private space available or could limit arrests to public areas. *Id.* On April 8, 2025, Dugan thanked Judge Perez for this information. *Id.*

Chief Judge Ashley scheduled a Zoom meeting for April 9, 2025, and circulated ICE's policy regarding courthouse enforcement. *See* Exh. 7. During the meeting, he noted that the state judiciary did not have the ability to control ICE activities in public hallways. Tr. 601. He circulated an initial and then a revised draft policy to his colleagues and others. *Id.* at 600. Both drafts recognized ICE's ability to make arrests in public spaces. *See* Exhs. 8, 9; Tr. 602-03. As of April 18, 2025, no official or interim policy was in effect mandating how courthouse staff should respond to ICE activity at the courthouse. *Id.* at 585-86, 602-04.

*Events at the courthouse on April 18*

Upon arriving at security on the morning of April 18, Task Force members advised the Milwaukee County Sheriff's Office (MCSO) of the planned arrest of

Flores-Ruiz in a public hallway outside Courtroom 615 and agreed to wait until after his hearing. Tr. 399. Officer Vasconcellos spoke with MCSO Sergeant David DeSmet, who explained that Dugan wanted arrests to be made outside – rather than inside – her courtroom. Tr. 493-95. Agents Baker and Jackling advised Dugan's courtroom deputy that they had a warrant for Flores-Ruiz and agreed to wait until after his hearing to arrest him in the hallway. Tr. 317. An MSCO supervisor also advised Chief Judge Ashley about the planned arrest prior to Dugan's arrival that morning. Tr. 607. All Task Force members were in plain clothes, unmasked, and waiting quietly in the hallway of the sixth floor for Flores-Ruiz's hearing to conclude. Tr. 247, 344.

Members of the Office of the State Public Defender (SPD) had a strong reaction to the presence of the officers. The SPD attorneys discussed ICE's presence, number, and location among themselves and with Alan Freed, Dugan's clerk. *See, e.g.,* Tr. 80-81, 660, 710-12.

Dugan arrived at approximately 8:40 a.m. and took the bench shortly thereafter. *See* Exh. 50L; Tr. 449-50. She began addressing *State v. Hruska*, a case being handled by Attorney Walter Piel. Tr. 661-63; Exh. 42. Freed interrupted the proceedings to advise Dugan that "five ICE agents" were in the hallway. *Id.* Freed offered to call the Chief Judge or even "walk" there, but Dugan told him to hold

off, remarking, "One second, just stay right there." *Id.* Dugan then left the courtroom through the door behind her bench. *Id.*

Dugan used a non-public hallway to enter the adjacent courtroom of Judge Kristela Cervera, through a jury door. Dugan summoned Judge Cervera off the bench in a manner that embarrassed her. Tr. 451. Dugan met Judge Cervera at her chamber's door, directed her to leave her robe on, and stated "ICE is here. We need to check a warrant." Tr. 452-53. Dugan then walked down a restricted hallway that leads to the public hallway. Dugan, who had a copy of the day's calendar, mentioned the name "Flores." Tr. 452, 658. Judge Cervera was confused and asked if Dugan was talking about someone on Judge Cervera's docket, but Dugan did not respond. *See* Tr. 452-53.

At approximately 8:43 a.m., Dugan entered the public hallway and confronted the agents. Tr. 453. Exhs. 50M, 52A, and 53K. Judge Cervera was hesitant to enter the hallway in her robe, and witnesses explained that it was highly unusual to see judges in the hallway in their robes outside of ceremonial functions. Tr. 100-01, 367, 454-55, 503, 538, 567, 703, 738. This is because Wisconsin judges have no authority to intervene in activities in the public hallway. Tr. 595-96, 601, 488.

Dugan approached Officer Vasconcellos and initially asked if he was present for a hearing or trial. When Officer Vasconcellos said no, Dugan told him to "leave." Tr. 403. Officer Vasconcellos responded by telling her that he was there to make an arrest of someone not lawfully present in the United States. Tr. 403, 456. Dugan asked if he had a judicial warrant. Tr. at 457. After Officer Vasconcellos explained he had an administrative warrant, Dugan became angry and stated that was not good enough, telling him repeatedly that he needed a judicial warrant to make an arrest in a public hallway. *Id.*

Dugan's statements to Officer Vasconcellos about his ability to be present in the hallway and the validity of the warrant were false. Public hallways in the courthouse are accessible to everyone, including law enforcement. Tr. 443-44. Arrests at the Milwaukee County Courthouse are a common practice and can be made in a public hallway with or without a warrant based on probable cause. Tr. 445, 492, 495. Dugan not only was aware that arrests took place in the hallways but had advised MCSO Sergeant DeSmet that arrests needed to take place in public spaces because she believed they could not take place in courtrooms. Tr. 494-95. As noted above, Dugan also had thanked Judge Perez for sending information regarding ICE's ability to act in public spaces on April 2 and 4, 2025. *See* Exh. 6. Because she knew ICE could operate in the hallways, Dugan had also displayed a

sign on her courtroom door, stating that if anyone felt unsafe coming to court in person, they could request to appear by Zoom. *See* Exhs. 10, 29, 30; Tr. 473.

Dugan did not ask to see the warrant or give Officer Vasconcellos an opportunity to provide it. Tr. 404. Rather, Dugan directed him to go to the Chief Judge's office, which was at the end of the sixth floor hallway. *Id.* Because he did not know where to go, Judge Cervera offered to escort Officer Vasconcellos. Judge Cervera was uncomfortable with Dugan's behavior and tone. Tr. 457, 484. Witnesses testified that Dugan was "upset," "irritated," "stern," and "angry." Tr. 259, 319, 364, 404, 457.

Dugan also ordered Agent Jackling to go to the Chief Judge's office. Tr. 320. She then approached Officer Zuraw, angrily gestured at him, and told him to "Get out!" Tr. 366; Exh. 53-K. Dugan ultimately ordered all members of the arrest team she had identified to leave. However, Dugan did not accompany them to the Chief Judge's office, a fact that surprised Judge Cervera, who felt "abandoned" by Dugan. Tr. 460, 466. Judge Cervera was also surprised by the number of arrest team members who arrived at the Chief Judge's office, as she expected only Officer Vasconcellos to accompany her, and no policy was in effect that required everyone to report to that area. Tr. 462-63.

Meanwhile, Dugan set about helping Flores-Ruiz leave her courtroom quickly and discreetly while the agents were in the Chief Judge's office. As the agents entered the Chief Judge's office, Dugan gestured to Freed, who had entered the hall, and they immediately walked towards her courtroom. *See* Tr. 107-08. As they left the hallway, they had a short period of time together before entering a second set of doors to her courtroom. Dugan told Freed that the ICE agents had an administrative warrant. Tr. 687, 692-93. Freed learned the warrant was for Flores-Ruiz shortly thereafter, before or while Flores-Ruiz's matter was being addressed off the record. Tr. 687.

Flores-Ruiz and his attorney, Mercedes de la Rosa, were inside Courtroom 615. Attorney de la Rosa's colleagues had alerted her to ICE's presence. *See* Tr. 710. She was concerned and wanted to get her client out as soon as possible. Tr. 711, 727, 733. Dugan asked Attorney de la Rosa, "Which client is it?" *See* Exh. 42B. Dugan then stated that she would take the case "right away." *Id.* She told Attorney Piel, the defense lawyer whose case had been interrupted, to "step back" from the defense table. *See* Tr. 737. Dugan asked Attorney de la Rosa for her client's name and if he needed an interpreter. *See* Exh. 42B. The clerk quickly answered that an interpreter was required, which would have required a wait of minutes to an hour. *See* Tr. 667. Dugan then repeatedly directed Attorney de la Rosa to get a date off

the record "right now" and directed Flores-Ruiz to "stay right there." *See* Exh. 42B. Dugan even told Attorney de la Rosa to "take your client out and come back and get a date." *Id.* That was a very unusual and potentially problematic directive. Tr. 669, 740-41, 760. Dugan then changed her mind, stating, "Oh wait, I'm sorry - Just give her a date." *See* Exh. 42B.

Dugan and her court reporter, Joan Butz, then began to whisper to each other. *See* Tr. 760. Dugan suggested taking Flores-Ruiz out through the jury door and "down the stairs," Tr. 761; Exh. 42B, meaning stairs accessible from a restricted hallway behind the jury door that led down to the fifth floor. Tr. 761-62. After Dugan mentioned the stairs, Butz asked, "You want me to show them?" Tr. 761-62; Exh. 42B. Butz added, "I don't think she knows. She might go out the wrong door." *Id.* By the "wrong door," Butz meant the door to the public hallway because ICE was in that area. Tr. 764. Dugan declined Butz's offer, and responded, "I'll do it. I'll get the heat." Exh. 42B.

