**No. 26-2440**

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

HANNAH C. DUGAN,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Eastern District of Wisconsin,
No. 25-cv-00089

# REPLY BRIEF FOR DEFENDANT-APPELLANT

Oral Argument Requested

STEVEN M. BISKUPIC
STEVEN BISKUPIC LAW
OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com
(414) 828-7233

PAUL D. CLEMENT
*Counsel of Record*
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

November 19, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... ii

INTRODUCTION .................... 1

ARGUMENT .................... 3

I. The Conviction Violates Judge Dugan's Judicial Immunity From Criminal Prosecution .................... 3

II. Judge Dugan's Conviction Violates The Tenth Amendment .................... 11

III. The District Court Improperly Broadened The Scope Of 18 U.S.C. §1505 .................... 15

A. The Execution of an ICE Warrant Cannot Qualify as a "Pending Proceeding" Under §1505 .................... 15

B. The District Court Failed to Properly Instruct the Jury on the Scope of §1505 .................... 22

1. Nexus Requirement .................... 22

2. Lawful Acts .................... 25

CONCLUSION .................... 30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Arthur Andersen LLP v. United States*,
544 U.S. 696 (2005) .......... 25, 26, 28

*Bond v. United States*,
572 U.S. 844 (2014) .......... 12, 15

*Bradley v. Fisher*,
80 U.S. (13 Wall.) 335 (1871) .......... 28

*Commonwealth v. Tartar*,
239 S.W.2d 265 (Ky. 1951) .......... 9, 10

*Doermer v. Callen*,
847 F.3d 522 (7th Cir. 2017) .......... 11

*Ex parte Virginia*,
100 U.S. 339 (1879) .......... 4

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 19

*Floyd v. Barker*,
77 Eng.Rep. 1305 (Star Chamber 1607) .......... 8, 9

*Glick v. Gutbrod*,
782 F.2d 754 (7th Cir. 1986) .......... 10

*Green v. U.S. Cash Advance Ill.*,
724 F.3d 787 (7th Cir. 2013) .......... 5

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 11, 12

*Hicks v. Forest Pres. Dist.*,
677 F.3d 781 (7th Cir. 2012) .......... 25

*Imbler v. Pachtman*,
424 U.S. 409 (1976) .......... 5, 6

*Kugler v. Helfant*,
421 U.S. 117 (1975)....7

*Life Techs. Corp. v. Promega Corp.*,
580 U.S. 140 (2017)....17

*McDonnell v. United States*,
579 U.S. 550 (2016)....18

*McHenry Cnty. v. Kwame Raoul*,
44 F.4th 581 (7th Cir. 2022)....14

*Mireles v. Waco*,
502 U.S. 9 (1991)....5

*O'Shea v. Littleton*,
414 U.S. 488 (1974)....5

*Pierson v. Ray*,
386 U.S. 547 (1967)....4

*Printz v. United States*,
521 U.S. 898 (1997)....9

*Pulliam v. Allen*,
466 U.S. 522 (1984)....8

*Randall v. Brigham*,
74 U.S. (7 Wall.) 523 (1868)....3, 8

*Rockett v. Eighmy*,
71 F.4th 665 (8th Cir. 2023)....3

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)....9

*Shlahtichman v. 1-800 Contacts*,
615 F.3d 794 (7th Cir. 2010)....17

*Spalding v. Vilas*,
161 U.S. 483 (1896)....3

*Stevens v. Osuna*,
877 F.3d 1293 (11th Cir. 2017) .......... 11

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022) .......... 17

*Trump v. United States*,
603 U.S. 593 (2024) .......... 4, 6, 9, 27

*United States v. Aguilar*,
515 U.S. 593 (1995) .......... 23

*United States v. Baumgartner*,
581 F. App'x 522 (6th Cir. 2014) .......... 7

*United States v. Brewster*,
408 U.S. 501 (1972) .......... 7

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 14

*United States v. Chaplin*,
54 F.Supp. 926 (S.D. Cal. 1944) .......... 9, 10

*United States v. Claiborne*,
727 F.2d 842 (9th Cir. 1984) .......... 6

*United States v. Cochran*,
682 F.App'x 828 (11th Cir. 2017) .......... 7

*United States v. Cueto*,
151 F.3d 620 (7th Cir. 1998) .......... 28

*United States v. Edwards*,
869 F.3d 490 (7th Cir. 2017) .......... 25

*United States v. Goines*,
988 F.2d 750 (7th Cir. 1993) .......... 23

*United States v. Grubb*,
11 F.3d 426 (4th Cir. 1993) .......... 6

*United States v. Hernandez*,
173 F.4th 94 (4th Cir. 2026) ........ 17, 18, 21

*United States v. Higgins*,
511 F.Supp. 453 (W.D. Ky. 1981) ........ 18

*United States v. Johnson*,
875 F.3d 360 (7th Cir. 2017) ........ 17

*United States v. Joseph*,
2020 WL 4288425 (D. Mass. July 27, 2020) ........ 6

*United States v. Kanahele*,
951 F.Supp. 921 (D. Haw. 1995) ........ 19

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006) ........ 23

*United States v. Rouse*,
452 F.2d 311 (5th Cir. 1971) ........ 19

*United States v. Senffner*,
280 F.3d 755 (7th Cir. 2002) ........ 18, 21, 23

*United States v. Young*,
316 F.3d 649 (7th Cir. 2002) ........ 25

*W. Va. Univ. Hosp. v. Casey*,
499 U.S. 83 (1991) ........ 16

**Constitutional Provisions**

U.S. Const. amend. X ........ 1, 11, 13, 14

Wis. Const. art. VII, §1 ........ 28

Wis. Const. art. VII, §11 ........ 28

Wis. Const. art. VII, §13 ........ 28

**Statutes**

18 U.S.C. §242 ........ 5, 6, 9, 10

18 U.S.C. §1071 .......... 18, 19

18 U.S.C. §1501 .......... 16, 19

18 U.S.C. §1502 .......... 16

18 U.S.C. §1505 .......... *passim*

Wis. Stat. §§757.81-.99 .......... 28

**Other Authorities**

*United States v. Ash*,
No.1:19-mj-9341 (S.D.N.Y.) .......... 7

*United States v. DeLaughter*,
No.3:09-cr-2-2 (N.D. Miss.) .......... 6

*United States v. Moreland*,
No.3:17-cr-66 (M.D. Tenn.) .......... 6

*United States v. Walker*,
No.3:14-cr-93 (S.D. Miss.) .......... 7

## INTRODUCTION

This prosecution is unprecedented for good reason. Our federalism depends on mutual respect between the federal government and the States. While the Supremacy Clause ultimately gives the federal government the upper hand, that does not mean that federal statutes will be lightly assumed to abrogate judicial immunity or upset the federal-state balance. Nor does it mean that when federal authorities take advantage of a state court's compulsory process to execute a federal arrest warrant in a state courthouse, a state court's failure to cooperate constitutes a federal felony. Yet, as the government's brief makes clear, this conviction depends on such a profoundly skewed vision of federalism.