Dugan then left the bench, opened the jury door, and instructed Attorney de la Rosa and Flores-Ruiz to "come" with her. *See id.* When Attorney de la Rosa did not immediately go through the jury door, Dugan asked aloud, "Where did she go?" *Id.* Dugan then gestured for Attorney de la Rosa to follow and directed her to "come" through the jury door. Tr. 654, 741, 768.

Dugan also stated that Flores-Ruiz should appear by Zoom for his next hearing (confirming that Dugan believed Flores-Ruiz would be successful in evading arrest). *See* Exh. 42B. Neither Flores-Ruiz's victims (who were present and ended up waiting for over an hour not knowing what had happened with the case), nor the Assistant District Attorney were included in these events. *See* Tr. 632-33, 639-40. This was so even though Dugan's practice was to call victim cases on the record or at least have the defense attorney confirm with the DA's office that a proposed hearing date worked. Tr. 138, 678-79, 744.

Dugan pointed Flores-Ruiz and his attorney down the restricted hallway towards an exit sign over the door that led to the stairs. Tr. 719. Attorney de la Rosa had never been in this hallway before. She was nervous and "freaking out." Tr. 724. Her "brain was spinning," she was not listening well, and she ended up going out the "wrong door" and into the public hallway. *Id.*

After Dugan had directed Flores-Ruiz down the restricted hallway, she returned to the bench and told Attorney Piel and his client to "step up again." Tr. 768-69; Exh. 42. Although no interpreter was present, Freed asked Dugan if they should do other "interpreter cases first." Exh. 42. Dugan asked if there was "anybody else that looks …" before Freed interrupted with, "We aren't sure." *Id.*

Butz then asked what if ICE was on other floors, prompting a loud sigh from Dugan. *Id.*

Only 2 minutes and 48 seconds after Dugan reentered her courtroom, Flores-Ruiz and his attorney exited the courtroom through the restricted hallway. *See* Tr. 104, 122. Dugan's handling of the Flores-Ruiz matter was unusually quick, and Freed, who had been present for thousands of cases in Dugan's courtroom, had never seen a defendant use the door through which Dugan took Flores-Ruiz. *See* Tr. 346, 669-71, 674. Allowing a criminal defendant to utilize the restricted hallway was both unusual and presented a safety concern. Tr. 496.

*Flores-Ruiz flight/arrest*

After Attorney de la Rosa and Flores-Ruiz entered the public hallway, they walked past a set of elevators to a bank located away from Courtroom 615. *See* Tr. 725. Special Agent Spitaletto, whom Dugan had not previously noticed, and Special Agent Ayers, who reentered the hallway after being advised that Dugan was rushing Flores-Ruiz's case, saw Flores-Ruiz and followed. Tr. 540-43. Special Agent Ayers, who did not believe it was safe to arrest Flores-Ruiz alone, was able to get on the elevator with Flores-Ruiz, but Special Agent Spitaletto did not catch up in time. *Id.* As Flores-Ruiz left the building, Special Agent Ayers relayed his location and movements to other Task Force members. *Id.* at 543-44. Agents

eventually got close enough to announce their presence, causing Flores-Ruiz to run. *Id.* He led them on a foot chase in the rain, crossing in front of a moving vehicle. Exhs. 59, 60. Special Agent Ayers eventually apprehended Flores-Ruiz. Tr. 545.

*Activities inside Chief Judge Ashley's office*

Meanwhile, inside the Chief Judge's office, Officer Vasconcellos presented his credentials and the warrant to Judge Cervera. Tr. 405-06. The other members of the Task Force were split between the vestibule area just outside the Chief Judge's office and the public hallway outside of Courtroom 615, where Special Agent Spitaletto had remained undetected. Tr. 407-08. District Court Administrator (DCA) Stephanie Garbo arranged for Chief Judge Ashley (who was not in the office that day) to speak to Officer Vasconcellos using her cell phone, and they moved to a conference room. Tr. 409-10. As soon as this happened, Judge Cervera left to get back to her busy docket. Tr. 464. By this time, Flores-Ruiz and Attorney de la Rosa were on their way out of the courthouse. As Judge Cervera left, Officer Vasconcellos waved for Officer Zuraw to join him behind the second set of glass doors to listen to the conversation with Chief Judge Ashley. Tr. 406. Chief Judge Ashley explained that he was working on a draft policy that he wanted to send to ICE. *Id.* at 410-11. He never told the officers that they could not

make immigration arrests in the public hallway. *Id.*; Tr. 587-88. DCA Garbo also verified that they could make arrests in the public hallways. Tr. 588.

*Judge Cervera's return to her courtroom*

The SPD attorneys who witnessed the events on the sixth floor were left with the impression that Dugan and Judge Cervera had attempted to help Flores-Ruiz avoid arrest. Later that morning, an SPD attorney approached Judge Cervera's bench and told her, "Just so you know, our client was arrested on 10th Street." Tr. 466-67. The attorney added, "Because we know what you were trying to do." *Id.* Another SPD attorney pumped his fist and stated, "Go Judge!" *Id.* A third told Judge Cervera that she was the G.O.A.T. ("greatest of all time"). *Id.* These comments puzzled Judge Cervera, who was not aware that Dugan had rushed Flores-Ruiz's case, that Dugan had directed him through the restricted hallway, or that the arrest had not taken place in the courthouse. When she learned the context for these comments, Judge Cervera was "mortified." Tr. 470.

*Dugan admits to Cervera that she's "in the doghouse"*

The following Monday, Dugan encountered Judge Cervera. Although Judge Cervera tried to avoid the topic, Dugan stated that she was "in the doghouse" with Chief Judge Ashley "[b]ecause I tried to help that guy." *See* Tr. 475. Dugan then demonstrated that she had directed Flores-Ruiz to go through the restricted

hallway to exit her courtroom. *Id.* Dugan made the "doghouse" comment even though she had not spoken with the Chief Judge about the incident. *See* Tr. 614-15.

## II. Procedural History

On May 13, 2025, a grand jury returned a two-count indictment against Dugan, charging her with concealing Flores-Ruiz from arrest, in violation of 18 U.S.C. § 1071 (Count One), and corruptly endeavoring to obstruct a proceeding, in violation of 18 U.S.C. § 1505 (Count Two). R. 6.

The following day, Dugan moved to dismiss the indictment, arguing that she was entitled to judicial immunity and that the prosecution was "entirely unconstitutional" under the Tenth Amendment. R. 15.

After the parties briefed the motion, a magistrate judge recommended denial, providing a detailed analysis of the judicial immunity and Tenth Amendment issues. *Id.* Dugan objected, and after more briefing, the district court adopted the magistrate judge's report and recommendation. R. 48.

Before trial, the parties submitted proposed jury instructions and motions in limine. Trial commenced December 15, 2025, and lasted four days. R. 92.

At the close of the government's case, on December 17, 2025, the defense moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Tr. 773-74. The district court took the motion under advisement. *Id.*; R. 88.

During deliberations, the jurors asked two questions. The first concerned whether Dugan "needed to know the identity of the subject of the arrest warrant, for example, his specific name," for purposes of Count One. Tr. 909. Over the government's objection, the district court responded that, "in order to commit the offense charged in Count 1, the defendant needed to know the identity [of] the subject of the warrant." Tr. 918. The jury's second question was whether Dugan "needed to know the identity of the subject of the pending proceeding" for purposes of Section 1505's second element (that "the defendant knew of the pending proceeding"). Tr. 919. The district court declined to instruct the jury that this element required Dugan to know Flores-Ruiz's specific name. Instead, the Court explained, "To know <u>of</u> the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the proceeding." Tr. 926 (emphasis in the original).

The jury returned verdicts of not guilty as to Count One of the indictment, and guilty as to Count Two. R. 96.

In January 2026, Dugan filed a "renewed" Rule 29 motion and moved for a new trial under Rule 33. R. 109.[3] The district court denied Dugan's post-trial motions in a nearly-forty-page opinion. R. 117.

In April 2026, the defense asked the court to reconsider its ruling, citing *United States v. Hernandez*, 173 F.4th 94 (4th Cir. 2026), in which a split panel of the Fourth Circuit held that immigration enforcement actions were not proceedings under Section 1505. This led to further briefing and oral argument. R. 120-27. In June 2026, the district court denied the reconsideration motion, providing more than thirty additional pages of analysis in light of *Hernandez*. R. 128.