The government's view is as flawed as it is ahistorical. Bedrock common-law and constitutional principles confirm that a state judicial officer who exercises her judicial authority to manage her docket, courtroom, and surrounding environs, as Judge Dugan did here, presumptively enjoys the twin protections of common-law judicial immunity and the Tenth Amendment. Congress may abrogate those protections if it speaks clearly, but no one seriously contends that 18 U.S.C. §1505—which neither requires state action nor targets judicial conduct—comes anywhere close to providing such a clear statement.

The government tries to evade that result by repeating the district court's erroneous claims that neither judicial immunity nor clear-statement principles apply

in the criminal context. But there is no reason to think that those principles cease to apply where the stakes are highest. The threat of damages liability may chill judicial independence and the application of federal anti-discrimination laws may undermine state sovereignty, but they pale in comparison to the threat of felony convictions. In reality, the progenitor of judicial immunity was a criminal case, courts have applied it in the rare instances when prosecutors have targeted official judicial conduct, and the Supreme Court has applied clear-statement principles to criminal statutes.

While that suffices to resolve this appeal, the problems with this misguided prosecution do not end there. A mountain of caselaw, including the sole on-point circuit precedent, rejects the application of §1505 to ordinary law-enforcement activities, like executing arrest warrants. That makes sense as other statutes specifically target that conduct, albeit as a misdemeanor. Moreover, instructional errors exacerbated the other problems with this prosecution.

In the final analysis, the reason this prosecution is unprecedented is not just that federal prosecutors have long respected federalism principles or that federal agents have long respected the very ancient privilege against arresting defendants and witnesses in state courthouses. This prosecution is unprecedented because §1505 neither abrogates judicial immunity, nor reflects a clear statement to reach official state conduct, nor applies to arrest warrants. This Court should reverse.

## ARGUMENT

### I. The Conviction Violates Judge Dugan's Judicial Immunity From Criminal Prosecution.

As the Supreme Court observed long ago, the common-law doctrine of judicial immunity, which protects judicial officers from any personal exposure for their judicial acts, "has been maintained by a uniform course of decisions in England for centuries, and in this country ever since its settlement." *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 536 (1868). That observation carries just as much force today. *See Rockett v. Eighmy*, 71 F.4th 665, 669-70 (8th Cir. 2023). Most applications of judicial immunity have involved civil suits filed by disgruntled private litigants. But that is a testament to the rarity of attempted criminal prosecutions for official judicial actions, not an indication that the threat of criminal conviction or demotion from judicial officer to felon poses less of a threat to judicial independence than civil liability. To the contrary, state and federal courts alike have consistently recognized that judicial immunity is no less vital or applicable to the relatively rare efforts to threaten judges with criminal penalties for their judicial acts. *See* Op.Br.21-23. As the Supreme Court has stated, judicial immunity applies equally to a "civil suit or indictment." *Spalding v. Vilas*, 161 U.S. 483, 494 (1896).

To be sure, as with other common-law immunities, Congress can abrogate judicial immunity. But it must make its intention to do so explicit by making clear that a criminal prohibition reaches state action. *See* Op.Br.23-25. Generally

applicable prohibitions addressed to "any" or "every person," like 18 U.S.C. §1505 here, do not get the job done. *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *accord* Op.Br.24-25. Thus, while Judge Dugan, no less than any other individual, could be prosecuted under §1505 for actions undertaken in her individual capacity, she was judicially immune to the extent that the charged conduct involved official judicial acts. And as ample authority confirms—and the government itself told the jury—Judge Dugan's conviction is premised on quintessential judicial acts. *See* Op.Br.25-28. That reality means that the judgment below cannot stand.

The government largely disregards this analysis. It instead contends (like the district court) that judicial immunity is wholly inapplicable in criminal cases. But it can do so only by minimizing history and precedent it dislikes, while reading Supreme Court *dicta* out of context.[1] Those arguments are unavailing.

The government first invokes *Ex parte Virginia*, 100 U.S. 339 (1879), to support its categorical no-immunity rule. But as the federal government concedes, *Ex parte Virginia* did not "reject criminal judicial immunity" and instead simply

[1] In fact, rather than beginning with history or precedent, the government starts with the procedural safeguards in criminal cases and lauding the "assurances" of its "good faith" exercise of prosecutorial discretion, *Trump v. United States*, 603 U.S. 593, 636-37 (2024). *See* Resp.Br.27. Those arguments failed to carry the day in *Trump*, and they are no more persuasive here. "Just trust us" is rarely a winning argument for the government, especially in the context of nearly unprecedented prosecutions. *See Trump*, 603 U.S. at 637 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

rejected the argument that the acts underlying the criminal prosecution were "judicial acts," Resp.Br.28—reasoning that would be beside the point in the absence of a judge possessing judicial immunity from criminal prosecutions for judicial acts. Op.Br.23. The government dismisses that conclusion as "rank speculation," Resp.Br.28, but no other reasoning makes sense of the Court's holding. While the Supreme Court's assumption that a judge's official acts triggered common-law judicial immunity in the criminal context may have stopped short of a square holding, the "assumption of the Supreme Court[] deserve[s] greater weight" than the government gives it. *Green v. U.S. Cash Advance Ill.*, 724 F.3d 787, 790 (7th Cir. 2013).