On July 8, 2026, the district court sentenced Dugan to a $5,000 fine. R. 135. Judgment was entered the same day. R. 136. This timely appeal followed. R. 138.

---

[3] At this juncture, Dugan raised—for the first time—an argument premised on a common law privilege protecting parties and witnesses from civil arrests in courthouses. With good reason, she has abandoned the argument on appeal. The district court found that this argument was untimely under Rules 29 and 33, and that Dugan lacked standing to assert any privilege. R. 117 (pp. 15-17). *See also Ryan v. United States Immigration & Customs Enforcement*, 974 F.3d 9 (1st Cir. 2020).

## SUMMARY OF THE ARGUMENT

Dugan asserts that her prosecution is barred by judicial immunity and the Tenth Amendment, that the term "proceeding" is too narrow to embrace the arrest of Flores-Ruiz, and that the district court "improperly broadened the scope of 18 U.S.C. § 1505," entitling her to an acquittal or a new trial.

The district court correctly determined that Dugan was not immune from prosecution, a conclusion amply supported by Supreme Court precedent and other cases illustrating that judges have been prosecuted for a wide variety of crimes. Likewise, the district court correctly ruled that the Tenth Amendment does not bar the federal criminal prosecution of a state court judge or require a "clear statement" in the statute authorizing such a prosecution.

The district court also correctly defined the scope of "proceeding," both in its jury instructions and in its careful analysis of the post-trial motions. The term should be given a broad construction, consistent with precedent, and no special exception should be made for cases involving immigration enforcement. Specifically, the district court was right to reject the approach of the Fourth Circuit *Hernandez* majority because the trial evidence in this case established that Dugan did not merely obstruct an isolated law enforcement action, as was arguably the

case in *Hernandez*, but rather obstructed an arrest that was part of a series of steps comprising an ICE removal proceeding.

Lastly, neither the district court's response to the jury's question about the second element of Section 1505 nor its refusal to give a "lawful acts" instruction are bases for acquittal or a new trial.

**STANDARDS OF REVIEW**

This Court "review[s] the district court's denial of a motion for acquittal under Rule 29 *de novo*, and the denial of a motion for a new trial under Rule 33 for abuse of discretion." *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022). The denial of a reconsideration motion is also reviewed for abuse of discretion. *United States v. Sarno*, 37 F.4th 1249, 1253 (7th Cir. 2022).

A court addressing a Rule 29 motion asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). "Great deference is owed to the jury's verdict" under this "highly demanding standard," which imposes "a nearly insurmountable burden." *United States v. Hofschulz*, 105 F.4th 923, 931-32 (7th Cir. 2024).

Under Rule 33, a court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, "the exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018)). For this reason, and because trial judges are best-

positioned to evaluate such motions, appellate review is "highly deferential." *Id.; see also United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998).

## ARGUMENT

### I. Dugan's position as a state-court judge does not immunize her against criminal liability.

#### A. The doctrine of judicial immunity applies to civil suits but does not shield judges from liability for criminal acts.

Under the doctrine of judicial immunity, "generally, a judge is immune from a suit for money damages" for judicial acts. *Mireles v. Waco*, 502 U.S. 9 (1991) (per curiam). The doctrine evolved to shield judges from civil liability based on their judgments, in order to promote independent decision-making in both civil and criminal cases. *Dennis v. Sparks*, 449 U.S. 24, 31 (1980) (judicial immunity "arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear"). Dugan argues that this doctrine also applies in the criminal context, even though the Supreme Court has long recognized just the opposite: that a judge "is not absolutely immune from criminal liability." *Mireles*, 502 U.S. at 10 n.1 (citing *Ex parte Virginia*, 100 U.S. 339, 348-49 (1879)).

Dugan would like the law to be different. The justification for immunity, she says, is greater in criminal cases because "the 'apprehension of personal consequences' and the resulting threat to judicial independence are only heightened when the consequences shift from civil to criminal." Br. 22. This is far

from obvious. Dugan's argument ignores the many procedural barriers that apply to bar vindictive or otherwise inappropriate criminal prosecutions. These include indictment, burden of proof, and presumption of innocence. *United States v. Claiborne*, 727 F.2d 842, 848 (9th Cir. 1984). As well, "[i]t can scarcely be doubted that the citizenry would justifiably lose respect for and confidence in a system of government under which judges were apparently held to be above the processes of the criminal law." *Id.* at 849. Yet another salient point is that only a prosecutor, with all the attendant obligations of responsible government decision-making and acting in the public interest, may bring criminal charges, while any citizen may bring a civil suit. Thus, there is a much greater danger of baseless and harassing civil suits than of frivolous criminal prosecution.

B. According to the Supreme Court, judicial immunity does not shield judges from criminal liability.

The Supreme Court first contended with what amounted to a claim of judicial immunity from *criminal* prosecution in *Ex Parte Virginia*, 100 U.S. 339 (1880). There, a state court judge was charged with excluding African Americans from juries, in violation of a federal criminal statute. On habeas review, the Court characterized the act of selecting jurors as "ministerial," not judicial. It noted, however, that even if it could be characterized as judicial, state law gave the judge

no authority to exclude African Americans from a jury panel. Thus, the Court rejected the judge's argument that the challenged federal criminal statute penalized state judges for their judicial acts. 100 U.S. at 348-49. While *Ex Parte Virginia* did not definitively reject criminal judicial immunity, it did not in any way endorse it. Dugan engages in rank speculation when she argues that "the Court [must have] understood that judicial immunity extends to criminal prosecutions" or it would have said otherwise. Br. 23.

Since *Ex Parte Virginia*, moreover, the Supreme Court has consistently disclaimed any notion that judges are immune from criminal prosecution. It has stated:

> Whatever may be the case with respect to civil liability generally, or civil liability for willful corruption, we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, *the judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress.*

*O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (cleaned up; emphasis added); *see also Imbler v. Pachtman*, 424 U.S. 409, 428-429 (1976) ("This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even

judges, cloaked with absolute civil immunity for centuries, could be punished criminally").

C. Consistent with Supreme Court authority, courts have entertained criminal cases against judges for a wide range of criminal conduct, including obstruction.

Dugan describes a criminal prosecution against a judge as a "rare bird." Br. 30. While such cases may be *relatively* rare, this stands to reason because judges are selected, at least in part, for their probity and respect for the law. Notwithstanding this, judges have been prosecuted for a wide range of crimes, including obstruction and offenses stemming from or enabled by their roles. *See, e.g.*, *Kugler v. Helfant*, 421 U.S. 117, 131 (1975) (judge indicted on state charges of obstruction and lying to a grand jury); *United States v. Cochran*, 682 F. App'x 828, 842 (11th Cir. 2017) (affirming state court judge's convictions for, *inter alia*, witness tampering in violation of 18 U.S.C. § 1512); *United States v. Baumgartner*, 581 F. App'x 522, 534 (6th Cir. 2014) (affirming conviction of state court judge for misprision of a felony, in violation of 18 U.S.C. § 4); *United States v. Grubb*, 11 F.3d 426, 438 (4th Cir. 1993) (affirming conviction of state court judge under 18 U.S.C. § 1503 for obstructing a grand jury investigation by lying to FBI agent); *Claiborne*, 727 F.2d at 843 n.1 (federal judge prosecuted for urging a grand jury witness to lie, in violation of 18 U.S.C. § 1503); *United States v. Hastings*, 681 F.2d 706, 710 (11th Cir. 1982)

(prosecution under 18 U.S.C. § 1503); *United States v. Ash*, No. 19-mj-9341-UA (S.D.N.Y. filed Oct. 4, 2019) (state court judge prosecuted under 18 U.S.C. § 1512(c) and other statutes for obstructing a grand jury proceeding); *United States v. Moreland*, Crim. No. 17-00066 (M.D. Tenn. May 24, 2018) (state court judge convicted under 18 U.S.C. § 1512(c)(2) and other statutes for directing grand jury witness to lie and destroy documents); *United States v. Walker*, Crim. No. 14-00093-DCB-FKB (S.D. Miss. Oct. 7, 2014) (state court judge convicted under 18 U.S.C. § 1512(c)(2) for telling grand jury witness that a subpoenaed document "probably needs to be somewhere else"); *United States v. DeLaughter*, Crim. No. 09-0002-GHD-SAA (N.D. Miss. July 30, 2009) (state court judge convicted under 18 U.S.C. § 1512(c)(2) for lying to FBI about case in which he made rulings favorable to the defense at the request of an attorney friend); *cf. Wallace v. Powell*, No. CIV. A 3:09-CV-0291, 2009 WL 4051974, at *6, *8-9 (M.D. Pa. Nov. 20, 2009) (citing the fact that judges who took bribes could be prosecuted for their "egregious behavior" as a justification for absolute *civil* judicial immunity).[4]

[4] Nor is the federal prosecution of a state judge for endeavoring to obstruct an immigration arrest entirely unprecedented. See *United States v. Joseph*, No.19-cr-10141-LTS, 2020 WL 4288425 (D. Mass. July 27, 2020).