Nothing in *Mireles v. Waco*, 502 U.S. 9 (1991), *O'Shea v. Littleton*, 414 U.S. 488 (1974), or *Imbler v. Pachtman*, 424 U.S. 409 (1976), is to the contrary. Resp.Br.26-29. While *Mireles* noted that judges are "not absolutely immune from criminal liability," 502 U.S. at 10 n.1, no one has suggested otherwise when it comes to non-judicial acts. In fact, *Mirales* cited *Ex parte Virginia* for that proposition, suggesting that what constitutes a "judicial act," not judicial status, is what matters for judicial immunity. Likewise, as the government's own block quote confirms, *O'Shea* did not hold that judicial immunity is inapplicable to all prosecutions; the Court focused only on prosecutions under 18 U.S.C. §242—the prototypical example of a criminal law that abrogates judicial immunity by targeting official acts

explicitly. *See* Op.Br.28-29. And while the government (misleadingly) excerpts *Imbler*'s analysis to suggest that judges "could be punished criminally" for official acts, the rest of the sentence confirms that the Court was addressing only "willful deprivations of constitutional rights" under §242. 424 U.S. at 429.

The government fares no better with lower-court authority, Resp.Br.29-30, as its long string cite provides no support for its sweeping rule that judicial immunity is categorically inapplicable in criminal cases.[2] The vast majority of the government's cases involved bribery or related graft. *See United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993); *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984); *United States v. Hastings*, 681 F.2d 706 (11th Cir. 1982); *United States v. Moreland*, No.3:17-cr-66 (M.D. Tenn.); *United States v. DeLaughter*, No.3:09-cr-2-2 (N.D. Miss.). But, as the opening brief explained, Op.Br.29 & n.6, prosecutions for judicial bribe-taking—no less than legislative bribe-taking—do not reflect a lack of immunity for official acts (which is conferred by the Constitution itself when it comes to federal legislators). Rather, those prosecutions rest on the reasoning that agreeing to a corrupt promise is an unofficial act and treat any official act fulfilling the promise as irrelevant. *See, e.g.*, *Trump*, 603 U.S. at 632 n.3; *Claiborne*, 727 F.2d

[2] The government briefly references the First Trump Administration's indictment of a Massachusetts state-court judge. But the district court there deferred resolution of the judicial-immunity defense until trial, *see United States v. Joseph*, 2020 WL 4288425, at *3 (D. Mass. July 27, 2020), and the government then voluntarily dismissed the indictment before trial, *see* Op.Br.11.n.2.

at 848 (analogizing judicial bribe-taking to legislative bribe-taking analyzed in *United States v. Brewster*, 408 U.S. 501 (1972)). That careful parsing of unofficial promises and official acts would be beside the point absent immunity from criminal prosecutions for official judicial acts.

Several other cases the government invokes involve judges who were prosecuted for purely private (*i.e.*, unofficial) acts. *See Kugler v. Helfant*, 421 U.S. 117 (1975) (lying before grand jury); *United States v. Baumgartner*, 581 F. App'x 522 (6th Cir. 2014) (illegal distribution of controlled substances); *United States v. Ash*, No.1:19-mj-9341 (S.D.N.Y.) (signing fraudulent financial records and destroying evidence); *United States v. Walker*, No.3:14-cr-93 (S.D. Miss.) (lying to investigators after pressuring a witness to conceal a subpoenaed document). And the only prosecution premised on a judge's official acts that the government identifies, Resp.Br.29-30, was brought under criminal statutes that Congress enacted pursuant to its Reconstruction Amendment authority. *United States v. Cochran*, 682 F.App'x 828, 831 (11th Cir. 2017). In short, the government's cases stand only for the unremarkable proposition that judges do not receive blanket immunity from criminal law by virtue of their judicial status—which Judge Dugan has never disputed. And the only exceptions involve statutes that abrogated the common-law immunity by expressly targeting state action, unlike §1505 here. *See* Op.Br.23-24.

Unable to marshal history or precedent to support its categorical no-judicial-immunity-for-criminal-liability position, the government tries to disparage Dugan's historical evidence. But nothing sticks. It first dismisses *Floyd v. Barker* because it "arose in an unusual legal context that has no parallel in modern American law." Resp.Br.31-32.[3] But the Supreme Court itself has (repeatedly) invoked *Floyd* as support for holding that judges have judicial immunity from liability for their official acts—apparently untroubled by the lack of an exact parallel in American jurisprudence. *E.g.*, *Randall*, 74 U.S. (7 Wall.) at 536. To be sure, over time, *Floyd*'s articulation of judicial immunity "was refined" and "its focus shift[ed]" to "our contemporary understanding" that the doctrine protects the "public interest in independent judicial decisionmaking." *Pulliam v. Allen*, 466 U.S. 522, 531-32 (1984). But the Court still clearly understood *Floyd* (and its progeny) to provide robust support for judicial immunity. If *Floyd* (a criminal case) suffices to substantiate judicial immunity in civil cases, the protections in criminal cases should follow *a fortiori*. *See* Op.Br.30-31.

Next, the government dismisses the wealth of precedents acknowledging judges hold judicial immunity from civil and criminal liability, *see* Op.Br.20-23, as

[3] *Contra* Resp.Br.31, Judge Dugan never suggested that *Floyd* is the common-law source for judicial immunity. In fact, the common-law roots run much deeper. *See* Op.Br.20 (citing a 14th-century case in which a criminal prosecution was barred by judicial immunity).