D. Dugan's contention that history supports judicial immunity *from criminal prosecution* lacks merit.

1. 17th Century England

Dugan traces judges' supposed common law immunity from *criminal* proceedings to *Floyd v. Barker*, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). However, *Floyd* arose from a collision between the Court of the Star Chamber and the common-law courts of Jacobean England. Lord Coke determined that a claim of conspiracy brought against a judge of the Courts of Assize "for any thing done by him as Judge" while trying a murder case was "not examinable in the Star-Chamber," because both the Star Chamber and the Courts of Assize drew their authority from the King and therefore only "the King himself" could review the judge's actions. *Floyd*, 77 Eng. Rep. at 1307. Allowing each of the King's courts to superintend the others in such a manner, Lord Coke reasoned, would "tend[] to the slander of the justice of the King" and thereby "scandal of the King himself"; result in "continual calumniations" that would "subver[t]" the King's authority "to deliver justice to all his subjects"; and usurp the King's prerogative to supervise his judges. *Id.*

*Floyd* thus arose in an unusual legal context that has no parallel in modern American law—certainly not in this case, involving a federal prosecution of a state judge for federal crimes she committed outside the scope of her judicial duties.

Even assuming that *Floyd* endorsed a broad doctrine of judicial immunity extending to *criminal* prosecution, that aspect of the doctrine did not take root in American law. While the common-law tradition of immunity from *civil* suit has established itself here, the same is not true of immunity from criminal prosecution. Indeed, this dichotomy is pronounced and has been noted in scholarship about judicial immunity.[5]

2. 19th Century America

Dugan argues that American courts embraced the idea of judicial immunity against *criminal* prosecution early and have consistently maintained that common law tradition ever since. One problem with this storyline is that most of the nineteenth century cases she cites were not criminal cases at all. *See Yates v. Lansing*, 5 Johns. 282 (N.Y. Sup. Ct. 1810), *Hamilton v. Williams*, 26 Ala. 527 (1855), *Lange v. Benedict*, 73 N.Y. 12 (1878). One of them, *Commonwealth v. Dandridge*, 4 Va.

---

[5] Nancy Amoury Combs, Redressing Judicial Misbehavior: An Integrated Approach to Judicial Immunity, 58 U.C. DAVIS L. REV. 1165, 1171 (2024); *see also* Jeffrey M. Shaman, Judicial Immunity from Civil and Criminal Liability, 27 SAN DIEGO L. REV. 1, 18 (1990).

408 (Va. Gen. Ct. 1824), did not involve criminal charges against a judge.[6] Therefore, to the extent these cases opine that judicial immunity "holds a judge exempt from a civil suit *or indictment*," *Yates*, 5 Johns. at 291 (emphasis added), they are *dicta*.

*Spalding v. Vilas*, 161 U.S. 483 (1896)—neither a criminal case nor a case against a judge—likewise does not provide substantial support for Dugan's argument. Dugan twice quotes *Spalding* as saying that there is no distinction between "a civil suit or indictment" for purposes of judicial immunity. *Id.* at 20, 22. Although that language does appear in *Spalding*, it is a quotation from *Yates*, one of several immunity cases surveyed by the Court. But in *Yates* itself, as discussed, the "or indictment" language was *dicta* because *Yates* did not involve criminal charges. *Spalding*, likewise, did not concern immunity from criminal prosecution; indeed, it did not concern *judicial* immunity at all because it arose from an action against the postmaster general.

---

[6] *Commonwealth v. Addison*, 4 U.S. (4 Dall.) 225 (Pa. 1801) was a criminal case against a judge, but the facts and holding of the one-paragraph opinion in *Addison* are somewhat obscure. The Pennsylvania Supreme Court appears to have rejected an effort to charge a judge who, while presiding over the court of common pleas, "willfully" prevented another judge from "delivering his sentiments to the grand jury." *Id.* Although the reviewing court thought this behavior "indecent and improper," it concluded the case did not "present … an indictable offense." *Id.*

3. The few cases that Dugan cites from the 20th and 21st centuries do not advance her argument for criminal judicial immunity

Notwithstanding these examples of criminal prosecutions of judges and the consistent pronouncements of the Supreme Court, Dugan invokes a handful of cases from the modern era that she claims support the idea that "'judicial immunity continues to apply today … in prosecutions.'" Br. 23 (quoting *Rockett v. Eighmy*, 71 F.4th 665 (8th Cir. 2023)).

One such case is *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944). Chaplin was a municipal judge whom federal prosecutors charged with a criminal civil rights violation (under a predecessor to 18 U.S.C. § 242) in connection with his sentencing of a vagrant. Judge Chaplin interposed the defense that he was "immune from indictment and prosecution for judicial acts performed by him in judicial proceedings pending in his court and within the jurisdiction thereof." *Id.* at 927. The federal judge presiding over his criminal case agreed and ruled that Chaplin's plea acted as a "bar to the whole indictment." *Id.* at 926.

The district court in *this* case rightly noted that the *Chaplin* decision relied mostly on civil immunity precedents. More significantly, the district court found the *Chaplin* decision difficult to square with subsequent Supreme Court cases like *O'Shea*, 414 U.S. 488, and *Imbler*, 424 U.S. 409, which clearly hold that judges may

be prosecuted criminally under 18 U.S.C. § 242. Indeed, Dugan admits as much in her brief, Br. at 28-29, which makes her reliance on *Chaplin* problematic.

The district court here also concluded, justifiably, that *Commonwealth v. Tartar*, 239 S.W.2d 265 (Ky. Ct. App. 1951), was "a thin reed upon which to rest a claim of criminal judicial immunity." R. 48 (p. 14).[7] Tartar was indicted for "wrongfully and corruptly" certifying a list of grand jurors and was charged with the common law offense of "misfeasance in office." *Id.* at 266. The trial court sustained a demurrer to the indictment, which the appellate court affirmed. In a short opinion, the court cited *Yates* for the proposition that "judges acting in their official capacities should be protected from harassment by either civil suits or criminal prosecutions." *Id.* It is unclear, as the district court put it, "whether the *Tartar* court found the judge immune or decided that the indictment failed to charge a common law offense against the judge." R. 48 (p. 14). The significance of *Tartar*, beyond the realm of immunity for malfeasance or misfeasance in office, is therefore uncertain. Dugan, of course, was not charged with malfeasance or misfeasance, but with violating a federal criminal law of general applicability. *Id.*

[7] Isolated state cases like *Tartar* and *Yates* also provide no support for a longstanding common-law rule of judicial immunity in criminal cases at the *federal* level, given that states may define immunities under their own laws differently.

Dugan also cites *Rockett*, 71 F.4th 665, yet that case is an even thinner reed than *Tartar* upon which to rest a claim of criminal judicial immunity. The appeal in *Rockett* arose from a Section 1983 action brought against a Missouri judge who, among other things, personally jailed two juveniles in connection with a child custody dispute. Like some of the nineteenth century cases cited by Dugan, the Eighth Circuit's opinion in *Rockett* cites *Yates* for a broad rule of immunity that extends to criminal cases. *Id.* at 669. Yet *Rockett* was not a criminal case and offered little beyond the *dicta* in *Yates* to support the idea of immunity from criminal prosecution. *Rockett*'s statement that "[j]udicial immunity continues to apply today . . . in prosecutions" was neither accurate nor necessary to the Eighth Circuit's disposition of the appeal. *Id.* In fact, civil immunity notwithstanding, the court in *Rockett* allowed the plaintiff's claims about the jailing of his children to go forward, on the theory that the judge "crossed the line" separating judicial from non-judicial acts when he "escorted the kids to jail, stood there while they removed their clothes and belongings, and personally came back an hour later to release them." *Id.* at 671. Similarly, Dugan's acts crossed the line separating judicial from non-judicial acts when she took it upon herself to thwart a lawful arrest over which she had no jurisdiction as a state judge.