"*dicta*" because most arose in civil contexts. *See* Resp.Br.32-33, 36. But that misses the point. That courts have so rarely addressed judicial immunity in criminal cases is a testament to the sound prosecutorial discretion exercised by prosecutors, even during prior eras of considerable federal-state tension. The absence of prior prosecutorial efforts under statutes that do not single out state action (*i.e.*, outside the context of bribery prosecutions and prosecutions under provisions like §242) is hardly a strike in the executive branch's favor. *See Printz v. United States*, 521 U.S. 898, 905 (1997). After all, "[p]erhaps the most telling indication of [a] severe … problem" with the novel exercise of a highly attractive government power "'is [the] lack of historical precedent' to support it." *Seila Law LLC v. CFPB*, 591 U.S. 197, 220 (2020); *accord Trump*, 603 U.S. at 605-06; *contra* Resp.Br.37. That observation is especially pertinent here, where the "*dicta*" the government wishes to ignore *uniformly* recognizes that judicial immunity applies equally in the criminal context. It could hardly be otherwise given the roots of the doctrine in a criminal case (*e.g.*, *Floyd*), and the greater threat to judicial independence implicated by the threat of criminal punishment. *See Trump*, 603 U.S. at 613. For that reason, the cases squarely holding judicial immunity applicable in criminal cases, *see, e.g., United States v. Chaplin*, 54 F.Supp. 926, 934-35 (S.D. Cal. 1944), or *Commonwealth v. Tartar*, 239 S.W.2d 265, 266-67 (Ky. 1951), understandably relied

on the more numerous civil cases applying judicial immunity to judicial acts. *Contra* Resp.Br.34-35.[4]

As a half-hearted fallback argument, the government briefly suggests that §1505 abrogated Judge Dugan's immunity here. That is a non-starter. Section 1505 is a prototypical example of a statute that casts a wide any-or-every-person net, without any suggestion that Congress confronted the sensitive issues implicated in holding judges criminally liable for their official acts. *See* Op.Br.24-25; *accord Glick v. Gutbrod*, 782 F.2d 754, 756 (7th Cir. 1986). In reality, as the government never disputes, there are a thousand ways to violate §1505 via non-official conduct, and no evidence whatsoever that Congress thought it was opening up state judges to federal prosecutions in enacting §1505.

Finally, the government retreats to asserting that the charged conduct here did not implicate any judicial acts. *See* Resp.Br.39-41. But every single purportedly "obstructionist" act that Judge Dugan took fell within the scope of her judicial authority—discretionary decisions about when to hear cases, how to conduct hearings, and where parties entered and exited the courtroom—as courts across the

[4] As the district court had, the government tries to distinguish *Chaplin* and *Tartar* by noting that the former involved a prosecution under §242 and by claiming that it is uncertain whether the latter involved an application of judicial immunity. Resp.Br.34-35. Neither works. The key insight from *Chaplin* is that the court, after exhaustively canvassing historical sources, held that judicial immunity applies in federal criminal cases. 54 F.Supp. at 934-35. And *Tartar*—in no uncertain terms—invoked "the common law" immunity for judges. 239 S.W.2d at 266.

country have recognized. *See* Op.Br.26-27. The government contests none of that. Instead, it emphasizes that Judge Dugan purportedly "obstruct[ed] an *unrelated* proceeding before a different sovereign." Resp.Br.40-41. But that assertion merely begs the question of how she accomplished that supposed obstruction. No one doubts that if Judge Dugan traveled to Washington and burst into the courtroom of a federal immigration judge, her status as a state judge would give her no immunity. But that is essentially the opposite of the situation here, where Judge Dugan's alleged "obstruction" involved her conduct in her own courthouse. Those are quintessential judicial acts.

"A judge's authority to control h[er] courtroom—*and, necessarily, the environment surrounding h[er] courtroom*—stems directly from h[er] duties as a judge." *Stevens v. Osuna*, 877 F.3d 1293, 1305 n.9 (11th Cir. 2017) (emphasis added). Indeed, the government gives the game away when it admits that it charged Judge Dugan for how she purportedly "misused her office." Resp.Br.41. Such official acts, even if alleged to be "misconduct"—and here they are not—trigger judicial immunity's protections. *Doermer v. Callen*, 847 F.3d 522, 530 (7th Cir. 2017); Op.Br.28. The conviction accordingly cannot stand.

## II. Judge Dugan's Conviction Violates The Tenth Amendment.

The government fares no better in suggesting that the federalism principles underlying *Gregory v. Ashcroft*, 501 U.S. 452 (1991), are inapplicable in criminal

cases, and it offers no serious argument that §1505 provides the requisite clear statement necessary to reach state judges.

"States retain substantial sovereign powers under our constitutional scheme," so courts must presume that "Congress does not readily interfere" with those powers absent a "clear statement" evincing its actual intent to do so. *Id.* at 461. That principle has never been limited to federal anti-discrimination statutes and has been routinely invoked by the Supreme Court to reign in federal prosecutions that failed to respect the federal-state balance. *See Bond v. United States*, 572 U.S. 844, 859-60 (2014) (collecting cases). Just as there is no reason to presume that Congress intended to intrude deeply into matters of state authority by treating state judges as ordinary employers, there is no reason to conclude that Congress intended §1505's generic reference to "[w]hoever" to extend to state judges. In both instances, the clear statement requirement protects the federal-state balance from unintended and inadvertent interference.

That principle resolves this case. Indeed, the government concedes as much when it acknowledges that §1505 "makes it a crime for *anyone* to obstruct a federal agency proceeding." Resp.Br.44. Such broad language falls short of the "clear statement assur[ing] that the legislature has in fact faced, and intended to bring into issue, the critical" sovereign acts of state-court judges. *Bond*, 572 U.S. at 858.