Last, chronologically, is *United States v. Trump*, 603 U.S. 593, 630 (2024), which Dugan also attempts to enlist in support of her immunity argument. In *Trump*, the Supreme Court held that the *President* has criminal immunity for official acts based on the presidency's "unique position in the constitutional scheme" and the "unique risks to the effective functioning of government" if Presidents were forced to constantly assess whether their decision-making while in office might one day prompt criminal inquiries by state or federal prosecutors. 603 U.S. at 611, 613. As the district court observed, "[t]hese same concerns do not arise when one of the nation's many judges is subject to prosecution." R. 48 (p. 18).

Dugan argues that *Trump* supports her argument indirectly because it recognized that the rarity of criminal prosecutions of presidents could be taken as evidence that "some immunity" existed all along. Br. 30. Likewise, she argues, the fact that criminal prosecutions of judges are ″rare birds" is evidence that judges enjoy immunity from criminal prosecution. The "rare bird" metaphor misses the mark, however, for there are many examples of judges-as-criminal-defendants, compared with only a handful of cases involving presidents. And in any event, unlike in *Trump*, the Supreme Court has repeatedly affirmed that judicial immunity extends only to civil damages for judicial acts, not to criminal charges.

4. Dugan's abrogation argument is a red herring

Assuming that there has long been judicial immunity from criminal prosecution, Dugan argues that Congress's failure to abrogate such immunity in Section 1505 means that the doctrine "remains" in place and fully shields her from criminal liability. The same argument could presumably be leveled at other obstruction statutes under which judges have been criminally prosecuted, including bribery and public corruption statutes that contain no specific abrogation of judicial immunity. *See, e.g., Hastings*, 681 F.2d at 710. The flaw in the argument is that there is no firm American tradition of judicial immunity from criminal prosecution *in the first place*, and thus, there was nothing for Congress to abrogate when it passed Section 1505.

Moreover, in the decades since Section 1505 has been on the books: (1) the Supreme Court has never indicated that there is any judicial immunity for criminal conduct, and (2) judges have been prosecuted under other generally applicable laws, *e.g., Hastings*, *supra*.

Dugan points to 18 U.S.C. § 242 as an example of a statute "clearly evincing Congress' intent to abrogate judicial immunity by targeting official misconduct." Br. 29. To be sure, the Supreme Court has recognized that judges are not immune from criminal prosecution under civil rights statutes such as 18 Section 242. See

*Imbler*, 424 U.S. at 429. But, again, that is because judicial immunity from criminal prosecution *does not exist*--not because Congress *abrogated* judicial immunity in those statutes. In any event, Section 242, which arose in a very particular historical context—indeed, partly in response to judges violating civil rights—should not be taken for the proposition that judges are presumptively immune from criminal prosecution.

5. Even if judicial criminal immunity applied, it would only immunize "judicial acts" from prosecution.

As alleged in the indictment, and proven at trial, Dugan went well beyond her official role when she endeavored to prevent federal law enforcement officers from executing a valid arrest of Flores-Ruiz in a public area of the courthouse. Thus, even if judicial criminal immunity applied, it would not help Dugan.

The considerations that gave rise to civil judicial immunity help distinguish judicial from non-judicial acts. "[Civil] judicial immunity arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and corruption." *Dennis*, 449 U.S. at 31 (emphasis added). Civil judicial immunity exists, in other words, to protect the

"adjudicative function." *Forrester v. White*, 484 U.S. 219, 226-27 (1988) ("paradigmatic judicial acts" are those that involve "resolving disputes between parties who have invoked the jurisdiction of a court"). Traditional "adjudicative" functions "include such things as weighing evidence, making factual findings, reaching legal determinations, choosing sanctions, and expounding reasons for decisions." *Goldstein v. Galvin*, 719 F.3d 16, 25 (1st Cir. 2013) (citation and internal quotation marks omitted). Judicial acts also include entering judgment, *Pope v. United States*, 323 U.S. 1, 12 (1944); imposing or altering a sentence, *United States v. Benz*, 282 U.S. 304, 311 (1931); and issuing a search warrant, *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993).

In contrast, as this case demonstrates, some actions taken by judges are *not* judicial acts. As long ago as 1879, the Supreme Court recognized that a judge does not engage in a judicial act when she acts "outside of [her] authority," *Ex Parte Virginia*, 100 U.S. at 348, which is exactly what Dugan did when she endeavored to obstruct an *unrelated* proceeding before a different sovereign in a public space where federal agents had every right to enforce federal law. This was not "a function normally performed by a [state court] judge." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978).

Accordingly, prosecuting Dugan for violating Section 1505 does not impair "the independent and impartial exercise of judgment vital to the judiciary," *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993), because no such judgment was exercised by Dugan. Rather, she misused her office to thwart an arrest over which she had no jurisdiction, which was not her concern as a judge, and in a public hallway where she had no authority. In such circumstances, Dugan's claim that the government is somehow threatening judicial independence by seeking to hold her accountable for her actions rings hollow.

## II. Dugan's conviction comports with the Tenth Amendment.

Dugan argues that the Tenth Amendment bars this prosecution. She constructs an elaborate explanation for this position, based on *Gregory v. Ashcroft*, 501 U.S. 452 (1991), but the district court rightly rejected a similar argument. The district court also observed, correctly, that Dugan had failed to identify any authority for her argument that a clear statement from Congress is needed before a federal criminal statute of general applicability, such as Section 1505, may be applied to a state official. Dugan's opening brief to this Court is similarly devoid of any precedent directly supporting this argument.

The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved

to the States respectively, or to the people." U.S. Const. amend. X. The amendment embodies the concept of a federalist system comprised of "dual sovereigns"; a system that among other things acts as "a check on abuses of government power." *Gregory*, 501 U.S. at 458. As this Court has explained:

> The Tenth Amendment does not itself demarcate the boundary dividing state from federal authority; its text "is essentially a tautology," declaring only that the States retain those powers not surrendered. Whether Congress has invaded the province reserved to the States by the Tenth Amendment is therefore a question that must be answered by inquiring whether Congress has exceeded the limits of authority bestowed upon it by Article I of the Constitution.

*Gillespie v. City of Indianapolis*, 185 F.3d 693, 704 (7th Cir. 1999) (quoting and citing *New York v. United States*, 505 U.S. 144, 156-57 (1992)).

One way that Congress exceeds the limits of its authority is by "using the States as the instruments of federal governance." *Printz v. United States*, 521 U.S. 898, 919 (1997). The Supreme Court's "anti-commandeering" precedents forbid attempts by Congress to dictate policy to a state legislature, enlist state officials in a federal regulatory program, or prohibit a state from enacting new laws. *Murphy v. NCAA*, 584 U.S. 453 (2018) (summarizing development of anti-commandeering doctrine). Dugan does not rely directly upon this line of cases but cites *Printz*, *supra*, in her discussion of "background federalism principles." Br. 33.

*Gregory*, the centerpiece of Dugan's Tenth Amendment argument, is a preemption case. The Court in *Gregory* held that the Age Discrimination in Employment Act ("ADEA") could not be applied to Missouri state court judges, consistent with the Tenth Amendment, absent a clear statement that Congress intended to interfere with the state's power to define the qualifications of its own officials. *Gregory*, 501 U.S. at 461. *Gregory* says simply that Congress must be explicit to warrant a conclusion that it has preempted state law about "a decision of the most fundamental sort for a sovereign entity." *Id.* at 460. The Court said that requiring a clear statement was "nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.*

According to Dugan, the Supreme Court's decision in *Bond v. United States*, 572 U.S. 844 (2014), "reaffirm[s] the clear statement rule's application to this context." Br. 18. But *Bond* involved a conflict between a federal criminal statute prohibiting the use of "chemical weapons" and "purely local crimes" within the traditional police powers of the state, such as assault. The Court was skeptical that a jilted spouse's spreading irritating chemicals on the car, mailbox, and doorknob of her rival involved using a "chemical weapon" within the "ordinary meaning" of the term. *Id.* at 861. The Court did discuss federalism as a

"background principle" and cited *Gregory*, but its principal concern was with federalizing "'traditionally local criminal conduct,'" including "the simplest of assaults." *Id.* at 859 (quoting *United States v. Bass*, 404 U.S. 336, 250 (1971)). Section 1505 does not similarly threaten areas of the criminal law traditionally reserved to the states. Indeed, as embodied in its text, its purpose is to protect the integrity of *federal* agency proceedings.