Although the government spills much ink discussing the Tenth Amendment and *Gregory*, its response distills to a single contention: that no court has held that "federal criminal laws of general applicability may never be applied to state officials absent a 'clear statement' from Congress." Resp.Br.44. But that claim attacks a strawman. To repeat, Judge Dugan does not claim that broadly worded federal statutes do not reach the unofficial conduct of state officials. A bank robber is a bank robber even if his day job is state judge or legislator. But when the premise of the prosecution is that Congress has authorized federal prosecutors to reach into the state courthouse and prosecute official actions under statutes that do not single out official or state action, the clear-statement principle of *Gregory* applies with full force.

It is no answer for the government to insist that Congress properly attached "criminal liability [to] … [Judge] Dugan's official actions" because (in the government's view) her "intent" was improper. Resp.Br.44-45. Absent the kind of clear statement that is missing from §1505, it does not matter whether Judge Dugan agrees with federal immigration policy or priorities. Absent any clear statement to the contrary, she is under no obligation to conduct her courtroom in a manner that facilitates federal immigration enforcement. Any other rule would allow the federal government to criminally penalize state officials for enforcing sanctuary policies—an outcome courts have rejected as inconsistent with the Tenth Amendment. *See*

Op.Br.36-37.[5] That the government never grapples with nor disputes the startling implications of its position underscores that *Gregory* and its clear statement rule are fully applicable when they are most urgently needed, *i.e.*, in criminal prosecutions during moments of federal-state tension.

Nor does this analysis change just because §1505 "protect[s] the integrity" of federal agency activity or because immigration enforcement "lay[s] wholly within the jurisdiction of the federal government." Resp.Br.45-46. No one doubts the federal government's power to protect federal proceedings from interference. But it is precisely because "[t]he federal government's advantage under the Supremacy Clause is 'an extraordinary power,'" that courts "must assume Congress does not exercise [it] lightly." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 587 (7th Cir. 2022). So, *contra* Resp.Br.45, that the federal government was engaged in an exclusively federal activity is only *the start*, not the end, of the inquiry. After all, the Supremacy Clause could always be used to justify the use of federal legislation "to trench on the States' arrangements for conducting their own governments." *McHenry*, 44 F.4th at 590. But as *Gregory* instructs, that alone is not sufficient—a "plain statement [is] require[d]" as well. *Id.*

---

[5] Indeed, courts have rejected such arguments *even when* the federal government has argued that states' sanctuary policies constitute "obstruction" of "federal immigration enforcement." *United States v. California*, 921 F.3d 865, 888-91 (9th Cir. 2019). For that reason, regardless what Judge Dugan's "intent" was for her actions, it does not affect whether the Tenth Amendment bars this prosecution.

In short, the "ambiguity derive[d] from the improbably broad reach of" §1505, *Bond*, 572 U.S. at 860, is powerful evidence that Congress did not intend §1505 to reach into the state courthouse. There is no shortage of ways for individuals, even state judges, to violate §1505 via unofficial conduct. But there is a shortage—indeed, a complete absence—of reasons to think Congress was authorizing a prosecution like this when it enacted §1505. Clear-statement principles play a critical role in preserving the federal-state balance and protecting against federal overreach. Not coincidentally, they also require reversal here.

## III. The District Court Improperly Broadened The Scope Of 18 U.S.C. §1505.

The government invites this Court to open a circuit split on the scope of §1505 and ignore serious instructional errors. This Could should decline those invitations.

### A. The Execution of an ICE Warrant Cannot Qualify as a "Pending Proceeding" Under §1505.

This case remains a §1505 prosecution in search of the requisite "pending proceeding" "before" a federal agency. Text, evidence, and the sole on-point circuit precedent all confirm that federal officers' execution of an ICE administrative arrest warrant is ordinary law-enforcement activity that does not cut it under §1505. Obstructing the execution of such an arrest warrant may violate other (misdemeanor) prohibitions, but it is not a felony violation of §1505. While the government emphasizes the potential breadth of the word "proceeding" *standing alone*, *see* Resp.Br.46, it ignores the balance of §1505, which plainly cabins its scope. In

particular, the full provision makes clear that the requisite "pending proceedings" are active adjudicative or rule-making proceedings "before" federal agencies, not ordinary law-enforcement activity, like investigating a crime or arresting a suspect. Op.Br.40-42.

That construction of §1505 not only gives meaning to the statute as whole, rather than the word "proceeding" in isolation, but also "make[s] sense rather than nonsense of the *corpus juris*." *W. Va. Univ. Hosp. v. Casey*, 499 U.S. 83, 101 (1991). After all, there are separate statutory provisions which target the specific activity of interfering with the arrest of suspects and fugitives, and those offenses are misdemeanors. *See, e.g.*, 18 U.S.C. §§1501-02. It makes little sense to give the government the option to treat that same activity as a felony under §1505 when it comes to administrative arrests, but not when it comes to the arrest of a dangerous felon by the Federal Bureau of Investigation (FBI) or the Marshals Service.

Here, it is clear that the arrest of Flores-Ruiz involved ordinary law-enforcement activity, not interference with a "pending proceeding" "before" an agency. The agents who were present in the Milwaukee courthouse that Friday morning understood that they were tasked with making "[a]n arrest," nothing more. Tr.193. And the I-200 administrative warrant here indicated that Flores-Ruiz's arrest was *not* authorized due to "ongoing removal proceedings." GX.1A. After all, as one of the officers confirmed at trial, "there were no removal proceedings" or

"immigration-related hearings pending" regarding Flores-Ruiz. Tr.391. As a result, there is simply no way to shoehorn this case into the text of §1505. The Fourth Circuit held as much in *United States v. Hernandez*, concluding that "ICE's execution of a warrant of removal," "akin to a police officer effectuating an arrest," did not constitute a "pending proceeding." 173 F.4th 94, 96, 100-02 (4th Cir. 2026). In short, text, context, and precedent all confirm that the purported obstruction of officers taking custody of a removable alien—unconnected to any pending removal proceedings—does not trigger criminal liability under §1505.