Dugan somehow derives from *Gregory* a "rule" that has yet to be recognized by any court, namely, that federal criminal laws of general applicability may never be applied to state officials absent a "clear statement" from Congress that they may be so used. This proposition is far afield from any of the cases Dugan cites. Section 1505 does not regulate states or their political subdivisions at all, nor does it intrude upon traditional state police powers. Nor is it accurate to say that the law "target[s] private actors." Br. 15. Rather, Section 1505 makes it a crime for *anyone* to obstruct a federal agency proceeding.

Dugan claims, nonetheless, that Section 1505's "capacious language" has been used in this case to "stretch federal prosecutorial authority so far as to allow for criminalizing official state acts." Br. 36. This is hyperbole, and Dugan's focus on her official acts is misplaced. The jury was not invited to make a finding of criminal liability based upon Dugan's official actions as such, but based on the

intent with which she took those actions. Also, while Dugan characterizes this as a case involving conflict between competing state and federal "policy priorities," Br. 36, nothing about the indictment or the government's presentation of the evidence at trial invited the jury to decide the case on such a basis.

To the extent federalism concerns come into play at all, the Supremacy Clause tips the balance in favor of Section 1505. *United States v. Gillock*, 445 U.S. 360, 370 (1980) ("[I]n those areas where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power."). In a conflict between Section 1505 and Dugan's "official state acts," moreover, the argument that Section 1505 should prevail is particularly compelling because the part of the immigration proceeding that Dugan endeavored to obstruct—a lawful arrest occurring in a public place—lay wholly within the jurisdiction of the federal government. *See Arizona v. United States*, 567 U.S. 387, 395 (2012) (federal power over immigration – including removal – is undoubted and exclusive).

To summarize, Dugan's case was not charged or prosecuted in a way that diminished the sovereignty of the State of Wisconsin, or that overstepped the bounds of the federal government's authority to protect the integrity of its own agency proceedings. The specific federalism concerns raised by the Supreme Court

in *Gregory*, *Bond*, and its anti-commandeering cases are not present. And Dugan fails to come forward with any precedent directly supporting her "clear statement" argument.

## III. Dugan endeavored to obstruct a "proceeding" because ICE removal operations are "proceedings" under Section 1505.

### A. Nearly unanimous precedent holds that "proceeding" in Section 1505 is "rather broadly defined"

Dugan endeavored to obstruct an ICE removal proceeding when she attempted to thwart Flores-Ruiz's arrest. As this Court has observed, "proceeding" is "a term that is defined rather broadly … for the purpose of section 1505." *United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002). In the leading case, *Rice v. United States*, the Eighth Circuit concluded that "proceeding" is "a comprehensive term meaning the action of proceeding – a particular step or series of steps, adopted for accomplishing something." 356 F.2d 709, 712 (8th Cir. 1966). Thus, as the jury was instructed, "proceeding" as used in Section 1505 "simply mean[s] proceeding in the manner and form prescribed for conducting business before the department or agency, including *all* steps and stages in such an action from its inception to its conclusion." *Id.* (emphasis added); R. 94. In other words, "proceeding" is "a term of very broad scope." *Id.* at 715, *accord Senffner*, 280 F.3d at 761.

This Court in *Senffner* held that, by obstructing the recovery of funds subject to a temporary restraining order, the defendant "obstructed the district court, and, as a consequence, the SEC's initial investigation and enforcement of securities law violations (an SEC proceeding), which sought the return of the funds." 280 F.3d at 760-61 (emphasis added); *see also United States v. Hopper*, 177 F.3d 824, 830-31 (9th Cir. 1999) (concluding that the "enforcement of tax liens by the IRS is an IRS proceeding" as that term is used in Section 1505) (emphasis added). In *Senffner*, this Court said:

> The SEC, as a government agency, can only act through individuals or other instrumentalities using the enforcement mechanisms it has available. These mechanisms may be internal or involve other entities, including the federal courts. Therefore, whenever an entity acting for or at the direct request of an agency has been obstructed, the agency itself has also been obstructed.

*Senffner*, 280 F.3d at 760. Not only did *Senffner* endorse a broad construction of proceeding, it embraced a definition that included "enforcement mechanisms," which makes it difficult for Dugan to argue that such mechanisms should be carved out of the definition.

Other circuits likewise have recognized the broad nature of "proceeding" as used in Section 1505. *See United States v. Rainey*, 757 F.3d 234, 245 (5th Cir. 2014) (Section 1505 "should be broadly construed"); *United States v. Leo,* 941 F.2d 181,

199 (3d Cir. 1991) ("[g]iven the broad meaning of the word 'proceeding' …"); *United States v. Schwartz*, 924 F.2d 410, 423 (2d Cir. 1991) (the "term 'any proceeding' as used in Section 1505 has been defined broadly"); *United States v. Browning, Inc.*, 572 F.2d 720, 723 (10th Cir. 1978) (the term "proceeding" in Section 1505 is "broad"); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (an "administrative investigation is a 'proceeding' within the meaning" of Section 1505); *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir. 1970) ("'proceeding' is a term of broad scope").

B. The ordinary meaning of "proceeding" is broad.

"When interpreting the meaning of undefined statutory terms, the 'cardinal rule is that words used in statutes must be given their ordinary and plain meaning.'" *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015) (quoting *Sanders v. Jackson,* 209 F.3d 998, 1000 (7th Cir.2000)). To ascertain the plain meaning of words, this Court frequently looks to dictionary definitions. *Id.* As the dissent in *Hernandez* observed, both lay and law dictionaries define the term broadly. *Proceeding*, OXFORD ENGLISH DICTIONARY, available at https://doi.org/10.1093/OED/4783441135 (visited October 2, 2026) ("The carrying on of an action or series of actions; action, course of action; conduct, behaviour."); *Proceeding*, BLACK'S LAW DICTIONARY 1459 1324 (9th ed. 2009) ("As

applied to actions, the term 'proceeding' may include … the enforcement of the judgment …. (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3–4 (2d ed. 1899)).

C. "Proceeding" is not limited to adjudicative matters.

Dugan argues that the term "proceeding" in Section 1505 "connotes an official action by a deliberative body" and reaches only those agency activities that implicate its formal decision-making or adjudicative process, *i.e.,* the kind of proceedings that can be obstructed, much like court proceedings." Br. 18. Although that is arguably a fair characterization of the term "official proceeding" used in nearby Section 1512(c)(2), it is far narrower than the meaning of "proceeding" in Section 1505. *Compare United States v. Sutherland*, 921 F.3d 421, 425 (4th Cir. 2019) (holding that "official proceeding" under Section 1512 "implies some formal convocation of the agency in which parties are directed to appear") (internal quotes and citations omitted).[8]

The portion of Section 1505 under which Dugan was convicted was enacted in its original form in 1940. *See United States v. Adams*, 472 F. Supp. 2d 811, 815 (W.

[8] Dugan cites *McDonnell v. United States*, 579 U.S. 550 (2016), for the proposition that "not everything government does rises to the level of a 'pending proceeding.'" Br. 20. She apparently refers to *McDonnell*'s discussion of what the Supreme Court regarded as the government's too-broad interpretation of the term "official act" in 18 U.S.C. § 201.

Va. 2007) (citing Pub. L. No. 76-401; 54 Stat. 13, 13). The law enacted in 1940 contained the "catchall" provision concerning obstruction, which criminalized those who would "corruptly . . . endeavor to influence, obstruct, or impede the due and proper administration of the law under which such proceeding is being had before such department . . . or other agency of the United States." *Id*. That language is largely unchanged in its current form.

The history of the 1940 statute indicates that Congress intended to extend the protection from obstruction that applied to court proceedings to proceedings before administrative agencies. *Id.* at 816. Unlike the "catchall" provision of the original obstruction statute (now codified in Section 1503), which focused on the "justice [that] was being administered in [a] Court," the "catchall" provision of the 1940 statute focused on the "law under which [any pending proceeding] is being had" before a department or agency of the United States. *Id.* (citations omitted). That history suggests that a judicial proceeding under Section 1503 is different from a proceeding before a department or agency of the United States under Section 1505 "because courts and agencies proceed differently, and work to accomplish different things." *Id.* The judicial power is limited to deciding cases and controversies, while "the power of federal agencies is, in many respects, far broader." *Id.* at 816-17. Agencies "investigate, enforce, cajole, publicize, spend,

hire, fire, contract, collect information and disseminate information." *Id.* at 817 (citing 1 Kenneth Cul Davis & Ricard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE § 1.1 (3d ed. 1994)).