The government's contrary argument depends on isolating a single word—"proceeding"—and then using generic dictionary definitions to read that term expansively. The Supreme Court and this Court have repeatedly rejected this form of statutory (mis)construction. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (statutory interpretation cannot be based on snippets of text, viewed "in isolation" and stripped from "context"); *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 146 (2017) ("[A] word is given more precise content by the neighboring words with which it is associated."); *Shlahtichman v. 1-800 Contacts*, 615 F.3d 794, 798 (7th Cir. 2010); *United States v. Johnson*, 875 F.3d 360, 366 (7th Cir. 2017). Indeed, the Supreme Court itself has refused previous government entreaties to read the very term "proceeding" to its definitional limits to create a criminal statute of

alarming breadth. *See McDonnell v. United States*, 579 U.S. 550, 567-68, 570 (2016); Op.Br.41.

Needless to say, the term "proceeding" does not stand alone in §1505. And the balance of the provision—the requirements that the proceeding be "pending" "before" an agency—plainly limits the statute to interference with ongoing agency proceedings and forecloses efforts to expand the felony prohibition of §1505 to reach "mere police" activity. *United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002). That latter category includes investigatory law-enforcement activity on the front end, *see, e.g.*, *United States v. Higgins*, 511 F.Supp. 453, 455 (W.D. Ky. 1981) (obstruction of "surveillance by federal undercover agents"), and arresting fugitives or removable aliens on the back end, *see, e.g., Hernandez*, 173 F.4th at 100 (collecting cases). Indeed, the latter is even more squarely addressed by other misdemeanor provisions.

The government's argument thus not only ignores the host of cases refusing to extend §1505 to ordinary law-enforcement activity, but it creates a bizarre regime in which the interference with the arrest of an out-of-status alien is a felony, but interference with an arrest of a violent criminal or fugitive by the FBI or Marshals Service is just a misdemeanor. After all, the latter arrests are in conjunction with judicial proceedings, not proceedings pending before an agency. Thus, interference with an FBI arrest is squarely covered by statutory misdemeanors, such as §§1071

and 1501, that are equally applicable to interference with arrests by ICE agents. Yet in the government's view, the heavy artillery of §1505 is available only when it comes to arrests in service of potential agency proceedings.

The government resists the suggestion that other statutes more directly target the precise conduct at issue here. The government boldly claims that there is "no overlap" between §1505 and §1501, and "very little overlap" with §1071. Resp.Br. 52. But that text-defying claim is hard to take seriously, when the government *itself* has a track record of charging these precise provisions when an individual allegedly helps the subject of an arrest warrant evade arrest. *See, e.g.*, *United States v. Kanahele*, 951 F.Supp. 921, 923 (D. Haw. 1995) (charging an individual under both 18 U.S.C. §§1501, 1071 for "obstructing the execution of a federal arrest warrant"); *accord United States v. Rouse*, 452 F.2d 311, 314 (5th Cir. 1971) (noting that §1501 covers non-violent efforts to "resist[] arrest"). While some overlap among criminal prohibitions may be "inevitable," Resp.Br.53, that is no excuse for ignoring the reality that §§1071 and 1501 precisely target the conduct here and treat it as a misdemeanor. Under those circumstances, there is no basis for stretching the text of a felony provision with a very different heartland to reach the conduct at issue here. Op.Br.43-44. In the obstruction context itself, the Supreme Court has rejected comparable efforts as impermissible. *See Fischer v. United States*, 603 U.S. 480, 492-93 (2024).

While the government expressly invites this Court to reject the Fourth Circuit's analysis in *Hernandez*, it also suggests that *Hernandez* is distinguishable on its facts. That is impossible to square with the government's position below, which repeatedly relied on the district court opinion in *Hernandez* up until the point it was reversed on appeal.[6] *See also* D.Ct.Dkt.97.at.4-5; D.Ct.Dkt.117.at.27. The government's belated efforts to distinguish the procedural postures of the two cases goes nowhere. Relying on its reticulated checklist that breaks down the component steps ICE agents must take to arrest a removable alien, the government contends that Judge Dugan's actions "occurred much earlier" in that process. Resp.Br.5-6, 55-56. But atomizing the arrest process does not mean the taskforce here was engaged in anything less than rote police work—*viz.*, conducting "[a]n arrest." Tr.193. After all, the government could go through the same exercise and create a checklist for any number of activities that do not qualify as "pending proceedings" under §1505; neither the number of steps nor the decision-making language used can detract from that reality. *See* Op.Br.46 & n.10. Regardless, the essential holding of *Hernandez* has nothing to do with the precise facts of that case, and everything to do with the

[6] *Compare* D.Ct.Dkt.75.at.1 (discussing the district court decision in *Hernandez* as support for its view on "how to define 'proceeding'" under §1505), *and* D.Ct.Dkt.113.at.36-37 (contending that the district court decision in *Hernandez* "[f]ollow[s] th[e] logic" of the government's position that Flores-Ruiz's arrest constitutes a §1505 "pending proceeding"), *with* D.Ct.Dkt.123.at.6 (backtracking from *Hernandez*, and contending, for the first time, that "the facts of this case are not remotely comparable to those at issue in *Hernandez*").

holding that obstructing ICE agents' efforts to arrest an alien is ordinary law-enforcement activity that does not interfere with a pending proceeding before an agency under §1505. 173 F.4th at 100-01. That holding is equally applicable here.