Thus, "courts have rejected the argument that the word 'proceeding' as used in § 1505 refers only to those steps before a federal agency which are juridical or administrative in nature." *Adams*, 472 F. Supp. 2d. at 817. Rather, "proceedings" are within the purview of Section 1505 "if they are dependent on a department or agency's authority." *Id.* (citing *Rice*, 356 F.2d at 712).

Section 1512 is another matter, because the definition of "official proceeding" that applies there (found in Section 1515) "provides an express basis for treating the term 'proceeding' differently in § 1512(c)(2) than one might in § 1505." *United States v. Guertin*, 581 F. Supp. 3d 90, 99 (D.D.C. 2022), *overruled on other grounds by Kousisis v. United States*, 145 S. Ct. 1382 (2025). As noted in *Guertin*, "the two provisions *are* textually distinct – § 1505 contains none of the [] indicia limiting its applicability to formal tribunals." 581 F. Supp. 3d at 99.

D. The jury instructions did not impermissibly broaden the scope of Section 1505

Under Dugan's view, Section 1505 "seems to contemplate only presently pending administrative proceedings," and "exclud[es] certain anterior and

posterior steps remote in time and space," which is how she characterizes the arrest she endeavored to obstruct. *Id.* at 40.

Thus, Dugan argues that the definition of "proceeding" given to the jury in her case impermissibly broadened the statute because it swept in "isolated law enforcement activity like an arrest." *Id.* at 43. According to Dugan, this renders the "more focused provisions [in 18 U.S.C. §§ 1071 and 1501] beside the point and allow[s] the federal government to elevate what Congress intended to be a mere misdemeanor to a felony." Br. 43. Dugan asserts that in "materially similar circumstances," the Supreme Court has insisted that courts adopt a narrow construction, citing *Fischer v. United States*, 603 U.S. 480, 492-93 (2024), and *Marinello v. United States*, 584 U.S. 1, 9 (2018).

First, Dugan's contention that the government's interpretation creates impermissible statutory overlap lacks merit. There is no overlap between Section 1505 and Section 1501, which deals with obstruction of federal process-servers. And there is very little overlap between Section 1505 ("corrupt" obstruction of a *proceeding*) and Section 1071 (concealment of a *person*). R. 117 (p. 28).

Nor do the Supreme Court authorities cited by Dugan show that the district court's Section 1505 instruction impermissibly broadened the statute. To be sure, *Fischer* and *Marinello* each involved obstruction statutes, the application of which

the Supreme Court found problematic in some way, but neither dealt directly with Section 1505. *Fischer* was essentially an *ejusdem generis* case that involved the internal structure of 18 U.S.C. § 1512 and the scope of a "catch-all" provision in subsection (c)(2). *Marinello* dealt with an obstruction provision in the Internal Revenue Code, 26 U.S.C. § 7212, and whether the government's broad interpretation of an "omnibus" provision in that law rendered superfluous misdemeanor provisions *in the same enactment*. The Court agreed that it did, but as for overlap with Section 1505, the Court was less concerned, stating, "Some overlap in criminal provisions is, of course, *inevitable*." 584 U.S. at 9 (emphasis added); *see also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws, a court must give effect to both."). Thus, the fact that the same conduct in some circumstances could violate two statutes gets Dugan nowhere.

E. This Court should not create a special rule excluding agency enforcement actions from the term "proceeding."

In fashioning jury instructions and when ruling on post-trial motions, the district court gave appropriate weight to the substantial body of law giving the term "proceeding" a broad rather than a narrow construction. In her motion to

reconsider, Dugan enlisted the Fourth Circuit's majority opinion in *Hernandez*, 173 F.4th 94, to support her contrary view of "proceeding." *Hernandez* is the first circuit-level opinion to address the scope of "proceeding" in the immigration enforcement context. However, as the district court observed, the rule it endorses "cannot be reconciled with the plain language of the statute ('any pending proceeding') or the existing caselaw." R. 128 (p. 31); *see also Hernandez*, 173 F.4th at 105 (Wilkinson, J., dissenting). This Court should "stay true" to precedent and "remain in th[e] plentiful company" of courts that have consistently given "proceeding" a broad interpretation. *Id.*

Among other things, the *Hernandez* majority is at odds with this Court's opinion in *Senffner*. Indeed, *Hernandez* did not challenge *Senffner* directly, much less the language in that opinion concerning "enforcement mechanisms." Instead, *Hernandez* distinguished *Senffner* by pointing out that when ICE apprehended Hernandez it was enforcing "a decision already issued by a different agency," namely, the Executive Office of Immigration Review ("EOIR"). *Hernandez*, 173 F.4th at 103-104. Whatever the merit of that distinction, it does not affect the application of Section 1505 here. In *Senffner*, the SEC was both the agency charged with investigating violations and the agency engaged in the enforcement action. So too here. Unlike in *Hernandez*, ICE was not arresting Flores-Ruiz to enforce a

decision already issued by another agency; it was investigating and enforcing its own, not-yet-final determinations about Flores-Ruiz's status. This critical distinction brings Dugan's case within the scope of cases like *Senffner* and *Hopper*, *supra*, and outside the holding of *Hernandez*.

F. In addition to being wrongly decided, *Hernandez* is factually distinguishable

*Hernandez* is further distinguishable on its facts. In *Hernandez,* the defendant was encountered at the border in 2016. *Hernandez*, 173 F.4th at 96. He made an asylum claim and was released on bond. *Id.* When he did not appear as ordered in December 2019, the Executive Office for Immigration Review, a DOJ agency, issued an order of removal *in absentia*. *Id.* He remained a fugitive until 2023, when he was arrested on state charges in Virginia. *Id.* at 97. In May 2023, upon his release from state custody, he was taken into ICE custody pursuant to a DHS Warrant of Removal (I-205). *Id.* In July 2023, a few days before his planned deportation, he escaped. *Id.* The district court found that his *escape* obstructed a pending proceeding. *Id.* On appeal, the majority ultimately concluded that ICE's isolated execution of a decision already issued by a *different* federal agency did not

constitute a pending "proceeding" before ICE for purposes of Section 1505. *Id.* at 104.[9]

In contrast, Dugan's obstructive conduct occurred much earlier in the proceedings, all of which were pending before a *single* federal agency, ICE. She intervened before Flores-Ruiz's order of removal was reinstated and before a Warrant of Removal (I-205) was issued by ICE – not after as in *Hernandez*. As the trial testimony established (and Exhibit 47 demonstrated), the arrest *was* part of an agency proceeding and cannot be ripped out of that context, *especially* in Flores-Ruiz's case, where the arrest did not come at the tail-end of that proceeding. Exh. 47; R. 128 (pp. 6-8, 29).

"Proceeding" in Section 1505 is best understood as referring to "a continuum of agency actions encompassing not just adjudications, but also enforcement." *Hernandez*, 173 F.4th at 104 (Wilkinson, J., dissenting). Thus, as the district court recognized, the ICE arrest that Dugan endeavored to obstruct was not an "isolated" law enforcement activity but part of an agency proceeding, broadly defined. R. 128 (p. 30).

---

[9] The Fourth Circuit did not reach the government's argument that Hernandez obstructed his pending motion to reopen when he escaped ICE custody because the government did not raise the argument in the district court. 173 F.4th at 102.

## IV. The district court's response to the jury's question about the second element of Section 1505 did not "negate" the nexus requirement of the statute, as to which the jury was properly instructed.

Dugan argues that the district court's answer to the jury's question concerning the second element of Section 1505 undermined the "nexus requirement" of *United States v. Aguilar*, 515 U.S. 593 (1995), allowing the jury to convict based merely upon a finding that she had the intent to "make ICE's job more difficult." Br. 51. However, when the jury's question and the Court's answer are evaluated in the context of the instructions as a whole, it is clear that the jury was required to find a nexus between Dugan's conduct and *the* pending removal proceeding referenced in the indictment. R. 117 (p. 21). Requiring more—*i.e.*, knowledge of the *name* of the subject of the proceeding—was simply not required.

### A. The district court's jury instruction on the elements of Section 1505 and its answer to the jury's question concerning the second element.

As the district court's instructions explained, Section 1505 requires proof of four elements: (1) a proceeding was pending before a department or agency; (2) the defendant knew of the pending proceeding; (3) the defendant endeavored to influence, obstruct, or impede the pending proceeding; and (4) the defendant did so corruptly, that is, with the purpose of wrongfully impeding the proceeding. R. 94 at 21. The Court also explained that "endeavored" meant acting purposefully

and with knowledge that an action would have the natural and probable effect of obstructing the proceeding, and that the term "pending proceeding" meant "any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its inception to its conclusion." *Id.*

During deliberations, the jury asked "whether or not Judge Dugan needed to know the identity of the subject of the pending proceeding" for purposes of Section 1505's second element (that "the defendant knew of the pending proceeding"). Tr. 919. The defense argued that Dugan must have known Flores-Ruiz's name to satisfy this element; the government disagreed. After some deliberation, the district court declined to instruct the jury that the second element of Section 1505 required Dugan to know Flores-Ruiz's specific name. Instead, the Court explained, "To know <u>of</u> the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the proceeding." Tr. 926.