Nor is there any justification for accepting the government's invitation to open up a circuit split. Contrary to the government's claim, Resp.Br.54-55, *Hernandez* is fully consistent with this Court's precedent. While the government repeatedly invokes *Senffner*, the Fourth Circuit fully embraced that decision, explaining that the Securities and Exchange Commission (SEC) there "was [not] engaged in isolated enforcement activity," but enforcement activity directly tied to an "*existing*" (*i.e.*, "pending") SEC proceeding aimed at assessing whether the defendant had violated securities laws within the SEC's remit. *Hernandez*, 173 F.4th at 101; *cf.* Tr.213 (testifying that ICE agents must "refer" asylum claims to a separate agency "for adjudication"). That matches this Court's own description of the SEC's actions to a T and captures the distinction this Court drew between the proceedings at issue in *Senffner* from "mere police investigation[s]." *See* 280 F.3d at 760-61. As *Hernandez* explained, ICE's effectuation of an arrest warrant looks nothing like those SEC proceedings because such "isolated enforcement activity" "mirror[s] traditional law enforcement activity." 173 F.4th at 100-01. The same is true here. *See* Tr.193.[7]

[7] The government's claim that Flores-Ruiz's arrest involved ICE's "own, not-yet-final determinations about Flores-Ruiz's status," Resp.Br.55, cannot be squared with *its own* evidence (that the government's briefing conveniently omits) showing that

In the end, accepting the government's reading of §1505 would open a clear circuit split with *Hernandez*. But it would also require ignoring the text of §1505 as a whole and surrounding provisions, which target the precise activity at issue here while declining to treat it as a felony. The far better course is to limit the strong medicine of §1505 to efforts to obstruct pending agency proceedings, rather than ordinary law-enforcement efforts.

### B. The District Court Failed to Properly Instruct the Jury on the Scope of §1505.

The government obtained the conviction here via jury instructions that contravene applicable Supreme Court precedent. That result cannot stand.

#### 1. Nexus Requirement.

As Judge Dugan explained and the government admits, to secure a conviction under §1505 the government must prove there is a "nexus" between the charged conduct and the federal proceeding purportedly obstructed. Op.Br.49-50. Nevertheless, the district court here allowed the jury to return a guilty verdict based on Judge Dugan's mere awareness of "the nature of the proceeding," Tr.926—*i.e.*, that ICE generally intended to conduct an arrest of someone in the courthouse that day—without proving that she "“kn[e]w that h[er] … actions ‘[we]re likely to

---

there was *no* question posed for ICE's resolution, *see* Op.Br.44-45. In fact, that the government stretches to identify a "determination" ICE must make is a clear concession that Judge Dugan has the better reading of §1505, as it has implicitly conceded that §1505 reaches only official actions by a deliberative body.

affect" Flores-Ruiz's arrest. *United States v. Quattrone*, 441 F.3d 153, 178-79 (2d Cir. 2006). Worse still, the trial court refused to provide clarity when the jury asked for additional help. If (contrary to the argument above) there was a pending proceeding before an agency, the jury needed to find that Judge Dugan knew her actions would have a "'natural and probable' effect of interfering with that" pending proceeding. *Senffner*, 280 F.3d at 762. The Supreme Court required as much in *United States v. Aguilar*. *See* 515 U.S. 593, 599-600 (1995). But the instructions here required far less, and that error was plainly not harmless. *See* Op.Br.52-53.[8]

The government repeats the same two arguments the district court adopted. But neither works. First, it attacks a strawman by arguing that the Court was not required to instruct the jury that it needed to find that Judge Dugan "kn[ew] the specific name of the person" ICE sought to arrest. Resp.Br.59-61. As Judge Dugan's opening brief explains and defense counsel below made clear, her objection is "*not* about proving the name." Tr.923 (emphasis added). Rather, Judge Dugan's position has always been that the government needed to prove that Judge Dugan knew the

[8] The government briefly attempts to contend otherwise, pointing to inferences it tried to convince the jury to accept. *See* Resp.Br.61.n.10. But the jury's verdict tells a different story. It acquitted Judge Dugan on the concealment count after receiving the nexus instruction the court refused to supply for the obstruction count, *see* Op.Br.52-53, which makes clear that "the jury would [not necessarily] have reached the same verdict" on the obstruction count with a nexus instruction, *United States v. Goines*, 988 F.2d 750, 773 (7th Cir. 1993). There accordingly can be no serious argument that any error was harmless.

*subject* of ICE's arrest warrant.[9] Knowledge of an arrestee's name certainly would suffice. Perhaps, a description of the subject's appearance (*e.g.*, his distinctive tattoos or outfit) or some other identifying characteristics, such as learning that the next defendant on a call sheet is the subject of an arrest warrant, *cf.* Resp.Br.60, would too. But what the law does not allow is for the government to water down that nexus requirement and obtain a conviction based solely on Judge Dugan's high-level awareness that ICE planned to take into custody some unidentified visitor to the Milwaukee courthouse. Yet the district court's response to the jury's specific query did just that. Indeed, far from requiring the jury find that "Dugan knew that the person whose arrest she sought to prevent was the same person subject to the pending removal proceeding," Resp.Br.60, the district court's response allowed the jury to return a guilty verdict for a broad range of conduct, so long as Judge Dugan was aware of "the nature of the proceeding" generally, Tr.926. That is untenable under *Aguilar*. *See* Op.Br.51.

Second, the government fares no better with its effort to shift the focus to the instructions as whole. As explained, the error here arose from the district court's affirmative misstatement of the law. Op.Br.53-54. To be sure, the district court initially informed the jury that Judge Dugan's actions must "have the natural and

[9] Indeed, that is how the district court responded to the jury's materially similar question regarding the concealment count, and it did not include a knowledge-of-name requirement. *See* Tr.918.

probable effect of wrongfully obstructing the proceeding" for her to violate §1505, D.Ct.Dkt.94.at.22. *See* Resp.Br.59. But it was the district court's *subsequent* actions that led the jury astray. Namely, when the jury asked the district court to *clarify* those original instructions, rather than clear up *that* confusion "with concrete accuracy" as this Court requires, *United States v. Young*, 316 F.3d 649, 661 (7th Cir. 2002), the district court provided a response that affirmatively *misstated* the law, facilitating a guilty verdict based on an insufficiently close connection between *Flores-Ruiz*'s arrest and Judge Dugan's actions. That "the jury was confused [*and*] misled" by the court's instructions only confirms that a new trial is required. *Hicks v. Forest Pres. Dist.*, 677 F.3d 781, 790 (7th Cir. 2012).