B. The district court's answer did not undermine the nexus requirement.

The jury instructions included a nexus requirement derived from *Aguilar*, 515 U.S. 593. In *Aguilar*, a judge lied to FBI agents who were investigating the improper disclosure of a wiretap. *Id.* at 597. The judge was indicted for endeavoring to obstruct a grand jury investigation, in violation of the "catchall"

provision of § 1503. *Id.* at 599-600. The Supreme Court found there was no evidence that the judge knew his false statement would be provided to the grand jury. Thus, there was not sufficient evidence of intent to obstruct the grand jury proceeding. The Court noted that there must be a "nexus" between the wrongful conduct and the proceeding, namely that the defendant's "endeavor must have the 'natural and probable effect' of interfering" with the proceeding. *Id.*

Here, the court ensured that the nexus requirement was satisfied by using *Aguilar's* nexus language. Specifically, the instructions made clear that to find that Dugan "endeavored" to obstruct the pending proceeding, the government had to prove that she acted purposefully and "with knowledge that her action would have the natural and probable effect of obstructing the proceeding." R. 94 (p. 22). Further, the court instructed the jury that to have acted with corrupt intent, Dugan must have acted "with the purpose of wrongfully impeding the pending proceeding." *Id.* These instructions – separately and together – ensured that the jury had to find a "nexus" between Dugan's conduct and her knowledge.

The jurors' question related to the level of detail needed for them to find – as required by the second element – that the defendant "knew of" the pending proceeding. Did Dugan have to know Flores-Ruiz's "specific name" to satisfy that element? As the Court correctly concluded, the answer was "No." To "know of"

the proceeding, Dugan had to have knowledge of the nature of the proceeding, but it was sufficient that Dugan knew that the person whose arrest she sought to prevent was the same person subject to the pending removal proceeding—regardless of whether she knew his name. R. 117 (p. 22).

C. Dugan's proposed answer to the jury's question would have added an element not found in the law and could lead to absurd results

In contrast, Dugan's proposed answer would have required the Court to misstate the law by adding a requirement that "to know of the pending proceeding, the defendant must have known that the specific name of the person subject to that proceeding was Eduardo Flores-Ruiz." No case law supports the addition of such a requirement, which could plainly lead to absurd results.

Under Dugan's view, a defendant could intentionally obstruct the arrest of an individual but escape liability because she knew the person only by an alias or because she avoided learning the person's name at all. For example, suppose a driver of a car sees an agent seeking to arrest an individual and asks what is happening. In response, the agent says he is a federal agent and is executing a warrant for the subject to appear for pending removal proceedings. Upon hearing this, the driver opens his door, yells to the wanted individual to get in, and successfully drives the subject away. Under Dugan's view, the driver could not

have obstructed a pending proceeding because she did not at the time of her conduct know the name of the person she helped avoid arrest. That result would make no sense and require more than the statute provides.[10]

## V. The district court rightly declined to instruct the jury that Dugan could not be found guilty based on her "lawful acts as a state-court judge."

Dugan takes issue with the district court's refusal to give instructions that would have "account[ed] for [her] lawful acts as a state-court judge." Br. 48. She argues that the district court should have instructed the jury that she "could not violate § 1505 if she was legally authorized to engage in the charged conduct as a state court judge." Br. 57.[11] According to Dugan, the failure to instruct the jury in this limiting fashion exacerbated the district court's "insufficiently bounded

---

[10] The court should likewise have instructed, for Count One, that Dugan did not need to know Flores-Ruiz's specific name to conceal him from arrest. In any event, the jury's not-guilty verdict on Count One is only relevant to Dugan's argument that the error in answering the jury's question as to Count Two was not harmless. Br. 52. Here, no error occurred. Under a harmless error analysis, however, there was sufficient evidence of Dugan's obstructive intent *after* she learned Flores-Ruiz's name. After returning from the hallway, Dugan immediately asked, "Which client is it?" and "What's the name of the client?" *See* Exh. 42B. Defense counsel explained his name was Eduardo Flores-Ruiz. *Id.* This was before Dugan mentioned "down the stairs" and before she shepherded the defendant and his attorney through the non-public hallway.

[11] Presumably this argument refers to proposed jury instructions numbers 4, 5, and 12. R. 57. As relevant to Count Two, the first of these instructions would have instructed the jury that "[a] person who has a legal right to act as she did does not obstruct justice," the second that "[a] state court judge's official act, something that was part of her job, does not obstruct justice," and the third that "[a] defendant who has a legal right to act does not corruptly endeavor."

interpretation of § 1505" and requires a new trial. *Id.* This Court should reject Dugan's argument, which the district court correctly characterized as a "rehash" of her judicial immunity and federalism arguments, and properly rejected as inconsistent with Seventh Circuit law.

A recurring theme of Dugan's defense, and now her appeal, is that the government seeks to criminalize acts that she was lawfully entitled to perform. Thus, in connection with jury instructions, Dugan argues that "regardless of her motives, [she] had broad authority as a *state official* and as a *judge* to take *all* of the actions that purportedly obstructed ICE's arrest of Flores-Ruiz." Br. 55 (emphasis in original). In essence, Dugan's proposed instructions would have told the jury to acquit her, "regardless" of her reasons for taking those actions.

Such instructions would have misstated the law. As a judge, Dugan had the ability to do certain things that others could not, including (as relevant here) appear in a judicial robe, manage her court calendar, and direct people in and out of her courtroom. However, neither these prerogatives of judicial office nor the office itself placed her above the law. She could be held criminally liable for taking these actions "corruptly," or with the "improper purpose" of obstructing the arrest. As the district court observed, it is irrelevant that the indictment described conduct that could be considered "part of a judge's job" because a judge may be

held criminally liable for "us[ing] judicial acts or tools as the means to accomplish an unlawful end." R. 48 (p. 21), R. 72 (pp. 13-24), R. 97 (p. 4), R. 117 (p.31); *see also* R. 43 (p. 30). Consistent with its ruling on Dugan's motion to dismiss, therefore, the district court refused to confer immunity *via* jury instruction. Circuit precedent further supports the district court's rejection of Dugan's proposed instructions. *See United States v. Cueto*, 151 F.3d 620, 631 (7th Cir. 1998) ("Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids."); *see also United States v. Cintolo*, 818 F.2d 980, 992 (1st Cir. 1987).

According to Dugan, *Arthur Andersen, LLP v. United States*, 544 U.S. 696 (2005), teaches that courts "must police the line between lawful and obstructionist acts carefully to account for any privileges or constitutional rights a defendant may lawfully invoke." Br. 56-57. But the privileges discussed in *Arthur Andersen* are either well-established common-law privileges or derive from the Constitution itself. Dugan, by contrast, relies upon a form of judicial immunity that does not exist—immunity from criminal prosecution—and her status as a state official, which no court has recognized as a bar to federal prosecution.[12]

---

[12] *Arthur Andersen* involved the "corruptly persuades" language in Section 1512(b). The instructions given to the jury were problematic because they required "striking[ly] … little culpability" on the part of the defendant. 544 U.S. at 706. Indeed, the jury was

## CONCLUSION

For the reasons stated above, this Court should affirm Dugan's conviction.

Dated at Milwaukee, Wisconsin, this 29th day of October, 2026.

Respectfully submitted,

*s/ Jonathan H. Koenig*
JONATHAN H. KOENIG
Assistant United States Attorney

530 United States Courthouse
517 E. Wisconsin Ave
Milwaukee, WI 53202
(414) 297-1700

instructed that "even if [petitioner] honestly and sincerely believed that its conduct was lawful, you may find [petitioner] guilty." *Id.* Nothing like that instruction was given in Dugan's case.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word, the Brief contains 13,682 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 13-point Book Antiqua font.

*s/ Jonathan H. Koenig*

JONATHAN H. KOENIG
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2026, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*s/ Jonathan H. Koenig*

JONATHAN H. KOENIG
Assistant United States Attorney

530 United States Courthouse
517 E. Wisconsin Ave, Room 530
Milwaukee, WI 53202
(414) 297-1700