**2. Lawful Acts.**

The district court's refusal to instruct the jury that Judge Dugan could not violate §1505 if she had a legal right to act also requires a new trial. That approach directly conflicts with *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). As the government does not dispute, "certain forms of interference" with federal activity, which could otherwise be labeled obstructionist, "are 'not inherently malign,'" *United States v. Edwards*, 869 F.3d 490, 498 (7th Cir. 2017) (quoting *Arthur Andersen*, 544 U.S. at 704), since they arise from a "common-law privilege[]" or a right "derive[d] from the Constitution itself," Resp.Br.63. Thus, *e.g.*, encouraging someone to assert her rights is perfectly lawful conduct, and not

fodder for an obstruction offense. An instruction directing the jury not to treat lawful conduct as obstruction is critical to ensure that conduct the law protects and even encourages is not improperly criminalized. *Arthur Andersen*, 544 U.S. at 706.

Such an instruction was plainly required here. Judge Dugan indisputably could have taken actions that are fully protected even if doing so had the effect—or even intent—of frustrating the federal arrest efforts. Cancelling the day's hearings or moving them to zoom could not possibly give rise to a federal felony. The facts of this case are not materially different. As the government concedes, all the charged conduct falls within the heartland of Judge Dugan's judicial authority because, "[a]s a judge, [Judge] Dugan had the ability to … appear in a judicial robe, manage her court calendar, and direct people in and out of her courtroom." Resp.Br.62. Indeed, the government does little to hide the fact that the prosecution was a patent effort to target and penalize several "prerogatives of [the] judicial office" that Judge Dugan occupied. Resp.Br.62. Under these circumstances, an instruction precluding an obstruction conviction premised on lawful conduct was necessary.

The government dismisses this as just a retread of the judicial-immunity arguments it believes are unfounded. But even if judicial-immunity and clear-statement principles did not preclude this prosecution altogether, they certainly obligated the district court to instruct the jury that it needed to account for the lawfulness of Judge Dugan's actions as a state-court judge in determining whether

she "corruptly" obstructed Flores-Ruiz's arrest. Op.Br.54-56. It erred in refusing to do so.

The government insists that Judge Dugan can "be held criminally liable for taking [official] actions 'corruptly,' or with [an] 'improper purpose.'" Resp.Br.62. The Supreme Court has been rightly skeptical of government efforts to rely on the word "corruptly" to cabin overbroad criminal statutes in general. *See, e.g., Snyder v. United States*, 603 U.S. 1, 15-18 (2024). And in this particular context, an instruction about corrupt intent provides woefully insufficient protection for perfectly lawful actions undertaken by Judge Dugan in her official capacity. The thrust of *Arthur Andersen* is that certain actions that tend to frustrate the government's enforcement efforts are nonetheless protected without regard to the intent to erect obstacles to such efforts. Co-defendants, no less than family members, are permitted to encourage someone to invoke a constitutional privilege, despite their motive to frustrate a federal prosecution. In the same way, a state judge has the discretion to structure proceedings without regard to whether she supports, opposes, or is entirely indifferent to a federal immigration crackdown. Judge Dugan maintains that discretion is protected by judicial immunity, which forecloses this prosecution altogether. But at a minimum, she was entitled to an instruction that

prevented her prosecution based on perfectly lawful conduct.[10] One way or the other—via immunity or through protective jury instructions—official judicial acts must be given some protection.

To be sure, that does not mean Judge Dugan is above the law. *Contra* Resp.Br.62. She (and other judges like her) still must comply with all federal prohibitions when acting in her private capacity in addition to any federal proviso evincing a clear congressional intent to regulate official conduct. Her legal errors can be corrected by appellate review. And she can be subject to proceedings under Wisconsin's judicial disciplinary process, *see* Wis. Stat. §§757.81-.99, or face impeachment or removal by address, *see* Wis. Const. art. VII, §§1, 11, 13.

But what those principles do mean is that state-court judges must be given some protection to ensure that they can discharge their duties "independently and freely, without favor and without fear." *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 349 n.16 (1871). So when the federal government seeks to attach criminal liability to a state judges' official acts, district courts are obligated to provide the jury the guidance that is necessary to allow them to avoid improperly penalizing "innocent conduct." *Arthur Andersen*, 544 U.S. at 706. As the Court did not do so here, Judge Dugan is entitled to a new trial at a bare minimum.

[10] Like the district court, the government relies on *United States v. Cueto*, 151 F.3d 620 (7th Cir. 1998). Resp.Br.63. But it never addresses the material distinctions that render *Cueto* inapposite here. *See* Op.Br.57.n.12.

* * *

Simply put, this case was riddled with errors, which alone requires a reversal. But it is especially merited here, considering Judge Dugan's conviction is a historical and constitutional aberration. Neither side could identify any other instance in the entire 250-year history of this country of a judge who was criminally convicted under a generally applicable criminal statute for her official acts. That is telling, as this is hardly the first time that federal and state authorities have had different views about federal priorities in general or immigration law in particular. Yet, for nearly the entire history of the Republic, federal prosecutors have stayed their hands. And while this prosecution is without precedent; if affirmed, it will not be the last. This Court should not create that precedent.

**CONCLUSION**

This Court should reverse and order a judgment of acquittal or a new trial.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
*Counsel of Record*
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

STEVEN M. BISKUPIC
STEVEN BISKUPIC LAW
OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com
(414) 828-7233

*Counsel for Defendant-Appellant Judge Hannah C. Dugan*

November 19, 2026

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2016, the Brief contains 6,966 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

November 19, 2026

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement